FILED
CLERK

2012 MAR -5 PM 12: 35

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 0 5 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

BRIAN RAYMOND CALLAHAN,
HORIZON GLOBAL ADVISORS LTD., AND
HORIZON GLOBAL ADVISORS, LLC,

Defendants.

CV 12 - 1065

JURY DEMANDED

SPATT, J.

BOYLE, M.J.

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Brian Raymond Callahan ("Callahan"), Horizon Global Advisors Ltd. ("HGA Ltd."), and Horizon Global Advisors, LLC ("HGA LLC") (collectively, the "Defendants") alleges as follows:

## SUMMARY

1.      Defendants engaged in a long-running fraud in which investors were routinely misled about the nature of their investments and also were unaware of Defendants' frequent misuse and misappropriation of their money. From at least 2005 to January 2012, Callahan raised over $74.9 million from at least 24 investors for at least five offshore funds ("Callahan Funds") that he operates through HGA Ltd. and HGA LLC. Callahan's solicitation of investors involved material misrepresentations about the use of their money, the liquidity of their investments and the asset diversification of the Callahan Funds. He represented to a number of U.S. residents that their money in the Callahan Funds would be invested with New York-based

hedge funds. Defendants also represented that these investments would be liquid. Although some of the Callahan Funds' assets were invested in the New York-based hedge funds, Callahan misused a portion of investor assets to pay certain other investors seeking redemptions from other Callahan Funds and to make a down payment on a multimillion dollar cooperative unit on Long Island in Callahan's name.

2.      Callahan also improperly diverted assets of the Callahan Funds to his brother-in-law's private real estate project that was facing foreclosure. Callahan received unsecured promissory notes issued by one of the brother-in-law's entities that falsely state they are payable on demand when actually they are illiquid and unsecured. In addition, the promissory notes reflect amounts that far exceed the amount Callahan gave his brother-in-law's real estate project.

3.      Callahan engaged in a fraudulent scheme where he used the false promissory notes to hide his misuse of assets of the Callahan Funds and to inflate the amount of assets under management, which resulted in Callahan receiving management fees that were inflated by as much as 800% or more.

4.      Callahan also failed to disclose to investors and prospective investors that in 2009, he was barred by the Financial Industry Regulatory Authority ("FINRA") from associating with any FINRA member.

5.      Callahan refused to testify in the Commission's investigation of this matter.

6.      In February 2012, Callahan disclosed the Commission's investigation in a letter to investors but he gave false assurances to investors that no laws had been broken.

7.      By engaging in this misconduct, Defendants violated and, unless restrained and enjoined, will continue to violate, the antifraud provisions of the federal securities laws.

8. Accordingly, the Commission brings this action to enjoin Defendants' unlawful acts and to seek disgorgement, prejudgment interest, and civil monetary penalties against Defendants. Preliminarily, the Commission seeks a temporary restraining order and asset freeze against Defendants, as well as an order requiring them to account for the use of investor money and assets of the Callahan Funds, expediting discovery, preventing the destruction or alteration of documents and repatriating assets that are offshore. The Commission also seeks the appointment of a receiver over Defendants' assets, the Callahan Funds, the HGA entities, and related entities.

## JURISDICTION AND VENUE

9. The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], Sections 21 and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act")[15 U.S.C. § 80b-9(d)].

10. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

11. The Defendants, directly and indirectly, used the means or instrumentalities of interstate commerce or of the mails, in connection with the acts, practices, and courses of business described in this Complaint.

12. Venue is appropriate in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because certain acts and transactions constituting the violations occurred in this district. For example, Defendant Callahan is a resident of Old

Westbury, NY and conducted business relating to the funds from his home. In several offering memoranda for the Callahan Funds, HGA LLC lists its address as located in Great Neck, NY. Both Callahan and HGA LLC have bank accounts in Rosslyn Heights, NY that received money from the Callahan Funds.

## DEFENDANTS

13.     **Brian Raymond Callahan**, is a resident of Old Westbury, New York. Callahan either directly, or through a series of related entities that he established, controlled, operated, and managed at least five offshore funds that were not registered with the Commission. The Callahan Funds are: Pangea Offshore High Yield Portfolio, LLC ("Pangea High Yield"); Diversified Global Investment (BVI), L.P ("Diversified"); Fiduciary Select Income Fund, L.P. ("Fiduciary"); Horizon Millennium Investments, L.P. ("Horizon Millennium"); and The Masters Global Fund, L.P. ("Masters"). Callahan manages the Callahan Funds directly or through the investment adviser entities he controls, HGA Ltd. and HGA LLC. Callahan made the investment decisions for the Callahan Funds.

