FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 0 5 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| BRIAN RAYMOND CALLAHAN, HORIZON GLOBAL ADVISORS LTD. and HORIZON GLOBAL ADVISORS LLC., | ) ) ) ) |
| Defendants. | ) ) ) ) |

**CV12 - 1065**

Civil Action No.

**SPATT, J.**

BOYLE M.J.

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM IN SUPPORT OF APPLICATION FOR A
TEMPORARY RESTRAINING ORDER FREEZING ASSETS AND GRANTING
OTHER RELIEF, AND FOR AN ORDER TO SHOW CAUSE WHY
A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED**

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully

submits this memorandum of law in support of its emergency application to prevent further

misappropriation of assets and harm to investors by Defendants Brian R. Callahan ("Callahan"),

Horizon Global Advisors Ltd. ("HGA") and Horizon Global Advisors LLC ("HGA LLC")

(collectively the "Defendants").

**PRELIMINARY STATEMENT**

From at least 2005 to January 2012, Callahan, a New York resident, raised over $74.9

million from at least 24 investors. This money was purportedly to be invested by Callahan in at

least five offshore funds that he operated and controlled either directly or through HGA and

HGA LLC (the "Callahan Funds"). Callahan represented to a number of U.S. residents that their

money would be invested at several New York-based hedge funds and, furthermore, that these

hedge fund investments would be liquid. Although a small portion of the assets of the Callahan Funds were invested as promised, Callahan misused most of the invested assets by: (1) lending money to his brother-in-law's financially-imperiled private real estate venture (the "Panoramic Project") in exchange for illiquid promissory notes; (2) improperly paying certain investors (who were seeking investment redemptions) with other investors money; and (3) using assets from the Callahan Funds to make a down payment on Callahan's purchase of a multi-million dollar beachfront "coop" in the Panoramic Project.

Callahan also never disclosed to investors that, in 2009, he consented to a permanent bar from associating with any Financial Industry Regulatory Authority ("FINRA") member.

Finally, despite being served with an SEC investigative subpoena, Callahan has refused to appear for sworn testimony and also has refused to produce key documents in response to the SEC's document subpoena. As a result of his lack of cooperation, the SEC has been greatly impeded in its investigation of this matter.

## STATEMENT OF FACTS

The evidence supporting this emergency application is set forth in the Declaration of Natalie Lentz executed on March 2, 2012 ("Lentz Decl.") and the attached Exhibits 1-34,[1] which are true copies of documents obtained by the Commission staff during the course of the Commission staff's investigation of the Defendants that led to this action; the Declaration of Osman Handoo executed on March 3, 2012 ("Handoo Decl.") and the attached Exhibits A-EE, which are true copies of documents obtained by the Commission staff during the course of the Commission staff's investigation of the Defendants that led to this action; the Declaration of Marjorie J. Biller executed on February 27, 2012 ("Biller Decl.") and the attached Exhibits 1-17,

---

[1]      All exhibits referenced herein will be referred to as "Ex."

which are true copies of documents produced to Commission staff during the course of the Commission staff's investigation of the Defendants that led to this action; the Declaration of Dallen E. Wendt executed on February 24, 2012 ("Wendt Decl.") and the attached Exhibits 1-9, which are true copies of documents produced to Commission staff during the course of the Commission staff's investigation of the Defendants that led to this action; the Declaration of Thomas Claus executed on February 28, 2012 ("Claus Decl.") and the attached Exhibits 1-10, which are true copies of documents produced to Commission staff during the course of the Commission staff's investigation of the Defendants that led to this action; the Declaration of Jan Kesslen executed on February 28, 2012 ("Kesslen Decl.") and the attached Exhibits 1-6, which are true copies of documents produced to Commission staff during the course of the Commission staff's investigation of the Defendants that led to this action; and the Declaration of Gil A. Raviv executed on February 29, 2012 ("Raviv Decl.") and the attached Exhibits 1-2, which are true copies of documents produced to Commission staff during the course of the Commission staff's investigation of the Defendants that led to this action.

This evidence is summarized below.

### A.   CALLAHAN DEFRAUDED INVESTORS BY MAKING MISREPRESENTATIONS ABOUT THE USE OF THEIR FUNDS AND THE LIQUIDITY OF THEIR INVESTMENTS

Callahan raised over $74.9 million for the offshore Callahan Funds.[2] (Lentz Decl. at ¶ 31). Callahan operated and controlled the Callahan Funds either directly or through HGA and

---

[2]   Specifically, the Callahan Funds are comprised of (1) the Pangea Offshore High Yield Portfolio, LLC ("Pangea High Yield"); (2) the Diversified Global Investment (BVI), L.P ("Diversified"); (3) The Masters Global Fund, L.P. ("Masters"); (4) Fiduciary Select Income Fund, L.P. ("Fiduciary"); and (5) Horizon Millennium Investments, L.P. ("Horizon Millennium"). The offering memoranda indicate that Callahan receives a 1% or 1.5% annual management fee based on the value of the Callahan Funds and most provide for a 20% annual performance fee based on their return. (Handoo Decl. at ¶ 12, Ex. I at pp. BC 01382; BC 00977,

HGA LLC. (Handoo Decl. at ¶12, Ex. I).  A number of the investors in the Callahan Funds (that

the SEC has been able to identify) are U.S.-based individuals who invested through offshore

trusts and insurance policies. (Wendt Decl. at ¶¶ 13, 18; Biller Decl. at ¶ 6; Claus Decl. at ¶¶ 3,

7, 9, 11-13, 18-19).[3]

Generally, Callahan represented to these individuals that their money would be pooled in

one or more offshore funds that would then invest in certain New York-based hedge funds.  For

example, Callahan provided Power Point presentations to several investors stating that investors

in the Diversified fund would in turn be invested in the New York-based hedge fund, Kinetics

Institutional Partners, L.P. ("Hedge Fund #1"), and investors in the Horizon Millennium fund

would in turn be invested in the New York-based hedge fund, Millennium USA ("Hedge Fund

#2"). (Wendt Decl., Ex. #1 at pp. DW 90-104; Claus Decl., Ex. #1 at pp. CLAUS 0219-238).

According to the Power Point, another of the Callahan Funds, the Masters fund, was purportedly

going to invest in the ten other U.S.-based hedge funds via a portfolio of funds offered by

Morgan Stanley ("Hedge Fund #3"). (Wendt Decl., Ex. #1 at pp. DW 110-115; Claus Decl., Ex.

