UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

BRIAN RAYMOND CALLAHAN, ADAM
MANSON, DISTINCTIVE INVESTMENTS
LLC, and DISTINCTIVE VENTURES LLC;

Defendants,

SHERI MANSON CALLAHAN,

Relief Defendant.

------------------------------------------------------------------x

Case No. 12-CV-1065 (ADS/ETB)

Assigned to:
Hon. Arthur D. Spatt (DJ)
Hon. A. Kathleen Tomlinson (MJ)

**RECEIVER'S REPORT FOR THE 2013 FOURTH QUARTER**
**COVERING THE PERIOD OF OCTOBER 1, 2013 THROUGH DECEMBER 31, 2013**

GOTTESMAN, WOLGEL, MALAMY,
FLYNN & WEINBERG, P.C.
A PROFESSIONAL CORPORATION INCORPORATED IN THE STATE OF NEW YORK
ATTORNEYS FOR
*RECEIVER*

11 HANOVER SQUARE
NEW YORK, N.Y. 10005
TEL. NO. (212) 495-0100
FAX NO. (212) 480-9797

## **TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| RECEIVER'S REPORT: | | | 1 |
| I. | Background and Legal Proceedings | | 2 |
| | A. | Receivership Proceeding and Appointment of Receiver | 2 |
| | B. | Civil Forfeiture Action | 4 |
| | C. | Intervention by U.S. Government and Non-Receivership Stay | 5 |
| | D. | Indictment of Brian R. Callahan and Adam J. Manson | 6 |
| | E. | Proceedings During the Subject Quarterly Period | 6 |
| | F. | Distinctive Notes | 7 |
| | G. | Citizens Bank's Motion to Intervene and Modify Stay | 8 |
| | H. | Cromwell/Ten Hillside | 8 |
| II. | Operations and Investigation | | 9 |
| | A. | Establishing the Receivership Estate | 11 |
| | B. | The Receivership Financial Report and Condition | 14 |
| | C. | Evaluating and Preserving Receivership Assets | 17 |
| | D. | Understanding, Evaluating and Advising Upon Private Investments | 19 |
| | E. | The Real Property and Business Operations Therein | 20 |
| | | (a)  The Panoramic View Coop/Montauk Property | 21 |
| | | (b)  The Callahan Coop Unit | 23 |
| | | (c)  The Callahan Residence | 23 |
| | | (d)  The Cromwell Storage Units | 24 |
| | | (e)  Creditors | 26 |
| | F. | Investigating and Organizing Claims Against Third Parties | 27 |
| III | The Status of the Proposed Plan For the Receivership Estate | | 28 |
| | A. | The Real Property | 28 |
| | | (i)   The Panoramic View | 28 |
| | | (ii)  The Callahan Coop Unit and Residence | 29 |
| | | (iii) Cromwell Property | 30 |
| | B. | Non-Real Property | 31 |
| | | (i)   The Callahan Funds | 31 |
| | | (ii)  Redemptions | 31 |
| | C. | Summary | 31 |
| IV. | Claims Process | | 32 |
| V. | Assets, Liquidation and Distribution of Proceeds | | 33 |
| VI. | Conclusion | | 34 |
| EXHIBIT A | Standardized Fund Accounting Report | | |
| EXHIBIT B | List of Known Potential Claimants | | |

**RECEIVER'S REPORT FOR THE 2013 FOURTH QUARTER**
**COVERING THE PERIOD OF OCTOBER 1, 2013 THROUGH DECEMBER 31, 2013**

Steven Weinberg, as the court appointed receiver (the "Receiver") for Horizon Global Advisors Ltd. ("HGA LTD"), Horizon Global Advisors LLC ("HGA LLC"), Diversified Global Investments (BVI), L.P. ("Diversified Global") f/k/a Horizon Global Investments, L.P. ("Horizon Global"), The Masters Global Fund, L.P. ("Masters Global"), Fiduciary Select Income Fund, L.P. ("Fiduciary Select") f/k/a Pangea Bridge Investment, L.P. ("Pangea Bridge"), Horizon Millennium Investments, L.P. ("Horizon Millennium") and Pangea Offshore High Yield Portfolio, LLC ("Pangea Offshore") respectfully submits this as his quarterly report (the "Report") for the period of October 1, 2013 through December 31, 2013 (the "Quarterly Period"). The Report states the Receivership activities, the Receivership Assets and Receivership Property (as those terms are defined in the Receivership Orders) during the Quarterly Period, and the following as required by Paragraph 55 of the Receivership Order:

A.    A summary of the operations of the Receiver;

B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.    A schedule of all the Receiver's receipts and disbursements (attached as EXHIBIT A to the Quarterly Status Report), with one column for the quarterly period covered and another column for the entire duration of the receivership;

D.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources;

1

approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and (ii) collecting such judgments);

F.      A list of all known creditors with their addresses and the amounts of their claims;

G.      The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.      The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

## I.       BACKGROUND AND LEGAL PROCEEDINGS.

### A.  The Receivership Proceeding & Appointment of the Receiver:

This receivership proceeding was commenced on March 5, 2012 by the United States Securities and Exchange Commission ("SEC") against Defendants Brian Raymond Callahan ("Callahan"), HGA LTD and HGA LLC (the "SEC/Receivership Action") for misappropriation of investors' assets and violations of Securities Laws, namely: §17(a)(1), (2) and (3) of the Securities Act; §10(b) of the Exchange Act and §206(1), (2) and (4) of the Advisors Act.  By the Amended Complaint (the "Amended Complaint") filed in the SEC/Receivership Action on May 31, 2012 (ECF Doc. 28), the SEC expanded the action to include as defendants, five offshore funds, Diversified Global, Masters Global, Fiduciary Select, Horizon Millennium and Pangea Offshore (collectively, the "Callahan Funds"), along with Defendant Callahan's brother-in-law, Adam Manson, his companies, Distinctive Investments, LLC ("Distinctive Investments") and Distinctive Ventures, LLC ("Distinctive Ventures"), and as a Relief Defendant, Defendant Callahan's spouse, Sheri Manson Callahan.

On March 27, 2012, on the motion made by the SEC (ECF Doc. 2), this Court signed the Receivership Order (ECF Doc. 22) placing the HGA Fund Managers (HGA LTD and HGA LLC) into Receivership, and appointed Steven Weinberg as their Receiver.  Pursuant to a Stipulation (ECF Doc. 29) entered into by the SEC and Defendant Callahan, and "So Ordered" (ECF Doc. 33) on June 4, 2012 (the "Fund Receivership Order"), the Receivership Court also placed the Callahan Funds into receivership with Steven Weinberg, being the Receiver for both HGA Fund Managers and the Callahan Funds (collectively, the "Receivership Entities").  The Receivership Order and the Fund Receivership Order are collectively referred hereinafter as the "Receivership Orders".

