**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                             Plaintiff,               **MEMORANDUM OF**

   -against-                               **DECISION AND ORDER**

                                             12-CV-1065 (ADS)(AKT)
BRIAN RAYMOND CALLAHAN, ADAM MANSON,
DISTINCTIVE INVESTMENTS LLC, and
DISTINCTIVE VENTURES LLC,

                             Defendants.

SHERI MANSON CALLAHAN,

                             Relief Defendant.
--------------------------------------------------------X

**APPEARANCES:**

**Gottesman, Wolgel, Secunda, Malamy & Flynn, P.C.**
*Attorneys for the Receiver Steven Weinberg*
11 Hanover Square, 4th Floor
New York, NY 10005
        By:    Steven Weinberg, Esq.
                Stewart W. Lee, Esq.
                Richard B. Demas, Esq., Of Counsel

**United States Securities and Exchange Commission**
*Attorneys for the Plaintiff*
100 F. Street, NE
Washington, DC 20549
        By:    Dean M. Conway, Assistant Chief Litigation Counsel

**Park & Jensen LLP**
*Attorneys for the Defendant Brian Raymond Callahan*
630 Third Avenue
New York, NY 10017
        By:    Robert Knuts, Esq., Of Counsel

**Herskovits PLLC**
*Attorneys for the Defendant Brian Raymond Callahan*
1065 Avenue of the Americas, 27th Floor
New York, NY 10018
        By:    Robert L. Herskovits, Esq., Of Counsel

**Law Offices of Andrew J. Frisch**
*Attorneys for the Defendants Adam Judd Manson, Distinctive Investments LLC and Distinctive Ventures LLC*
40 Fulton Street, 23rd Floor
New York, NY 10038
      By:   Andrew J. Frisch, Esq., Of Counsel

**Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer**
*Attorneys for the Defendant Adam Judd Manson, Distinctive Investments LLC and Distinctive Ventures LLC*
565 Fifth Avenue
New York, NY 10017
      By:   Robert J. Anello, Esq.
            Gates Salyers Hurand, Esq.
            Judith L. Mogul, Esq., Of Counsel

**Sher Tremonte LLP**
*Attorneys for the Relief Defendant Sheri Manson Callahan*
41 Madison Avenue, 41st Floor
New York, NY 10010
      By:   Michael Tremonte, Esq., Of Counsel

**Brian Spears LLC**
*Attorneys for Interested Party Brian F. Callahan*
2425 Post Road, Suite 203
Southport, CT 06890
      By:   Brian Edward Spears, Esq., Of Counsel

**United States Attorney's Office**
*Attorneys for Intervenor United States Attorney for the Eastern District of New York*
271 Cadman Plaza East
Brooklyn, NY 11201
      By:    David C. Woll, Jr., Assistant United States Attorney

**LeClair Ryan, PC**
*Attorneys for Intervenor RBS Citizens, National Association*
830 Third Avenue, 5th Floor
New York, NY 10022
      By:    Michael Terrance Conway, Esq., Of Counsel

**SPATT, District Judge.**

      In this securities fraud action, the Plaintiff United States Securities Exchange

Commission (the "SEC") alleges that in violation of § 17(a)(1), (2) and (3) of the Securities Act,

§ 10(b) of the Exchange Act and §§ 206(1), (2) and (4) of the Advisers Act, the Defendants

Brian Raymond Callahan ("Callahan"), Adam Judd Manson ("Manson"), Distinctive

Investments, LLC ("Distinctive Investments") and Distinctive Ventures, LLC ("Distinctive

Ventures," and collectively, the "Defendants") engaged in or aided and abetted "a long-running

fraudulent Ponzi scheme in which investors were routinely misled about the nature of their

investments and also were unaware of [the] frequent misuse and misappropriation of their

money." (Amend. Compl., ¶ 1.)

Presently before the Court is a motion by RBS Citizens, National Association ("RBS

Citizens") to intervene pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 24 and for

relief from the Court's March 27, 2012 Preliminary Injunction Order, in which the Court, in

relevant part, established a Receivership, appointed a Receiver and issued an "Asset Freeze" and

a "Stay of Litigation." In this regard, RBS Citizens seeks to release the assets and business

operations of Ten Hillside Road, LLC ("Hillside") and Cromwell AAA Self Storage, LLC

("Cromwell AAA") from the Asset Freeze and Stay of Litigation. For the reasons that follow,

the Court denies the motion by RBS Citizens.

## I. BACKGROUND

### A. Underlying Facts

Hillside owns real property located at Ten Hillside Road, Cromwell, Connecticut (the

"Property"), which it leases to Cromwell AAA pursuant to the terms of a written lease. On the

Property, Cromwell AAA operates a business that rents self-storage units to the general public

and sells certain related products (the "Business"). The Defendant Callahan is the sole member

of Hillside, while the Defendant Callahan and his father, Brian F. Callahan, are the sole members

of Cromwell AAA. At present, Brian F. Callahan manages the daily operation of the Business,

including collecting rent from tenants of the storage units, paying bills and overseeing maintenance.

