UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

                  Plaintiff,

      v.

BRIAN RAYMOND CALLAHAN, ADAM
MANSON, DISTINCTIVE INVESTMENTS
LLC, and DISTINCTIVE VENTURES LLC;

                  Defendants,

SHERI MANSON CALLAHAN,

                  Relief Defendant.

-------------------------------------------------------------------x

Case No. 12-CV-1065 (ADS/ETB)

Assigned to:
Hon. Arthur D. Spatt (DJ)
Hon. A. Kathleen Tomlinson (MJ)

## RECEIVER'S REPORT FOR THE 2014 FIRST QUARTER
## COVERING THE PERIOD OF JANUARY 1, 2014 THROUGH MARCH 31, 2014

GOTTESMAN, WOLGEL, MALAMY,
FLYNN & WEINBERG, P.C.
A PROFESSIONAL CORPORATION INCORPORATED IN THE STATE OF NEW YORK
ATTORNEYS FOR

RECEIVER

11 HANOVER SQUARE
NEW YORK, N.Y. 10005
TEL. NO. (212) 495-0100
FAX NO. (212) 480-9797

**TABLE OF CONTENTS**

Page

RECEIVER'S REPORT:                                                                    1

I.      Background and Legal Proceedings                                              2

        A.    Receivership Proceeding and Appointment of Receiver                     2
        B.    Civil Forfeiture Action                                                 5
        C.    Intervention by U.S. Government and Non-Receivership Stay               5
        D.    Indictment of Brian R. Callahan and Adam J. Manson                      6
        E.    USAO's Motion for Interlocutory Sale                                    7
        F.    The USAO's Sealed Bidding Process                                       8
        G.    The Receiver's Motion to Partially Lift Stay                            9
        H.    The Distinctive Notes and the Montauk Property                         9
        I.    Offers Relating to the Distinctive Notes & Montauk Property           10
        J.    Negotiations with Three Interested Purchasers                         12
        K.    The Receiver/HFZ Letter of Intent                                     14
        L.    The Contract Between the Receiver and HFZ                             14
        M.    The USAO's Letter Application                                         16
        N.    Citizens Bank's Motion to Intervene and Modify Stay                   18
        O.    Cromwell/Ten Hillside                                                 19
        P.    Defendant Callahan's Motion to Modify Asset Freeze                    20
              /Motion to Withdraw

II.     Operations and Investigation                                                20

        A.    Establishing the Receivership Estate                                  23
        B.    The Receivership Financial Report and Condition                       26
        C.    Evaluating and Preserving Receivership Assets                         29
        D.    Understanding, Evaluating and Advising Upon                           31
              Private Investments
        E.    The Real Property and Business Operations Therein                     33
              (a)   The Panoramic View Coop/Montauk Property                        33
              (b)   The Callahan Coop Unit                                          38
              (c)   The Callahan Residence                                          38
              (d)   The Cromwell Storage Units                                      39
              (e)   Creditors                                                       46
        F.    Investigating and Organizing Claims Against Third Parties             46

III     The Status of the Proposed Plan For the Receivership Estate                 48

        A.    The Real Property                                                     48
              (i)    The Panoramic View                                             48
              (ii)   The Callahan Coop Unit and Residence                           49
              (iii)  Cromwell Property                                              49

|   |   |   |   |   |
|---|---|---|---|---|
| | B. | Non-Real Property | | 50 |
| | | (i) | The Callahan Funds | 50 |
| | | (ii) | Redemptions | 50 |
| | C. | Summary | | 50 |
| IV. | | Claims Process | | 51 |
| V. | | Assets, Liquidation and Distribution of Proceeds | | 52 |
| VI. | | Conclusion | | 53 |

EXHIBIT A     Standardized Fund Accounting Report
EXHIBIT B     Previous List of Known Potential Claimants
EXHIBIT C     List of Potential Claims Submitted as of March 31, 2014 Pursuant
                      to the Order Establishing a Claims Bar Deadline

### RECEIVER'S REPORT FOR THE 2014 FIRST QUARTER
### <u>COVERING THE PERIOD OF JANUARY 1, 2014 THROUGH MARCH 31, 2014</u>

Steven Weinberg, as the court appointed receiver (the "Receiver") for Horizon Global Advisors Ltd. ("HGA LTD"), Horizon Global Advisors LLC ("HGA LLC"), Diversified Global Investments (BVI), L.P. ("Diversified Global") f/k/a Horizon Global Investments, L.P. ("Horizon Global"), The Masters Global Fund, L.P. ("Masters Global"), Fiduciary Select Income Fund, L.P. ("Fiduciary Select") f/k/a Pangea Bridge Investment, L.P. ("Pangea Bridge"), Horizon Millennium Investments, L.P. ("Horizon Millennium") and Pangea Offshore High Yield Portfolio, LLC ("Pangea Offshore") respectfully submits this as his quarterly report (the "Report") for the period of January 1, 2014 through March 31, 2014 (the "Quarterly Period"). The Report states the Receivership activities, the Receivership Assets and Receivership Property (as those terms are defined in the Receivership Orders) during the Quarterly Period, and the following as required by Paragraph 55 of the Receivership Order:

A.   A summary of the operations of the Receiver;

B.   The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.   A schedule of all the Receiver's receipts and disbursements (attached as EXHIBIT A to the Quarterly Status Report), with one column for the quarterly period covered and another column for the entire duration of the receivership;

D.   A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.   A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources;

1

approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and (ii) collecting such judgments);

F.     A list of all known creditors with their addresses and the amounts of their claims;

G.     The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.     The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.


## I.     BACKGROUND AND LEGAL PROCEEDINGS.

The following is a summary of the Receivership Proceedings, its related proceedings, the Civil Forfeiture Action and the Criminal Action/Criminal Forfeiture Action, and background information relating to those proceedings.

### A. The Receivership Proceeding & Appointment of the Receiver:

This receivership proceeding was commenced on March 5, 2012 by the United States Securities and Exchange Commission ("SEC") against Defendants Brian Raymond Callahan ("Callahan"), HGA LTD and HGA LLC (the "SEC/Receivership Action") for misappropriation of investors' assets and violations of Securities Laws, namely: §17(a)(1), (2) and (3) of the Securities Act; §10(b) of the Exchange Act and §206(1), (2) and (4) of the Advisors Act.  By the Amended Complaint (the "Amended Complaint") filed in the SEC/Receivership Action on May 31, 2012 (ECF Doc. 28), the SEC expanded the action to include as defendants, five offshore funds, Diversified Global, Masters Global, Fiduciary Select, Horizon Millennium and Pangea Offshore (collectively, the "Callahan Funds"), along with Defendant Callahan's brother-in-law,

2

Adam Manson, his companies, Distinctive Investments, LLC ("Distinctive Investments") and

Distinctive Ventures, LLC ("Distinctive Ventures"), and as a Relief Defendant, Defendant

Callahan's spouse, Sheri Manson Callahan.

On March 27, 2012, on the motion made by the SEC (ECF Doc. 2), this Court signed the

Receivership Order (ECF Doc. 22) placing the HGA Fund Managers (HGA LTD and HGA

LLC) into Receivership, and appointed Steven Weinberg as their Receiver.  Pursuant to a

Stipulation (ECF Doc. 29) entered into by the SEC and Defendant Callahan, and "So Ordered"

(ECF Doc. 33) on June 4, 2012 (the "Fund Receivership Order"), the Receivership Court also

placed the Callahan Funds into receivership with Steven Weinberg, being the Receiver for both

HGA Fund Managers and the Callahan Funds (collectively, the "Receivership Entities").  The

Receivership Order and the Fund Receivership Order are collectively referred hereinafter as the

"Receivership Orders".

The Amended Complaint asserts that from 2005 to 2012, Defendant Callahan raised over

$90 million (the "Investor Funds") from at least 45 investors (the "Investors") for at least five

offshore funds, namely, Diversified Global, Masters Global, Fiduciary Select, Horizon

Millennium and Pangea Offshore, which he operated and controlled, directly or indirectly

through HGA LTD and HGA LLC. [1]  According to the Amended Complaint, "Callahan's

solicitation of investors involved material misrepresentation about the use of their money, the

liquidity of their investment and the asset diversification of the Callahan Funds." ***Amended***

***Complaint*** ¶ 2.  Specifically, Callahan "represented to a number of U.S. residents that their

---

[1] According to the News Release from the U.S. Attorney's Office for the Eastern District of New York dated April 29, 2014 (the "USAO News Release"), which reported Defendant Brian R. Callahan's guilty plea, "between December 2006 and February 2012, Callahan raised more than $118 million from at least 40 investors in connection with four different investment funds that he managed." *See **USAO News Release*** (http://www.justice.gov/usao/nye/pr/April 14/2014Apr29.php).

money in the Callahan Funds would be invested with New York-based hedge funds" and that their "investments would be liquid". *Amended Complaint* ¶ 2. However, according to the Amended Complaint, Callahan "improperly diverted assets of the Callahan Funds to his brother-in-law Manson's private real estate project that was facing foreclosure." *Amended Complaint* ¶ 3.

This Court charged the Receiver with the duty: (a) to use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, of whatever kind, (b) to take custody, control and possession of all Receivership Property and records relevant thereto, and (c) subject to leave from this Court, to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto, including pursuing all suits, actions, claims and demands which may be brought by the Receivership Estate, and bringing legal actions based on law and equity as the Receiver deems necessary or appropriate in discharging his duties as Receiver, and (d) to take such action as necessary and appropriate for the preservation of Receivership Property or to prevent dissipation or concealment of Receivership Property. Since his appointment, the Receiver has been active in:

- Establishing and Operating the Receivership Estate;

- Investigating the Receivership Entities and Defendants;

- Evaluating and Preserving Receivership Assets and Receivership Property;

- Investigating and Evaluating Receivership Fund Investments;

- Investigating and Analyzing Third Party Claims.

**B.  The Civil Forfeiture Action.**

Separately, and in addition to the subject SEC/Receivership Proceeding, the United States Attorney's Office for the Eastern District of New York ("USAO") commenced a civil forfeiture action on April 17, 2012 in the United States District Court for the Eastern District of New York – Civil Case No. 12 CV 1880 (the "Civil Forfeiture Action").  The action seeks the forfeiture and condemnation of: (a) the real property located at 272 Old Montauk Highway, Montauk, New York 11954 (the "Montauk Property"), (b) all the shares of 93 Old Montauk Owners, Inc., a New York cooperative corporation (the "Panoramic View Coop"), held in the name of Defendant Distinctive Ventures and all proceeds traceable thereto (the "Distinctive Coop Shares"), (c) all the shares of Panoramic View Coop held in the name of Defendant Callahan, and his wife, Defendant Sheri Callahan (the "Callahan Coop Shares"), together with the proprietary lease appurtenant to the Callahan Coop Shares (the "Callahan Coop Unit"), and all proceeds traceable thereto; and (d) the real property located at 47 Clock Tower Lane, Old Westbury, New York 11568 (the "Westbury Property").  According to the Forfeiture Action's Complaint, Investors Funds were used for the acquisition and/or finance of the Montauk Property, the Distinctive Coop Shares, the Callahan Coop Shares and the Old Westbury Property (collectively, the "Distinctive/Callahan Properties").