14.     Callahan previously was registered as an Investment Adviser Representative from 2004 to 2006. Callahan once held Series 7, 24, 63, and 65 licenses and was a registered representative at a number of securities firms.

15.     In June 2009, Callahan consented to a FINRA order barring him from associating with any FINRA member, based on allegations that Callahan: (i) created false documents; (ii) engaged in outside business activities and private securities transactions, without prompt written notice to his member firm of these activities (or approval from his member firm for the private securities transactions); and (iii) failed to respond to a FINRA request for documentation and information.

4

16.     Callahan also owns and is CEO of Cromwell AAA Self Storage, LLC, a general warehousing and self-storage business in Cromwell, Connecticut.

17.     **Horizon Global Advisors Ltd.** ("HGA Ltd"), a Cayman Islands limited liability company founded by Callahan, is an unregistered investment adviser.  HGA Ltd. is listed in offering memoranda as the manager of three of Callahan's offshore funds:  Fiduciary (fka Pangea Bridge Investments, L.P.); Diversified; and Horizon Millennium (in 2009).  Callahan is the managing member of HGA Ltd. and he makes all of the investment decisions for the Callahan Funds.

18.     **Horizon Global Advisors, LLC** ("HGA LLC"), a Connecticut limited liability company formed in 2007 by Callahan, is an unregistered investment adviser.  HGA LLC is listed in offering memoranda as the manager of three of Callahan's offshore funds:  Masters; and two funds that are currently managed by HGA Ltd., Horizon (in 2007); and Pangea Bridge Investments, L.P. (in 2008).  Callahan is the sole member of HGA LLC and makes all investment decisions for the Callahan Funds it manages.  Callahan designated another one of his entities, Cromwell AAA Self Storage, LLC, as HGA LLC's agent.

## RELATED INDIVIDUAL AND ENTITIES

19.     **Diversified Global Investments (BVI), L.P.** ("Diversified") (formerly known as Horizon Global Investments, LP), an unregistered investment fund operated and managed by Callahan through the adviser entities he controls, was incorporated in the British Virgin Islands ("BVI") on November 9, 2006.

20.     **The Masters Global Fund L.P.** ("Masters"), an unregistered investment fund operated and managed by Callahan through the adviser entities he controls, was incorporated in the BVI on September 12, 2007.

21.     **Fiduciary Select Income Fund, L.P.** ("Fiduciary") (formerly known as Pangea Bridge Investments, LP), an unregistered investment fund operated and managed by Callahan through the adviser entities he controls, was incorporated in the BVI on August 7, 2008.

22.     **Horizon Millennium Investments, L.P.** ("Horizon Millennium"), an unregistered investment fund operated and managed by Callahan through the adviser entities he controls, was incorporated in the BVI on August 7, 2008.

23.     **Pangea Offshore High Yield Portfolio, LLC** ("Pangea High Yield"), an unregistered investment fund directly operated and managed by Callahan, was formed as a Nevis limited partnership in about 2005.

24.     **Adam Manson,** a resident of New York, New York, is Callahan's brother-in-law. Manson is the sole member of Distinctive Investments which, in turn, is the sole member of Distinctive Ventures LLC. Distinctive Ventures purchased cooperative rights to a beach resort on Long Island (the "real estate project"). Distinctive Ventures received millions of dollars from the Callahan Funds and Distinctive Investments issued unsecured promissory notes to at least two of the Callahan Funds.

## FACTS

### Callahan Solicits Investors through Material Misrepresentations About, Among other Things, the Liquidity of their Investments and the Use of their Funds

25.     From at least 2005 to January 2012, Callahan raised over $74.9 million from at least 24 investors for the Callahan Funds. The offering memoranda for the Callahan Funds state that Callahan receives a 1% or 1.5% annual management fee based on the value of the Callahan Funds and most provide for a 20% annual performance fee based on the returns. A number of the investors are U.S. individuals who invested in the Callahan Funds through offshore trusts and insurance policies.

6

26. Callahan solicited investors for the Callahan Funds through misrepresentations regarding, among other things, the use of investor funds and the liquidity of their investments.