#1 at pp. CLAUS 0239-244). Callahan, HGA and HGA LLC also falsely represented to investors

that the Callahan Funds were liquid. (Wendt Decl. at ¶¶ 15-18; Claus Decl. at ¶¶ 5, 22, 28; Biller

Decl., Ex. #10 at p. MB-000210).  In reality, however, the vast majority of the assets of the

Callahan Funds were either loaned to the Panoramic Project in exchange for inflated promissory

---

BC 00161, BC 00111-12; ¶ 16. Ex. L at pp. BVIFSC-0000305, BVIFSC-0000230, BVIFSC-
0000437, BVIFSC-0000788-89).

[3]      Defendant Callahan has identified additional offshore trusts and life insurance companies
which invested in the Callahan Funds, but has not identified the underlying beneficial owners of
those trusts.

notes (see infra at pp. 15-17) or improperly used to pay redemption requests (see infra at pp. 11-13).

## Specific Examples of Callahan's Misrepresentations to Investors

### 1.  Marjorie Biller

In October 2008, Callahan raised $270,000 from California school teacher Marjorie Biller ("Biller").  The money was for Callahan's Horizon Millennium and Masters funds. Callahan sent a series of emails to Biller in late January 2009 in connection with an additional investment. (Biller Decl. ¶¶ 10-15, Ex. #3).  Callahan lured Biller into investing $250,000 in the Callahan's Fiduciary fund in February 2009, with false assurances that her money would be invested in a secure short term/fixed income cash fund. (Biller Decl. at ¶¶ 10-15, Ex. #3).

Callahan emailed Biller: "We also now have opened up our short term institutional cash fund to smaller account values at VP Bank." (Biller Decl., Ex. #3 at MB-000302).  In response, Biller asked Callahan what type of bank account her money would be invested in and whether her deposit could be guaranteed like a certificate of deposit. (Biller Decl, Ex. #3 at MB-000301). Biller specifically noted that she did not want to risk the principal of her investment.  (Biller Decl. at ¶ 14, Ex. #3 at MB-000301).  Callahan responded that Biller's investment in his Fiduciary fund would be in a separate capital account in the name of her offshore trust (through which she invested) at VP Bank and he specifically described the Fiduciary fund as a "short term cash/fixed income solution." (Biller Decl. at ¶ 14, Ex. #3 at MB-000301).

Although Callahan sent Biller subscription agreements for her initial investments in his Horizon Millennium and Masters funds, Callahan never sent Biller a subscription agreement (or the offering memorandum) for his Fiduciary fund.  Instead, Callahan sent Biller account opening

forms for VP Bank, reassuring Biller that she was opening a bank account for her trust. (Biller Decl. at ¶ 15. Ex. #4-5).

Contrary to Callahan's representations to Biller about the liquidity of her investment in his Fiduciary fund, none of the money that Callahan raised for this fund was actually placed in liquid investments. (Lentz Decl. at ¶ 6, Ex. 3, p. 12). Callahan now claims that all the money he raised for his Fiduciary fund was loaned to the Panoramic Project in exchange for unsecured promissory notes in return. Id. These promissory notes are illiquid and do not provide any fixed income. (Id. & Handoo Decl. at ¶ 11, Ex. H and ¶ 21, Ex. P). In addition, despite Callahan's assurances to Biller that her money would be safe and segregated in a separate account, this simply was not true. (Lentz Decl. at ¶¶ 18-20).

In January 2012, Biller asked Callahan for the return of her investments. (Biller Decl. at ¶¶ 35-37.) Biller, however, has not received any of her money back. (Biller Decl. at ¶ 45). In February 2012, Biller then called VP Bank to verify the existence of the bank account there, which Callahan told her had been opened in her name. (Biller Decl. at ¶ 34). VP Bank told Biller they did not have any account in her name, and that the account she had wired her money to, had been closed since May 2010. (Biller Decl. at ¶ 34).

### 2. Dallen Wendt

Between 2007 and 2011, Callahan raised a total of about $2.9 million from Dallen Wendt ("Wendt"), a small business owner in Kentucky. (Wendt Decl. at ¶¶ 2-3, 8, 14, 18, 24). Wendt invested in Callahan's Horizon Millennium, Diversified and Masters funds. (Wendt Decl. at ¶¶ 8, 14, 18, 24). In emails, and oral and written presentations, Callahan represented to Wendt that money in Horizon Millennium would be invested solely in Hedge Fund #2 (and later that the Horizon Millennium fund invested 70% of its money in Hedge Fund #2 and kept 30% of its

6

money in cash), money in the Diversified fund would be invested in Hedge Fund #1, and an investment in the Masters fund would be invested solely in Hedge Fund #3. (Wendt Decl. at ¶¶ 10-13, 16, 18-19, 22, 24, 27-28).

Callahan also assured Wendt of the liquidity of his investments. (Wendt Decl. at ¶¶ 15-18). For instance, in January 2010, Callahan explained that the returns for his Horizon Millennium fund and Hedge Fund #2, were different because his Horizon Millennium fund keeps 30% of its investments in cash for investor redemption requests. (Wendt Decl. at ¶ 16). In addition, in a December 29, 2007 email, Callahan told Wendt: "One of my funds, The Masters Global fund has several managers with credit market expertise that will be buying these debt prices at huge discounts to provide much needed short term liquidity to current holders/sellers." (Wendt Decl. at ¶ 23, Ex. #3 at p. DW 352).

Contrary to Callahan's representations, a large portion of the money that Wendt invested with Callahan was never actually invested with any New York-based hedge fund. For instance, in May 2011, Wendt invested $600,000 in Callahan's Horizon Millennium fund. Since April 2008, however, Callahan has not invested any new money with Hedge Fund #2. (Wendt Decl. at ¶ 18; Raviv Decl., at ¶¶ 5, 11, Ex. #1).

In November 2011, moreover, Callahan raised an additional $100,000 from Wendt for the Diversified fund. (Wendt Decl. at ¶ 27). On November 15, 2011, Callahan sent Wendt an email, representing that the Diversified fund is designed with "an extraordinary emphasis on diversification and holds medium term private and public debt in currently 11 sectors on a global basis via [Hedge Fund #1.]" (Wendt Decl. at ¶ 25, Ex. #4 at p. DW 429). None of Wendt's November 2011 investment, however, was invested with, or managed by Hedge Fund #1. Callahan's last investment in Hedge Fund #1 was in March 2008. (Kesslen Decl., at ¶¶ 8, 12).