The Amended Complaint asserts that from 2005 to 2012, Defendant Callahan raised over $90 million (the "Investor Funds") from at least 45 investors (the "Investors") for at least five offshore funds, namely, Diversified Global, Masters Global, Fiduciary Select, Horizon Millennium and Pangea Offshore, which he operated and controlled, directly or indirectly through HGA LTD and HGA LLC.  According to the Amended Complaint, "Callahan's solicitation of investors involved material misrepresentation about the use of their money, the liquidity of their investment and the asset diversification of the Callahan Funds." *Amended Complaint* ¶ 2.  Specifically, Callahan "represented to a number of U.S. residents that their money in the Callahan Funds would be invested with New York-based hedge funds" and that their "investments would be liquid". *Amended Complaint* ¶ 2.  However, according to the Amended Complaint, Callahan "improperly diverted assets of the Callahan Funds to his brother-in-law Manson's private real estate project that was facing foreclosure." *Amended Complaint* ¶ 3.

This Court charged the Receiver with the duty: (a) to use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, of whatever kind, (b) to take custody, control and possession of all Receivership Property and records relevant thereto, and (c) subject to leave from this Court, to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto, including pursuing all suits, actions, claims and demands which may be brought by the Receivership Estate, and bringing legal actions based on law and equity as the Receiver deems necessary or appropriate in discharging his duties as Receiver, and (d) to take such action as necessary and appropriate for the preservation of Receivership Property or to prevent dissipation or concealment of Receivership Property.  Since his appointment, the Receiver has been active in:

- Establishing and Operating the Receivership Estate;

- Investigating the Receivership Entities and Defendants;

- Evaluating and Preserving Receivership Assets and Receivership Property;

- Investigating and Evaluating Receivership Fund Investments;

- Investigating and Analyzing Third Party Claims.

**B.  The Civil Forfeiture Action.**

Separately, and in addition to the subject SEC/Receivership Proceeding, the United States Attorney's Office for the Eastern District of New York ("USAO") commenced a civil forfeiture action on April 17, 2012 in the United States District Court for the Eastern District of New York – Civil Case No. 12 CV 1880 (the "Forfeiture Action").  The action seeks the forfeiture and condemnation of: (a) the real property located at 272 Old Montauk Highway, Montauk, New York 11954 (the "Montauk Property"), (b) all the shares of 93 Old Montauk Owners, Inc., a New

4

York cooperative corporation (the "Panoramic View Coop"), held in the name of Defendant Distinctive Ventures and all proceeds traceable thereto (the "Distinctive Coop Shares"), (c) all the shares of Panoramic View Coop held in the name of Defendant Callahan, and his wife, Defendant Sheri Callahan (the "Callahan Coop Shares"), together with the proprietary lease appurtenant to the Callahan Coop Shares (the "Callahan Coop Unit"), and all proceeds traceable thereto; and (d) the real property located at 47 Clock Tower Lane, Old Westbury, New York 11568 (the "Westbury Property").  According to the Forfeiture Action's Complaint, Investors Funds were used for the acquisition and/or finance of the Montauk Property, the Distinctive Coop Shares, the Callahan Coop Shares and the Old Westbury Property.

**C.   Intervention by U.S. Government and Non-Receivership Stay.**

On July 6, 2012, the U.S. Attorney's Office for the Eastern District of New York made a motion (ECF Doc. 43) to intervene and to stay the SEC/Receivership Action and all discovery therein (the "USAO Stay") until the resolution of a related, ongoing criminal matter, by verdict, pretrial disposition, or until otherwise allowed by the Receivership Court (the "Intervention & Stay Motion").  Under the terms of the proposed Order, the USAO Stay shall not apply to the Receiver and specifically provides that the Receiver may continue to exercise each and all of the authority granted to him under the Receivership Orders.  The Receivership Court granted the Motion to Intervene and Stay by an Order (ECF Doc. 48) dated July 19, 2012 (the "Intervention & Stay Order").  Subsequently, the Court issued an Order (ECF Doc. 57) on September 7, 2012 amending the Intervention and Stay Order to include a provision stating that "[n]othing herein shall be deemed to preclude defendant Callahan from filing an application with the Court for relief from the asset freeze … [and] nothing … shall prevent the SEC from challenging any application by defendant Callahan made pursuant to this paragraph."

**D.  Indictment of Brian R. Callahan and Adam J. Manson**

On August 1, 2013 a 24 count indictment against Brian R. Callahan and Adam J. Manson for securities fraud, conspiracy to commit securities fraud, wire fraud, conspiracy to commit wire fraud, and aggravated identity theft was unsealed, and the defendants were arraigned.  A plea of not guilty was pleaded and entered on each count.

The indictment lays out the allegations or the acts for each count, including allegations of raising over $108,000,000.00 and diverting approximately $96,000,000.00 to operate the investment funds as well as a ponzi scheme.  The allegations are that the monies were utilized for the Panoramic View, redemptions to a few investors at the expense of later investors, and to maintain a luxury lifestyle in lieu of maintaining the funds in liquid accounts in mutual funds, hedge funds or low risk securities as represented to investors.

The criminal case includes a criminal forfeiture proceeding as to the Montauk Property, Distinctive Coop Shares, the Callahan Coop Shares, the Westbury Property, and a certain Westhampton beach front unit.  The criminal case was re-assigned to Judge Spatt who has been assigned to all of the related pending cases before this Court.

**E.  Receiver's Motion to Partially Lift Stay.**

As previously reported, the Receiver filed a motion seeking an order: (i) authorizing the Receiver to commence an action against Defendant Distinctive Investments LLC on the notes that they had executed and indebtedness evidenced thereby (the "Distinctive Notes"), and (ii) partially lifting the blanket stay against actions of any nature involving the Receiver or the Receivership Property for such limited purpose.  The Manson/Distinctive Defendants opposed (ECF Docs. 135 and 136) the Receiver's Motion.  On July 29, 2013, the Receiver filed its Reply papers (ECF Docs. 138 and 139).  The motion is fully briefed and remains *sub judice*.

**F.  The Distinctive Notes.**

As previously reported, various people and entities have expressed interest in purchasing the Distinctive Notes, a Receivership Asset.  During this Quarterly Period, as well as the two prior quarterly periods, the Receiver conducted due diligence investigations and inquiries, and negotiated with those interested parties who showed readiness, experience and financial means to purchase the Distinctive Notes.

One of such interested parties had initially made its proposal for the purchase of the Distinctive Notes to the Manson/Distinctive Defendants' attorney, Andrew Frisch.  However, such proposal was not disclosed to this Court and the Receiver until it appeared in the Manson/Distinctive Defendants' opposition papers to the USAO's motion for an interlocutory sale in the Forfeiture Action.  Another proposal for the Distinctive Notes was made by another interested party, which was addressed to Manson/Distinctive Defendants' attorneys, Morvillo, Abramwitz, Grand, Iason & Anello, P.C., and the Receiver.  A third proposal was made directly to the Receiver for the purchase of the Distinctive Notes.  Each of these three interested parties possessed the experience and financial means, and demonstrated the genuine interest and knowledge, to purchase the Distinctive Notes.  All three were developers with a portfolio of current and past projects and transactions.  The Receiver's negotiation with these three interested parties culminated in the execution of a Letter of Intent for the purchase of the Distinctive Notes during this Quarterly Period.  The parties have since been negotiating the terms of a contract of sale and trying to resolve issues emanating from other transactions not involving the Receiver but would effect the closing for the purchase of the Notes.