Hillside is obligated to RBS Citizens pursuant to (1) two Commercial Term Promissory Notes (the "Notes") in the original principal amounts of $2,170,000 and $280,000 and (2) an International Swap Dealers Association, Inc. Master Agreement, together with a Schedule and Confirmation letter agreement (collectively, the "Swap Agreement"). Both the Notes and the Swap Agreement were entered into between Hillside and RBS Citizens in December of 2003. As of July 1, 2013, Hillside owed RBS Citizens a total of $1,893,254.12 under the Notes and the Swap Agreement, which included (1) $1,599,477 for the principal on the first Note; (2) $198.017 for the principal on the Second Note; and (3) $95,760.12 for the default interest. Further, under the Swap Agreement, there is a breakage fee of approximately $49,320 in the event the Swap Agreement is broken.

The obligations owed by Hillside to RBS Citizens are secured by the following: (1) a first priority mortgage on the Property (the "Mortgage"); (2) a first priority Collateral Assignment of Leases and Rentals (the "Collateral Assignment"), which includes an assignment of all leases, rental agreements and occupancy agreements pertaining to the Property (collectively, the "Leases") and all rents, income and profits arising from any Lease or otherwise derived from or produced by the Property, however designated (collectively, the "Property Income"), as well as a Guaranty signed by Hillside and Cromwell AAA; and (3) a first priority security interest in all personal property assets of Hillside pursuant to a Security Agreement.

**B. Procedural History**

On March 5, 2012, the SEC commenced this action against Callahan, Horizon Global Advisors Ltd. ("HGA Ltd.") and Horizon Global Advisors, LLC ("HGA LLC"). The SEC

alleged that, in violation of § 17(a)(1), (2) and (3) of the Securities Act, § 10(b) of the Exchange

Act and §§ 206(1), (2) and (4) of the Advisers Act, Callahan, HGA Ltd. and HGA LLC

"engaged in a long-running fraud in which investors were routinely misled about the nature of

their investments and also were unaware of [Callahan, HGA Ltd. and HGA LLC's] frequent

misuse and misappropriation of their money." (Orig. Compl., ¶ 1.)

On March 27, 2012, the Court issued a preliminary injunction in which it placed HGA

Ltd. and HGA LLC into Receivership and appointed Steven Weinberg ("Weinberg") as their

Receiver (the "March 27, 2012 Order"). The March 27, 2012 Order also instituted an "Asset

Freeze," as follows:

> "Receivership Assets" are hereby defined as all assets titled
> in the name of the Receivership Defendants. Except as otherwise
> specified herein, all Receivership Assets and all of the funds and
> other assets of the Defendants presently held by them, for their
> direct or indirect benefit, under their direct or indirect control or
> over which they exercise actual or apparent investment or other
> authority, in whatever form such assets may presently exist and
> wherever located . . . are frozen until further order of this Court.
> Accordingly, all personas and entities with direct or indirect
> control over any Receivership Assets and/or any assets frozen by
> this Order other than the Receiver, are hereby restrained and
> enjoined from directly or indirectly transferring, setting off,
> receiving, changing, selling, pledging, assigning, liquidating or
> otherwise disposing of or withdrawing such assets.

(March 27, 2012 Order, ¶ 3.)

As a result, the Court froze the assets of Cromwell AAA and Hillside, including

Cromwell AAA's operating account at RBS Citizens (the "RBS Citizens bank account"),

because Callahan maintained control over these assets and may have improperly diverted funds

from investors to Hillside and Cromwell AAA. However, the Court permitted Callahan "to

make the April 2012 mortgage payment from the [RBS] Citizens [b]ank account in the name

Cromwell AAA [ ], account no. XXXX1928, not to exceed $21,000 for the property associated

with Cromwell AAA [ ]." (March 27, 2012 Order, ¶ 3.) The Court further directed Callahan to "provide proof of this payment to the [SEC] within five business days of the payment." (March 27, 2012 Order, ¶ 3.) The March 27, 2012 Order did not provide for any additional mortgage payments to be made to RBS Citizens pursuant to the Notes and Swap Agreement. In addition, pursuant to the March 27, 2012 Order, the Receiver allegedly asserted control over the Property, the operation of the Business and the RBS Citizens bank account.

Moreover, the March 27, 2012 also included a "Stay of Litigation," which provided as follows:

> [T]he following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the [SEC] related to the above-captioned enforcement action, are stayed until further Order of this Court:
>
> All civil proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

(March 27, 2012 Order, ¶ 32.)

On May 31, 2012, the SEC filed an Amended Complaint and added the following parties as defendants in this action: Diversified Global Investments, L.P. ("Diversified"), The Masters Global Fund, L.P. ("Masters"), Fiduciary Select Income Fund, L.P. ("Fiduciary"), Horizon Millennium Investments, L.P. ("Horizon Millennium"), Pangea Offshore High Yield Portfolio, LLC ("Pangea High Yield"), Manson, Distinctive Investments and Distinctive Ventures. In

addition, Callahan's wife and Manson's sister, Sheri Manson-Callahan ("Manson-Callahan"), was added as a relief defendant.