**C.  Intervention by U.S. Government and Non-Receivership Stay.**

On July 6, 2012, the U.S. Attorney's Office for the Eastern District of New York made a motion (ECF Doc. 43) to intervene and to stay the SEC/Receivership Action and all discovery therein (the "USAO Stay") until the resolution of a related, ongoing criminal matter, by verdict, pretrial disposition, or until otherwise allowed by the Receivership Court (the "Intervention & Stay Motion").  Under the terms of the proposed Order, the USAO Stay shall not apply to the

Receiver and specifically provides that the Receiver may continue to exercise each and all of the authority granted to him under the Receivership Orders.  The Receivership Court granted the Motion to Intervene and Stay by an Order (ECF Doc. 48) dated July 19, 2012 (the "Intervention & Stay Order").  Subsequently, the Court issued an Order (ECF Doc. 57) on September 7, 2012 amending the Intervention and Stay Order to include a provision stating that "[n]othing herein shall be deemed to preclude defendant Callahan from filing an application with the Court for relief from the asset freeze … [and] nothing … shall prevent the SEC from challenging any application by defendant Callahan made pursuant to this paragraph."

### D. **Indictment of Brian R. Callahan and Adam J. Manson**

On August 1, 2013 a 24 count indictment against Brian R. Callahan and Adam J. Manson for securities fraud, conspiracy to commit securities fraud, wire fraud, conspiracy to commit wire fraud, and aggravated identity theft was unsealed (the "Criminal Action"), and the defendants were arraigned.  A plea of not guilty was pleaded and entered on each count.[2]

The indictment lays out the allegations or the acts for each count, including allegations of raising over $108,000,000.00 and diverting approximately $96,000,000.00 to operate the investment funds as well as a ponzi scheme.  The allegations are that the monies were utilized for the Panoramic View, redemptions to a few investors at the expense of later investors, and to maintain a luxury lifestyle in lieu of maintaining the funds in liquid accounts in mutual funds, hedge funds or low risk securities as represented to investors.

---

[2] On April 29, 2014, according to the News Release from the U.S. Attorney's Office for the Eastern District of New York dated April 29, 2014 (the "USAO News Release"), Defendant Brian R. Callahan "pleaded guilty to one count of securities fraud and one count of wire fraud for operating a $96 million Ponzi scheme through his various offshore investment funds."  *See USAO News Release* (http://www.justice.gov/usao/nye/pr/April 14/2014Apr29.php).

The criminal case includes a criminal forfeiture proceeding as to the Montauk Property, Distinctive Coop Shares, the Callahan Coop Shares, the Westbury Property, and a certain Westhampton beach front unit (the "Criminal Forfeiture Action").  The criminal case was re-assigned to Judge Spatt who has been assigned to all of the related pending cases before this Court.

### E.  **USAO's Motion for Interlocutory Sale**

On May 15, 2013, the USAO filed a motion in the Forfeiture Action seeking an order for the interlocutory sale of the Distinctive Coop Shares and the Westbury Property (the "Interlocutory Sale Motion").  *See **Civil Forfeiture Action – ECF Docs. 50 & 51**.  The Interlocutory Sale Motion was pursued after it appeared that a consensual sale of the Montauk Property and the Distinctive Coop Shares with Defendants Adam Manson and Distinctive Ventures would be unlikely.  Defendants Adam Manson and Distinctive Ventures continued to decline the Receiver's request for them to enter into the Letter of Intent presented by Kept Hotel for the offering price of $54 Million, which would have resulted in a net recovery to the Investors in the approximate sum of $36,000,000.00.  *See **ECF Doc. 83**.

By a So Ordered Stipulation filed in the Civil Forfeiture Action on January 23, 2014, and on the consent of the USAO, OneWest Bank FSB (a claimant in the Civil Forfeiture Action), and Defendant Sheri Manson-Callahan, the Court removed the Old Westbury Property from the Interlocutory Sale Motion and Civil Forfeiture Action, and authorized the private sale of the Old Westbury Property for the purchase price of $1.4 million dollars.  *See **Civil Forfeiture Action – ECF Doc. 67**.  On February 22, 2014, this Court found that an interlocutory sale of the Montauk Property is proper and necessary, but found that the proposed private sale by the USAO to HFZ Capital LLC and BSG Real Estate Group (separately referred as, "HFZ" and "BSG", collectively

as "HFZ/BSG") was "commercially unreasonable" and allowed the USAO and HFZ/BSG to submit a revised proposal for the purpose of the interlocutory sale sought in the Interlocutory Sale Motion (the "Interlocutory Sale Decision").  *See Civil Forfeiture Action - ECF Doc. 69*. HFZ sought to submit a revised proposal for the Court's consideration.  However, the USAO declined to continue its pursuit of an interlocutory sale with HFZ, and instead is now seeking to implement a consensual sale through a private sealed bidding process (the "Sealed Bidding Process").  The Sealed Bidding Process was first proposed by the USAO in its letter to this Court on March 7, 2014 (the "USAO's March 7, 2014 Letter").  *See Civil Forfeiture Action - ECF Docs. 70 & 79*.

**F.  The USAO's Sealed Bidding Process**

According to the USAO's March 7, 2014 Letter, the Sealed Bidding Process will "allow the Montauk Property and Distinctive Shares to be sold: (i) in a competitive environment open to multiple bidders; (ii) to a purchaser who demonstrates the ability to close the transaction during a pre-set time frame required by the terms of the bid package; (iii) for the highest price and on the best terms."  *See USAO's March 7, 2014 Letter*, p. 2 (Civil Forfeiture Action – ECF Docket No. 70).  In the USAO's status report to the Court dated March 21, 2014 (the "March 21, 2014 Status Report"), the USAO reported that the USAO "has been working with counsel for Adam Manson and Distinctive to arrive at terms under which due diligence materials, such as license applications, environmental reports, and financial statements, may be produced for inclusion in a proposed bid package to be sent to prospective purchasers" and will provide another report in thirty (30) days of its progress in structuring and proceeding with the Sealed Bidding Process. *See USAO's March 21, 2014 Status Report*, p. 3 (Civil Forfeiture Action – ECF Doc. 79).

8

### G. **Receiver's Motion to Partially Lift Stay.**

On June 28, 2013, the Receiver filed a motion seeking an order: (i) authorizing the Receiver to commence an action against Defendant Distinctive Investments LLC on the notes that they had executed and indebtedness evidenced thereby (the "Distinctive Notes"), and (ii) partially lifting the blanket stay against actions of any nature involving the Receiver or the Receivership Property for such limited purpose.  The Manson/Distinctive Defendants opposed (ECF Docs. 135 and 136) the Receiver's motion.  On July 29, 2013, the Receiver filed its Reply papers (ECF Docs. 138 and 139).

On March 1, 2014, the Court denied the Receiver's motion without prejudice (ECF Doc. 189) with leave to renew, if necessary, following the interlocutory sale of the Montauk Property (the "Lift Stay Denial Order").  As noted in the Court's Lift Stay Denial Order, the Receiver pursued the enforcement of the notes as a means to obtain a recovery on behalf of the Investors through the Receivership Estate when it no longer appeared that a consensual sale of the Montauk Property was likely.  However, since the Court had just authorized the interlocutory sale of Montauk Property, the Court deferred deciding the Receiver's motion until after the interlocutory sale of the Montauk Property.

### H. **The Distinctive Notes and the Montauk Property**

It has been the Receiver's position that the Distinctive Notes evidence the debt owed to the Receivership Entities, Diversified Global and Fiduciary Select.  It also has been and continues to be the Receiver's position that Investors Funds were improperly and fraudulently diverted to or for the benefit of the Montauk Property, the Distinctive Coop Shares, the Callahan Coop Shares, Defendant Adam Manson, Defendant Distinctive Ventures, Defendant Brian R.

Callahan and Defendant Sheri Callahan.  The former represents the contractual claims and the latter represents the fraud based claims.[3]

### I.  <u>Offers Relating to the Distinctive Notes & Montauk Property</u>

Prior to and even since the inception of this Receivership, the Montauk Property has been and continues to be marketed by Defendants Adam Manson and Distinctive Ventures.  In the initial months of the Receivership, the Receiver sought to work with Defendant Adam Manson to bring about a consensual sale.  Defendant Manson provided the Receiver with the marketing materials, floor plans, price list, appraisals and financial information for the Panoramic View, and gave the Receiver a walk-through of the property.  Various people and entities have made, and continue to make, inquiries with and expressed interest to the Receiver about purchasing the Distinctive Notes and the Montauk Property.  The inquiries and interest in the property did not wane, but remained steady, as various news agencies reported on this Receivership Action and the related Civil Forfeiture Action and Criminal Action.

To maximize the best offer and recovery, the Receiver: (i) compiled and provided due diligence information to interested parties, (ii) conducted background investigations of bidders, (iii) addressed inquiries, and (iv) negotiated with interested parties who showed readiness, experience and financial means to purchase the Distinctive Notes.  With each inquiry, the

---

[3] On March 27, 2013, the Court issued an Order which removed the Distinctive Notes from the Receivership Estate.  *See ECF Doc. 217.*  According to the March 27, 2013 Order:

> It is the Government's theory that the Notes were simply designed to cover up the alleged fraudulent scheme between Callahan, Manson and Distinctive to use the Investors' monies to fund the acquisition and the development of the Montauk Property.  As such, the Government contends that the Notes only have value if the Government allows for a conveyance of the Montauk Property.

*See ECF Doc. 217*, p. 9.

Receiver negotiated and sought the highest offering price, the shortest due diligence period and closing date, a downpayment of at least $1 Million upon the acceptance of a letter of intent ("LOI") and requirement that the purchaser pays for all closing costs and expenses (other than the Receiver's attorney fees).  All interested parties were told what was the highest offering price to date and informed that only an offer equal or more, with comparable or better contract terms, would be seriously considered.

The Receiver has and will continue to inform the SEC and the USAO of all inquiries and offers made to the Receiver.  Those inquiries and offers were also communicated to Defendants Adam Manson and Distinctive Ventures or their attorney during the period that the Receiver attempted to have a consensual sale of the Montauk Property.  The offers which the Receiver informed the SEC, the USAO, Defendant Adam Manson and Defendant Distinctive Ventures included the offer from Kept Hotel LLC ("Kept Hotel") to purchase the Montauk Property for $54 Million (the "Kept Hotel LOI").  The Receiver also notified the USAO of HFZ's inquiry and interest.  On April 9, 2013, the USAO accepted and executed a letter of intent with HFZ and BGS for the purchase the Montauk Property in the sum of $54,150,000.00.  *See USAO's Interlocutory Sale Motion* (Civil Forfeiture Action – ECF Doc. 50-2).  Subsequently, HFZ entered into an agreement with the Receiver to purchase the Distinctive Notes for $41,500,000.00.  Both agreements have been set aside by this Court.  *See ECF Doc. 217*.  *See also Civil Forfeiture Action - ECF Doc. 69*.