27. Callahan represented to a number of individuals that their money would be pooled in one or more of the Callahan Funds that would then invest in certain New York-based hedge funds. For example, Callahan provided Power Point presentations to several investors stating that investors in the Diversified fund would gain access to the New York-based hedge fund, Kinetics Institutional Partners, L.P. ("New York Hedge Fund #1"), and investors in the Horizon Millennium fund would gain access to the New York-based hedge fund, Millennium USA ("New York Hedge Fund #2"). The Power Point also identified ten U.S.-based hedge funds in which the Masters fund was invested. These hedge funds were part of a portfolio of funds offered by Morgan Stanley ("New York Hedge Fund #3").

28. Callahan promoted the Callahan Funds as a means for investors to participate in New York Hedge Funds #1, #2 and #3.

29. Callahan misrepresented to investors that advisers to New York Hedge Funds #1 and #2 were sub-advisers to the Callahan Funds, when in fact, the New York Hedge Funds ##1-3 are unrelated and unaffiliated with the Callahan Funds.

30. Callahan, HGA Ltd. and HGA LLC also represented to investors that their investments in the Callahan Funds would be liquid and they could easily withdraw their funds.

31. Callahan initially did invest some of the assets from the Callahan Funds in New York Hedge Funds ##1-3. As set forth below, however, contrary to his representations to investors, Callahan diverted a portion of the assets of the Callahan Funds to his brother-in-law's real estate project and obtained illiquid promissory notes with values that exceeded the amount of money actually paid to the brother-in-law's entities or for his benefit. Callahan also misused

7

the assets of the Callahan Funds by making redemptions to some investors with the money of other investors.

32.     Callahan provided or authorized the issuance of account statements to investors showing false balances in investors' accounts.

### Callahan Diverts Investor Funds to his Brother In-Law's Real Estate Project and Obtains False Promissory Notes

33.     In 2007, after securing financing from a bank, Distinctive Ventures purchased cooperative rights to a beach resort on Long Island (the real estate project).

34.     Callahan's brother-in-law had plans to develop the property, convert the units to cooperatives to sell for several million dollars each, pay off the bank loan and make a profit. However, after the downturn in the real estate market beginning in 2008, Distinctive Ventures has only been able to sell nine of the high-priced cooperatives and has not yet converted many of the units to cooperatives. The resort is not profitable, and Distinctive Ventures has had trouble making its loan payments.

35.     From 2007 to 2012, unbeknownst to investors, Callahan diverted approximately $21.8 million of investors' money from the Callahan Funds to Distinctive Ventures' real estate project to help make bank loan payments to avoid foreclosure and operate the property.

36.     Distinctive Investments issued unsecured promissory notes to the Fiduciary and Diversified funds. The promissory notes falsely state that the Fiduciary and Diversified funds could demand the return of principal and interest upon 30 days notice. In reality, the promissory notes are illiquid. Callahan's February 2012 letters to investors concede that most of the assets of the Callahan Funds are tied up for years in the real estate project. These letters also disclose that there is a substantial risk that the lender could foreclose on its loan and seize the remaining unsold units of the real estate project.

8

37.     The promissory notes also falsely state that the principal amounts were advanced to Distinctive Investments when, in fact, Callahan transferred a fraction of the principal amount toward the real estate project. For instance, in 2011, even though Callahan only gave about $3.3 million from the Callahan Funds to the real estate project, Callahan received promissory notes from Distinctive Investments to the Fiduciary fund with a total principal amount of over $14.5 million.

38.     The principal amounts and interest of the promissory notes were used to calculate the Callahan Funds assets under management. Because the amounts on the promissory notes are inflated, the assets of Callahan Funds under management were inflated. Callahan received management fees based on the inflated assets under management. For example, Callahan received over $883,000 in management fees for 2011. These fees are inflated by as much as 800% or more. Callahan received inflated management fees in other years as well. The promissory notes are included in the Callahan Funds' financial statements, which accordingly are also inaccurate.

## Callahan Commingles Investor Monies and
## Misuses Fund Assets to Pay Investors in Other Funds

39.     Callahan defrauded the Callahan Funds and their investors by commingling and misusing Callahan Fund assets. Callahan engaged in a fraudulent scheme to divert assets from some of his funds to pay investors in his other funds.