Callahan's November 15, 2011 email also listed representative holdings of his Diversified fund with the holding's percentage of the total portfolio. (Wendt Decl. at ¶ 25, Ex. #4 at p. DW 430). Callahan falsely represented that Diversified's holding of Distinctive Investments (the Panoramic Project) was 9.75% of the total portfolio. (Wendt Decl. at ¶ 25, Ex. #4 at p. 430). Callahan now claims promissory notes from Distinctive Investments make up virtually the entire portfolio (over 97%) of his Diversified fund. (Lentz Decl. at ¶ 6, Ex. #3 at pp. 2 & 9).

Callahan also sent to Wendt Diversified's offering memorandum, which misrepresented its liquidity and portfolio diversification. According to the offering memorandum, investors were able to withdraw money (as of the last day of each calendar month) by providing written notice on or before that date, and that the proceeds generally would be paid within thirty (30) days of the withdrawal date. (Wendt Decl., Ex. #5 at p. DW 246). The offering memorandum also states that "[t]he fund seeks rigorous portfolio diversification, investing in historically uncorrelated investment opportunities and positions across all sectors, with an emphasis on the preservation of capital." (Wendt Decl., Ex. #5 at p. DW 244). To the contrary, in four letters sent to investors in February 2012, Callahan admits that most of the assets of the Callahan Funds (with the exception of Pangea High Yield), are, at best, tied up for years in the Panoramic Project and that there is a substantial risk that the lender could foreclose on its loan and seize the remaining unsold units of the Panoramic Project. (Handoo Decl. at ¶ 35; Lentz Decl. at ¶3, Ex. 3 at pp. BC 06022, BC 06032, BC 06043, BC 06053.)

Finally, Callahan failed to disclose his securities industry disciplinary record to Wendt. On June 2, 2009, Callahan consented to a permanent bar by FINRA from associating with any FINRA member, based on allegations that Callahan: (1) created false documents; (2) engaged in

8

outside business activities and private securities transactions, without prompt written notice to his member firm of these activities (or approval from his member firm for the private securities transactions); and (3) failed to respond to a FINRA request for documentation and information. (Wendt Decl., Ex. #7). Wendt did not become aware that Callahan had been barred by FINRA until January or February 2012, and would not have invested with Callahan if he had known about the FINRA bar against Callahan. (Wendt Decl. at ¶¶ 30-32).

### 3. Thomas Claus

Callahan solicited Thomas Claus, who resides in Wisconsin, to invest in two of Callahan's funds. (Claus Decl. at ¶¶ 2, 4-5, 10). Between 2008 and 2012, Claus (through his family's offshore trust) invested more than $380,000 in Diversified and more than $450,000 in Fiduciary. (Claus Decl. at ¶ 19). Callahan made misrepresentations to Claus about the use of his funds and liquidity of his investments. Callahan also failed to disclose his FINRA disciplinary record to Claus.

In 2008, Callahan sent Claus a Power Point presentation promoting his Diversified, Horizon Millennium, and Masters funds. (Claus Decl. at ¶ 4, Ex. #1). Callahan gave a presentation to Claus over the phone and specifically brought to Claus's attention a slide from the Power Point presentation showing that the annual performance of his Diversified fund was the same annual performance as Hedge Fund #1 (Claus Decl. at ¶¶ 4-5, Ex. #1, at p. CLAUS 0223). Yet none of the money that Claus invested with Callahan in Diversified ever was actually invested in Hedge Fund #1. Since March 2008, Callahan's Diversified fund has not made any new investments in Hedge Fund #1. Claus began investing in Diversified in October 2008. (Kesslen Decl. at ¶¶ 8, 12, Ex. #2 at DGI000000060, Ex. #3 at DGI000000118).

9

Callahan also misrepresented to Claus that his Diversified fund had no withdrawal restrictions and that investments in the Diversified fund were liquid. (Claus Decl. at ¶ 5). In point of fact, Callahan diverted some of the assets of the Diversified fund to the Panoramic Project in exchange for illiquid, unsecured promissory notes.

In about May 2009, Callahan marketed his Fiduciary fund to Claus as being similar to a money market fund and that this investment was liquid. (Claus Decl. at ¶¶ 5, 10, 20, 22, 28). Callahan never told Claus that money in Callahan's Fiduciary fund could be transferred to other funds that Callahan managed. (Claus Decl. at ¶ 20). In reality, Callahan misused Claus' January 2010 investment ($70,225 ) in the Fiduciary fund by diverting this money to two other funds, Pangea High Yield and Diversified. (Lentz Decl. at ¶ 20).

In about January 2012, Claus asked Callahan whether he could redeem $400,000 of his investments within two days notice and Callahan falsely assured Claus that this could be done. (Claus Decl. at ¶¶ 21-22). Similar to Wendt, it was not until January 2012, that Claus learned that Callahan had been permanently barred by FINRA from associating with any other FINRA member. (Claus Decl. at ¶¶ 23-26, Ex. #8). After learning that Callahan had been barred by FINRA, Claus requested a total liquidation of his investments in Callahan's Diversified and Fiduciary funds. (Claus Decl. at ¶¶ 26-27). Claus has not received any money in response to his redemption request. (Claus Decl. at ¶ 33).

## B. CALLAHAN COMMINGLES INVESTOR MONIES AND MISUSES INVESTOR ASSETS TO PAY SOME INVESTORS IN OTHER FUNDS

Until sometime in 2010, Callahan directed investors to wire their investments to at least three different accounts in the British Virgin Islands ("BVI"). (Wendt Decl., Ex. #8 at pp. 2, 5-

13). In about 2010, Callahan began using the HSBC Bermuda "Client Funds Account." (Wendt Decl., Ex. #8 at pp. DW 1, DW 3-4; Claus Decl., Ex. #6 at p. CLAUS 0053).

Callahan then wired respective assets of the Callahan Funds to an escrow account set up by Barry Manson (the "Escrow Account"), where the assets of the Callahan Funds were commingled. (Lentz Decl. at ¶ 16). According to the escrow agreement, the Escrow Account was set up to hold payments from purchasers and subscribers relating to the Panoramic Project. (Handoo Decl. at ¶ 19, Ex. N at p. 1). The Escrow Account received and disbursed money from people who purchased cooperative units in the Panoramic Project but were not investors in the Callahan Funds. (Lentz Decl. at ¶ 15). Although the purpose of the Escrow Account was solely for the Panoramic Project, Callahan used the account to direct transfers of assets among the various Callahan Funds or to pay redemption requests of other investors. (Lentz Decl. at ¶¶ 18-20). Callahan was able to hide this misuse by obtaining promissory notes from his brother-in-law's entity in amounts that far exceeded the sum that the Callahan Funds actually tendered to him. (Lentz Decl. at ¶¶ 9 & 17). Below are several specific examples of this misconduct.