**G.  Citizens Bank's Motion to Intervene and Modify Stay.**

In the prior Quarterly Period, Citizens Bank moved to intervene and to lift the stay to pursue all of its remedies as to the injunctive relief provisions of the Receivership Orders affecting Cromwell AAA Storage, LLC and the storage facility it operates on the real property in Cromwell CT, based upon an alleged loan default.  (ECF Doc 141).  The SEC and the Receiver each separately opposed Citizen Bank's application on the grounds that there was no right to intervene and that the purpose of the asset freeze stay was to maintain the status quo, to allow the Receiver to investigate and pursue recoveries of liabilities to the Receivership Estate, and to maximize the estate for claimants such as the Investors.  (ECF Docs. 152, 154 & 155).  Though Citizens Bank asserted in its papers that its loan was in default, it omitted in its moving papers that Citizens Bank received all its required loan payments to date.  Among the reasons Citizens Bank identifies as being the basis for declaring the loan to be in default and their entitlement to default interest, is the restraint and injunctive provisions of the Receivership Orders which affects the Cromwell Property.  On September 30, 2013, without leave from this Court and when the motion was already *sub judice*, Citizens Bank submitted an untimely reply (ECF Doc. 157), which by a letter dated October 2, 2013, the Receiver's Counsel requested the Court to reject for a variety of reasons, including that the Reply was made by an attorney without personal knowledge, improperly disclosed settlement discussions, and contained false statements.  (ECF Doc. 159). The motion remains *sub judice*.

**H.  Cromwell/Ten Hillside.**

Issues remain in the negotiation between the Receiver, Citizens Bank and Cromwell AAA Storage LLC for a consensual sale of the real property and for the Receivership Entities to recover monies that were traced through bank accounts to Investor Funds and paid to Cromwell

for the real estate mortgage and/or taxes.  Near the end of this Quarterly Period, non-party Brian F. Callahan, the manager of the Cromwell storage facility, retained new counsel, to participate in and continue negotiations.  It is believed that there is at least $228,000.00 of Investor Funds which went to or were used for the benefit of Cromwell, and is continuing to be reviewed and traced.

## II.   <u>OPERATIONS AND INVESTIGATIONS</u>

During the subject Quarterly Period:

- The Receiver, through a motion, requested the Court to establish a claims bar deadline for claims against the Receivership, and proposed a procedure to determine claims against the Receivership.  The motion is presently *sub judice* and without any opposition thereto.

- The Receiver entered into a Letter of Intent with an interested party for the purchase of the Distinctive Notes, and has been negotiating the terms and provisions a Contract of Sale with that interested party, with the input of the certain government offices, including the SEC.

- The Receiver demanded repayment of funds received by a third-party purporting to be their net profits of their investments.

- The Receiver continues to consider and evaluate possible claims against other third-parties, and to seek documents and information on those claims.

- The Receiver, by a motion, requested the Court to authorize the Receiver to retain an accounting firm to assist the Receiver in preparing any required tax filings, forensic analysis and/or claims review and analysis.

- The Receiver continued its investigation of an alleged loan transaction between one Receivership Entity and an investor which was secured by a mortgage on real property.  During this Quarterly Period, the Receiver entered into an agreement pursuant to which the investor exchanged the collateral in the form of a mortgage to a cash collateral, by depositing its cash equivalent in escrow in consideration of the Receiver releasing the mortgage.  The cash equivalent, when converted to U.S. currency based on the present market exchange rate, is approximately, $772,588.56.  The terms of the agreement is reported later in this Quarterly Report.d

- The Receiver continued to assert and protect the Receivership interest and control over all Receivership Assets and Property.

- The Receiver continued to demand that Defendants, and interested persons and entities, produce all personal property, including the books and records, of the HGA Fund Managers and the Receivership Fund entities, and to seek the production of tax documents for the Receivership Entities.

- The Receiver continued to issue investigatory subpoenas, to make court application for service of subpoenas pursuant to the Hague Convention and other international agreements, and to review the responses concerning: (i) properties owned by the Defendants, (ii) properties benefited by Investor Funds, (iii) bank records of the Callahan Funds, and (iv) bank records of entities controlled or owned by Defendant Callahan.

- The Receiver continued to seek and review documents from Rochdale Investment Management, RIM Securities, LLC, Rochdale Offshore Investment Management

and other persons and entities concerning certain transactions of the Defendants and Investors, funds and assets of the Receivership Entities, and investments and redemptions.

- The Receiver has exhausted its efforts to obtain documents and information from Pictet & Cie on a voluntary basis, and will pursue the balance through the available international treaties for document discovery and production.

- The Receiver continued to collect additional information from and communicate with Investors to review investments and redemptions.

- The Receiver continued to compile and collect information concerning investments with or for Callahan and the Callahan Funds.

- The Receiver continued to investigate properties owned by the Defendants and identify mortgages, liens, encumbrances and claims thereon, including operational information of the Panoramic View.

- The Receiver continued to engage in multiple discussions with certain Defendants or their attorneys as to assets and property for the use for recovery of Investor Funds.

- The Receiver continued to receive offers for the repayment of loans made to Pangea Offshore, Diversified Global and Fiduciary Select, appearing to be approximately $58 million in principal plus another $14 million in interest.

A.    **ESTABLISHING THE RECEIVERSHIP ESTATE.**

1.    Immediately upon being appointed, the Receiver issued notices of the Receivership Orders and its injunctive provision, and demanded the production of certified statements and information from banks, financial advisors, administrators, accountants, and other

parties who had direct or indirect control of Receivership Assets or Receivership Property and/or who have appeared to have conducted business with the Receivership Defendants.

2.    The Receiver demanded and continues to demand that Defendant Callahan: (i) turnover all assets and property of the HGA Fund Managers, (ii) repatriate assets, and (iii) comply with Paragraphs 8, 9, 10, and 11 of the Initial Receivership Order which includes (a) turning over HGA Fund Managers' books and records, (b) providing a sworn statement and accounting of all assets and property of HGA Fund Managers, and (c) producing the tax returns for HGA Fund Manager.  To date, Defendant Callahan has failed to produce the demanded items and has claimed, through his attorney's letter and email, that: (a) he has no assets of HGA Fund Managers, (b) all documents are in the possession of the U.S. Attorney's Office or with the Offshore Administrator, and (c) he is invoking his Fifth Amendment privilege against self-incrimination for any meeting with or disclosure of information requested by the Receiver's correspondence and subpoenas.