Similar to the Original Complaint and as stated above, the Amended Complaint alleged that in violation of § 17(a)(1), (2) and (3) of the Securities Act, § 10(b) of the Exchange Act and §§ 206(1), (2) and (4) of the Advisers Act, Callahan, HGA LLC, HGA Ltd., Diversified, Masters, Fiduciary, Horizon Millennium, and Pangea High Yield "engaged in a long-running fraudulent Ponzi scheme in which investors were routinely misled about the nature of their investments and also were unaware of [the] frequent misuse and misappropriation of their money." (Amend. Compl., ¶ 1.) In this regard, from some point in 2005 to January of 2012, Callahan allegedly raised more than $90 million from at least forty-five investors (the "Investors") for five offshore funds, which were the defendants Diversified, Masters, Fiduciary, Horizon Millennium and Pangea High Yield (the "Callahan Funds"). According to the SEC, Callahan operated the Callahan Funds directly or through HGA Ltd. and HGA LLC.

The Amended Complaint further alleges that Manson and his two entities, Distinctive Investments and Distinctive Ventures "aided and abetted Callahan's fraudulent scheme." (Amend. Compl, ¶ 1.) Allegedly, Manson, Distinctive Investments and Distinctive Ventures received millions of dollars in loans from the Callahan Funds in order to purchase and renovate a real estate project in Montauk, New York (the "Montauk Property"), as well as to pay off debts and obligations which were owed by Distinctive Investments and Distinctive Ventures, and guaranteed by Manson. In addition, of relevance here, the Receiver believes at least $228,000 in Investor funds went to or were used for the benefit of Cromwell AAA and Hillside. (1/30/14 Receiver's Report, pg. 8–9.)

Also on May 31, 2012, the SEC and the Callahan Funds entered into a stipulation which placed the Callahan Funds into Receivership with Weinberg being their Receiver. The stipulation fully incorporated the terms of the March 27, 2012 Order, including the Asset Freeze and Stay of Litigation provisions. The Court "so ordered" this stipulation on June 4, 2012.

On March 9, 2013, the Court approved a consent judgment against HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium and Pagea High Yield. As a result, the only remaining Defendants in this case are Callahan, Manson, Distinctive Investments and Distinctive Ventures. Manson-Callahan remains the relief defendant.

On July 30, 2013, RBS Citizens filed the present motion to intervene and for relief from the Court's March 27, 2012 Order. In support of its motion, RBS Citizens claims that its Mortgage and security interest in the Property, Leases, Property Income and other assets of Hillside and Cromwell AAA are senior in priority to the interests of the Receiver, Callahan and Brian F. Callahan. Moreover, according to RBS Citizens, for over a year, the Receiver has permitted Brian F. Callahan to continue to operate Cromwell AAA and the Business on the Property with minimal oversight, because Brian F. Callahan has agreed to do so without compensation. Apparently, retaining an outside manager to oversee Cromwell AAA, the Business and the Property would be a substantial expense that would deplete the assets of the Receivership assets. At the time of RBS Citizens' motion, the Property and the Business were allegedly operating at a monthly deficit.

RBS Citizens further alleges that with the Receiver's knowledge, Brian F. Callahan has deliberately violated the terms of the March 27, 2012 Order in that he has taken income from the Property and the Business, including rental income generated from the storage units, and diverted that income elsewhere. In addition, Hillside has purportedly continued to collect rent

from Cromwell AAA based on Cromwell AAA's occupancy of the Property. RBS Citizens claims that Brian F. Callahan, Hillside and/or Cromwell AAA are diverting some of the income to accounts other than the RBS Citizens bank account, such as to other banks outside of the state of Connecticut. According to RBS Citizens, this income is its collateral, but it cannot control it due to the March 27, 2012 Order. In this regard, RBS Citizens argues that it is unable to enforce the Notes and the Swap Agreement and is unable to control the collateral securing these loan documents.

Despite the March 27, 2012 Order, Brian F. Callahan and Cromwell AAA have continued to make monthly Mortgage and Swap Agreement payments to RBS Citizens. Brian F. Callahan and Cromwell AAA have also continued to make tax payments to the Town of Cromwell on a payment plan, although sometimes their payments are late. Nevertheless, RBS Citizens asserts that Hillside is in default on the Notes and the Swap Agreement for the following reasons: (1) the aggregate principal balances of the Notes exceed seventy percent of the fair market value of the Property; (b) there has been a change in Callahan's financial condition which materially and adversely impact his ability to perform under his personal guaranty; (3) Hillside has failed to maintain a Debt Service Coverage Ration of 1.25 times to one; (4) Hillside has failed to pay its municipal real property taxes in full and on time; (5) Hillside was deprived of control of the Property under the March 27, 2012 Order; (6) a Receiver has been appointed for the Property; and (7) the commencement of the instant action and the issuance of the March 27, 2012 Order constitutes an event which, according to RBS Citizens, materially and adversely impacts the ability of Hillside and Callahan to perform their obligations under the Notes and the Swap Agreement.