While the USAO's Interlocutory Sale Motion was pending *sub judice*, the Receiver received three expressions of interest and offers which warranted the Receiver's attention.  The offers came from entities who demonstrated that they possessed the knowledge, experience, financial means, and genuine interest in purchasing the Distinctive Notes.  Each of them

understood that the Montauk Property is one of the properties involved in the Civil Forfeiture

Action and the USAO's Interlocutory Sale Motion.  Each understood that the Receiver has no

ownership interest in the Montauk Property.  They each understood that in the absence of an

interlocutory sale order, the Montauk Property can only be conveyed by Defendant Distinctive

Ventures and by satisfying the liens held by the secured lenders.  Each understood that the

consent of the USAO and this Court will be required to release the Montauk Property from the

Civil Forfeiture Action.  With this understanding, they each sought to enter into an agreement

with the Receiver for the purchase of the Distinctive Notes.

**J.   Negotiations with Three Interested Purchasers**

One of the aforesaid three entities was HFZ, who along with BSG, had previously entered

into a letter of intent with the USAO to purchase the Montauk Property and the Distinctive Coop

Shares (the "USAO&HFZ LOI").  Another was 40 North Properties LLC ("40 North"), whose

principals had submitted a letter of intent to the Court as Latus Partners, LLC ("Latus").  The

third, who has not publically identified themselves, is a developer with a portfolio of current and

past projects similar to HFZ and 40 North (the "Unnamed Developer").  Each of the offers were

made specifically to the Receiver for the purchase of the Notes.  Unlike the USAO&HFZ LOI,

none of these offers to the Receiver were subject to any brokerage fees, payments of taxes, fees

or closing costs, payments or the removal of any liens or claims, or the consents of any other

party other than this Court and the USAO.  The full offering price would be paid to the

Receivership.  In contrast, in the USAO&HFZ LOI, the Investors will only receive the net sale

proceeds, after any brokerage fees, closing costs, transfer taxes, and satisfactions of liens and

encumbrances on the Montauk Property, and only receive that portion of the net sales proceeds remaining after the resolution of the claims in the forfeiture proceeding.[4]

The Receiver held negotiations with and between the Unnamed Developer and 40 North in or around June of 2013.  The Unnamed Developer presented an offer to pay the Receiver the sum of $38 Million for the Distinctive Notes.  40 North also initially offered to pay $38 Million but agreed after negotiations to a purchase price for the Distinctive Notes in the sum of $41 Million.  In August of 2013, after negotiations with 40 North, HFZ with an entity Gurney's Inn Resort & Spa Ltd. ("Gurneys") communicated their interest in purchasing the Distinctive Notes. Further negotiations ensued between the Receiver, 40 North and HFZ, which including a bidding process that required each of them to make their best offer by a date certain.  Though the best offers made by HFZ and 40 North were comparable, HFZ appeared to have the best knowledge of the Montauk Property, the contractual claims for the Distinctive Notes, the various parties and interests in the Receivership Action and the Civil Forfeiture Action.  HFZ's best offer included other good and valuable consideration to the Receivership.

HFZ offered a purchase price of $41,500,000.00 for the Distinctive Notes.  Compared to the USAO/HFZ LOI, this offer by HFZ would have resulted in a greater recovery of the Investors Funds, by approximately $5,500,000.00 or more.  The USAO/HFZ LOI had a contract price of $54,150,000, but it is estimated that after brokerage fees, transfer taxes and using the closing proceeds to satisfy the secured liens would have resulted in net sales proceeds of approximately $36,000,000.00 or less.

---

[4] Defendants Adam Manson, Distinctive Ventures and Distinctive Investment, along with Claimants CreXus S. Holdings, LLC and Gilbratar Private and Trust Company are claimants in the Civil Forfeiture Actions who have made claims against the Montauk Property, the Distinctive Coop Shares, the Callahan Coop Shares, and the proceeds therefrom.

### K.  The Receiver/HFZ Letter of Intent

HFZ prevailed in the bidding process near the end of August of 2013.  Thereafter, the Receiver and HFZ began an extensive negotiation of the terms and language of the letter of intent.  The negotiation resulted in indemnity and hold harmless provisions in favor of the Receiver and the Receivership Estate, and included an option, if exercised, that would increase the offering price from $41.5 Million to $42.75 million.  Under the terms negotiated, there was a 20 day due diligence period, and if the letter of intent was not terminated prior to the expiration of the due diligence period, then HFZ's $1 Million contract deposit became hard and non-refundable, regardless if the transaction actually closes, unless the approvals from the USAO were not given.  The closing was to occur within 20 days after obtaining the approvals from the USAO, and the obligation to close was not subject to HFZ obtaining any consent or agreements with the holders of the secured liens on the Montauk Property or with Defendants Adam Manson or Distinctive Ventures.  The letter of intent negotiated by and between the Receiver and HFZ was accepted by the Receiver and dated October 1, 2013 (the "Receiver/HFZ LOI").  The SEC, USAO and Defendants Manson and Distinctive Ventures were notified of the Receiver/HFZ LOI.  No objections were expressed.

### L.  The Contract Between the Receiver and HFZ

The Receiver and HFZ engaged in substantial negotiations of the contract terms for the purchase of the Distinctive Notes.  It has been HFZ's intent to purchase the Montauk Property free and clear of all liens and claims.  To accomplish that, HFZ intended to satisfy the secured lien holders, the Receiver, and procure the release of the Montauk Property and the Distinctive Coop Shares from the Civil Forfeiture Action and Criminal Forfeiture Action (collectively, the "Forfeiture Action").  The terms of the Receiver/HFZ LOI contemplated and included the

14

requirement of the USAO's approval for the release of the Montauk Property from the Civil

Forfeiture Action, and the closing was subject to obtaining such approval.  In light of such

requirement, the parties sought to set forth the terms and conditions which the USAO will

impose for obtaining their approvals.  Both, the Receiver and HFZ requested the USAO to

specify and clarify what would be required to procure their approvals for the release of the

Montauk Property from the Forfeiture Actions.

The initial draft of the proposed contract sought to incorporate the terms and conditions

which the USAO would require for their approvals.  However, when contract negotiations stalled

over what would be required to procure the USAO approvals, and what that process and

procedure would entail, the Receiver and HFZ proceeded to restructure the original contemplated

transaction and previously agreed terms.  The proposed contract was restructured several times.

On February 18, 2014, the Receiver's counsel provided HFZ's counsel with another

restructured version of the proposed contract, with notice that the Receiver will be exercising its

right to terminate the Receiver/HFZ LOI if the parties cannot agree on the final terms for the

contract within three (3) business days.  On February 19, 2014, the Receiver notified the SEC

and the USAO of the latest restructured version of the proposed contract and the Receiver's

notice of intent to terminate if the final terms for the contract cannot be agreed by February 21,

2014.  No objections were expressed.  On Friday, February 21, 2014, in a telephone call between

the counsel for the Receiver and HFZ, and after months of negotiations and redrafting, the

Receiver and HFZ reached an agreement on all material and substantive terms for a contract.

The next day, Saturday, February 22, 2014, this Court issued its Interlocutory Sale Order.

On Monday, February 24, 2014, the Receiver informed the SEC and USAO that the Receiver

and HFZ finalized and agreed to all material and substantive terms for the contract, which the

Receiver intends to execute when the Contract is presented to the Receiver.  On that same day and thereafter, the USAO disclosed for the first time to the Receiver that the USAO intends to proceed with its Sealed Bidding Process, and requested that the Receiver not sign the contract with HFZ.  The USAO requested the Receiver's participation and consent in the Sealed Bidding Process.  However, the Receiver/HFZ LOI contained an exclusivity provision which contractually precludes the Receiver from contracting with any other party other than HFZ for the sale of the Distinctive Notes, and therefore precludes the Receiver from participating in the Sealed Bidding Process.  The Receiver also informed the USAO and gave the Receiver's opinion that there was an agreement with HFZ and that both the contract and the Sealed Bidding Process can proceed concurrently, that one should not exclude the other until there is in fact another contract ready to be executed with better terms, and that, on the information before the Receiver, executing the contract with HFZ will be in the best interest of the Receivership Estate and the Investors.

Prior to executing the contract, which was then already signed by HFZ, the Receiver held a telephone conference with the Investor Committee formed by the Investors to discuss the contract, the USAO's request that the Receiver not sign the contract, and the USAO's proposal for the Sealed Bidding Process.  The majority of the Investor Committee expressed no objection to executing the contract.  The Receiver, the Receiver executed and returned a fully contract to HFZ on March 7, 2014 (the "Note Contract").

**M. The USAO's Letter Application**

On the same day that the Receiver executed the Note Contract, the USAO made a letter application to this Court seeking a court conference and leave to move to enjoin the Receiver from executing the Note Contract and from selling the Distinctive Notes (the "USAO's Letter

16

Application"). *See ECF Doc. 195*. According to the USAO's Letter Application, because the Court's Interlocutory Sale Order and because "the government and counsel for Manson and Distinctive have been cooperatively engaged in a discussion of marketing the Montauk Property …", the USAO believes that a sealed bidding process rather than the Receiver's Note Contract would result in the best recovery for the Investors. *See ECF Doc. 195.* When the USAO learned that the Note Contract was executed on the same day of the USAO's Letter Application, the USAO sought to have the Court set aside the Note Contract and remove the Distinctive Notes from being part of the Receivership Assets.

The Receiver opposed the USAO's application: (i) to set aside the contract of sale for the notes; (ii) to remove the notes from the Receivership Estate; and (iii) to enjoin the Receiver from selling the notes on the grounds that the contract represented the best and only contract in existence to date for a potential recovery for the investors in the sum of $41.5 to $42.75 Million. *See ECF Doc. 198.* While the Receiver did not oppose the USAO pursuit of the Sealed Bidding Process, the Receiver strongly opposed the suggestion and speculation that the Note Contract and Sealed Bidding Process cannot proceed together. *Id.* The Receiver also opposed on the grounds that multiple processes can co-exist to maximize the recovery for the Investors, and that there is no evidence that the Sealed Bidding Process or any other process would be completed before June 3, 2014, the date when the Note Contract must close or terminate. *Id.*

Pursuant to the terms of the Note Contract, if the purchase of the Notes did not close by June 3, 2014, which date being time is of the essence, the Receiver will be released from the Contract, and free to participate in any contract resulting from the Sealed Bidding Process or the originally proposed Interlocutory Sale. If the purchase did close on June 3, 2014, a sum of $41.5 to $42.75 Million would be available for Investors.