40.     Until sometime in 2010, Callahan directed investors to wire their investments to several offshore accounts in the BVI. In about 2010, Callahan advised investors to wire their funds to a Bermuda client funds account ("Bermuda Client Funds Account").

41.     Callahan then wired assets of the Callahan Funds from the BVI accounts or the Bermuda Client Funds Account to an escrow account established by his father-in-law (the

9

"Escrow Account"), which was established to hold payments from purchasers and subscribers relating to the real estate project. In the Escrow Account, assets from all of the Callahan Funds were commingled and then sometimes improperly transferred to other investors.

42.     For example, in late February 2010, Callahan improperly transferred Fiduciary fund assets to two other Callahan Funds, Pangea High Yield and Diversified. On February 26, 2010, an investor in the Fiduciary fund wired a $1.2 million investment to an account in the BVI. On March 2, 2010, Callahan then wired $485,000 of this Fiduciary investment to the Escrow Account and on the same day he transferred all of these assets to two other funds, Pangea High Yield ($368,000) and Diversified ($117,000). On March 2, 2010, Callahan also wired $350,000 from the Pangea High Yield account to a different investor in Pangea High Yield to redeem his investment.

43.     Callahan obtained a promissory note dated March 2, 2010 from Distinctive Investments falsely stating that the Fiduciary fund had advanced $485,000 to Distinctive Investments, even though no Fiduciary fund assets were actually given to the real estate project at that time.

44.     In another example, in March 2010, Callahan received a $990,000 Fiduciary subscription from an investor and then Callahan misused a portion of this money to make a redemption to an investor in another one of Callahan's funds, Pangea Global Opportunities Portfolio, LP. On March 24, 2010, after the investor wired $990,000 into a Fiduciary account at a bank in the BVI, Callahan transferred $895,000 to the Escrow Account. From the Escrow Account, Callahan transferred $892,000 to two other funds, Pangea High Yield ($640,000) and Diversified ($52,000), and to Distinctive Ventures ($200,000). On March 25, 2010, Callahan

wired $440,000 from the Pangea High Yield account to a different investor in Callahan's fund, Pangea Global Opportunities Portfolio, LP, to redeem his investment.

45.     While only $200,000 went to Distinctive Ventures on March 24, 2010, Callahan obtained a promissory note dated March 24, 2010 from Distinctive Investments falsely stating that the Fiduciary fund had advanced $895,000 to Distinctive Investments.

46.     In a third example, in early 2010, Callahan received subscriptions from two investors for the Fiduciary fund which he then diverted to two other Callahan Funds, Diversified and Pangea High Yield. On January 28, 2010, Callahan received a $70,225 subscription for the Fiduciary fund from an investor. Callahan had marketed the Fiduciary fund to this investor as being similar to a money market fund and never disclosed that money in the Fiduciary fund could be transferred to other Callahan Funds. On February 5, 2010, Callahan received a $128,000 subscription for the Fiduciary fund from another investor. Both subscriptions came via wire transfer into a Fiduciary account at a bank in the BVI.

47.     Callahan transferred money obtained from these subscriptions as follows: On February 2, 2010, Callahan wired $19,870.66 to his HGA LLC bank account, and on February 8, 2010, he wired $160,000 to the Escrow Account. On the following day, February 9, 2010, Callahan improperly transferred the $160,000 out of the Escrow Account to two other funds, Pangea High Yield ($50,000) and Diversified ($110,000).

48.     Although the $160,000 went to Pangea High Yield and Diversified, not Distinctive Ventures, Callahan obtained a promissory note dated February 8, 2010 from Distinctive Investments falsely stating that the Fiduciary fund had advanced $160,000 to Distinctive Investments, even though no Fiduciary fund assets were actually given to the real estate project.

11

## Callahan Misuses Fund Assets for his Personal Benefit

49.     Callahan misused assets of the Callahan Funds for his personal benefit. For example, in March 2011, Callahan engaged in a series of transfers through numerous accounts and misused assets of the Callahan Funds for a down payment on a $3.35 million cooperative unit at the real estate project that Callahan and his wife purchased. On March 10, 2011, an investor wired $1,120,000 to Callahan's Bermuda Client Funds Account for an investment in the Horizon Millennium fund. On March 17, 2011, Callahan transferred $930,000 in two wires from the Bermuda Client Fund Account to the Escrow Account. On March 17, 2011, Callahan instructed his father-in-law to transfer $455,600 of the money from the Escrow Account to Callahan's HGA LLC bank account stating, "I need this amount to fund [a lending bank] account for the closing." On March 18, 2011, Callahan transferred the $455,600 from HGA LLC's account to his personal bank account and then to the lending bank which issued a $2,278,000 mortgage. Callahan misappropriated the $455,600 to help purchase the cooperative unit in his and his wife's name.