### The Misuse of the Citco Bank Investment

Callahan improperly transferred Fiduciary fund assets to the Pangea High Yield and Diversified funds and misused a portion of these monies to satisfy a redemption request by another investor in Pangea High Yield. (Lentz Decl. at ¶ 18). Specifically, on February 26, 2010, Callahan received a $1.2 million investment from Citco Bank, an investor in Callahan's Fiduciary fund. (Lentz Decl. at ¶ 18). Citco Bank's wire came into the Fiduciary account at VP Bank in the BVI. (Lentz Decl. at ¶ 18). On March 2, 2010, Callahan wired $485,000 of Citco's Fiduciary investment from that fund to the Escrow Account and --on the same day-- transferred all of these assets to two other funds, Pangea High Yield ($368,000) and Diversified ($117,000).

(Lentz Decl. at ¶ 18).  On March 2, 2010, Callahan wired $350,000 from the Pangea High Yield account to an investor in Pangea High Yield for a redemption.  (Lentz Decl. at ¶ 18).  Callahan obtained a promissory note from the Panoramic Project, however, which falsely represented that Callahan's Fiduciary fund had invested $485,000 in Distinctive Investments (the Panoramic Project), when in reality no assets of the Fiduciary fund were invested in the Panoramic Project at that time.  (Lentz Decl. at ¶ 18).

### The Misuse of the Pictet & Cie Investment

On March 24, 2010, Callahan received a $990,000 investment for his Fiduciary fund from Pictet & Cie.  Callahan misused a portion of these monies to satisfy a redemption request by another investor in a different Callahan fund, the Pangea Global Opportunities Porfolio, LP fund.  (Lentz Decl. at ¶ 19).[4]  On March 24, 2010, Pictet & Cie's $990,000 wire came into the Fiduciary account at VP Bank in the BVI.  (Lentz Decl. at ¶ 19).  On March 24, 2010, Callahan transferred $895,000 of Pictet & Cie's Fiduciary investment from Fiduciary to the Escrow Account.  (Lentz Decl. at ¶ 19).  From the Escrow Account, $892,000 was transferred to two other funds, Pangea ($640,000) and Diversified ($52,000), and to Distinctive Ventures ($200,000), an entity related to the Panoramic Project.  (Lentz Decl. at ¶ 19; Handoo Decl. at ¶ 28, Ex. V).  On March 25, 2010, Callahan wired $440,000 from the Pangea High Yield account to an investor in Pangea Global Opportunities Portfolio, LP, to satisfy a redemption request.  (Lentz Decl. at ¶ 19).  Even though only $200,000 went to Distinctive Ventures, Callahan produced a promissory note dated March 24, 2010 for $895,000 (issued from a Panoramic Project-related entity, Distinctive Investments) to Fiduciary.  (Lentz Decl. at ¶ 19).

---

[4]     This fund is not the subject of the instant emergency action.

**The Misuse of the Claus and Second Citco Bank Investments**

Callahan received subscriptions from investors for his Fiduciary fund and then diverted

that money to two of his other funds, Diversified and Pangea High Yield. (Lentz Decl. at ¶ 20).

On January 28, 2010, Callahan received a $70,225 subscription from the Claus family (for the

Helvetia Trust) for his Fiducary fund. (Lentz Decl. at ¶ 20). On February 5, 2010, Callahan

received a $128,000 subscription for his Fiduciary fund from Citco Bank. (Lentz Decl. at ¶ 20).

Both subscriptions came via wire into the Fiduciary account at VP Bank in the BVI. (Lentz

Decl. at ¶ 20). Callahan wired out monies from these subscriptions as follows: On February 2,

2010, Callahan wired $19,870.66 to his HGA account and, on February 8, 2010, he wired

$160,000 to the Escrow Account. (Lentz Decl. at ¶ 20). On the following day, February 9,

2010, Callahan transferred $160,000 out of the Escrow Account to two of his other funds,

Pangea High Yield ($50,000) and Diversified ($110,000). (Lentz Decl. at ¶ 20). Although the

money went to Pangea High Yield and Diversified, not the Panoramic Project-related entity,

Distinctive Investments, Callahan produced a promissory note issued by his brother-in-law's

Panoramic Project-related entity, Distinctive Investments, to Fiduciary dated February 8, 2010

for $160,000. (Lentz Decl. at ¶ 20).

### C.   CALLAHAN MISUSES INVESTORS ASSETS FOR A DOWNPAYMENT ON A $3.35 MILLION "COOP"

In March 2011, Callahan engaged in a series of money transfers through numerous

accounts and ultimately used that money as a down payment for the purchase of a $3.35 million

cooperative unit at the Panoramic Project, which is titled in his and his wife's name. (Lentz

Decl. at ¶ 21). Specifically, on March 10, 2011, Pictet & Cie wired $1,120,000 to Callahan's

HSBC Bermuda Client Funds Account for the Horizon Millennium fund. (Lentz Decl. at ¶ 22).

On March 17, 2011, Callahan transferred $930,000 in two wires from the HSBC Bermuda Client

13

Fund Account to the Escrow Account. (Lentz Decl. at ¶ 23). These monies were not for

Callahan's fees. (Lentz Decl. at ¶ 34). On March 17, 2011, Callahan instructed Barry Manson to

transfer $455,600 of the money from the Escrow Account to the HGA LLC bank account stating,

"I need this amount to fund the Gibraltar account for the closing." (Lentz Decl. at ¶ 24). On

March 18, 2011, Callahan transferred the $455,600 from HGA LLC's account to his personal

bank account also at Bank of America and then to Gibraltar Private Bank. (Lentz Decl. at ¶ 26,

27). The $455,600 that Callahan misappropriated from investors was used as a 20% down

payment for the Panoramic Project cooperative unit that Callahan purchased in his name with a

$2,278,000 mortgage from Gibraltar Private Bank. (Lentz Decl. at ¶ 28).

**D.      THERE ARE VERY FEW LIQUID ASSETS REMAINING**

Callahan produced documents showing that the total approximate current value of the

Callahan Funds is over $65 million. (Lentz Decl. at ¶ 5). The only liquid assets of the Callahan

Funds that the SEC has been able to locate, however, are investments with hedge funds totaling

about $6.4 million and a bank account with a balance of less than $1,000. (Lentz Decl. at ¶ 8).