3.    The Receiver lead discussions among the parties for exchange of the documents seized by the FBI pursuant to the related ongoing investigation by the U.S. Attorney's Office (described above) to permit the Receiver to continue his investigation for the information and documents concerning Receivership Assets and Property.

4.    When HSBC Bermuda, an offshore financial institution, declined to voluntarily recognize the Receiver's authority and the Receivership Orders, the Receiver sought and obtained Defendant Callahan's cooperation to sign a joint request demanding that Drake Fund Advisors, Ltd., as the Administrator of certain Callahan Funds, redeem the monies and funds deposited with HSBC Bermuda in the account name of Waterstreet Corporate Services Limited, and wired such funds to the Receiver.  The joint request enabled the repatriation of those funds

back into the United States without time consuming international legal proceedings, which would not have been cost effective and would have significantly eroded the benefit and value of repatriating the funds remaining in the Waterstreet Corporate Services Limited account.

5.      When Pictet & Cie declined to pay account balances to certain individual investors on concerns of possible claw-back claims by the Receiver based upon the Receivership Order, the Receiver wrote to Pictet & Cie to consent to payment of the nominal account balance as of the date of the Receivership Order to each individual investor.  In response to the Receiver's consent, Pictet & Cie agreed to pay and did pay the account balance to at least three individual account title owners.  The Receiver has since entered into discussions with Pictet & Cie, and Pictet & Cie are cooperating in the production of certain account documents and files for the Receivership Entities and certain inventors.

6.      The Receiver has given notices and made demands to the banks, financial institutions, administrators, and accountants located in the British Virgin Island, Bermuda, Cayman Islands and Nevis.  As of the end of this Quarterly Period, none of them have voluntarily responded to the Receiver's notices and demands for information as set forth in the Receivership Orders, except for Drake Fund Advisors, Ltd.  The Receiver continues his investigation during the subject Quarterly Period by making application to the Receivership Court for the production of documents and information, including books, records, ledgers and information for all of the Receivership Entities, pursuant to the Hague Convention for certain entities and companies located in the British Virgin Islands.  (Bermuda is not a signatory the Hague Convention for Evidence Abroad).  This Court has authorized and approved the Receiver's requests for such production pursuant to the Hague Convention.  Though no documents have been received to date yet, it is anticipated that some documents will be

13

forthcoming.  At least two off-shore entities have advised they will respond as soon as they receive service of the papers via the Hague Convention.  In addition, as stated above, Pictet & Cie has been cooperating with the Receiver in producing certain documents and information which they are authorized to release to lessen the expenses of the Receivership.

7.      A portion of Investors Funds that were located and were on hold at certain New York based hedge-funds were previously recovered.  The Receiver continued to monitor the remaining balance of the Investors Funds at those New York based hedge funds which were required to be withheld or that were not liquid.  The Hedge Forum Fund <u>SCF</u> and <u>Golden Tree</u> are being liquidated and recoveries have been made during 2013.  Recovery from Golden Tree commenced during the Fourth Quarter of 2013.  Recovery from SCF commenced in the Third Quarter of 2013, and will continue in the First Quarter of 2014.  The Hedge Forum fund Altima non-liquid investment will be redeemed and paid during 2014.  The Receiver will continue to assess and report the anticipated recovery from SCF, Golden Tree and Altima in the next Quarterly Report.

8.      Recovery has been previously made by the Receiver of the funds of the Receivership Entities from the accounts restrained by Receivership Orders and said account holders transferred those funds to the Receiver's custodial accounts at a federal insured bank.

**B.      THE RECEIVERSHIP FINANCIAL REPORT AND CONDITION**

The Receiver previously recovered funds from the following financial institutions who were in possession of a balance of the Investor Funds:

**MASTERS GLOBAL:**

- Hedge Forum –
  Morgan Stanley Smith Barney                    $597,268.70
- Hedge Forum –
  Citibank                                       $109,166.82

- Hedge Forum SCF – Citibank     $2,144.90
- Hedge Forum Goldentree– Citibank     $1,365.85

|  | TOTAL: | $709,946.27 |
|---|---|---|

Morgan Stanley Smith Barney/Citibank's Hedge Forum have informed the Receiver that, in addition to the $706,435.52, there are also "side pocket" investments, which according to them, are non-liquid investments with an estimated value of $23,612.32. The Receiver requested and received additional information confirming the nature of the "side pocket", confirming the non-liquid status of the investments, and continues to monitor the side pocket investments.

### DIVERSIFIED GLOBAL:

- Horizon Kinetics LLC /Kinetics Institutional Partners, L.P.:     $697,131.21

|  | TOTAL: | $697,131.21 |
|---|---|---|

### HORIZON MILLENNIUM:

- Millennium USA, L.P.     $4,723,783.00
- Hold back turnover     $474,363.00

|  | TOTAL: | $5,198,146.00 |
|---|---|---|

The $5,198,146.00 turned over to the Receiver excludes $51,871.00 which Millennium USA claims will be withheld subject to a holdback for Lehman Brothers claims and expenses. The Receiver continues to monitor the holdback and remains in discussions with Millennium USA for the release of said funds.

**PANGEA OFFSHORE:**

- Bank of America:               $882.58

                                            $11.96

                       TOTAL:     **$894.54**

**WATERSTREET ACCOUNT:**

- HSBC Bermuda:            $43,773.40

                       TOTAL:     **$43,733.40**

At this juncture, it is believed that any further recovery of liquid assets of the Receivership that will be found offshore, and any further recovery of assets and property in the United States will require a legal proceeding for diversion, conversion, fraud, fraudulent transfer, constructive trust and other legal claims. The Receiver is continuing to subpoena and evaluate financial information to trace the flow of Investor Funds and to determine the ultimate recipient to demand the return of Investor Funds. This analysis has included tracing funds through subpoenaed and other available bank records and included reviewing substantial wire transfers, account transfers, checks and withdrawals. The Receiver is also continuing its review of all other documents which the Receiver obtains by means other than a subpoena, or which has been furnished to the Receiver to determine other possible Receivership Assets and claims.

The available liquid assets of the Callahan Funds are extremely limited. The lack of liquidity severely hampers its ability to operate. The bulk of the Callahan Funds were allegedly invested or loaned to Distinctive Investments, which investments or loans are purportedly evidenced by promissory notes made by Distinctive Investments, payable to Pangea Offshore, Fiduciary Select or Diversified Global. The loans and/or promissory notes have face amount or a stated principal amount of approximately $58,000,000.00

These promissory notes represent a "non liquid investment" that was part of the fraud perpetrated by the Defendants.  The promissory notes represent an unsecured investment in real property that severely restricts and impairs the Callahan Funds ability to operate, while temporarily keeping the Montauk Property afloat for the Defendants.  The lack of purchasers for the Distinctive Coop Shares and the Callahan Coop Shares directly placed the Callahan Funds in perilous financial condition, to a point where the Callahan Funds were not financially viable.