In August of 2012, RBS Citizens obtained an appraisal for the Property which found that it had an "as-is" value of $2,025,000 and a liquidation value of $1,600,000. RBS Citizens contends that the Receiver is not focused on the Property or the Business, because he does not view either as being a significant source of recovery for the Investors. In this regard, according to RBS Citizens, even if the Property was sold at its as-is appraisal value of $2,025,000 any equity remaining after the $1,893,254.12 obligation to RBS Citizens was paid would be expended on the broker's commission of approximately $200,000, which is ten percent of the sale price, and state and local conveyance taxes of approximately $35,000. As such, because there is allegedly no income or equity in the Property or the Business available for Investors, RBS Citizens argues that the March 27, 2012 Order should be lifted for the limited purpose of allowing RBS Citizens to pursue its rights in and to its collateral, including "foreclosing the Property, exercising its rights under the Assignment of Leases and Rents to collect property revenues, and/or retaining a property manager to take control over the Property and [the] Business." (RBS Citizens' Mem., pg. 13.) RBS Citizens "also seeks freedom to sue Callahan Hillside and/or Cromwell AAA on [Hillside's] [o]bligations [owed to RBS Citizens] or to enter into agreements with them concerning the transfer or liquidation of the Business and [the] Property." (RBS Citizens' Mem., pg. 13.)

On September 11, 2013, the SEC opposed RBS Citizens' motion on the grounds that (1) Section 21(g) of the Securities Exchange Act of 1935 prevented intervention absent the SEC's consent and (2) the Asset Freeze should continue to remain in full force until the conclusion of this action so as to preserve assets.

The following day, September 12, 2013, the Receiver also filed his opposition. For his part, the Receiver opposes RBS Citizens' motion, because the Asset Freeze and Stay of

Litigation ensure that asset funds will be available for the creditors of the Receivership Estate, including the Investors. According to the Receiver, RBS Citizens has not demonstrated they suffer any prejudice by the Court maintaining the Asset Freeze and Stay of Litigation, since Brian F. Callahan and Cromwell AAA have continued to make monthly Mortgage and Swap Agreement payments, as well as tax payments to the Town of Cromwell. Purportedly, despite its complaints, RBS Citizens was in fact the primary beneficiary and recipient of any diversions on the part of Brian F. Callahan and "knowingly and deliberately violated the Asset Freeze each and every time they accepted the monthly payments from Cromwell AAA." (Receiver Opp., pg. 3.) At the time the Receiver filed his opposition papers, these alleged diversions resulted in RBS Citizens allegedly receiving a total of approximately $336,000 over a sixteen month period. Further, the Receiver argues that RBS Citizens does not have a right to intervene since it has failed to meet any of the requirements for intervention as of right pursuant to Fed. R. Civ. P. 24(a) or for permissive intervention pursuant to Fed. R. Civ. P. 24(b), because such intervention will cause undue delay and cost to the Receivership.

On September 30, 2013, RBS Citizens filed its reply in further support of its motion. In its reply, RBS Citizens explains that the Receiver's counsel has authorized the ongoing monthly payment of the obligation to RBS Citizens by Brian F. Callahan so as to prevent the Business and the Property from failing. RBS Citizens contends it is legally entitled to receive these monthly debt service payments. In addition, RBS Citizens argues that despite the Receiver's arguments to the contrary, it will be harmed because even though the subject mortgage loan matured on December 31, 2013, RBS Citizens must wait to collect on this loan until after the Receiver administers the entire Receivership Estate.

On October 2, 2013, the Receiver filed a letter requesting that the Court reject RBS Citizens' reply as untimely filed. The Receiver also requests that the Court strike the reply from the docket not only because it was untimely, but on the alleged grounds that (1) the reply was made without personal knowledge; (2) without justification, RBS Citizens continues to violate the Court's March 27, 2012 Order by accepting monthly payments under the Notes and Swap Agreement; (3) the reply improperly discloses settlement negotiations; and (4) the reply contains additional false statements. RBS Citizens has not filed any additional submissions addressing the Receiver's arguments that the Court should reject and strike the reply from RBS Citizens.

## II. DISCUSSION

### A. The Receiver's Request that this Court reject and strike RBS Citizens' Reply

As an initial matter, the Court denies the request by the Receiver to strike RBS Citizens' reply as untimely. In this regard, RBS Citizens' reply papers were filed on September 30, 2013, eleven days after they were due on September 19, 2013. However, despite the fact that RBS Citizens never sought an extension of time to file its reply papers, the Court nonetheless declines to reject the reply papers on this ground "because [the Receiver and the SEC] [have] suffered no prejudice from the delay." Young v. Suffolk County, 922 F. Supp. 2d 368, 383 n.5 (E.D.N.Y. 2013); see also JTH Tax, Inc. v. Gouneh, 721 F. Supp. 2d 132, 137–38 (N.D.N.Y. 2010) ("The court . . . is troubled by [the defendants'] failure to offer any justification for their untimely filing [of their reply memorandum of law]. Nonetheless, because [the defendants'] four-day delay did not result in any appreciable harm or prejudice to [the plaintiff], the motion to disregard [the defendants' reply memorandum of law] is denied, and the court will receive [the defendants'] reply memorandum.")

As to the Receiver's request that the Court strike the reply because it was without personal knowledge, the Court finds "[t]he request frivolous." In re Gushlak, 11-MC-0218 NGG JO, 2012 WL 2564466, at *9 (E.D.N.Y. Jan. 30, 2012) report and recommendation adopted, 2012 WL 1514824 (E.D.N.Y. Apr. 30, 2012). In this regard, "although . . . a court may disregard unsupported factual assertions or strike an attorney's affidavit attesting to facts in the absence of personal knowledge, no legal authority . . . of which [the Court is] aware, requires or even justifies striking a memorandum of law on such grounds." Id. Further, concerning the Receivers contentions that RBS Citizens is continuing to violate the Court's March 27, 2012 Order and that the reply contains additional false statements, the Court finds these arguments by the Receiver to constitute an improper sur-reply and thus, will not consider them.