17

The Court, by its Order dated March 27, 2014 (ECF Doc. 217), set aside the Note

Contract on the grounds that one process should proceed without interference, removed the notes

from the Receivership, and permitted the USAO to substitute the Sealed Bidding Process for the

interlocutory sale process.  The USAO's application for an additional thirty days from March 22,

2014 was granted to assemble the due diligence, materials, and information for a consensual sale

by a sealed bidding process.[5]

**N.  <u>Citizens Bank's Motion to Intervene and Modify Stay.</u>**

In the 2013 Third Quarterly Period, Citizens Bank moved to intervene and to lift the stay

to pursue all of its remedies as to the injunctive relief provisions of the Receivership Orders

affecting Cromwell AAA Storage, LLC and the storage facility it operates on the real property in

Cromwell CT, based upon an alleged loan default.  *See **ECF Doc. 141***.  The SEC and the

Receiver each separately opposed Citizen Bank's application on the grounds that there was no

right to intervene and that the purpose of the asset freeze stay was to maintain the status quo, to

allow the Receiver to investigate and pursue recoveries of liabilities to the Receivership Estate,

and to maximize the estate for claimants such as the Investors.  *See **ECF Doc. 152, 154 & 155***.

---

[5] By a letter dated April 28, 2014, the USAO reported to the Court the status of the Sealed
Bidding Process and requested another thirty (30) days to report back (the "April 28, 2014 Status
Report").  Specifically, the USAO reported that "[i]n the thirty days that have elapsed since the
Court's Order, the government has complied a prospective bid package, which includes a
summary of terms for the proposed transaction, together with a proposed definitive contract of
sale", that "[t]hose material are presently in draft form", and that "[p]rior to finalizing them, the
government is attempting to obtain additional information about the status of the Co-Op, such as
the Co-op's minutes, notices, budget, and financial statements distributed to shareholders (to
include balances in the Co-Op's reserve and working capital accounts), current insurance
policies, and floor plans for units to be sold."  The Court granted the 30 day request and the next
status report is due on or before May 28, 2014.

Though Citizens Bank asserted in its papers that its loan was in default, it omitted to disclose in its moving papers that Citizens Bank received all of the required loan payments at the time of Citizens Bank's motion.  Among the reasons Citizens Bank identified as the basis for declaring the loan to be in default and their entitlement to default interest, were the restraint and injunctive provisions of the Receivership Orders which affects the Cromwell Property.  On September 30, 2013, when the motion was already *sub judice*, Citizens Bank submitted an untimely reply.  *See ECF Doc. 159*.  The Receiver's Counsel objected on a variety of reasons, including that the Reply was made by an attorney without personal knowledge, improperly disclosed settlement discussions, and contained false statements.  *See ECF Doc. 159*.  On March 5, 2014, the Court denied the motion to intervene and to modify the injunctive provisions of the Receivership Orders, and directed the Receiver to furnish the Court a status report on the Cromwell Property.  *See ECF Doc. 190*.  On April 9, 2014, the Receiver submitted a status report on the Cromwell Property and matters relating thereto (the "Cromwell Status Report"). *See ECF Doc. 223*.  It is respectfully submitted that the Court refers to Cromwell Status Report for a more thorough report on the Cromwell Property and the storage business being operated on the property.

**O.  Cromwell/Ten Hillside.**

As reported to this Court on March 13, 2014, the Receiver, Citizens Bank and Cromwell AAA Storage LLC have negotiated and reach an agreement on the terms for a consensual sale of the real property, and for the Receivership Entities to recover monies that were traced through bank accounts to Investor Funds and paid to Cromwell for the real estate mortgage and/or taxes. In addition, the aforesaid parties have also reached an agreement for the monitoring the storage business being operated on the Cromwell Property while the parties seek to sell the property on a

consensual basis.  The Receiver anticipates in presenting a signed agreement by the Receiver,

Citizens Bank and Cromwell AAA Storage LLC to the Court for review and approved in the next

few weeks following this Quarterly Report.

**P.**   **Defendant Callahan's Motion to Modify Assets Freeze/Motion to Withdraw**

On March 26, 2014, Defendant Callahan moved to modify the injunctive provisions in

the Receivership Orders and to use Receivership Assets to pay for his legal defense.  (ECF Docs.

208, 209, & 210).  Contemporaneously with Defendant Callahan's motion, his counsel, Sher

Tremonte LLP moved to be relieved as Defendant Callahan's attorneys.  (ECF Docs. 211, 212 &

213).  Both the Receiver and the SEC opposed Defendant Callahan's motion.  (ECF Docs. 220,

221, 224, 225 & 226).  The USAO took no position as to Defendant Callahan's motion.  (ECF

Doc. 222).  Defendant Callahan submitted a reply in response to the opposition raised by the

Receiver and the SEC.  (ECF Doc. 227).  Both, the motion by Defendant Callahan and the

motion by his counsel, are fully submitted and are now *sub judice*.


## II.  OPERATIONS AND INVESTIGATIONS

During the subject Quarterly Period:

- On February 20, 2014, the Court issued the Order (ECF Doc. 186) to establish a

  claims bar deadline for claims against the Receivership, and a procedure to

  determine claims against the Receivership.  The Receiver gave notice of the

  Claims Bar Deadline Procedure to all known claimants, creditors, investors and

  parties pursuant to the Order by: (i) providing the Claims Order, Notice of Claims

  Bar Deadline and Procedures for Submitting Proof of Claim (the "Claims

  Deadline Notice") and Proof of Claims Form in the Receiver's dropbox, and the

20

Claims dropbox; (ii) providing the Claims Deadline Notice and Proof of Claims Form through electronic mail and regular mail, if no electronic mail was available, to all known potential claimants, (iii) publication of the Claims Deadline Notice in the New York Times, the Financial Times, the St. Kitts and Nevis Observer and The BVI Beacon, and (iv) making available the Notice and Proof of Claims Form upon request.  The Receiver began receiving and evaluating claims.  As of March 31, 2014, 27 claims totaling $40,709,345.08 have been received.

- The Receiver entered into a contract of sale to sell the Distinctive Notes to HFZ for the purchase price of $41.5M with an option to increase the purchase price to $42.75M.  However, on the application of the USAO and the review of the contract for the Court's approval, the Court issued an Order on March 27, 2014 (ECF Doc. 217) that set aside the contract, removed the Notes from the Receivership Estate, and withdrew the Receiver's authority to sell the Distinctive Notes to allow the USAO to proceed with their Sealed Bidding Process.

- The Receiver continued to pursue those third-parties who the Receiver had demanded the repayment of money received by such third-parties purporting to be their net profits of their investments and recovered Investor Funds as reported in Section II B of the report.

- The Receiver continued to consider and evaluate possible claims against other third-parties, and to seek documents and information on those claims.  In connection therewith, continued to issue investigatory subpoenas, to make court application for service of subpoenas pursuant to the Hague Convention and other

international agreements, and to review the responses concerning: (i) properties owned by the Defendants, (ii) properties benefited by Investor Funds, (iii) bank records of the Callahan Funds, and (iv) bank records of entities controlled or owned by Defendant Callahan.

- The Court on February 20, 2014 (ECF Doc. 183) granted the Receiver's motion to retain and employ an accounting firm to assist the Receiver in preparing any required tax filings, forensic analysis and/or claims review and analysis.

- The Receiver continued its investigation into an alleged loan transaction between one Receivership Entity and an investor which was secured by a mortgage on real property. During this Quarterly Period, pursuant to a certain agreement entered into between the Receiver and that investor, a cash collateral was given and being held in escrow to substitute for the mortgage given to the Receivership Entity to secure the alleged loan transaction.

- The Receiver continued to assert and protect the Receivership interest and control over all Receivership Assets and Property.

- The Receiver continued to issue investigatory subpoenas, to make court application for service of subpoenas pursuant to the Hague Convention and other international agreements, and to review the responses concerning: (i) properties owned by the Defendants, (ii) properties benefited by Investor Funds, (iii) bank records of the Callahan Funds, and (iv) bank records of entities controlled or owned by Defendant Callahan.

- The Receiver continued to seek and review documents from Rochdale Investment Management, RIM Securities, LLC, Rochdale Offshore Investment Management and other persons and entities concerning certain transactions of the Defendants and Investors, funds and assets of the Receivership Entities, and investments and redemptions.

- The Receiver continued to communicate with the Investors and keep the Investors informed about the Receiver's effort to pursue recoveries of Receivership Assets, and answer inquiries by the Investors regarding the Claims Bar Process and the Receivership.

- The Receiver continued to receive offers and expressions of interest to purchase the Distinctive Notes and the Montauk Property.

A.  **ESTABLISHING THE RECEIVERSHIP ESTATE**.

1.      Immediately upon being appointed, the Receiver issued notices of the Receivership Orders and its injunctive provision, and demanded the production of certified statements and information from banks, financial advisors, administrators, accountants, and other parties who had direct or indirect control of Receivership Assets or Receivership Property and/or who have appeared to have conducted business with the Receivership Defendants.

2.      The Receiver demanded and continues to demand that Defendant Callahan: (i) turnover all assets and property of the HGA Fund Managers, (ii) repatriate assets, and (iii) comply with Paragraphs 8, 9, 10, and 11 of the Initial Receivership Order which includes (a) turning over HGA Fund Managers' books and records, (b) providing a sworn statement and accounting of all assets and property of HGA Fund Managers, and (c) producing the tax returns for HGA Fund Manager.  To date, Defendant Callahan has failed to produce the demanded items

23

and has claimed, through his attorney's letter and email, that: (a) he has no assets of HGA Fund Managers, (b) all documents are in the possession of the U.S. Attorney's Office or with the Offshore Administrator, and (c) he is invoking his Fifth Amendment privilege against self-incrimination for any meeting with or disclosure of information requested by the Receiver's correspondence and subpoenas.

3.      The Receiver lead discussions among the parties for exchange of the documents seized by the FBI pursuant to the related ongoing investigation by the U.S. Attorney's Office (described above) to permit the Receiver to continue his investigation for the information and documents concerning Receivership Assets and Property.

4.      When HSBC Bermuda, an offshore financial institution, declined to voluntarily recognize the Receiver's authority and the Receivership Orders, the Receiver sought and obtained Defendant Callahan's cooperation to sign a joint request demanding that Drake Fund Advisors, Ltd., as the Administrator of certain Callahan Funds, redeem the monies and funds deposited with HSBC Bermuda in the account name of Waterstreet Corporate Services Limited, and wired such funds to the Receiver.  The joint request enabled the repatriation of those funds back into the United States without time consuming international legal proceedings, which would not have been cost effective and would have significantly eroded the benefit and value of repatriating the funds remaining in the Waterstreet Corporate Services Limited account.

5.      When Pictet & Cie declined to pay account balances to certain individual investors on concerns of possible claw-back claims by the Receiver based upon the Receivership Order, the Receiver wrote to Pictet & Cie to consent to payment of the nominal account balance as of the date of the Receivership Order to each individual investor.  In response to the

Receiver's consent, Pictet & Cie agreed to pay and did pay the account balance to at least three individual account title owners.