50.     Callahan not only used the false promissory notes to hide his misuse of assets of the Callahan Funds, but he also used the false promissory notes to inflate the amount of assets under management, which resulted in Callahan's receiving management fees that were inflated by as much as 800% or more.

## Callahan Made Material Misstatements and Omissions to Fund Investor #1

51.     After raising $270,000 in October 2008, from a California teacher ("Investor #1") for the Horizon Millennium and Masters funds, Callahan sent a series of emails to Investor #1 in late January 2009 regarding an additional investment opportunity in his Fiduciary fund, which he described as a short term/fixed income cash fund. Callahan informed Investor #1 by email that,

"We also now have opened up our short term institutional cash fund to smaller account values at [a BVI] Bank."

52.     Investor #1 asked Callahan about the type of bank account in which her money would be invested and whether her deposit could be guaranteed like a certificate of deposit. Investor #1 specifically noted that she did not want to risk the principal of her investment.

53.     Callahan misrepresented to Investor #1 that her investment in the Fiduciary fund would be in a separate capital account in the name of her offshore trust (through which she invested) at a BVI Bank and he described the Fiduciary fund as a "short term cash/fixed income solution." Based on Callahan's representations, Investor #1 invested $250,000 in the Fiduciary fund in February 2009.

54.     Contrary to Callahan's representations to Investor #1 about the liquidity of her investment in the Fiduciary fund, the money Callahan raised for the Fiduciary fund was not in liquid investments. In Callahan's February 2012 letters to investors which was emailed to Investor #1, Callahan asserted that the only assets of the Fiduciary fund were illiquid promissory notes from Distinctive Investments.

55.     Callahan's February 2012 letters to investors disclosed the Commission's investigation but gave false assurances that no laws had been broken. Callahan's February 2012 letters to investors, which were from Diversified Global Partners, LTD. and Brian Callahan, stated, "The General Partner does not believe that any actions were taken with respect to the Partnerships that violated applicable U.S. or BVI regulation."

56.     In January 2012, Investor #1 asked Callahan for the return of her investments but she has not received her money back. Despite Callahan's assurances to Investor #1 that her money would be safe and segregated in a separate account, in February 2012, Investor #1 called

13

the BVI Bank to verify the existence of her bank account there but was told they did not have an account in her name and that the account to which she had wired her money had been closed since May 2010.

### Callahan Made Material Misstatements and Omissions to Fund Investor #2

57.     Between 2007 and 2011, Callahan raised a total of about $2.9 million from Investor #2, a small business owner in Kentucky. Investor #2 invested in the Horizon Millennium, Diversified and Masters funds. Callahan made material misrepresentations and omissions to Investor #2 about the use of assets of the Callahan Fund, the liquidity of his investments, the diversification of Fund assets, and Callahan's disciplinary history.

58.     In emails, and oral and written presentations, Callahan represented to Investor #2 that money in the Horizon Millennium fund would be invested in New York Hedge Fund #2, money in the Diversified fund would be invested in New York Hedge Fund #1, and an investment in the Masters fund would be invested in ten specific investment funds, which were offered by New York Hedge Fund #3.

59.     Callahan also assured Investor #2 that his investments would be liquid. For instance, in January 2010, Callahan said that his Horizon Millennium fund keeps 30% of its investments in cash for liquidation purposes. In addition, in a December 29, 2007 email, Callahan told Investor #2: "One of my funds, The Masters Global Fund has several managers with credit market expertise that will be buying these debt pieces at huge discounts to provide much needed short term liquidity to current holders/sellers."

60.     Contrary to Callahan's representations, a large portion of the money Investor #2 invested in the Callahan Funds was never invested in the underlying hedge funds that Callahan

14

promised. For instance, in May 2011, Investor #2 invested $600,000 in the Horizon Millennium fund but Callahan has not invested any money with New York Hedge Fund #2 since April 2008.