The following chart shows the breakdown of the current value of each of the respective Callahan

Funds and the shortfalls. (Lentz Decl. at ¶ 8).

| APPROXIMATE TOTAL LIQUID ASSETS (as of Dec 31, 2011) | | | |
|---|---|---|---|
| Fund | Value | Value of liquid assets | Shortfall |
| Diversified | $10,649,317 | $588,655 | $10,060,662 |
| Horizon Millennium | $9,998,359 | $5,126,670 | $4,871,689 |
| Masters | $3,281,144 | $739,864 | $2,541,280 |
| Fiduciary | $30,683,295 | -- | $30,683,295 |
| Pangea | $14,421,438 | $999 | $14,420,439 |
| TOTALS* | $65,058,353 | $6,456,188 | $58,602,165 |

*The investments of Horizon Millennium and Masters in Diversified have been excluded from the total.

Callahan also maintains the HSBC Bermuda Client Funds Account where investors in different Callahan Funds sent their money, but the SEC has not yet been able to determine the balance in that account. (Wendt Decl., Ex. #8 at pp. DW 1, DW 3-4; Claus decl., Ex. #6 at p. CLAUS 0053).

Callahan produced documents showing the remaining assets of the Callahan Funds are (1) unsecured demand promissory notes issued between 2008 and 2011 to the Diversified and Fiduciary funds totaling over $60.3 million ostensibly in exchange for purported loans to his brother-in-law's entities, and (2) an unsecured demand promissory note issued in 2005 to Pangea worth over $14 million. (Lentz Decl. at ¶ 6, Ex. #3 & ¶¶ 9-13). As described below, the promissory notes are actually illiquid and unsecured, and the amount of money given to the brother-in-law over a longer period of time (between 2006 and 2012) was approximately less than half of the total face amount on the promissory notes.

**1.     Callahan Diverts Investor Funds to the Panoramic Project and Obtains In Exchange Inflated Promissory Notes**

In 2005, Callahan's father-in-law, Barry Manson, an attorney on Long Island, New York, formed two entities for his son, Adam Manson: Distinctive Ventures and Distinctive Investments (discussed above). (Handoo Decl. at ¶ 19, Ex. N). Adam Manson is the sole member of Distinctive Investments, which is the sole member of Distinctive Ventures. (Handoo Decl. at ¶ 28; Ex. V at 18:10–19:6, 25:18-28:2, 90:19-91:22, 96:24-97:14, attaching Tr. Ex. 13, Tr. Ex. 14 ). In 2007, after securing financing from Barclays Capital Real Estate (Handoo Decl. at ¶ 22, Ex. Q; ¶ 28, Ex. V at pp. 106:16-18, 110:20-111:10), Adam Manson (through Distinctive Ventures) purchased cooperative rights to the Panoramic Project, a beach resort on Long Island. (Handoo Decl. at ¶ 28, Ex. V at 103:4-21, 111:8-10). Adam Manson's plan was to develop the property, convert the units to cooperatives to sell for several million dollars each, pay off the

bank loan and make a profit. (Handoo Decl. at ¶ 28, Ex. V at 105:22–106:14).  However, after the downturn in the real estate market beginning in 2008, Distinctive Ventures has only been able to sell nine of the high-priced cooperatives and it has not yet converted many of the units to cooperatives. (Handoo Decl. at ¶ 28, Ex. V at 104:3–105:21).  The resort is not profitable (Handoo Decl. at ¶ 28, Ex. V at 108:21–110:13, 130:11-130:19, attaching Tr. Ex. 16) and Distinctive Ventures has had trouble making its loan payments. (Handoo Decl. at ¶ 28, Ex. V at 112:11–113:12).

From 2007 to 2012, Defendant Callahan invested at least $22 million of assets from the Callahan Funds in the Panoramic Project to help Adam Manson operate and develop the property and to make bank loan payments for the property. (Lentz Decl. at ¶ 17; Hando Decl. ¶ 22; Ex. Q). Investors did not know, however, that their money would be used for this private real estate venture. (Wendt Decl. at ¶¶ 11, 22; Biller Decl. at ¶ 43). Adam Manson, moreover, issued unsecured promissory notes from Distinctive Investments to the Fiduciary and Diversified funds. (Handoo Decl. at ¶ 21, Ex. P). The terms of the promissory notes provided that the Callahan Funds could demand the return of principal and interest upon 30 days notice. (Id.) <u>Defendant Callahan's February 24, 2012 letters to investors, however, represented that if all goes well and all cooperative units are redeveloped and sold, the earliest the promissory notes would be repaid is approximately three years.</u> (Handoo Decl. at ¶ 35; Lentz Decl. at ¶3, Ex. 3 at pp. BC 06022, BC 06032, BC 06043, BC 06053; Biller Decl. ¶¶ 41-42, Ex. #16, #17; Claus Decl. at ¶¶ 31, 32, Ex. #9, #10).  A number of investors have recently made demands for the return of their investments and have not been repaid. (Biller Decl. at ¶¶ 35-37, 45, Ex. #13, #14; Wendt Decl. at ¶ 34, Ex. #9; Claus Decl. at ¶¶ 26-27, 33).

The promissory notes, moreover, falsely state that the principal amounts were loaned to Adam Manson's entity when, in fact, Callahan invested <u>only a fraction of that amount</u> with his brother-in-law's business venture. (Lentz Decl. Exs. #6, #12)  For instance, in 2011, even though Adam Manson received only $3.3 million from the Callahan Funds for the Panoramic Project -- at Callahan's request-- Adam Manson issued or authorized promissory notes with a total principal amount of over $14.5 million.  (Lentz Decl. at Exhibits 6 and 12)

### 2. Callahan Uses the Inflated Promissory Notes to Inflate His Own Management Fees

The principal amounts and interest of the promissory notes were used to calculate the Callahan Funds' assets under management. (Lentz Decl. at ¶¶ 32, 33).  Because the amounts on the promissory notes were inflated, the value of the assets of the Callahan Funds under management was also inflated.  As a result, Callahan's management fees were inflated because he received these fees based on the value of assets under management.  (Lentz Decl. at ¶¶ 32, 34 & 35).  For example, Callahan received over $883,000 in management fees for 2011.  These fees are inflated by as much as 800% or more.  (Lentz Decl. at ¶ 34).[5]

## ARGUMENT

### A. The Facts Presented Herein Satisfy The Commission's Burden For Obtaining Injunctive Relief.

Section 21(d) of the Securities Exchange Act of 1934 [15 U.S.C § 78u(d)] ("Exchange Act") provides that:

> Whenever it shall appear to the Commission that any person is engaged, or is about to engage in acts or practices constituting a violation of any provision of this title, the rules or regulations thereunder, . . . it may in its discretion bring an action . . . to enjoin such acts or practices, and upon a

---

[5]     The inflated value of the promissory notes was also improperly recorded in the financial statements of the Callahan Funds. (Lentz Decl. at ¶ 33).

proper showing a permanent or temporary injunction or restraining order
shall be granted without bond.[6]

By virtue of this statutory authority, the principles governing the issuance of an injunction sought

by the Commission are different than those governing a private party's request for that relief.