The Receiver is considering whether the requirements and procedures for the dissolution and liquidation of the Receivership Entities are practical and cost effective, and whether they mandate their dissolution and liquidation.  Based on the Receiver's inquiries to the U.S. Internal Revenue Service, neither the HGA Fund Managers nor the Callahan Funds filed their own U.S. income tax returns.  However, for certain years, income and losses derived or attributable to HGA Fund Managers and the Callahan Funds were reported on schedules on Callahan's individual returns.  The Receiver has met with accountants who specialize in filings for offshore entities to evaluate the steps necessary for dissolution and/or liquidation, and has made an application to the Court to retain accountants to assist the Receiver.

C.      **EVALUATING AND PRESERVING RECEIVERSHIP ASSETS**

As previously reported, upon being appointed, the Receiver verified that domestic institutions who held accounts of the Receivership Entities had placed a hold on the funds in those accounts and are complying with the Temporary Restraining Order (ECF Doc. 4) and the Initial Receivership Order (ECF Doc. 22) issued by this Court.  The Receiver has since directed $6,646,430.67 of those funds, as previously reported, to be transferred to Receivership Estate account in accordance with the Receivership Orders.  The Receiver's receipts and disbursements are set forth in the Quarterly Statement Report annexed hereto.

There are also real property and properties tangible to real property that the Receiver is continuing to evaluate and which are subject to the Receivership Orders. Some of those properties, such as the Montauk Property, the Distinctive Coop Shares together with the proprietary leases appurtenant thereto and all proceeds traceable thereto, the Callahan Coop Shares together with the proprietary lease appurtenant thereto and all proceeds traceable thereto, and the Old Westbury Property which was the Callahan's primary residence, are also the subject of the Civil Forfeiture Action and continues to be subject to a claim for recovery of the Investor Funds that were utilized for the purchase and/or development of the real property and/or for the payment of the mortgage with respect to the real property and/or loan for the cooperative unit.

In addition, the Receiver learned of the existence of an instrument granting Pangea Offshore a mortgage lien interest on a certain non-U.S. real property (the "Mortgage") to secure a loan or credit facility made by Pangea Offshore in the sum of $6,000,000.00 HKD. Based on the market conversion rate as of the date of this Quarterly Report, the loan or credit facility was approximately, $772,588.56 USD. In addition to the mortgage instrument, there was also a loan agreement dated November 29, 2011. The grantor of the Mortgage (the "Grantor") requested the Receiver to release the Mortgage so that the real property can be sold and contended that no funds were actually drawn down or disbursed. To avoid the sale of the real property from being delayed, the Receiver and the Grantor entered into an agreement whereby: (i) the Grantor will deposit in escrow a sum equivalent to the sum of $6,000,000 HKD (the "Cash Substitute") by an escrow agent located in Hong Kong, (ii) who is entitled to the Cash Substitute will be determined and disposed through the Claims Determination Process, (iii) the Grantor will submit a claim pursuant the Claims Determination Process to be established by this Court, (iv) the Grantor will be responsible and pay for all the costs of the Escrow Agent, including the Escrow Agent's fee

and any bank charges, so that the Cash Substitute is fully preserved, and (v) the Grantor and Escrow Agent each submit themselves to the jurisdiction of this Court.  The Agreement and its terms are governed by the laws of the State of New York.  The Escrow Agent has confirmed to the Receiver that the $6,000,000 HKD Cash Substitute is being held in escrow.

**D.    UNDERSTANDING, EVALUATING AND ADVISING
        UPON THE PRIVATE INVESTMENTS**

The Receiver continues its investigation and verification of the Receivership Entities, their corporate, managerial and administrative organization, to understand inter-relationship of each entity as well as its relationship with the Defendants, third-parties, and other people and entities.  This task is unfortunately very time consuming and difficult because of the multiple transfers of funds from one account to another, including to accounts not in the name of the Receivership Entities, commingling of investor funds, lack of adherence to corporate formalities, and lack of production and/or existence of books and records.

The Receiver continues to be in regular communication with interested parties and has received and maintained telephone, e-mail and written communications with from investors, their counsel or creditors.  The Receiver continues to update the drop box to provide investors with easier access to Receivership related papers and documents filed in this proceeding, and is considering other economical means for investors to obtain information and status of the Receivership and for the Civil Forfeiture proceeding.  The Receiver has continued to forward contact information of those investors who indicated that they wish to be contacted to the Investor Group.  Some investors have requested that the Receiver establish a website where the Investors can visit to obtain updates and the court documents.  However, upon inquiry, it is the Receiver's understanding that a website with such capabilities will entail several thousands of dollars to create and will require additional funds to maintain and update periodically.  Though

no decision has been made, it does not appear to be cost-effective to undertake given the number of investors and the limited funds of the Receivership Estate.

From time to time, the Receiver receives suggestions and information from investors concerning the recovery of assets and pursuit of third-party claims for the benefit of the Receivership Estate. Each suggestion is weighed, evaluated and considered by the Receiver and his counsel. The Receiver has also conducted or participated in conference calls with self organized investor committee to answer many of the investors' questions about this Receivership proceeding and the Receivership Estate.

The Receiver has been compiling and organizing information about the investment of each investor. To date, the Receiver has sent letters to all known investors requesting that they identify and confirm their investments and redemptions. To date, the Receiver currently has a list of 58 investors who may have potential claims totaling not less than the sum of $70,118,201.84. A list of potential claimants, without their addresses because the Receiver is continuing to obtain Investors' addresses and so as not to disclose principals' personal and confidential information, is annexed hereto as EXHIBIT B.

**E.      THE REAL PROPERTY AND BUSINESS OPERATIONS THEREIN**

The Receiver has continued to investigate the real property that are a Receivership Asset or in which the Receiver has a claim or interest. The investigation includes serving subpoenas for information and documents concerning the Receiver's claim or interest, the equity in the real property, and the income and expenses for the operation of any business that is conducted on the real property. The Receiver has confirmed that there is an equity position in the Montauk Property, the Distinctive Coop Shares, the Callahan Coop Shares and the Callahan Coop Unit, the Old Westbury Property, and in the real property owned by 10 Hillside Drive, LLC where the

Cromwell AAA Self Storage, LLC is operating.  Such equity warrants continued investigation, evaluation of proposals, negotiation and considerations of consensual resolutions and/or alternatively pursuit of legal remedies.

     **(a)**     <u>**The Panoramic View Coop/Montauk Property**</u>

     As previously reported, the Receiver held discussions with various interested parties, and after conducting its due diligence with respect to certain interested parties, undertook extensive negotiations with certain interested parties over the price, terms and conditions for the purchase of the Distinctive Notes.  Those negotiations lead to an executed Letter of Intent for the Notes during this Quarterly Period, and the Receiver has been trying to conclude negotiations of the terms of the Contract of Sale for the Notes, with the input of certain governmental offices, including the SEC.