However, the Court agrees with the Receiver that "it [is] inappropriate to disclose the substance of the parties' settlement negotiations[.]" Lee v. Santiago, 12 CIV. 2558 PAE DF, 2013 WL 4830951, at *14 n.13 (S.D.N.Y. Sept. 10, 2013). Therefore, the Court "will not consider those negotiations here." Id. To that end, the Court disregards those portions of RBS Citizens' reply that refer to the substance of the settlement negotiations between the parties.

## B. RBS Citizens' Motion to Intervene and for Relief from the March 27, 2012 Order

### 1. Legal Standard Under Federal Rule Civil Procedure ("Fed. R. Civ. P.") 24

Pursuant to Fed. R. Civ. P. 24(a), a putative intervener of right must establish four criteria: "the applicant must (1) file a timely motion; (2) claim an interest relating to the property or transaction that is the subject of the action; (3) be so situated that without intervention the disposition of the action may impair that interest; and (4) show that the interest is not already adequately represented by existing parties." Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 176 (2d Cir. 2001). "Failure to satisfy any one of these requirements is a sufficient ground

to deny the application." Security Pacific Mortg. and Real Estate Servs., Inc. v. Republic of Philippines, 962 F.2d 204, 208 (2d Cir. 1992) (quoting Farmland Dairies v. Comm'r of N.Y. Dep't of Agriculture, 847 F.2d 1038, 1043 (2d Cir.1988)).

For a party to intervene in a case as of right under Rule 24(a)(2), that party must have an interest in the case that is "'direct, substantial, and legally protectable.'" United States v. Peoples Benefit Life Ins. Co., 271 F.3d 411, 415 (2d Cir. 2001) (quoting Washington Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co., 922 F.2d 92, 97 (2d Cir. 1990)). According to the Second Circuit, "[a]n interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." Washington Elec., 922 F.2d at 97.

Intervention may also be granted on a permissive basis under Fed. R. Civ. P. 24(b). Rule 24(b) provides in part:

> On timely motion, the court may permit anyone to intervene who:
> . . . (B) has a claim or defense that shares with the main action a common question of law or fact. . . . In exercising its discretion the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Permissive intervention is thus within the court's broad discretion. Diversified Group, Inc. v. Daugerdas, 217 F.R.D. 152, 157 (S.D.N.Y. 2003); see U.S. Postal Service v. Brennan, 579 F.2d 188, 192 (2d Cir. 1978). In exercising that discretion, courts consider factors that include "'the nature and extent of the intervenors' interests,' the degree to which those interests are 'adequately represented by other parties,' and 'whether parties seeking intervention will significantly contribute to [the] full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.'" Id. (quoting H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc., 797 F.2d 85, 89 (2d Cir. 1986)). It is

notable that "[t]he test is flexible and courts generally look at all of the factors rather than focusing narrowly on any one of the criteria." Mass. Bricklayers and Mason Funds v. Deutsche Alt–A Secs., 273 F.R.D. 363, 365 (E.D.N.Y. 2011).

In considering a motion to intervene, the court must accept as true non-conclusory allegations of the motion. Oneida Indian Nation of Wisc. v. New York, 732 F.2d 261, 265 (2d Cir. 1984); Sackman v. Liggett Group, Inc., 167 F.R.D. 6, 20 (E.D.N.Y. 1996). Allegations that are frivolous on their face need not be considered by the court. Bay Casino, LLC v. M/V Royal Empress, 199 F.R.D. 464, 466 (E.D.N.Y. 1999). In addition, "an application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention. . . ." Brennan v. N.Y.C. Bd. of Educ., 260 F.3d 123, 129 (2d Cir. 2001). The putative intervenor has the burden of showing a right to intervene. In re NASDAQ Market–Makers Antitrust Litig., 187 F.R.D. 465, 490 (S.D.N.Y. 1998); Diduck v. Kaszycki & Sons Contractors, Inc., 149 F.R.D. 55, 58 (S.D.N.Y. 1993).

Finally, Rule 24(c) specifies the procedures to be followed when a party seeks intervention:

> A person desiring to intervene shall serve a motion to intervene upon the parties as provided in Rule 5. The motion shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought. The same procedure shall be followed when a statute of the United States gives a right to intervene.

Fed. R. Civ. P. 24(c).

### 2. Legal Standard for Lifting an Anti-Litigation Injunction in the Context of a SEC Receivership

"The Second Circuit has recognized that an anti-litigation injunction or litigation stay in a receiver order is a valid exercise of a district court's equitable powers." SEC v. Illarramendi,

3:11CV78 JBA, 2012 WL 234016, at *4 (D. Conn. Jan. 25, 2012) (citing SEC v. Byers, 609 F.3d 87, 92 (2d Cir. 2010) ("Byers II")).  In this regard, the Second Circuit has followed the Ninth Circuit's holding in SEC v. Wencke, 622 F.2d 1363 (9th Cir. 1980) ("Wencke I"), which provided that "[t]he power of the district court to issue a stay, effective against all persons, of all proceedings against the receivership entities rests as much on its control over the property placed in receivership as on its jurisdiction over the parties to the securities fraud action."  Byers II, 609 F.3d at 92 (quoting Wencke I, 622 F.2d at 1369); see also Liberte Capital Group, LLC v. Capwill, 462 F.3d 543 (6th Cir. 2006) ("Once assets are placed in receivership, a district court's equitable purpose demands that the court be able to exercise control over claims brought against those assets.  The receivership court has a valid interest in both the value of the claims themselves and the costs of defending any suit as a drain on receivership assets.").