6.     The Receiver has given notices and made demands to the banks, financial institutions, administrators, and accountants located in the British Virgin Island, Bermuda, Cayman Islands and Nevis.  As of the end of this Quarterly Period, none of them have voluntarily responded to the Receiver's notices and demands for information as set forth in the Receivership Orders, except for Drake Fund Advisors, Ltd.  The Receiver continued his investigation by making application to the Receivership Court for the production of documents and information, including books, records, ledgers and information for all of the Receivership Entities, pursuant to the Hague Convention for certain entities and companies located in the British Virgin Islands.  (Bermuda is not a signatory the Hague Convention for Evidence Abroad). This Court has authorized and approved the Receiver's requests for such production pursuant to the Hague Convention.  The Hague Requests which this Court had approved have been transmitted to the applicable authorities and agents in the foreign counties for service, process and handling.

7.     A portion of Investors Funds that were located and were on hold at certain New York based hedge-funds were previously recovered.  The Receiver continued to monitor the remaining balance of the Investors Funds at those New York based hedge funds which were required to be withheld or that were not liquid.  Recovery from Golden Tree commenced during the Fourth Quarter of 2013.  Recovery from SCF commenced in the Third Quarter of 2013, and continued in the First Quarter of 2014.  The Hedge Forum fund Altima non-liquid investment will be redeemed and paid during 2014.  The Receiver will continue to assess and report the anticipated recovery from SCF, Golden Tree and Altima in the next Quarterly Report.

8.    Recovery has been previously made by the Receiver of the funds of the
Receivership Entities from the accounts restrained by Receivership Orders and said account
holders transferred those funds to the Receiver's custodial accounts at a federal insured bank.

**B.    THE RECEIVERSHIP FINANCIAL REPORT AND CONDITION**

The Receiver previously recovered funds from the following financial institutions who
were in possession of a balance of the Investor Funds:

**MASTERS GLOBAL:**

- Hedge Forum –                                 $597,268.70
  Morgan Stanley Smith Barney
- Hedge Forum –                                 $109,166.82
  Citibank
- Hedge Forum SCF –                               $4,742.81
  Citibank
- Hedge Forum Goldentree–                          $1,365.85
  Citibank

                                    TOTAL:        **$712,544.18**

Morgan Stanley Smith Barney/Citibank's Hedge Forum have informed the
Receiver that, in addition to the $712,544.18, approximately $4,255.78 will be available
for redemption in 2014, and there are also "side pocket" investments, which according to
them, are non-liquid investments with an estimated value of $17,787.46.  The Receiver
has requested and received additional information for the purpose of confirming the
nature of the "side pocket" investments, confirming the non-liquid status of the
investments, and monitoring the side pocket investments.

**DIVERSIFIED GLOBAL:**

- Horizon Kinetics LLC                          $697,131.21
  /Kinetics Institutional Partners, L.P.:

                                    TOTAL:        **$697,131.21**

**HORIZON MILLENNIUM:**

|  |  |  |
|---|---|---|
| • Millennium USA, L.P. | | $4,723,783.00 |
| • Hold back turnover | | $474,363.00 |
| | **TOTAL:** | **$5,198,146.00** |

The $5,198,146.00 turned over to the Receiver excludes $51,871.00 which Millennium USA claims will be withheld subject to a holdback for Lehman Brothers claims and expenses. The holdback is now valued at approximately $90,000.00. The Receiver will receive $29,393.00 in the next quarterly period. The Receiver continues to monitor the holdback and remains in discussions with Millennium USA for the release of said funds.

**PANGEA OFFSHORE:**

|  |  |  |
|---|---|---|
| • Bank of America: | | $882.58 |
| | | $11.96 |
| | **TOTAL:** | **$894.54** |

**WATERSTREET ACCOUNT:**

|  |  |  |
|---|---|---|
| • HSBC Bermuda: | | $43,773.40 |
| | **TOTAL:** | **$43,773.40** |

In addition, the Receiver also made recoveries from the following people and entities who were in possession of a balance of the Investor Funds, or for setting off expense to the Receivership Estate:

**MONTAUK FIRE DEPARTMENT**

|  |  |  |
|---|---|---|
| • Recovery of Investor Funds in Excess of Principal | | $46,690.21 |
| | **TOTAL:** | **$46,690.21** |

## ANTHONY DICKEL ATTORNEY
## FEE REIMBURSEMENT

- Anthony Dickel Attorney Fee          $3,167.30
  Reimbursement

TOTAL:     **$3,167.30**

The Montauk Fire Department has repaid Investor funds during this Quarterly Period.  Anthony Dickel has also reimbursed the Receivership Estate $3,167.30 for attorney fees for the Receiver to provide a release of mortgage.

At this juncture, any further recovery of assets and property in the United States will require a legal proceeding for diversion, conversion, fraud, fraudulent transfer, constructive trust and other legal claims.  The Receiver is continuing to pursue and evaluate financial information to trace the flow of Investor Funds and to determine the ultimate recipient to demand the return of Investor Funds.  This analysis has included tracing funds through subpoenaed and other available bank records and included reviewing substantial wire transfers, account transfers, checks and withdrawals.  The Receiver is also continuing its review of all other documents which the Receiver obtains by means other than a subpoena, or which has been furnished to the Receiver to determine other possible Receivership Assets and claims.

The available liquid assets of the Callahan Funds are extremely limited.  The lack of liquidity severely hampers its ability to operate.  A substantial portion of the Callahan Funds was transferred from Pangea Offshore, Fiduciary Select or Diversified Global to and for the use of the Montauk Property and Defendants Adam Manson, Distinctive Ventures and Distinctive Investments.  The funds that were transferred represent a "non liquid investment" that was part of the fraud perpetrated by the Defendants.  The monies represent an unsecured investment in

real property that severely restricts and impairs the Callahan Funds ability to operate, while temporarily keeping the Montauk Property afloat for the Defendants.

The dissolution and liquidation of the Receivership Entities are not practical and not cost effective. Based on the Receiver's inquiries to the U.S. Internal Revenue Service, the HGA Fund Managers did not filed their own U.S. income tax returns for any tax period.  The Receiver continues to investigate whether the Callahan Funds filed their own U.S. income tax returns. However, for certain years, income and losses derived or attributable to HGA Fund Managers and the Callahan Funds were reported on schedules on Callahan's individual returns.  The Receiver has met with accountants who specialize in filings for offshore entities to evaluate the steps necessary for dissolution and/or liquidation, and upon this Court's Order Authorizing Receiver to Retain and Employ Accountants (ECF Doc. 183) retained and employed accounting firm Weiser Mazars to assist the Receiver.

## C.      EVALUATING AND PRESERVING RECEIVERSHIP ASSETS

As previously reported, upon being appointed, the Receiver verified that domestic institutions who held accounts of the Receivership Entities had placed a hold on the funds in those accounts and are complying with the Temporary Restraining Order (ECF Doc. 4) and the Initial Receivership Order (ECF Doc. 22) issued by this Court.  The Receiver has since directed $6,608,715.93 of those funds, as previously reported, to be transferred to Receivership Estate account in accordance with the Receivership Orders. The Receiver has recovered additional funds in the amount of $93,630.91, as reported in Section II B of this report. The Receiver's receipts and disbursements are set forth in the Quarterly Statement Report annexed hereto.

There are also real property and properties tangible to real property that the Receiver is continuing to monitor and which are subject to the Receivership Orders.  Some of those properties, such as the Montauk Property, the Distinctive Coop Shares together with the proprietary leases appurtenant thereto and all proceeds traceable thereto, the Callahan Coop Shares together with the proprietary lease appurtenant thereto and all proceeds traceable thereto, and the Old Westbury Property which was the Callahan's primary residence, are also the subject of the Civil Forfeiture Action and continue to be subject to a claim for recovery of the Investor Funds that were utilized for the purchase and/or development of the real property and/or for the payment of the mortgage with respect to the real property and/or loan for the cooperative unit.

In addition, the Receiver learned of the existence of an instrument granting Pangea Offshore a mortgage lien interest on a certain non-U.S. real property (the "Mortgage") to secure a loan or credit facility made by Pangea Offshore in the sum of $6,000,000.00 HKD.  Based on the market conversion rate as of the date of this Quarterly Report, the loan or credit facility was approximately, $772,588.56 USD.  In addition to the mortgage instrument, there was also a loan agreement dated November 29, 2011.  The grantor of the Mortgage (the "Grantor") requested that the Receiver release the Mortgage so that the real property can be sold and contended that no funds were actually drawn down or disbursed.  To avoid the sale of the real property from being delayed, the Receiver and the Grantor entered into an agreement (the "Cash Substitute Agreement") whereby: (i) the Grantor deposited in escrow a sum equivalent to the sum of $6,000,000 HKD (the "Cash Substitute") with an escrow agent located in Hong Kong, (ii) the parties agreed to allow the Claims Determination Process to determine who is entitled to the Cash Substitute, (iii) the Grantor will submit a claim pursuant the Claims Determination Process established by this Court, (iv) the Grantor will be responsible and pay for all the costs of the

30

Escrow Agent, including the Escrow Agent's fee and any bank charges, so that the Cash

Substitute is fully preserved, and (v) the Grantor and Escrow Agent each submit themselves to

the jurisdiction of this Court.  The Receiver recovered reimbursement of attorney fees in the

amount of $3,167.30 for providing the release of the Mortgage.  The Cash Substitute Agreement

and its terms are governed by the laws of the State of New York.  The Escrow Agent has

confirmed to the Receiver that the $6,000,000 HKD Cash Substitute is being held in escrow.

**D.     UNDERSTANDING, EVALUATING AND ADVISING
        UPON THE PRIVATE INVESTMENTS**

The Receiver continues its investigation and verification of the Receivership Entities,

their corporate, managerial and administrative organization, to understand inter-relationship of

each entity as well as its relationship with the Defendants, third-parties, and other people and

entities.  This task is unfortunately very time consuming and difficult because of the multiple

transfers of funds from one account to another, including to accounts not in the name of the

Receivership Entities, commingling of investor funds, lack of adherence to corporate formalities,

and lack of production and/or existence of books and records.

The Receiver continues to be in regular communication with interested parties and has

received and maintained telephone, e-mail and written communications with from investors,

their counsel or creditors.  The Receiver continues to update the drop box to provide investors

with easier access to Receivership related papers and documents filed in this proceeding, and is

considering other economical means for investors to obtain information and status of the

Receivership and for the Civil Forfeiture proceeding.  The Receiver has continued to forward

contact information of those investors who indicated that they wish to be contacted to the

Investor Group.  Some investors have requested that the Receiver establish a website where the

Investors can visit to obtain updates and the court documents.  However, upon inquiry, it is the

31

Receiver's understanding that a website with such capabilities will entail several thousands of dollars to create and will require additional funds to maintain and update periodically.  Though no decision has been made, it does not appear to be cost-effective to undertake given the number of investors and the limited funds of the Receivership Estate.

From time to time, the Receiver receives suggestions and information from investors concerning the recovery of assets and pursuit of third-party claims for the benefit of the Receivership Estate.  Each suggestion is weighed, evaluated and considered by the Receiver and his counsel.  The Receiver has also conducted or participated in conference calls with self organized investor committee to answer many of the investors' questions about this Receivership proceeding and the Receivership Estate.