61.     In addition, in November 2011, Callahan raised another $100,000 from Investor #2 for the Diversified fund. Callahan sent Investor #2 an email on November 15, 2011, representing that the Diversified portfolio is designed with "an extraordinary emphasis on diversification and holds medium term private and public debt in currently 11 sectors on a global basis via New York Hedge Fund #1." Callahan knew that none of Investor #2's November 2011 investment was invested with, or managed by the investment manager for New York Hedge Fund #1, as Callahan's last investment in New York Hedge Fund #1 was in March 2008.

62.     Callahan's November 15, 2011 email also listed representative holdings of the Diversified fund. One of the holdings listed was Distinctive Investments, which purportedly constituted only 9.75% of Diversified's total portfolio. Callahan's February 2012 letters to investors, however, represent that promissory notes from Distinctive Investments actually make up over 97% of the Diversified fund.

63.     Callahan also sent Investor #2 a Diversified fund offering memorandum that materially misrepresents its liquidity and portfolio diversification. The offering memorandum lists HGA Ltd as the fund manager and Callahan as HGA Ltd's Principal, who is responsible for managing the fund. The offering memorandum represents investors may withdraw as of the last day of each calendar month by providing written notice on or before that date, and that the proceeds generally would be paid within thirty (30) days of the withdrawal date. The offering memorandum also states that "[t]he fund seeks rigorous portfolio diversification, investing in historically uncorrelated investment opportunities and positions across all sectors, with an emphasis on the preservation of capital." To the contrary, Callahan admits in Callahan's

February 2012 letters to investors that most of the assets of the Callahan Funds will be tied up for years in his brother-in-law's real estate project and there is a substantial risk that the lender could foreclose on its loan and seize the remaining unsold units of the real estate project.

64. Callahan also failed to disclose his disciplinary record to Investor #2. On June 2, 2009, Callahan consented to a permanent bar from associating with any FINRA member. Investor #2 did not become aware that Callahan had been barred by FINRA until January or February 2012, and would not have invested with Callahan if he had known about the FINRA bar against Callahan.

### Callahan Made Material Misstatements and Omissions to Fund Investor #3

65. Callahan solicited Investor #3, who resides in Wisconsin, to invest in two of the Callahan Funds. Between 2008 and 2011, Investor #3 (through his family's offshore trust) invested more than $380,000 in the Diversified fund and more than $450,000 in the Fiduciary fund. Callahan made material misrepresentations and omissions to Investor #3 about the use of his funds, liquidity of the investments and Callahan's disciplinary history.

66. In 2008, Callahan sent Investor #3 a Power Point presentation promoting the Diversified, Horizon Millennium, and Masters funds. Callahan gave a presentation to Investor #3 over the phone and specifically brought to Investor #3's attention a slide from the Power Point presentation showing that the annual performance of the Diversified fund was the annual performance of New York Hedge Fund #1. Callahan knew that these representations were false and misleading because none of the money that Investor #3 invested in the Diversified fund went to New York Hedge Fund #1, as Callahan made no subscriptions after March 2008 to New York Hedge Fund #1 on behalf of the Diversified fund, and Investor #3 began investing in the Diversified fund in October 2008.

16

67. Callahan also misrepresented to Investor #3 that the Diversified fund had no withdrawal restrictions and that investments in the Diversified fund would be liquid. In reality, Callahan diverted some of Diversified assets to the real estate project in return for illiquid, unsecured promissory notes of questionable value.

68. In about May 2009, Callahan marketed the Fiduciary fund to Investor #3 as being similar to a money market fund and that his investment in the Fiduciary fund would be liquid. Callahan never disclosed to Investor #3 that money in the Fiduciary fund could be transferred to other funds that Callahan managed. In fact, as alleged above, Callahan improperly transferred Investor #3's $70,225 January 2010 Fiduciary subscription to two other Callahan Funds, Pangea High Yield and Diversified.

69. In about January 2012, Investor #3 asked Callahan whether he could redeem $400,000 of his investments within two days notice. Callahan falsely assured Investor #3 that this could be done. In actuality, Callahan could not honor this request because he had almost no liquid assets remaining.

70. It was not until January 2012, that Investor #3 learned Callahan had been permanently barred by FINRA from associating with any FINRA member. After learning of this disciplinary history, Investor #3 requested total liquidation of his investments in the Diversified and Fiduciary funds. Investor #3 has not received the return of his investments in response to his redemption request.