Specifically, where Congress grants district courts jurisdiction to enjoin those violating or about

to violate federal statutes, "the standards of public interest, not the requirements of private

litigation, measure the propriety and need for injunctive relief." SEC v. Unifund SAL, 910 F.2d

1028, 1035-36 (2d Cir. 1990), quoting The Hecht Company v. Bowles, Price Administrator, 321

U.S. 321, 331 (1944). See also SEC v. Northeastern Financial Corp., 268 F. Supp. 412, 414

(D.N.J. 1967).

To this end, the Commission faces a reduced burden of proof to obtain the authorized

relief as compared to private litigants.  To obtain a preliminary injunction, the Commission need

only show that it is likely to succeed in establishing the current violations and that there is a risk

that the violations will be repeated. SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998), citing

SEC v. Unifund SAL, 910 F.2d at 1039-1040.  Unlike in the private litigant context, the

Commission need not show risk of irreparable injury or the unavailability of remedies at law.

See Unifund SAL, 910 F.2d at 1036, 1038, and the cases cited therein.

Upon a proper showing, an injunction may issue regardless of the defendant's disclaimer

of any intention to continue and regardless of a defendant's cessation of illegal conduct; the

likelihood of future violations must be viewed in light of past conduct. Northeastern, 268

F.Supp. at 414.

---

[6]     Section 20(b) of the Securities Act of 1933 [15 U.S.C. § 77t(b)] ("Securities Act")
similarly confers such authority to the Commission in connection with violations of that Act.

As set forth below, the Commission has met its burden of making a "substantial showing" that it is likely to succeed in establishing each violation alleged against the Defendants in the Complaint and the risk of that those violations will be repeated.  Accordingly, a temporary injunction against further violations by the Defendants is appropriate.

### 1.       The Commission is Likely to Succeed on the Merits of its Action.

The Commission has alleged in its Complaint violations of the antifraud provisions of the Securities Act, Exchange Act and Advisers Act of 1940 ("Advisers Act").  As set forth below, the proof of each of these violations is abundant and, accordingly, the Commission is likely to succeed in establishing each of these violations.

### a.       The Commission Can Establish that the Defendant Has Violated the Antifraud Provisions of the Securities Act and the Exchange Act.

Section 17(a) of the Securities Act prohibits any person, in the offer or sale of any security, from, directly or indirectly:  (1) employing any device, scheme or artifice to defraud; (2) obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaging in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.  See 15 U.S.C. § 77q(a).  Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit essentially the same conduct, if committed in connection with the purchase or sale of any security.[7]

---

[7]       The Supreme Court has recognized that the antifraud provisions of the Securities Act and the Exchange Act prohibit essentially the same conduct.  See U.S. v. Naftalin, 441 U.S. 768, 778 (1979).

To prevail in a civil enforcement action alleging violations of these antifraud statutes, the Commission must show that the Defendants: (1) by the use of the mails or an instrumentality of interstate commerce; (2) made false and misleading statements or omissions of material fact or otherwise employed any device, scheme, or artifice to defraud or engaged in any transaction, practice or course of business which operates as a fraud or deceit; (3) in connection with the offer, purchase or sale of securities; and (4) acted with the requisite intent or scienter. Aaron v. SEC, 446 U.S. 680, 697 (1980). See also SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 860 (2d Cir. 1969), cert. denied, 394 U.S. 976 (1969); SEC v. Kimmes, 799 F. Supp. 852, 858 (N.D. Ill. 1992), aff'd, 997 F.2d 287 (7th Cir. 1993).

> (i)     *The Defendants' Fraudulent Conduct Was*
> *In Connection with the Offer or Purchase or Sale of Securities*

Defendants' fraudulent conduct was in connection with the offer or purchase and sale of securities. Callahan solicited investors so that their money could be pooled and invested in New York-based hedge funds. See supra at pp. 6-10. During the course of this solicitation, he made material misrepresentations concerning those investments. For example, Callahan never told Mr. Claus that none of his money would actually be invested as promised. Mr. Claus also was never told that his money would be invested in funds that he did not select or that the investment would be illiquid. Id. at 9-10. Accordingly, Defendants' scheme meets the "in connection with" requirement of the antifraud statutes.[8]

> (ii)    *The Defendants Used Means and Instrumentalities of*
> *Interstate Commerce in Connection with his Conduct*

The Defendants used multiple means or instrumentalities of interstate commerce in connection with their misconduct, including telephone, wire transfers and the internet. See, e.g.,

---

[8]     See SEC v. Zandford, 535 U.S. 813, 822 (2002) (noting that "in connection with" element requires only that the "scheme to defraud and the security coincide").

supra at 6. Accordingly, there is no doubt that Defendants used the instrumentalities of interstate commerce in connection with this fraud. See, e.g., Heyman v. Heyman, 356 F. Supp. 958, 969 (S.D.N.Y. 1973) (all that is necessary for jurisdiction is some means of "interstate commerce," such as a mailing, a phone call, or a trip, "used in some phase of the transaction, which need not be the part in which the fraud occurs"); Richter v. Achs, 962 F. Supp. 31, 33 (S.D.N.Y. 1997) ("[I]f a single telephone is used to call the defendants to a meeting at which they engage in fraudulent activity, the jurisdictional element is satisfied.").

### (iii) The Defendants Engaged in Transactions, Practices And Courses of Business that Operate as a Fraud or Deceit

Without doubt, the conversion of proceeds for personal use and to pay other investors is information that a reasonable investor would find important. See Superintendent of Ins. Of New York v. Bankers Life and Casualty Co., 404 U.S. 6, 92 S. Ct. 165, 167-68 (1971) (misappropriation or diversion of funds for uses other than those disclosed constitutes a scheme or artifice to defraud prohibited by the antifraud provisions). In each instance that Defendants misused investor funds, they failed to disclose material information to those investors about this misuse. Here, Callahan and his investment advisory entities, HGA and HGA, LLC, engaged in a fraudulent scheme. See supra at pp. 3-13. Callahan and his entities engaged in a scheme involving the misuse of investor funds that Callahan covered-up through the use of promissory notes which falsely stated they were payable on demand but which Callahan knew were illiquid, and which falsely reflected investments with Adam Manson's real estate venture. See supra at pp. 15-17. "Conduct itself can be deceptive, and so liability under § 10(b) or Rule 10b–5 does not require a specific oral or written statement." United States v. Finnerty, 533 F.3d 143, 148 (2d Cir.2008).