     The Receiver and his counsel also had discussions with Adam Manson's counsel who represented on several occasions that Adam Manson will cooperate but to date has not stated under what circumstances and conditions will that cooperation be given and lead to a consensual sale for the purchase of the Callahan Notes or Panoramic View, among 93 Old Montauk Owners, Inc., Distinctive Ventures, Distinctive Investment, Crexus Investment Corp. ("Crexus"), Gibraltar Private Bank and Trust ("Gibraltar"), the United States Attorney's Office, the Securities and Exchange Commission and the Receiver.  A consensual sale will provide an immediate recovery of a portion of the Investor Funds.

     As previously reported, the Receiver had forwarded and presented a Letter of Intent to Distinctive for the purchase of Panoramic View for the price of $54 million. This occurred before April 4, 2013.  Distinctive would not consent to the sale contending

21

that the interest in the unsold cooperative shares is worth more.  However, Distinctive previously requested the Receiver's consent for a sale based upon offers in the range of $50 million to $58 million.

The Receiver has reviewed documents which appeared to evidence the transfer of Investor Funds to entities controlled by Defendant Manson and/or for the benefit of the Panoramic View real property, as well as continued the review of loans and the promissory notes made by Distinctive Investments and the schedules of the loans and notes.  The Receiver previously made demand for repayment of the loans and promissory notes made by Distinctive Investments and payable to Pangea Offshore, Diversified Global, and Fiduciary Select which loans and notes have in the aggregate a face value or a stated principal sum of approximately $58,000,000.00; confirmed the outstanding balance of the loan made by Crexus in an amount not less than $12.9 million; confirmed the outstanding balance of the loan made by Gibraltar loan in an amount not less than $2.2 million and reviewed appraisals, and a profit/loss statement submitted by Distinctive for the Panoramic View.

The Forfeiture Complaint alleges that approximately $12.1 million of Investor Funds was used for the purchase of the shares and stockholder interest in 93 Old Montauk Owners, Inc., an entity formed under the laws of New York to be a cooperative corporation.  Approximately $17,000,000.00 of Investor funds, according to the Forfeiture Complaint, went to the servicer of the loan for Distinctive Ventures and the Panoramic View Coop.

The Receiver has confirmed that the title and fee-simple ownership of the Montauk Property is in the name of 93 Old Montauk Owners, Inc.  As of January 8,

2007, Distinctive Ventures acquired all of the sold and unsold shares of 93 Old Montauk Owners, Inc. allocated to all one hundred-seventeen (117) units in the Panoramic View Coop, and became the new "Sponsor" for the Panoramic View Coop offering. Distinctive Ventures is either wholly own and operated directly by Defendant Manson as its managing member, or through Distinctive Investments, which is wholly owned and operated by Defendant Manson as its managing member.

The Receiver previously confirmed that there is no pending application with the New York State Attorney General to convert Panoramic View to a condominium.

**(b)      The Callahan Coop Unit**

The Receiver's investigation has confirmed that Investor Funds of not less than the amount of approximately $350,000.00 was used as the down payment for the purchase of the Callahan Coop Unit at the Panoramic View. The Callahan Coop Unit was appraised at $3,125,000.00 on or around February 24, 2011. The Callahan Coop Unit is presently encumbered by security interested granted to Gibraltar to secure a coop loan in the principal sum of $2,278,000.00, having an approximate remaining balance of $2.2 million. The Callahan Coop Unit is the subject of the Civil and Criminal Forfeiture Actions.

**(c)      The Callahan Residence**

The Callahan residence, according to the SEC's amended complaint and according to the Civil Forfeiture Action, received the benefit of over $560,000.00 of Investor Funds which were used to pay the mortgage for the Callahan residence. Callahan's Old Westbury Property was appraised at $2,300,000.00 on or around January 12, 2006, but is now estimated to have a "full market value" of $1,350,000.00 for tax

assessment purposes.  The Old Westbury Property is encumbered by a mortgage lien granted to Indy Mac to secure a loan in the principal sum of $990,000 and having an approximate remaining balance of $907,000.  Callahan's Old Westbury Property is subject to the Civil and Criminal Forfeiture Actions.  The real property is the subject of the motion for permission for the USAO to conduct an Interlocutory sale.  As of the end of this Quarterly Period, a contract of sale for the Callahan's Old Westbury Property for the purchase price of $1,400,000.00 was entered into and executed.  The purchase price or its net sales proceeds will be subject to the claims and court review in the Forfeiture proceeding(s).  The Receiver will update the status of the sale in the next quarterly report.

**(d)**     **The Cromwell Storage Units**

Defendant Callahan indirectly owns a storage facility located at 10 Hillside Road, Cromwell, Connecticut (the "Cromwell Property") through Cromwell AAA Self Storage LLC ("Cromwell LLC"), a Connecticut limited liability company which Defendant Callahan is the Managing Member and owns a majority interest.  The real property where the storage facility is located is owned by Ten Hillside Drive, LLC ("Ten Hillside LLC"), a Connecticut limited liability company which Defendant Callahan is the Managing Member and wholly owns.  Cromwell LLC had been collecting rent from storage unit leases in the approximate amount of $325,000 per annum.  Cromwell had been paying rents in the approximate amount of $250,000 to 275,000.00 per annum to Ten Hillside LLC.  Ten Hillside LLC's income and expenses were reported on Schedule E of Defendant Callahan's U.S. Individual Income Tax Returns for the tax years of 2008 and 2009.  The Receiver is not in possession of Defendant Callahan's tax returns for any

other year.  Defendant Callahan's 2008 and 2009 U.S. Individual Income Tax Return was part of a subpoena response received by the Receiver.

The fair market value of the Cromwell Property is approximately $2,025,000.00 according to an appraisal commissioned by Citizens Bank, but only a liquidation value of approximately $1,600,000.00.  It is encumbered by mortgages given to Citizens Bank, having an approximate remaining principal balance of $1.8 million, but Citizens Bank seeks approximately an additional $95,760.12 for default interest (despite all required monthly loan payments have been made and received), and another $49,320.00 for a swap breakage fee, bringing the total amount (supposedly) owed to be approximately $1,950,000.00.  *See **Citizens' Motion*** (ECF Doc. 141).  The monthly mortgage payments are approximately $18,500.00 a month.

The Receiver has obtained documents concerning the income and expenses of Cromwell LLC's storage business, as well as past financial statements and an appraisal for the property itself.  Based on the documents reviewed, the Cromwell LLC's expenses exceed its income.  The bulk of its expenses are their mortgage payments and real estate taxes which are approximately $335,000.00 annually.  Its ability to generate more income is hampered by other storage facilities in the area.

Citizens Bank has moved to intervene in the Receivership Action and to lift the various injunctive provisions of the Receivership Order, including the asset freeze and Receivership Stay, from preventing them from foreclosing on the property and continuing to receive monthly loan payments in contravention of this Court's Receivership Order and the Asset Freeze contained therein.  Both the Receiver and the SEC opposed the

motion which is *sub judice* before this Court.  The motion practice was reported in Section II (D) of this Report.