When considering whether to modify a litigation stay in a receiver order, courts apply "a three-pronged test first articulated by the Ninth Circuit in Wencke" and thereafter adopted by the Second Circuit.  Illarramendi, 2012 WL 234016, at *4 (citing SEC v. Byers, 592 F. Supp. 2d 532, 536–37 (S.D.N.Y. 2008) ("Byers I"), aff'd 609 F.3d at 91–92).  Under the Wencke test, courts consider "(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim."  Id. (quoting SEC v. Wencke, 742 F.2d 1230, 1231 (9th Cir. 1984) ("Wencke II")).  "The burden 'is on the movant to prove that the balance of the factors weighs in favor of lifting the stay.'"  Id. (quoting United States v. Petters, No. 08–5348 ADA/SJM, 2008 WL 5234527, at *3 (D. Minn. Dec. 12, 2008)).

**3. As to RBS Citizens' Motion to Intervene**

The Court finds that RBS Citizens has not satisfied the Fed. R. Civ. P. 24 requirements either to intervene as of right in this action or for permissive intervention. As an initial matter, the Court notes that the SEC argues that Section 21(g) of the Securities Exchange Act of 1935 prevents intervention absent the SEC's consent, which the SEC does not give in this case. Section 21(g) provides as follows:

> Notwithstanding the provisions of section 1407(a) of Title 28, or any other provision of law, no action for equitable relief instituted by the [SEC] pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the [SEC], even though such other actions may involve common questions of fact, unless such consolidation is consented to by the [SEC].

15 U.S.C. § 78u(g).

"[H]owever, 'there is no persuasive authority which suggests that section 21(g) . . . bars intervention in all SEC enforcement actions.'" SEC v. Credit Bancorp, Ltd., 194 F.R.D. 457, 466 (S.D.N.Y. 2000) (quoting SEC v. Prudential Sec. Inc., 171 F.R.D. 1, 3 (D.D.C. 1997)) (ellipse in original). Indeed, "[n]ot only does the specific language of Section 21(g) not apply, on its face, to intervention, but the vast majority of cases addressing intervention in the context of SEC enforcement actions neglect to discuss Section 21(g) at all. Instead, intervention has been typically evaluated under the standards governing [Fed. R. Civ. P.] 24[.]" Id. Thus, "[g]iven that the language of Section 21(g) does not specifically prohibit intervention in SEC enforcement actions, and the persuasive reasoning of those cases that have rejected Section 21(g) as an absolute bar to intervention," the Court finds that "Section 21(g) does not bar intervention in this case" and will proceed to consider "the criteria set forth in [Fed. R. Civ. P.] 24." Id.; see also SEC v. Flight Transp. Corp., 699 F.2d 943, 950 (8th Cir. 1983) ("[T]he purpose of [Section 21(g)] is simply to exempt the [SEC] from the compulsory consolidation and coordination

provisions applicable to multidistrict litigation. It does not say that no one may intervene in an action brought by the SEC without its consent. It does not mention Fed. R. Civ. P. 24, nor does Rule 24 contain any clause giving special privileges to the SEC.").

Turning to the requirements of Fed. R. Civ. P. 24(a), the Court finds that RBS Citizens has not established that it may intervene as of right. First, with respect to timeliness, a district court has discretion to evaluate the timeliness of a motion to intervene in light of "all the circumstances," including "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." United States v. Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir. 1994). Here, RBS Citizens was aware of its interest in the Property and the Business since the commencement of the instant action on March 5, 2012. Nevertheless, RBS Citizens waited a year and five months to seek to intervene. Courts in this Circuit have found similar delays to be untimely. See, e.g., United States v. Simpson Borough Place Corp., 01-CV-693 DLI VVP, 2007 WL 2581888, at *3 (E.D.N.Y. Sept. 5, 2007) ("A delay of fifteen months is untimely.") (collecting cases).

Moreover, in the Court's view, the timeliness requirement is not met here, because permitting RBS Citizens to intervene at this stage would result in prejudice to existing parties due to the delay. "[C]ase law is clear that if an intervenor attempts to introduce collateral issues in a proceeding, a court may be justified in denying a motion to intervene based on undue delay or prejudice." FTC. v. First Capital Consumer Membership Servs., Inc., 206 F.R.D. 358, 366 (W.D.N.Y. 2001) (citing The Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton, 178 F.R.D. 39, 44 (E.D.N.Y. 1998)). Yet, this is exactly what RBS Citizens is attempting to do

in this case. In this regard, RBS Citizens wishes to intervene to pursue its rights in and to its collateral, but that issue is wholly separate from this civil securities fraud action that has been brought by the SEC.