The Receiver has been compiling and organizing information about the investment of each investor.  To date, the Receiver has sent letters to all known investors requesting that they identify and confirm their investments and redemptions.  The Receiver has also notified and reminded each investor of the Claims Deadline Notice and the deadline imposed therein.

The Receiver compiled a list of 58 investors who may have had potential claims totaling not less than the sum of $70,118,201.84.  That list of potential claimants, without their addresses so as not to disclose principals' personal and confidential information, is annexed hereto as EXHIBIT B.

The Claims Bar Determination process began during this Quarterly Reporting Period pursuant to the Order Establishing a Claims Bar Deadline, Approving the Form and Manner for a Claims Bar Deadline Notice, and Approve the Procedure and Process for Determining Claims (the "Claims Order") [ECF Doc. 186].  As of March 31, 2014, the end of this Quarterly Reporting Period, the Receiver received 27 potential claims submitted pursuant to the Claims

Order totaling $40,709,345.08.  A list of the potential claims submitted and received pursuant to the Claims Order as of the end of this Quarterly Report Period, which ended on March 31, 2014, without their addresses so as not to disclose principals' personal and confidential information is annexed hereto as EXHIBIT C.  Any potential claims submitted and received pursuant to the Claims Order between March 31, 2014 and April 21, 2014 5:00 p.m. EST, the deadline set by the Claims Order, will be reported in the next quarterly report.

E.      **THE REAL PROPERTY AND BUSINESS OPERATIONS THEREIN**

The Receiver has continued to investigate the real property that are a Receivership Asset or in which the Receiver has a claim or interest.  The investigation includes serving subpoenas for information and documents concerning the Receiver's claim or interest, the equity in the real property, and the income and expenses for the operation of any business that is conducted on the real property.  The Receiver has confirmed that there is an equity position in the Montauk Property, the Distinctive Coop Shares, the Callahan Coop Shares and the Callahan Coop Unit, the Old Westbury Property, and in the real property owned by 10 Hillside Drive, LLC where the Cromwell AAA Self Storage, LLC is operating.  Such equity warrants continued investigation, evaluation of proposals, negotiation and considerations of consensual resolutions and/or alternatively pursuit of legal remedies.

(a)      **The Panoramic View Coop/Montauk Property**

The Receiver's investigation has found that a substantial portion of Investors Funds have been used for the benefit Panoramic View and the Montauk Property, including its purchase, maintaining and improving it, and paying the debts secured by the Panoramic View and the Montauk Property.  Therefore, from the inception of this Receivership, the Receiver has focused on the Panoramic View and the Montauk

Property, including the Distinctive Coop Shares and the Callahan Coop Shares, as a source of recovery for Receivership and the Investors.

Initially, the Receiver sought the cooperation of Defendant Adam Manson, the principal of Defendant Distinctive Ventures, for a consensual sale of the Montauk Property.  Defendant Distinctive Ventures is the record owner of the unsold cooperative units in the Panoramic View.  In pursuit thereof, the Receiver met with Defendant Adam Manson and toured the Panoramic View to better understand the property and its hotel operations.  Additionally, the Receiver requested Defendant Adam Manson to furnish appraisal reports, financial information, and marketing information for the Montauk Property, including the offering plans/prospectus for the Panoramic View and financial statements[6].  The Receiver requested this information in order to be able to provide the information to interested purchasers.

In 2012, Defendant Manson, through Defendant Distinctive Ventures, listed the Montauk Property for sale and prepared a package of due diligence materials and information.  Through those marketing efforts, and the brokers who communicated with Defendant Adam Manson, multiple offers were received by the Receiver and Defendant Manson.

---

[6]  The offering plan/prospectus will provide detailed information concerning the floor plans of each unit, relevant information and disclosures of the land, such as easements, right of ways, licenses, liens and mortgages affecting the land, the coop management and board, what the Sponsor is retaining or what is not being offered for sale, applicable uses and restrictions, and the operating budgets.  Similarly, the financial statements, which are generally prepared annually, will disclose the financial health of the Panoramic View, its assets and expenses, capital reserves and working capital, if any, and their balances.  The offering plans/prospectus and the financial statements are documents commonly and readily furnished in any purchase of a cooperative or condominium unit.  The Panoramic View is a cooperative apartment and hotel operation.

Offers initially started in the range of $35,000,000.00.  However, the offers from experienced and well financed developers were generally in the range of $50,000,000.00 to $58,000,000.00.  There was one proposal which was not for purchasing the property, but to enter into a joint venture where the interested developer would be responsible for all costs associated with the development, with the sales or operation proceeds being first used to reimburse all of the interested developer's development costs, and then the balance and future proceeds would be shared on a 70/30 basis to the interested developer and the Receivership.[7]  A few of the offers developed into Letters of Intent.

In the interest of pursing a consensual sale, Distinctive Ventures prepared a contract of sale for the purchaser that had offered and entered into a letter of intent for $58,000,000.00.  However, after the purchaser received Distinctive Ventures' proposed contract of sale, the purchaser declined to negotiate the terms of the proposed contract of sale.  Another party, Kept Hotels, offered $55,000,000.00 initially, and then revised the offer to $54,150,000.00.  Distinctive Ventures declined to offer a contract of sale with that party.  Thereafter, Defendant Manson, through his various entities, made proposals to purchase the Panoramic View for $54,200,000.00 and then for $56,200,000.00.  However, Defendant Manson did not provide the Receiver with the requested proof and assurances that Defendant or his entities had or will have the financial ability to close on the purchase.  *See **ECF Doc. 83***.

---

[7] The Receiver did not entertain the joint venture proposal because the it would require the Investors to wait an undefined time before there will be a recovery, with no clear assurance that any real or substantial recovery will be realized.  On the other hand, a sale would have a set closing date when a recovery can be realized for a calculable sum certain.

When it did not appear that a consensual sale would be likely, the Receiver commenced discussions with the USAO for an application for an interlocutory sale on the grounds of economic waste based upon non-payment of the loan.  The advantage of proceeding with an interlocutory sale is that the Montauk Property can be sold under the guidance of the Court without the approvals of the property owners, which in this case is Defendant Distinctive Ventures, which is controlled by Defendant Adam Manson.  An interlocutory sale pursuant to 28 U.S.C. § 2001 will require a bidding process, notice of the bidding process by publication, and minimum bid equal to 110% of the proposed contract price, with rights to increase the original bid until there is no higher bid.

The Receiver informed the USAO of the Kept Hotel Offer which was in the sum of $54,150,000.00, which Defendants Adam Manson and Distinctive Ventures declined to accept. Subsequently Kept Hotel presented a letter of intent for the same sum to the USAO, however, the offer was withdrawn when Kept Hotel did not provide proof of their financial ability to close on the purchase.  The Receiver then informed the USAO of HFZ who had expressed interest in purchase the Montauk Property for the same price of $54,150,000.00.  On April 9, 2013, the USAO accepted and signed a letter of intent to sell the Montauk Property to HFZ for $54,150,000.00.

The HFZ/USAO LOI was the basis of the application of the USAO for permission and authority to conduct an interlocutory sale.  The Receiver suggested and the USAO determined that, as part of the interlocutory sale application, a request would be made to the Court to direct Distinctive to provide financial information for the business operations of the Panoramic View and to deposit any surplus funds with the United States Marshal Services ("U.S. Marshals").  The Receiver's suggestion was prompted by Defendants

Manson and Distinctive Ventures failure to comply with the Receiver's subpoenas and investigation demands, which demanded among other things, updated financial information and records of the Panoramic View and its hotel operations.

Defendants Distinctive Ventures and Distinctive Investments, as claimants (collectively, the "Distinctive Claimants") in the Civil Forfeiture Action, opposed the USAO's the motion for an interlocutory sale.  As part of their opposition, the Distinctive Claimants disclosed for the first time a letter of intent they received from 40 North to purchase the Distinctive Notes for $38 Million.  Since the Distinctive Notes were assets of the Receivership at that time, the Receiver contacted 40 North and informed them that any offer to purchase the Distinctive Notes should be directed to the Receiver.  The Receiver then performed the function of qualifying the purchasers and negotiating with the parties to maximize the recovery for the Investors.  This process was conducted while updating the USAO and SEC of the negotiations in conjunction with and as an alternative to the USAO's Interlocutory Sale Motion.  The sale of the Distinctive Notes was an alternate process where the proposed purchaser would be responsible to gain the necessary approvals for a sale and release of the property from the forfeiture proceedings.

Negotiations ensued for the sale of the Distinctive Notes.  Under the USAO/HFZ LOI, the recovery for the Investors could be between $34,000,000.00 and $36,000,000.00.  As noted earlier, negotiations among and between 40 North, the Undisclosed Developer and HFZ led to a purchase price of $41,500,000.00 for the Distinctive Notes.  Subsequently an option was added for additional consideration of $1,250,000.00 for a total of $42,750,000.00.

A summary and history of the Receiver/HFZ LOI, the Note Contract, and the Court's Order March 27, 2014 Order (ECF Doc. 217) regarding the Distinctive Notes and the Note Contract is provided in Section I, subparts H – M, of this Quarterly Report. It is respectfully requested that this Court refers thereto for such summary and history.

**(b)      The Callahan Coop Unit**

The Receiver's investigation has confirmed that Investor Funds of not less than the amount of approximately $350,000.00 was used as the down payment for the purchase of the Callahan Coop Unit at the Panoramic View. The Callahan Coop Unit was appraised at $3,125,000.00 on or around February 24, 2011. The Callahan Coop Unit is presently encumbered by security interested granted to Gibraltar to secure a coop loan in the principal sum of $2,278,000.00, having an approximate remaining balance of $2.2 million. The Callahan Coop Unit is the subject of the Civil and Criminal Forfeiture Actions.

**(c)      The Callahan Residence**

The Callahan residence, according to the SEC's amended complaint and according to the Civil Forfeiture Action, received the benefit of over $560,000.00 of Investor Funds which were used to pay the mortgage for the Callahan residence. Callahan's Old Westbury Property was appraised at $2,300,000.00 on or around January 12, 2006, but is now estimated to have a "full market value" of $1,350,000.00 for tax assessment purposes. The Old Westbury Property is encumbered by a mortgage lien granted to Indy Mac to secure a loan in the principal sum of $990,000 and having an approximate remaining balance of $907,000.00 Callahan's Old Westbury Property is subject to the Civil and Criminal Forfeiture Actions.

During the 2013 Fourth Quarter, a stipulation was submitted to the Court in the Civil Forfeiture Action for permission to private sale the Old Westbury Property pursuant to a contract sale for the purchase price of $1,400,000.00, and to withdraw the property from the Interlocutory Sale Motion.  On January 23, 2014, the Court "So Ordered" the stipulation and authorized the sale of the Old Westbury Property pursuant to the terms of the submitted stipulation (the "So Ordered Old Westbury Stipulation").  *See Civil Forfeiture Action – ECF Doc. 67*.  Pursuant to the So Ordered Old Westbury Stipulation, approximately $1,059,312.21 of the sales proceeds would be used to satisfy the mortgage lien held by the Residential Asset Securitization Trust 2006-A1, Mortgage Pass-Through Certificate Series 2006-A (the "Trust"), which being serviced by OneWest Bank FSB ("OneWest") and/or Ocwen Loan Servicing, LLC ("Ocwen"), the loans and notes secured by such mortgage, and the claims made by OneWest, Ocwen and the Trust in the Civil Forfeiture Action.  The net sales proceeds, after the closing costs and expenses and the aforesaid lien satisfaction, is $278,509.58, all of which is on deposit with the U.S. Marshals.