**The Callahan Funds had only $6.4 Million in Liquid Assets as of December 31, 2011**

71. Callahan produced documents to the Commission purporting to show that as of December 31, 2011, the total approximate value of the Callahan Funds was over $65 million. However, as of December 31, 2011, the value of the Callahan Funds' investments in the New

York Hedge Funds was only about $6.4 million. In addition, the Pangea fund had a bank account with a balance of less than $1,000. The following chart shows the breakdown of the purported approximate value of the Callahan Funds, the approximate value of the identified liquid assets for each fund, and the shortfalls.

| APPROXIMATE TOTAL LIQUID ASSETS (as of Dec. 31, 2011) | | | |
|---|---|---|---|
| Fund | Value | Value of liquid assets | Shortfall |
| Diversified | $10,649,317 | $588,655 | $10,060,662 |
| Horizon Millennium | $9,998,359 | $5,126,670 | $4,871,689 |
| Masters | $3,281,144 | $739,864 | $2,541,280 |
| Fiduciary | $30,683,295 | -- | $30,683,295 |
| Pangea | $14,421,438 | $999 | $14,420,439 |
| TOTALS* | $65,058,353 | $6,456,188 | $58,602,165 |

*The investments of Horizon Millennium and Masters in Diversified have been excluded from the total.

72.     According to Callahan's February 2012 letters to investors, the remaining assets of four of the Callahan Funds are the unsecured demand promissory notes, issued by Distinctive Investments, totaling about $60.3 million. Callahan also produced documents to the Commission showing an additional outstanding promissory note to the Pangea fund worth over $14 million. As described above, the promissory notes are actually illiquid and unsecured, and the amount of money Callahan gave to his brother-in-law for the real estate project is much less than the face amounts on the promissory notes.

## CLAIM ONE

### Violations of Section 17(a)(1), (2) and (3) of the Securities Act
### (All Defendants)

73.     The Commission realleges and reincorporates paragraphs 1 through 72 as if fully set forth herein.

74.     By engaging in the conduct described above, the Defendants, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the offer or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities offered or sold by the Defendants.

75.     By reason of their actions alleged herein, the Defendants violated Section 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

## CLAIM TWO

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c)
### (All Defendants)

76.     The Commission realleges and reincorporates paragraphs 1 through 72 as if fully set forth herein.

77.     By engaging in the conduct described above, the Defendants, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

78.     By reason of their actions alleged herein, the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) [17 C.F.R. 240.10b-5(a), (b) and (c)] thereunder.

## CLAIM THREE

### Violations of Sections 206(1) & (2) of the Advisers Act
### (All Defendants)

79.     The Commission realleges and reincorporates paragraphs 1 through 72 as if fully set forth herein.

80.     By engaging in the conduct described above, the Defendants, by use of the means or instrumentalities of interstate commerce or of the mails, and while acting as investment advisers: (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

81.     By reason of their actions alleged herein, the Defendants violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

## CLAIM FOUR

### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8
### (All Defendants)

82.     The Commission realleges and reincorporates paragraphs 1 through 72 as if fully set forth herein.

83.    By engaging in the conduct described above, the Defendants, while acting as investment advisers to pooled investment vehicles, (1) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in the pooled investment vehicles; and (2) otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the pooled investment vehicle.

84.    By reason of their actions alleged herein, the Defendants violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.C 275.206(4)-8] thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

i.    Enter a final judgment:

 a.    Permanently restraining and enjoining the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with the Defendants, from violating directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 17q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 17j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder; and Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. § 80b-6(1), (2) and (4)] and Rule 206(4)-8 [17 C.F.C 275.206(4)-8] thereunder;

 b.    Ordering Defendants to disgorge ill-gotten gains obtained through the violative conduct alleged in this complaint and directing Defendants to pay prejudgment interest thereon;

c. Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the

Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the

Advisers Act [15 U.S.C. §§ 77t(d), 78u(d)(3), 80b-9(e)]; and

ii. Grant such other relief as the Court deems appropriate.

Dated:        March 5, 2012

Respectfully submitted,

Dean M. Conway DC-4477
Of Counsel:                              Securities and Exchange Commission
                                         Mail Stop 4010
Antonia Chion                            100 F Street, N.E.
Lisa Deitch                              Washington, D.C.  20549
Linda French                             Tel: 202-551-4412 (Conway)
Holly Pal                                Fax: 202-772-9246 (Conway)
Osman Handoo