21

In addition, Defendants made numerous misstatements and omission to investors when he solicited the investments and later covered up his fraud. Callahan and the investment advisory entities that he solely controlled knowingly misrepresented orally and in emails, Power Point presentations, they issued and other materials attributed to them, numerous facts to investors, including the use of investor funds, the liquidity of the investments, the balances in investor accounts and investment returns, and Callahan's disciplinary history. See supra at pp. 3-13. Courts have recognized the materiality of the types of misstatements or omissions that are inherent to the operation of a Ponzi scheme (i.e., the use of investor proceeds, the source of the investors' returns, the profitability of the enterprise, the fraudulent nature of the scheme, the risks of investing and the ability of the promoter to pay the promised returns). See, e.g., SEC v. Credit Bancorp, Ltd., 195 F. Supp. 2d 475, 492 (S.D.N.Y. 2002).

The general standard for assessing materiality was enunciated by the Supreme Court in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976), in which the Court held:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important ... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

See also Basic, Inc. v. Levinson, 485 U.S. 224 (1988); Muller v. M.D. Sass Associates, Inc., 1992 U.S. Dist LEXIS 5736, *37 (D.N.J. Apr. 22, 1992) (a misstatement is material if an investor would consider the misstatements or omissions important in making an investment decision). Here, there is little doubt that the misconduct described above would be considered important by a reasonable investor.

### *(iv) The Defendants Acted With Scienter*

Defendants' actions were deliberate, thereby satisfying the requirement that they acted with scienter. Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).[9] Scienter includes conduct evidencing an intent to mislead, as well as conduct demonstrating a reckless disregard for misleading statements. Id. at 701-02.

This is not a case of recklessness, but one of knowing, deliberate, active, and intentional misconduct. Among other things, Callahan affirmatively directed the flow of investor funds for his own personal use, thereby misappropriating hundreds of thousands of dollars to which he had no claim. See supra at pp. 13-14. His knowledge of the wrongful nature of his actions is evident from the fact that he made repeated false statements to the investors about how their money would be invested. See supra at pp. 5-10. Further, Callahan's deliberate inflation of purported promissory notes demonstrates knowing and deliberate activity. See supra at p. 17.

**b. Defendants Violated the Antifraud Provisions of the Advisers Act.**

Sections 206(1) and (2) of the Advisers Act prohibits fraud by investment advisors. Section 206(1) prohibits an investment adviser from employing "any device, scheme or artifice to defraud any client or prospective client." Section 206(2) prohibits an investment adviser from engaging "in any transaction, practice or course of business that operates as a fraud or deceit upon any client or prospective client." Scienter need only be proven for a violation of Section 206(1), not Section 206(2). See SEC v. Steadman, 967 F.2d 636, 643, n.5 (D.C. Cir. 1992)(citing Capital Gains Research Bureau, 375 U.S. at 191-92 (1963)). Facts establishing a violation of Section 10(b) of the Exchange Act will also support a violation of Sections 206(1)

---

[9]     There is no scienter requirement for violations of Sections 17(a)(2) or 17(a)(3). Aaron, 446 U.S. at 697.

23

and 206(2) of the Advisers Act. SEC v. Berger, 244 F. Supp. 2d 180, 192 (S.D.N.Y. 2001). The fiduciary standards imposed by Sections 206(1) and 206(2) include the adviser's affirmative duty to its client of "'utmost good faith and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading [an investment advisor's] clients.'" SEC v. Blavin, 760 F.2d 706, 711-12 (6th Cir. 1985) (quoting SEC v. Capital Gains Research Bureau, 375 U.S. 180, 194 (1963).

Callahan satisfies Section 202(a)(11) of the Advisers Act's definition of an investment adviser: he made all of the investment decisions for the funds for which he received management fees. (Handoo Decl. at ¶ 12, Ex. # I & Lentz Decl. at ¶ 6, Ex. #3). In addition, Callahan exercised exclusive control over the HGA advisory entities through which he managed most of the Callahan Funds during the relevant period. See John J. Kenny and Nicholson/Kenny Capital Management, Inc., Adv. Act Rel. No. 2128, 2003 SEC LEXIS 1170 at 63 (May 14, 2003); SEC v. Berger, 2001 U.S. Dist. LEXIS 18448 at 28 (S.D.N.Y. 2001), aff'd on other ground, 2003 U.S. App. Lexis 3562 (2d. Cir. 2003).

Callahan violated Section 206(1) and 206(2) by breaching his fiduciary duty to the Callahan Funds by engaging in a scheme to invest fund assets in unsecured promissory notes that falsely stated the Callahan Funds could demand the return of principal and interest upon notice of 30 days, when Callahan knew any such demand could not be paid. (Handoo at ¶ 11, Ex. H and ¶ 21, Ex. P & Lentz Decl. at ¶ 6, Ex. #3). Callahan commingled assets in various accounts, and not only used assets of the Callahan Funds to make redemption payments to investors in other funds, but also misappropriated such assets for his personal benefit. (Lentz Decl. at ¶¶ 14-28). Callahan also included the full value of the fraudulent notes as Callahan Fund investments

when he calculated the assets under management and thus, took inflated management fees. (Lentz Decl. at ¶¶ 32-35).

### c.   Defendants Violated Section 206(4) of the Advisers Act And Rule 206(4)-8 Thereunder

Section 206(4) of the Advisers Act prohibits an investment adviser from, directly or indirectly, engaging in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. Rule 206(4)-8, which became effective on September 10, 2007, defines such prohibited conduct. Advisers to "pooled investment vehicles" are barred from making false or misleading statements to investors or prospective investors in those pools or otherwise defrauding investors or prospective investors. 17 C.F.R. § 275.206(4)-8; Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, SEC Release No. IA-2628 (Aug. 9, 2007). Pooled investment vehicles include hedge funds, private equity funds, venture capital funds, and other types of offered pools that invest in securities. Id. The rule applies to both registered and unregistered advisers. Id. It prohibits advisers to investment pools from making to current or prospective investors in pooled investment vehicles a misstatement or omitting material facts, which render statements misleading. Scienter is not required – conduct that is negligently, recklessly, or deliberately deceptive is sufficient. Id. Examples of the conduct prohibited include providing false or misleading information to investors in their account statements and in private placement memoranda. Id. Defendants Callahan, HGA and HGA LLC violated Section 206(4) and Rule 206(4)-8 based on the misrepresentations they made to individual investors of the Callahan Funds regarding, among other things, the liquidity of the investments and use of assets. See supra at pp. 5-10.