The Receiver, Citizens Bank and Cromwell LLC have held discussions whereby the Receiver and Citizens Bank would be able to monitor and verify the monthly income and expenses of Cromwell LLC's storage business.  Those discussions also included Cromwell LLC using only its business operating account at Citizens Bank.  The parties have continued to negotiate for a possible consensual sale that could lead to a recovery of funds traced to Investor Funds and for an agreement monitoring and verifying the use of the Citizens Bank's operating account for the operation of Cromwell.  The Receiver will seek this Court's approval of such an agreement if and when such is agreed upon by all parties concerned therein.

From the documents the Receiver obtained, and from the discussions it had with Citizens Bank (who as Cromwell's Lender continues to investigate and monitor the Cromwell LLC's storage business), it does not appear that the storage business is not an income producing asset from which the Receivership Estate can draw upon.  According to Citizens Bank, Cromwell LLC continues to make their monthly payments to Citizens Bank, but have not been consistent in paying their real estate taxes (though generally has paid it real estate taxes).  There is a small amount of equity in the Cromwell Property and Cromwell LLC's storage business based upon an appraisal report from August 2012.  No further action has been decided for Cromwell LLC and Cromwell Property at this present moment other than to continue to monitor and review.

(e)     **Creditors**

At this juncture, without any books, records, or accounts payable / receivable ledgers, it continues to remain impossible to identify, review or analyze known creditors of the Receivership Entities.  Based upon initial communication, Deloitte advised that allegedly $50,000.00 was still owed for preparing the 2010 financial statements and tax returns for the Callahan Funds and that allegedly Deloitte was not retained to prepare the 2011 tax returns.  The Receiver will be continuing its investigation with respect to creditors as well as with respect to third party claims of the Receivership Defendants.  To date, no one other Deloitte has communicated to the Receiver about pre-receivership debts owed by any of the Receivership Entities.

## F.     INVESTIGATING AND ORGANIZING CLAIMS AGAINST THIRD PARTIES

The Receiver continues its investigation of potential clawback claims for the repayment of Investor Funds paid for redemptions.  The Receiver has subpoenaed and received documents from several investors, including Roberta J. Hucek, and the Montauk Fire Department.  The Receiver has also demanded the repayment of funds received by the Montauk Fire Department purporting to be their net profits of their investments.

The Receiver continues to search and investigate Investor Funds transferred or held by third parties, including Investor Funds misappropriated from the Receivership Entities.  Defendant Callahan failed to maintain investor funds in liquid segregated accounts, and indiscriminately commingled and used commingled Investor Funds to satisfy redemption requests.  It is premature to evaluate if any recovery can be realized from third-party claims, whether as clawbacks claims or on any other basis.  The investors have outlined and made numerous suggestions of potential third party claims which the Receiver has reviewed and is

continuing to evaluate.  The Receiver has and continues to investigate and evaluate third party claims and the cost effectiveness of retaining special counsel and/or counsel in a foreign jurisdiction to pursue extra-territorial third party claims.

Certain investors have communicated with the Receiver about claims against Castle Re, Deloitte, Fidelity Insurance and Pictet & Cie, and Rochdale, among others.  The Receiver has informed these certain investors that he has no objections to any of them commencing their own private action against said third parties.  These claims appear to be unique to only a limited number of investors.  Any of such private actions by these certain investors will not be financed by the Receiver and will not deplete Receivership Estate assets, but a recovery in such private action may reduce the potential claim of certain investors.  The Receiver continues to monitor the commencement and status of claims or proceedings by individual investors against third parties.

Some of these investors have since commenced actions and/or proceedings against certain third-parties in various forums.  Such actions and/or proceedings are in the initial stages. The Receiver is not in a position at this time to report further on such third-party claims, or predict the likelihood or extent of any recovery.  The Receiver will continue to investigate the claims, evaluate the legal merits of any such claims, as well as the practical costs for pursuing such claims by the Receivership.

III.   **THE STATUS OF THE PROPOSED PLAN**
       **FOR THE RECEIVERSHIP ESTATE**

The Receiver has recovered approximately $6.5 million from the combination of $6.4 million dollars frozen by the Receivership Order's injunctive provisions and an offshore account. The Receiver continues to seek and pursue possible recoveries for the Receivership Estate.

A.      **The Real Property:**

i.      **The Panoramic View**:        The Receiver has participated in the negotiation of proposals for the consensual sale of the Panoramic View and will continue to participate in such negotiations if it is in the best interest of the Receivership Estate.  At the same time, the Receiver has demanded that Distinctive Investments repay the monies and loans evidenced by the promissory notes, and is seeking Receivership Court permission to commence a legal proceeding for recovery on the notes.  Adam Manson and the Distinctive Entities have acknowledged receipt of the demands, but no sum has been repaid as of the date of this Quarterly Report.  Adam Manson has taken the position that some notes have been satisfied or refinanced but has yet to provide any proof of either.  Adam Manson will not agree to a consensual sale based upon the Letter of Intent submitted with the USAO's motion for permission for an Interlocutory sale in the Civil Forfeiture Action, but have expressed interest in cooperating toward a consensual sale based upon a Letter of Intent with a third party for the Purchase of the Distinctive Notes.

The Receiver is reviewing the account records of Distinctive entities, is considering all of its legal remedies, and continuing to investigate into the operation of Panoramic View.  The Receiver is also continuing to monitor the Civil and Criminal Forfeiture Actions, communicating with the U.S. Attorney's Office regarding the application for an interlocutory sale  as well as whether there can be consent for a sale of the Distinctive Coop Shares in 93 Old Montauk Owners Inc., and whether the proceeds of any such sales will be paid into the Receivership Estate account and/or paid to the U.S. Attorney's Office who will then seek the establishment of a Fair Fund by the U.S. Department of Justice for the return of the proceeds to the investors.  In addition, the Receiver is following and investigating the claims and defenses asserted by lien

holders in the Civil Forfeiture Action, and how those claims or defenses, if any, may be affected by the actions or knowledge of the lien holders.

Following extension discussions and negotiations with various interested parties, the Receiver entered into a Letter of Intent for the purchase of the Distinctive Notes. The Receiver and an interested party are now in the process of negotiating a contract of sale for the Distinctive Notes, and addressing the various issues attendant thereto.

ii.    **The Callahan Coop Unit and Residence**:

The Receiver is continuing to monitor the Civil and Criminal Forfeiture Actions and is communicating with the U.S. Attorney's Office with respect to the Receiver's claim for the recovery of Investor Funds from the sale of the Callahan Coop Unit and/or from the sale of the Callahan residence, the Old Westbury Property, whether it is a payment to the Receivership Estate Account and/or payment to the U.S. Attorney's Office via a Fair Fund.