In addition, the Court finds that RBS Citizens will suffer minimal prejudice, if any, if its motion to intervene is denied. By virtue of the Asset Freeze in the March 27, 2012 Order, the status quo has been preserved with respect to Hillside and Cromwell AAA, thereby protecting RBS Citizens' collateral. Excluding speculation by RBS Citizens, the Court finds no evidence suggesting that Brian F. Callahan is diverting income from either the Property or the Business elsewhere, save to pay the obligations that Hillside owes to RBS Citizens and to make tax payments to the Town of Cromwell.

As RBS Citizens has failed to satisfy the first requirement under Fed. R. Civ. P. 24(a), it cannot intervene as a right and the court need not consider Rule 24(a)'s remaining criteria. Disability Advocates, Inc. v. Paterson, 03-CV-3209 NGG, 2009 WL 5185807, at *6, n.14 (E.D.N.Y. Dec. 23, 2009) ("Having denied intervention as of right on timeliness grounds, the court need not consider the other requirements under Rule 24(a). . . . [F]ailure to satisfy even one requirement defeats a claim to intervention as of right.") (citing Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 176 (2d Cir. 2001)).

Accordingly, the Court now turns to consider whether RBS Citizens should be granted permissive intervention under Fed. R. Civ. P. 24(b). However, the Court finds that permissive intervention would be inappropriate in this case, as "[c]oncerns about undue delay and complication resulting from permissive intervention are acute where the Government, and particularly the SEC, is a party to the underlying action." SEC v. Bear, Stearns & Co. Inc., 03 CIV.2937 WHP, 2003 WL 22000340, at *3 (S.D.N.Y. Aug. 25, 2003).

Here, if RBS Citizens were permitted to intervene to exercise its rights to its collateral, it would cause significant interference with the Receiver's ability to administer the Receivership Estate and recover assets for the Investors. In this regard, $228,000 of the monies the Investors contributed to the Callahan Funds was allegedly diverted to Cromwell AAA and Hillside. Allowing RBS Citizens to intervene for the purpose of unfreezing these assets would prejudice the Receiver in that he would be powerless to prevent RBS Citizens from foreclosing or liquidating the Property and the Business. Indeed, the Receiver needs to be able to determine whether a more lucrative sale of the Property and the Business is possible, thereby maximizing the funds that will be available for the Investors to recover once Hillside's obligations to RBS Citizens have been satisfied.

Accordingly, the Court denies the motion to intervene by RBS Citizens.

**4. As to RBS Citizens' Motion for Relief from the March 27, 2012 Order**

Even assuming that the Court had granted RBS Citizens' motion to intervene, the Court nevertheless would have declined to modify the March 27, 2012 Order with respect to all assets associated with Hillside and Cromwell AAA. As stated above, courts consider three factors when determining whether to modify an anti-litigation injunction, such as the March 27, 2012 Order at issue here. Byers I, 592 F. Supp. 23 at 536. These three factors are "(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim." Id. at 536–37 (quoting Wencke II, 742 F.2d at 1231).

As to the first factor, in this case, "maintaining the stay undeniably maintains the status quo." Id. at 537. In this regard, as the Court has already discussed, $228,000 of Investor funds

have been allegedly diverted to Hillside and Cromwell AAA.  If the Court were to lift the asset freeze and the stay on litigation so that RBS Citizens may exercise its rights to its collateral, there is a real risk that RBS Citizens will immediately take action to foreclose on the Property or liquidating the Business and the Property.  Indeed, in bringing this motion, RBS Citizens readily admits that it hopes to pursue its rights in and to its collateral by possibly "foreclosing the Property" or "enter[ing] into agreements with [Callahan, Hillside and/or Cromwell AAA] concerning . . . liquidation of the Business and [the] Property."  (RBS Citizens' Mem., pg. 13.) In doing so, RBS Citizens may generate enough revenue to quickly satisfy the Hillside obligations, but it will be at the expense of generating additional revenue from which the Investors could recover.

On the other hand, the Receiver has the incentive to work toward achieving a more profitable sale that will not just simply repay Hillside's obligations to RBS Citizens, but will also benefit the Investors' ability to recover some of their alleged losses.  Thus, maintaining the status quo and allowing the Receiver to continue its investigation appears to the Court to be the best way to serve the interests of all the parties.  See Byers I, 592 F. Supp. 2d at 537 ("The Receiver is charged with protecting the investors as a whole, and thus the best way to maintain the status quo is to permit him to carry on with his investigation.")

 Further, the Court notes that RBS Citizens will not suffer substantial injury by the denial of its motion.  First, RBS Citizens has continued to receive payments from Cromwell AAA and Brian F. Callahan toward Hillside's obligations under the Notes and the Swap Agreement.  These payments have amounted to at least $336,000.  Moreover, once the Receiver completes its investigation and the Property and the Business are sold, the obligations to RBS Citizens will be the first to be paid from the proceeds, as the RBS Citizens Mortgage and security interest in the

Property and the Business are senior in priority. In the Court's view, the RBS Citizens situation is no different from that of any of the other secured creditors that have been impacted by the Asset Freeze and Stay of Litigation found in the March 27, 2012 Order.