**(d)**     **The Cromwell Storage Units**

Defendant Callahan indirectly owns a storage facility located at 10 Hillside Road, Cromwell, Connecticut (the "Cromwell Property") through Cromwell AAA Self Storage LLC ("Cromwell LLC"), a Connecticut limited liability company which Defendant Callahan is the Managing Member and owns a majority interest.  The real property where the storage facility is located is owned by Ten Hillside Drive, LLC ("Ten Hillside LLC"), a Connecticut limited liability company which Defendant Callahan is the Managing Member and wholly owns.

By a letter dated September 4, 2003 to Defendant Brian R. Callahan, Citizens Bank made a commitment to lend a commercial loan up to $2,450,000.00 to refinance a 378 unit self-storage facility.  On or about December 16, 2003, Ten Hillside borrowed two commercial loans from Citizens Bank, one in the principal sum of $2,170,000.00 and the other in the principal sum of $280,000.00 (respectively, the "$2.17 Million Loan" and the "$280K Loan", and collectively, the "Citizens Loans").  The Citizens Loans are each evidenced by their own separate Commercial Term Promissory Note, each dated December 16, 2003, and each made by Ten Hillside to Citizens Bank (respectively, the "$2.17 Million Note" and the "$280K Note", and collectively, the "Citizens Notes"). As a condition for and as component of the $2.17 Million Loan, Ten Hillside also entered into and executed an International Swap Dealers Association, Inc.'s Master Agreement dated December 8, 2003 (the "Master Agreement") which is a ten (10) year agreement for interest rate swaps, interest rate caps and interest rate collars designed to hedge against fluctuations in interest rates and currency exchange rates. The Citizens Notes are secured by a mortgage (the "Mortgage") granted by Ten Hillside on the Cromwell Property pursuant to the Mortgage Deed and Financing Statement dated December 16, 2003.  The Citizens Loans, as evidenced by the Citizens Notes, are guaranteed by Cromwell AAA and Defendant Brian R. Callahan pursuant to a Guaranty dated December 16, 2003 (the "Guaranty").

Both the $2.17 Million Loan and the $280K Loan were a ten (10) year term loan with a maturity date of January 1, 2014.  Each has matured.  The Master Agreement has also expired.

The outstanding principal balance of the $2.17 Million Loan is $1,554,555.00. The outstanding principal balance of $280,000.00 loan is $192,048.51. The Receiver's investigation has revealed that at least $228,000.00 of Investors Funds have been diverted for the use or benefit of Ten Hillside, Cromwell AAA, and the Storage Business.  It appears that some funds have been used to pay the Citizens Bank loan and other funds were used to pay the real estate taxes on Cromwell Property.  The Cromwell Property consists of 4.80 acres (or 209,088 square feet) located in an industrial area of the Town of Cromwell. It is located approximately 15 miles south of Hartford, Connecticut, 30 miles north of New Haven, Connecticut, and 30 miles east of Waterbury, Connecticut.  The Town of Cromwell has a population of approximately 14,000 and 5,200 households, according to a 2010 U.S. Census.

According to the appraisal report commissioned by Citizens Bank in 2012 and prepared by Italia Lemp (the "Citizens Bank's Appraisal Report"):

- The subject site is improved with five single-story self-storage buildings and a 600 square foot office.

- The buildings were constructed in 2004 and contained an estimated gross building area of 49,675 square feet and a rentable building area of 48,400 square feet.

- The subject contains a total of 382 storage units, 72 (18.9%) of which are climate controlled and an occupancy of approximately 76% based on square footage.

- Based on the market conditions as of August 8, 2012, the Cromwell Property was appraised to have an "As Is Value Estimate" of $2,025,000.00,

41

"Prospective Valuation Upon Stabilization" of $2,375,000.00, and a "Liquidation Value" of $1,600,000.00. Ten Hillside purchased the Cromwell Property on or about September 26, 2002 for the sum of $340,000.00, which, upon information and belief, was at that time an unimproved tract of land.

The Storage Business is presently generating approximately $30,750.00 of monthly income from the rental of its storage units. This sum accounts for renting approximately 81.4% of its total 47,200 square feet of rental unit space. In 2013, its rental revenue was approximately $362,000.00 according to Cromwell AAA's Income Statement for 2013.

The bulk of the Storage Business' revenue is expended on the payments of the Citizens Loan. Payment of the Citizens Loan accounts for approximately 62% of the 2013 revenue expenditures. The remaining portion of the Storage Business' revenue is expended on the payments of real estate taxes, office and administrative expenses (i.e., telephones, postage, etc.) and maintenance of the Cromwell Property. Payment of the real estate taxes accounts for approximately 27% of the 2013 revenue expenditures. In 2013, approximately 4% of the 2013 revenue expenditures were for repairs and maintenance, 2.4% for telephone and utilities, 2% for insurance, 1.65% for bank and credit card fees, and 1.3% for advertising.

On March 13, 2014, Non-Party Brian F. Callahan, as the part owner of Cromwell and manager of the Storage Business, Citizens Bank, as the originator and holder of the Mortgage and the Citizens Loans, and the Receiver agreed upon the terms for the consensual sale of the Cromwell Property and the monitoring of the income, revenue and expenditures of Cromwell AAA and the Storage Business. It was represented to the

42

Receiver that Defendant Brian R. Callahan, as the sole owner of the Ten Hillside, the owner of the Cromwell Property will cooperate and agree to the consensual sale.

A consensual sale of the Cromwell Property and the Storage Business will yield a higher return than a foreclosure sale, and increase the chances of a full recovery for Citizens Bank and the Receiver, and equity residue for Non-Party Brian F. Callahan. To reach an agreement for a consensual sale, there were several compromises. Citizens Bank agreed to waive any right it may have to pursue default interest on the Citizens Loans, to limit its right to repayment on the Citizens Loan to just principal and interest, to extend the Citizens Loan but at modified reduced interest rates during the period the Cromwell Property and the Storage Business is being marketed, and to absorb the costs of the loan extension and modification.

Both Citizens Bank and Non-Party Brian F. Callahan have acknowledged the Receiver's right to recover the sum of $228,000.00 from the Cromwell Property, and have agreed to allow the Receiver to recover $100,000 of the $228,000 before Citizens Bank and Non-Party Brian F. Callahan. The Receiver has agreed to defer the collection and recovery of the $128,000 balance of the $228,000 sum until after Citizens Bank recovers it principal and interest, with the possibility that the sales proceeds from the sale of the Cromwell Property and the Storage Business (the "Sales Proceeds") may be insufficient thereafter to recover the $128,000 balance. Non-Party Brian F. Callahan agrees to continue to manage and operate the Cromwell Property and the Storage Business while they are being marketed for sale for a fee of $50,000.00, which is only recoverable if there are sufficient Sales Proceeds to pay same.

The terms for the consensual sale and the monitoring agreement, which will be memorialized in a written agreement to be executed, will include the following and will be subject to this Court's approval:

1.  Marketing of the Cromwell Property and the Storage Business:

    a.  Non-Party Brian F. Callahan will have the right to try to market and sell the Cromwell Property and the Storage Business without a broker for the first four initial months following the execution of the Consensual Sale Agreement, for a minimum asking price of $2.1 million dollars;

    b.  If there are no offers to purchase Cromwell Property (with or without the Storage Business) during those four initial months, Non-Party Brian F. Callahan will contract with a third party broker to sell the Cromwell Property and the Storage Business for a minimum listing price of $2.1 Million dollars;

    c.  The Broker must be approved by Citizens Bank and the Receiver;

    d.  All purchase agreements must be approved by Citizens Bank and the Receiver; and

    e.  Non-Party Brian F. Callahan will continue to manage the Storage Business while the Cromwell Property and Storage Business is being marketed for sale.

2.  Sale Proceeds will be disbursed in the following order and priority:

    a.  Payment of typical closing costs/taxes/brokerage fees;

    b.  Payment of $100,000.00 to the Receiver;

    c.  Payment of the outstanding Principal and (regular) Interest of the Citizens Loan, as extended and modified, from Sales Proceeds, and if the Sales Proceeds is insufficient then from the Citizens account (to be described below);

    d.  Then:

        i.  If the Sale Proceeds are sufficient to pay both Non-Party Brian F. Callahan's $50,000.00 Management Fee and the Receiver's $128,000.00 balance, then payment of said sums from and through the Sale Proceeds.

44

    ii. If the Sale Proceeds are insufficient to cover both Non-Party Brian F. Callahan's $50,000.00 and the Receiver's $128,000.00 balance, then, (A) the Receiver takes first from the Citizens Bank account balance; and (B) Brian F. Callahan takes up to $50,000.00 from the Sale Proceeds first, and if there is any Sales Proceed remaining, the Receiver then takes up to $128,000.00 from the Sale Proceeds less the amount the Receiver has taken from the Citizens Bank account in part (A).

   e. Payment of the balance of Sale Proceeds and Citizens Bank Account, if any, to Non-Party Brian F. Callahan and Defendant Brian R. Callahan, however, Defendant Brian R. Callahan's portion of Sales Proceeds and Citizens Bank Account are subject to approval and claims by the U.S. Securities and Exchange Commission, the U.S. Attorney's Office, the Asset Freeze in the Receivership Orders, and the Receivership Court.

3. Extension of the Citizens Loans:

   a. Citizens Bank will extend the Citizens Loans for 12 months (with an option to extend it for an additional six month);

   b. Citizens Bank will reduce the existing interest rate to Libor + 4.50% per annum;

   c. The Bank waives any right or claim to be paid default interest from the Sales Proceeds;

   d. Monthly payments to the Bank will resume based on the new interest rate terms; and

   e. The Bank will absorb all refinance closing costs, including the Banks attorney fees.

4. Cash Management and Monitoring Agreement:

   a. The Cash Management and Monitoring Agreement will be signed at the same time as the Consensual Sale Agreement;

   b. All cash receipts and expenses of the business will run through the Citizens Bank Account – under the control of the Receiver and the Bank as described in the Cash Management Agreement to be executed;

   c. Regular reports will be made to the Receiver as described in the Cash Management Agreement;

   d. A yearly and monthly budget will be completed as described in the Cash Management Agreement circulated on Wednesday, March 12, 2014;

    e.   Cromwell AAA will only use the Citizens Bank account and no other account as its operating account;

    f.   Cromwell AAA will close all its other bank accounts, including those accounts maintained at Bank of America and Liberty Bank.

    g.   The Receiver will request that the Receivership Court modify the Receivership Stay and Asset Freeze to unfreeze the Citizens Bank Account, which shall serve as the sole depository of all of Cromwell AAA and the Storage Business accounts receivable, revenues and income.

**(e)**    **<u>Creditors</u>**

At this juncture, without any books, records, or accounts payable / receivable ledgers, it continues to remain impossible to identify, review or analyze known creditors of the Receivership Entities. Based upon initial communication, Deloitte advised that allegedly $50,000.00 was still owed for preparing the 2010 financial statements and tax returns for the Callahan Funds and that allegedly Deloitte was not retained to prepare the 2011 tax returns. The Receiver will be continuing its investigation with respect to creditors as well as with respect to third party claims of the Receivership Defendants. To date, no one other Deloitte has communicated to the Receiver about pre-receivership debts owed by any of the Receivership Entities. As of March 31, 2014 no potential creditor claims had been submitted to the Receiver pursuant to the Claims Order.

**F.**    **INVESTIGATING AND ORGANIZING CLAIMS AGAINST THIRD PARTIES**

The Receiver continues its investigation of potential clawback claims for the repayment of Investor Funds paid for redemptions. The Receiver has subpoenaed and received documents from several investors, including Roberta J. Hucek, and the Montauk Fire Department. The Receiver has also demanded the repayment of funds received by the Montauk Fire Department purporting to be their net profits of their investments. The Montauk Fire Department repaided Investor Funds in the amount of $46,690.21 during this quarterly period.

The Receiver continues to search and investigate Investor Funds transferred or held by third parties, including Investor Funds misappropriated from the Receivership Entities. Defendant Callahan failed to maintain investor funds in liquid segregated accounts, and indiscriminately commingled and used commingled Investor Funds to satisfy redemption requests.  It is premature to evaluate if any recovery can be realized from third-party claims, whether as clawbacks claims or on any other basis.  The investors have outlined and made numerous suggestions of potential third party claims which the Receiver has reviewed and is continuing to evaluate.  The Receiver has and continues to investigate and evaluate third party claims and the cost effectiveness of retaining special counsel and/or counsel in a foreign jurisdiction to pursue extra-territorial third party claims.

Certain investors have communicated with the Receiver about claims against Castle Re, Deloitte, Fidelity Insurance, Pictet & Cie, and Rochdale, among others.  The Receiver has informed these certain investors that he has no objections to any of them commencing their own private action against said third parties.  These claims appear to be unique to only a limited number of investors.  Any of such private actions by these certain investors will not be financed by the Receiver and will not deplete Receivership Estate assets, but a recovery in such private action may reduce the potential claim of certain investors.  The Receiver continues to monitor the commencement and status of claims or proceedings by individual investors against third parties.

Some of these investors have since commenced actions and/or proceedings against certain third-parties in various forums.  Such actions and/or proceedings are in the initial stages. The Receiver is not in a position at this time to report further on such third-party claims, or predict the likelihood or extent of any recovery.  The Receiver will continue to investigate the

claims, evaluate the legal merits of any such claims, as well as the practical costs for pursuing such claims by the Receivership.

### III.   THE STATUS OF THE PROPOSED PLAN FOR THE RECEIVERSHIP ESTATE

The Receiver has recovered approximately $6,702,346.84 million from the combination of $6.4 million dollars frozen by the Receivership Order's injunctive provisions, an offshore account and clawback of Investor Funds paid in excess of the principal investment. The Receiver continues to seek and pursue possible recoveries for the Receivership Estate.

**A.**     **The Real Property:**

i.     **The Panoramic View**:      The Receiver has participated in the negotiation of proposals for the consensual sale of the Panoramic View.  The Receiver will continue to participate where it is in the best interest of the Receivership Estate to maximize the recovery for the Investors.  The Receiver has previously demanded that Distinctive Investments repay the monies and loans evidenced by the promissory notes.  The Receiver sought Receivership Court permission to commence a legal proceeding for recovery on the notes.  Defendant Adam Manson and the Distinctive Entities have acknowledged receipt of the demands, but no sum has been repaid as of the date of this Quarterly Report.  Defendant Adam Manson has taken the position that some notes have been satisfied or refinanced but has yet to provide any proof of either.  On March 1, 2014 this Court denied the Receiver's motion for an action on the notes without prejudice (ECF Doc. 189) based upon the USAO's motion for an interlocutory sale in the Civil Forfeiture Action.  Defendant Adam Manson has again expressed interest in cooperating toward a consensual sale.  The Court has removed the notes from the Receivership Estate by its March 27, 2014 Order (ECF Doc. 217).

The Receiver is considering all of its legal remedies.  The Receiver is also continuing to monitor the Civil and Criminal Forfeiture Actions, communicating with the U.S. Attorney's Office regarding the sealed bidding process for consensual sale, and how much of the proceeds of any such sale will be returned to the investors.

ii.      **The Callahan Coop Unit and Residence**:

The Receiver is continuing to monitor the Forfeiture Actions and is communicating with the U.S. Attorney's Office with respect to the recovery of Investor Funds from the sale of the Callahan Coop Unit and/or from the sale of the Callahan residence, the Old Westbury Property.

iii.      **Cromwell Property**:  The Receiver obtained documents and information concerning Cromwell LLC, the storage facility business, the Cromwell Property and Ten Hillside LLC from the subpoenas it issued.  Though the subpoena has multiple investigative purposes, the primary one was whether the Cromwell Property or Cromwell LLC's storage facility business can be a source of recovery for investors.  At the present time, the Cromwell Property has equity but not substantial equity to warrant a viable source of recovery.  Issues have been negotiated between the Receiver, Citizens Bank and Cromwell AAA Storage LLC for a consensual sale of the real property and for the Receivership Entities to recover monies that were traced through bank accounts to Investor Funds and paid to Cromwell for payment of the real estate mortgage and/or taxes.   It is believed that there is at least $228,000.00 of Investor Funds which went to or were used for the benefit of Cromwell.  In the next calendar quarter, we will submit he agreement for the court's review and approval.

B.    **Non-Real Property:**

(i)    **The Callahan Funds**:        The Receiver is continuing to seek the books and records of the Callahan Funds to determine the financial condition of the Receivership Entities which have not been turned over to the Receiver despite this Court's Order.  In pursuit of alternative sources of such information, the Receiver has served requests and investigatory subpoenas upon banks, financial institutions, administrators and accountants located in the British Virgin Islands, Bermuda, the Cayman Islands and/or Nevis.  As the these entities are outside the United States, compelling disclosure of information through judicial process is difficult, and if these entities are situated in a country that is not party to the Hague Convention, it will be exceptionally difficult if not costly.  It should be noted, that the Receiver has notified the off-shore banks, financial institutions and accountants, as wells as administrators which the Receiver discovered, of the Receivership Orders and has invited each of them to voluntary comply with the Receivership Order.

(ii)    **Redemptions**:        The Receiver is continuing its investigation of the use of Investor Funds for redemptions.  The Receiver has sent a letter for proof of each investor's claim for investment and redemption.

C.    **Summary:**     The Receiver's Initial Plan (ECF Doc. 42) outlined what assets it seeks to investigate and possibly pursue for which the Receiver believes is cost-effective and which presents a likelihood of recovery for investors.  During the Subject Quarterly Period, the Receiver primarily focused on pursuing the claims for the recovery of Investor Funds that were utilized for purchase, improvement or maintenance of real property or real property interest, including loan payments for such real property.  The Receiver's investigation as to other claims against third parties continues and are developing with consultations with potential special

counsel.  At this stage, it is premature for the Receiver to report on such claims or predict the likelihood or extent of any recovery.  The Receiver will continue to evaluate the legal merits of third party claims and make a practical evaluation of the potential benefits to the Receivership Estate versus the costs of pursuing such claims.  The Receiver continued his investigation during this reporting period of trails of monetary transfers originating and/or deriving from Investor Funds, as well as assets of defendants and third-parties against whom the Receiver may pursue claims based upon these transfers.

## IV.     **CLAIMS PROCESS.**

The Receiver, by a motion (ECF Docs. 177 – 180), proposed a claims determination procedure to the Receivership Court at the end of the 2013 calendar year.  The Claims Order (ECF Doc. 186) established the claims determination procedure which provided a process by which a formal notice was given to known investors and creditors, and public notice was given by publication in newspapers of general circulation, including the New York Times, the Financial Times, The St. Kitts and Nevis Observer and The BVI Beacon, to and for unknown investors/creditors, to submit a formal claim to the Receiver which the Receiver will evaluate. The Receiver will make a written Notice of Claims Determination to each potential claimant pursuant to the terms of the Claims Order.  The Claims Bar Deadline was established as April 21, 2014, 5:00 p.m. EST.  As of March 31, 2014 the Receiver had received 27 potential claims submitted pursuant to the Claims Order totaling $40,709,345.08.

Upon identifying the claimants and their respective claims, the Receiver by a separate and subsequent motion will propose to this Court a claims disposition procedure by which the Receiver will be able to recommend which claims of an investor or a creditor should be allowed or disallowed, in whole or in part for this Court to review and determine.  Prior thereto, the Claims Order provides the process by which any investor or creditor whose claim is recommended for disallowance in whole or in part can object and seek summary review and disposition of their objections. The objection will be submitted on paper with the opportunity for the Receiver to respond.  The Receivership Court will have the option to conduct a hearing and/or to issue a decision with respect to a final allowance or rejection of a claim.  As part of the claims recommendation procedure, the Receiver will also recommend classes of claimants for the Court to review and approve on behalf of whom the Receiver can make an application for recommended distribution of Receivership Estate proceeds.

### V.      ASSETS, LIQUIDATION AND DISTRIBUTION OF PROCEEDS

The assets that continue to be liquidated are reported on in Section II B. the Receivership Financial Report. Distribution will be by the procedure outlined the Section IV Claims Process.

## VI.   <u>CONCLUSION</u>

During this Quarterly Period, the Receiver continued to follow the proposed plan set forth in the Receiver's Initial Plan (ECF Doc. 42) to marshal and liquidate the Receivership Assets and Receivership Property.  Pursuant to the Receivership Court Orders, the Receiver will continue to report to this Court quarterly to update and supplement the Plan; report on the Receiver's continuing investigation; report on the activities of the Receiver taken since the last reporting period; to continue to marshal and liquidate the Receivership Assets and Receivership Property; to pursue the claims of the Receivership Estate; to report on the administration of the Receivership Estate; and to provide an accounting of the activities and disbursements of the Receiver including income received and disbursements made.  Please see the attached SFAR for the accounting for the reporting period of January 1, 2014 through March 31, 2014.

Dated: New York, New York
      May 2, 2014

RESPECTFULLY SUBMITTED,

STEVEN WEINBERG
as RECEIVER for
Horizon Global Advisors, Ltd.,
Horizon Global Advisors, LLC,
Diversified Global Investments (BVI), L.P.,
The Masters Global Fund, L.P.,
Fiduciary Select Income Fund, L.P.,
Horizon Millennium Investments, L.P.
and Pangea Offshore High Yield Portfolio, LLC