**2.  Injunctive Relief is Appropriate Because There is a Strong Likelihood that Defendants' Wrongdoing Will be Repeated.**

As set forth above, there is a substantial likelihood that the Defendants will continue their fraudulent conduct unless enjoined. Among the factors to be considered in assessing the likelihood that a defendant will repeat his wrongdoing are the character of the violation, the degree of scienter involved, and whether a defendant has acknowledged the wrongfulness of his conduct and given sufficient assurances that it will not be repeated. See SEC v. Savoy Industries, Inc., 587 F.2d 1149, 1168 (D.C. Cir. 1978), *cert. denied,* 440 U.S. 913 (1979); SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 100-01 (2d Cir. 1978). The scope and breath of the Defendants misconduct indicates a strong likelihood that it will continue unless enjoined. See supra at pp. 3-17. In addition, the misconduct described above, has been vey profitable for Callahan and therefore, it is likely to continue.

**II.  THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION OF INVESTOR ASSETS AND PROSECUTION OF THE CASE**

**A.  The Court Should Order the Appointment of a Receiver**

The Court should appoint a temporary receiver for the Pangea, Diversified, Masters, Fiduciary and Horizon Millennium funds, as well as HGA and HGA LLC. Courts will appoint a receiver where necessary (1) to preserve the status quo while various transactions are being unraveled so as to determine an accurate picture of the fraudulent conduct, Manor Nursing Ctrs., Inc., 458 F.2d at 1105; (2) to protect those already injured from "further despoliation of their property or rights," Esbitt v. Dutch-American Mercantile Corp., 335 F.2d 141, 143 (2d Cir. 1964); (3) to prevent the dissipation of assets pending further action by the court, SEC v. American Board of Trade, Inc., 830 F.2d 431, 436 (2d Cir. 1987); (4) to install a responsible officer of the court who could bring companies into compliance with the law, id. at 437; or (5) to

place hopelessly insolvent entities in bankruptcy to effect their liquidation, id. at 436.

The Defendants' conduct shows that they cannot be trusted to safeguard the remaining assets and act in the best interests of investors. It is especially exigent that the Defendants' assets be frozen and a receiver be appointed because Hedge Fund #1 decided, on February 29, 2012, to involuntarily redeem the investment of one of the Callahan Funds and return the money to an account controlled by Callahan. (Handoo Decl. ¶ 41, Ex. EE). A receiver will ensure that the funds will be protected and appropriate decisions can be made about the use of investor assets. A receiver also will be able to conduct an accounting in order to account for the uses and locations of investor assets.

### B.     The Court Should Enter an Asset Freeze and Repatriation Order

In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment interest thereon and civil penalties. The preliminary remedy of an immediate freeze of the assets under the direct or indirect control of the Defendants is appropriate here to ensure that sufficient funds will be available to satisfy any final judgments the Court might enter against the Defendants and to protect those assets against dissipation. Exchange Act Section 21(d)(5); see SEC v. Unifund, SAL, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (asset freeze was warranted in amount sufficient to satisfy potential judgment for penalties in insider trading case); SEC v. Infinity Group Co., 212 F.3d 180, 197 (3d Cir. 2000) (purpose of asset freeze is to preserve status quo by preventing dissipation and diversion of assets). When there are concerns that defendants might dissipate assets, a court need only find some basis for inferring a violation of federal securities laws in order to impose a freeze order. SEC v. Unifund, SAL, 910 F.2d 1028, 1041 (2d Cir. 1990); see 15 U.S.C. § 78u(d)(5) [Exchange Act, § 21(d)(5)] (court may grant any equitable relief appropriate or necessary for benefit of investors).

Here, the Commission has shown significant cause for concern about the safety of investor assets. An asset freeze is necessary to prevent: (a) further misappropriation or dissipation of assets; and (b) to prevent the Defendants' from making select repayments of interest and/or principal to some investors to the detriment of other investors. Similarly, it appears that Callahan is using offshore accounts to facilitate some of the transactions described here. This use of offshore accounts necessitates a repatriation order, which falls within a federal court's broad equitable authority. See generally SEC v. Infinity Group Co., 212 F.3d 180, 197 (3d Cir. 2000). Accordingly, the Commission further seeks a repatriation order to ensure that full recovery of the proceeds of the fraud alleged herein.

**C.     The Court Should Order An Accounting**

Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of unjust enrichment and defendants' current financial resources. See, e.g., SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1105 (2d Cir. 1972); SEC v. Lybrand, No. 00 Civ. 1387(SHS), 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000); SEC v. Margolin, No. 92 Civ. 6307(PKL), 1992 WL 279735, at *7 (S.D.N.Y. Sept. 30, 1992). In this case, bank records obtained so far indicate complex chains of questionable transfers of money among the Defendants and accounts under their control. An accounting is critical for determining the amount of the Defendants' unjust enrichment, and the assets available for disgorgement.

**D.     The Court Should Order Expedited Discovery**
**       and Prohibit the Destruction of Documents**

The Court should order expedited discovery under Federal Rules 30(a), 33(a) and 34(b) to allow the Commission to supplement its motion for a preliminary injunction. Expedited discovery is needed to enable the Commission to present a more complete evidentiary record to the Court and will sharpen and focus the issues that must be decided by the Court at a hearing

concerning the entry of a preliminary injunction. Expedited discovery will also assist the Commission in locating additional assets and effectuating any order entered by the Court freezing the Defendants' assets. Likewise, the Court should enter an order prohibiting the Defendants, or any of their agents, from destroying and altering documents to preserve as much of the evidence as possible.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying Declarations and exhibits, the Commission respectfully requests that its application be granted.

Dated:   March 4, 2012

Respectfully submitted,

Dean M. Conway DC4477
Securities and Exchange Commission
Mail Stop 4010
100 F Street, N.E.
Washington, D.C. 20549
Tel: 202-551-4412 (Conway)
Fax: 202-772-9246 (Conway)

Of Counsel:

Antonia Chion
Lisa Deitch
Linda French
Holly Pal
Osman Handoo