The Receiver is evaluating and considering the legal remedies it may have with respect to Callahan Coop Unit. As reported earlier herein, there is equity in the Callahan Coop Unit, as well as in Panoramic View and the Old Westbury Property to justify the continued expenditure of assets from the Receivership Estate Account in pursuit of recovery of Investor Funds from these properties. The Receiver is investigating into the claims and defenses asserted by the lien holder of the Callahan Coop Unit in the Civil Forfeiture Action, and how those claims and defenses may be affected by the actions and knowledge of the lien holders.

iii.    **Cromwell Property**: The Receiver obtained documents and information concerning Cromwell LLC, the storage facility business, the Cromwell Property and Ten Hillside LLC from the subpoenas it issued. Though the subpoena has multiple investigative purposes, the primary one was whether the Cromwell Property or Cromwell LLC's storage facility business

can be a source of recovery for investors.  At the present time, the Cromwell Property has equity but not substantial equity to warrant a viable source of recovery.  Issues remain in the negotiation between the Receiver, Citizens Bank and Cromwell AAA Storage LLC for a consensual sale of the real property and for the Receivership Entities to recover monies that were traced through bank accounts to Investor Funds and paid to Cromwell for the real estate mortgage and/or taxes. Near the end of this Quarterly Period, non-party Brian F. Callahan, the manager of the Cromwell storage facility, retained new counsel, to participate in and continue negotiations.  It is believed that there is at least $228,000.00 of Investor Funds which went to or were used for the benefit of Cromwell, and is continuing to be reviewed and traced.

**B.**     **Non-Real Property:**

　　　　(i)     **The Callahan Funds**:          The Receiver is continuing to seek the books and records of the Callahan Funds to determine the financial condition of the Receivership Entities which have not been turned over to the Receiver despite this Court's Order.  In pursuit of alternative sources of such information, the Receiver has served requests and investigatory subpoenas upon banks, financial institutions, administrators and accountants located in the British Virgin Islands, Bermuda, the Cayman Islands and/or Nevis.  As the these entities are outside the United States, compelling disclosure of information through judicial process is difficult, and if these entities are situated in a country that is not party to the Hague Convention, it will be exceptionally difficult if not costly.  It should be noted, that the Receiver has notified the off-shore banks, financial institutions and accountants, as wells as administrators which the Receiver discovered, of the Receivership Orders and has invited each of them to voluntary comply with the Receivership Order.

(ii)    **Redemptions:**        The Receiver is continuing its investigation of the use of Investor Funds for redemptions.  The Receiver has sent a letter for proof of each investor's claim for investment and redemption.

C.    **Summary:**      The Receiver's Initial Plan (ECF Doc. 42) outlined what assets it seeks to investigate and possibly pursue for which the Receiver believes is cost-effective and which presents a likelihood of recovery for investors.  During the Subject Quarterly Period, the Receiver primarily focused on pursuing the claims for the recovery of Investor Funds that were utilized for purchase, improvement or maintenance of real property or real property interest, including loan payments for such real property.  The Receiver's investigation as to other claims against third parties continues and are developing with consultations with potential special counsel.  At this stage, it is premature for the Receiver to report on such claims or predict the likelihood or extent of any recovery.  The Receiver will continue to evaluate the legal merits of third party claims and make a practical evaluation of the potential benefits to the Receivership Estate versus the costs of pursuing such claims.  The Receiver continued his investigation during this reporting period of trails of monetary transfers originating and/or deriving from Investor Funds, as well as assets of defendants and third-parties against whom the Receiver may pursue claims based upon these transfers.

## IV.    CLAIMS PROCESS.

The Receiver, by a motion (ECF Docs. 177 – 180), proposed a claims determination procedure to the Receivership Court at the end of the 2013 calendar year.  The claims determination procedure will provide a process by which a formal notice will be given to known investors and creditors, and a public notice by publication in newspapers of general circulation to and for unknown investors/creditors, to submit a formal claim to the Receiver which the

Receiver will then evaluate and make a recommendation for the disposition of each claim. The notices, as well as the claims determination procedure, will set forth a claims bar deadline by which all claims must be submitted to the Receiver. A list of creditors or potential creditors known to the Receiver is annexed hereto as EXHIBIT B.

Upon identifying the claimants and their respective claims, the Receiver by a separate and subsequent motion will propose to this Court a claims disposition procedure by which the Receiver will be able to recommend which claims of an investor or a creditor should be allowed or disallowed, in whole or in part for this Court to review and determine. Prior thereto, the Claims Bar Date Motion will also provide the process by which any investor or creditor whose claim is recommended for disallowance in whole or in part can object and seek summary review and disposition of their objections. The objection will be submitted on paper with the opportunity for the Receiver to respond. The Receivership Court will have the option to conduct a hearing and/or to issue a decision with respect to a final allowance or rejection of a claim. As part of the claims recommendation procedure, the Receiver will also recommend classes of claimants for the Court to review and approve on behalf of whom the Receiver can make an application for recommended distribution of Receivership Estate proceeds.

## V.  ASSETS, LIQUIDATION AND DISTRIBUTION OF PROCEEDS

The Receiver's claims which relate to real property and real property interests represent a significant portion of the Receivership Assets. The real property and interests at issue are non-liquid assets. Their fair market value are directly dependent and determined upon the real estate market and conditions from any given time to another, and which are anchored to the actual sale price a bona-fide good faith purchaser is willing to pay to a willing seller of real property in an arm's length transaction.

The Receiver is in negotiation with various parties and third-parties for resolution involving the sale of such real property and/or interests related thereto, which if a sale materializes, it would serve to increase the liquidity of the Receivership and source of recovery for the Investors.  At the same time the Receiver will pursue its legal remedies to judicially establish and liquidate its claims with respect to the misappropriation of Investor Funds.  Any interlocutory or consensual sale of real property will be subject to review and approval of the Receivership Court pursuant to 28 USC §2001.  A resolution for the sale of real property and interest will improve the timing as to when Receiver will be in a position to make application to the Court for a distribution for the Investors whose claims have been approved by this Court.

## VI.    CONCLUSION

During this Quarterly Period, the Receiver continued to follow the proposed plan set forth in the Receiver's Initial Plan (ECF Doc. 42) to marshal and liquidate the Receivership Assets and Receivership Property.  Pursuant to the Receivership Court Orders, the Receiver will continue to report to this Court quarterly to update and supplement the Plan; report on the Receiver's continuing investigation; report on the activities of the Receiver taken since the last reporting period; to continue to marshal and liquidate the Receivership Assets and Receivership Property; to pursue the claims of the Receivership Estate; to report on the administration of the Receivership Estate; and to provide an accounting of the activities and disbursements of the Receiver including income received and disbursements made.  Please see the attached SFAR for the accounting for the reporting period of October 1, 2013 through December 31, 2013.

Dated: New York, New York
      January 30, 2014

RESPECTFULLY SUBMITTED,

STEVEN WEINBERG

34

as RECEIVER for
Horizon Global Advisors, Ltd.,
Horizon Global Advisors, LLC,
Diversified Global Investments (BVI), L.P.,
The Masters Global Fund, L.P.,
Fiduciary Select Income Fund, L.P.,
Horizon Millennium Investments, L.P.
and Pangea Offshore High Yield Portfolio, LLC