In addition, the Court finds that the second factor also favors preserving the March 27, 2012 Order. Although RBS Citizens argues that the Receiver has had sufficient time to review the relevant assets since the issuing of the March 27, 2012 Order, the Court disagrees. The Asset Freeze and Stay of Litigation have only been in place for one year and five months. Given the complicated nature of this case, which includes the alleged comingling of $90 million of Investor funds and extensive international discovery, it does not appear unreasonable to the Court that the Receiver's investigation is still ongoing, including with respect to those funds that may have been wrongfully diverted to Hillside and Cromwell AAA.

As the first two of the Wencke factors weigh heavily against modifying the March 27, 2012 Order, the Court need not explore the merits of RBS Citizens' underlying claim. See Byers I, 592 F. Supp. 2d at 537 ("As to the third factor, the Court does not have enough information about the merits of the Movants' claims to render a judgment. Even assuming the Movants' claims are strong, however, the other two Wencke factors weigh heavily against lifting the injunction."). Therefore, the Court finds that, even if Rule 24 intervention was appropriate in this case, RBS Citizens would still not be entitled to a modification of the March 27, 2012 Order.

## C. Violations of the March 27, 2012 Order

As a final matter, both parties raise allegations that the March 27, 2012 Order has been violated with respect to the Asset Freeze. In this regard, the Receiver alleges – and RBS Citizens concedes – that Cromwell AAA and Brian F. Callahan have diverted assets to make tax payments to the Town of Cromwell and to pay the obligations owed by Hillside to RBS Citizens.

Concerning the payments to RBS Citizens, these diversions have apparently amounted to at least $336,000. RBS Citizens also asserts that due to the Receiver's failure to monitor the Property and the Business, Brian F. Callahan has diverted assets outside the state of Connecticut, but provides no concrete details beyond general speculation.

The Court is concerned that its March 27, 2012 Order has seemingly been consistently violated by RBS Citizens. Nowhere in the March 27, 2012 Order did the Court permit RBS Citizens to continue to be paid under the Notes and the Swap Agreement. In fact, the Asset Freeze only allowed for the April 2012 mortgage payment, which was not to exceed $21,000, and made no additional allowances. While RBS Citizens claims that the Receiver and the Receiver's Counsel authorized it to continue to be paid on the obligations owed by Hillside, it provides neither a sworn statement nor an affidavit based on personal knowledge nor any other evidence that might support this assertion. For their part, the Receiver and the Receiver's Counsel deny providing RBS Citizens with any such authorization.

Accordingly, the Court directs the Receiver, RBS Citizens and Brian F. Callahan to appear for a hearing on March 10, 2014 at 9:30 a.m. so that the Court may address this issue, particularly with respect to those alleged diversions that RBS Citizens has already received. The Court further directs that RBS Citizens comply with the Asset Freeze contained in the March 27, 2012 Order and must cease accepting any and all payments from Brian F. Callahan and Cromwell AAA.

Also, the Court directs Brian F. Callahan and Cromwell AAA to cease diverting the assets of Hillside and/or Cromwell AAA in violation of the Court's March 27, 2012 Order, except that the Court modifies the Asset Freeze for the limited purpose of permitting Cromwell AAA and Brian F. Callahan to continue making tax payments to the Town of Cromwell.

Further, the Court directs that the Receiver monitor the assets of the Property and the Business so as to prevent any future diversions while the March 27, 2012 Order is still in effect. The Receiver is directed to provide the Court with a status report with respect to the Business and the Property, and all related assets, within thirty days of the date of this Order.

Lastly, the Court notes that failure to comply with the March 27, 2012 Order or this Order may be grounds for a finding of contempt or sanctions. While the Court declines to make any such a finding at this time, the Court nevertheless warns the parties that continued disregard for this Court's orders may result in the Court considering the measures set forth above

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that RBS Citizens' motion to intervene and for relief from the March 27, 2012 Order is denied; and it is further

**ORDERED**, that the Receiver, RBS Citizens and Brian F. Callahan are directed to appear for a hearing on March 10, 2014 at 9:30 a.m. so that the Court may address alleged violations to the March 27, 2012 Order, particularly with respect to those alleged diversions that RBS Citizens has already received; and it is further

**ORDERED**, that RBS Citizens **is** directed to comply with the Asset Freeze contained in the March 27, 2012 Order and must cease accepting any and all payments from Brian F. Callahan and Cromwell AAA; and it is further

**ORDERED**, that Brian F. Callahan and Cromwell AAA are directed to cease diverting any of Hillside's and/or Cromwell AAA's assets in violation of the Court's March 27, 2012 Order, except that the Court modifies the Asset Freeze for the limited purpose of permitting

Cromwell AAA and Brian F. Callahan to continue making tax payments to the Town of Cromwell; and it is further

**ORDERED**, that the Receiver is directed to monitor the assets of the Property and the Business so as to prevent any future diversions while the March 27, 2012 Order is still in effect; and it is further

**ORDERED**, that the Receiver is directed to provide the Court with a status report with respect to Hillside and Cromwell AAA, and all related assets, within thirty days of the date of this Order; and it is further

**ORDERED**, that failure to comply with the March 27, 2012 Order or this Order may be grounds for a finding of contempt or sanctions.

**SO ORDERED.**
Dated: Central Islip, New York
　　　 March 5, 2014

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge