**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
SECURITIES AND EXCHANGE
COMMISSION,

                     Plaintiff,         **MEMORANDUM OF**
                                      **DECISION & ORDER**
           -against-             12–CV–1065 (ADS)(AYS)

BRIAN RAYMOND CALLAHAN, ADAM
MANSON, DISTINCTIVE INVESTMENTS
LLC, and DISTINCTIVE VENTURES LLC,

                     Defendants,

SHERI MANSON CALLAHAN,

                     Relief Defendant.
-----------------------------------------------------------X

**APPEARANCES:**

**Gottesman, Wolgel, Secunda, Malamy & Flynn, P.C.**
*Attorneys for the Receiver Steven Weinberg*
11 Hanover Square, 4th Floor
New York, NY 10005
      By: Richard B. Demas, Esq.
           Stewart W. Lee, Esq.
           Kelsey Bilodeau, Esq.
           Steven Weinberg, Esq., Of Counsel


**United States Securities and Exchange Commission**
*Attorneys for the Plaintiff*
100 F Street, NE
Washington, DC 20549
      By: Dean M. Conway, Esq., Assistant Chief Litigation Counsel

**Sher Tremonte LLP**
*Attorney for the Relief Defendant Sheri Callahan*
41 Madison Avenue, 41st Floor
11 Elm Place
New York, NY 10010
      By: Michael Tremonte, Esq., Of Counsel

Brian Callahan, Pro Se
3 Windsor Drive
Old Westbury, New York 11568

**Law Offices of Andrew J. Frisch**
*Attorneys for the Defendants Adam Manson, Distinctive Investments LLC, and Distinctive Ventures LLC*
40 Fulton Street - 23rd Floor
New York, NY 10038
      By: Andrew J. Frisch, Esq., Of Counsel


**Johnson & Bell, Ltd.**
*Attorneys for the Objectors William V. Johnson, Diane Johnson, and Bocogrande Trust*
33 W Monroe St, Ste 2700
Chicago, IL 60603
      By: Joseph Renato Marconi, Esq., Of Counsel

**SPATT, District Judge**.

Presently before the Court are objections to an April 24, 2015 Notice of Determination by the Receiver Steven Weinberg (the "Receiver") partially denying a claim submitted by William V. Johnson and Diane Johnson on behalf of the Bocagrande Trust (the "Trust" and together with William and Diane Johnson, the "Claimants") against the Receivership Estate for $4,707,149.23 (the "April 24, 2015 Notice of Determination").

Also before the Court are two additional motions by the Claimants to (i) amend the March 27, 2012 Preliminary Injunction Order (the "Preliminary Injunction Order"); and (ii) to intervene in this action pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 24.

For the reasons set forth below, the objections to the April 24, 2015 Notice of Determination are denied; the motion to amend the Preliminary Injunction Order is denied; and the motion to intervene is denied.

# I. BACKGROUND

This case involves three parallel actions: (i) <u>U.S.A. v. Callahan and Manson</u>, 13-cr-453, a criminal action against Brian Callahan ("Callahan") and Adam Manson ("Manson") (the "Criminal Action"); (ii) <u>United States v. The Real Property Located at 272 Old Montauk Highway</u>, 12-cv-1880, a civil forfeiture action initiated by the United States against certain properties associated with Manson and Callahan (the "Forfeiture Action"); and (iii) the present action initiated by the Plaintiff the Securities and Exchange Commission ("SEC") seeking the disgorgement of alleged ill-gotten gains and civil penalties against Manson, Callahan, and some of the offshore funds that they operated (the "SEC Action").

Although familiarity with these actions is presumed, the Court finds it necessary to provide an overview of the Criminal Action and the SEC Action, as well as the procedural history relevant to the Claimants' present motions.

## A. As to the Criminal Action

On July 31, 2013, the United States filed a twenty-four count criminal indictment against Callahan and Manson in the Criminal Action for (i) securities fraud; (ii) conspiracy to commit securities fraud; (iii) wire fraud; (iv) conspiracy to commit wire fraud; (v) and aggravated identify theft (the "Indictment"). (<u>See</u> the Indictment, 13-cr-453, Dkt. No. 1, at ¶¶ 46–72.).

According to the Indictment, from June 2005 to February 2012, Callahan managed a number of offshore funds, including, as relevant here, Pangea Offshore High Yield Portfolio, LLC ("Pangea Offshore") and Pangea Global Opportunities Portfolio, LLC ("Pangea Global"). (<u>See</u> <u>id.</u> at ¶ 2.) Allegedly, in 2005, Callahan organized Pangea Offshore as a Nevis, West Indies limited liability company. (<u>Id.</u> at ¶ 3.) Pangea Global was also a Nevis limited liability company and allegedly a wholly owned subsidiary of Pangea Offshore. (<u>Id.</u>)

In 2006, Callahan and Manson purchased the Panoramic View, a cooperative development in Montauk, New York (the "Panoramic View"), by obtaining a $35 million acquisition loan and a $10 million construction loan from an unidentified mortgage bank. (<u>See</u> <u>id.</u> at ¶¶ 10–12.)

Although Callahan allegedly represented to investors in Pangea Offshore and Pangea Global that he was investing their money in mutual funds and other securities, he instead used the investors' money to pay part of the purchase price of the Panoramic View; to pay several monthly loan payments on the Panoramic View; to pay redemptions to old investors of the Pangea funds; and for his own personal expenses. (<u>See</u> <u>id.</u> at ¶¶ 14–17.)

In addition, among other allegations, the Indictment alleges that Callahan improperly used other investment funds as a Ponzi Scheme by commingling investors' deposits and taking money from new investors and using that money to pay redemptions to existing investors. (<u>Id.</u> at ¶ 21.)

On April 29, 2014, the Court accepted Callahan's guilty plea to one count of securities fraud and one count of wire fraud. (<u>See</u> 13-cr-453, Dkt. No. 62.)

On May 13, 2014, the Court accepted Manson's guilty plea to one count of conspiracy to commit securities fraud. (<u>See</u> <u>id.</u> at Dkt. No. 67.)

Manson is presently scheduled to be sentenced on July 29, 2016. Callahan is presently scheduled to be sentenced on September 30, 2016.

**B. As to the Instant SEC Action**

On March 5, 2012, the Plaintiff the Securities and Exchange Commission (the "SEC") commenced this action against the Defendants Callahan and two investment funds that he managed, Horizon Global Advisory LTD. ("HGA") and Horizon Global Advisors LLC ("HGA

LLC" and collectively, the "Original Defendants").  The complaint alleged that from 2005 to 2012, Callahan raised over $74.9 million from twenty-four investors for five offshore funds to ostensibly invest in Hedge Funds.  (Compl., Dkt. No. 1, at ¶ 1.)  Allegedly, contrary to his representations to those investors, Callahan misused a portion of the investors' assets to, among other things, pay other investors seeking redemptions and to pay monthly loan payments on the Panoramic View.  (See id. at ¶¶ 1–3.)

The SEC sought injunctive relief, disgorgement, prejudgment interest, and civil monetary penalties based on the Original Defendants alleged violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), codified as 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), codified as 15 U.S.C. § 78j(b); Rule 10b–5 promulgated under the Exchange Act as 17 C.F.R. § 240.10b–5 ("Rule 10b–5"); and Section 206 of the Investment Advisers Act of 1940 (the "Advisers Act"), codified as 15 U.S.C. § 80b–6.  (See id. at ¶¶ 73–84.)

On March 27, 2012, the Court granted the SEC's motion for a preliminary injunction (i) restraining the Original Defendants from violating the Securities Act, the Exchange Act, Rule 10b–5, and the Advisers Act, see Prelim. Injunction Order, Dkt. No. 22, at pp. 1–4; (ii) directing the Original Defendants to place assets obtained from investors which were located outside of the United States into the registry of the Court, see id. at p. 4; (iii) prohibiting the Original Defendants from soliciting money from potential investors until the resolution of this action and from destroying documents related to the allegations in the complaint, see id. at p. 5; and (iv) as relevant here, placing the assets of HGA and HGA LLC (the "Receivership Defendants") into a receivership and appointing Weinberg as the Receiver for the estates of the Receivership Defendants, see id. at p. 5, ¶¶ 1–2.

To facilitate the Receivership, the Preliminary Injunction Order froze "all Receivership Assets and all of the funds and other assets of the Defendants presently held by them, for their direct or indirect benefit under their direct or indirect control or over which they exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located, including but not limited to those assets identified in the attached Exhibit A." (Id. at p. 6, ¶ 3.)

The term, "Receivership Assets," is defined as "all assets of in the name of the Receivership Defendants." (Id. at pp. 5–6, at ¶¶ 2–3.) Exhibit A lists assets of additional funds subject to the asset freeze, which are not named as Defendants in the complaint, including Pangea Offshore and Pangea Global, as well as Westminster Alternative Investments, LLC; Westminster Flagship Global LLC; Westminster Horizon Global Investments, LLC; Westminster Hedged Portfolio, LLC; and Westminster High Yield Portfolio, LLC (collectively, the "Westminster Funds"). (See id. at Ex. A.)

Among the general powers and duties assigned to the Receiver by the Preliminary Injunction Order is the duty "[t]o use reasonable efforts to determine the nature, location and value" of the Receivership Property and Receivership Estates. (Id. at p. 7, at ¶ 7(a).) The Order defines "Receivership Property" and "Receivership Estate" as the "property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, effects, goods chattels, land, premises, leases, rights and other assets, together with all rents, profits dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendants own possess, have a beneficial interest in, or control directly or indirectly." (Id.)

The Preliminary Injunction also stayed "Ancillary Proceedings" until further order of the Court, which included, "[a]ll civil legal proceedings of any nature . . . involving . . . any of the

Receivership Defendants, including subsidiaries and partnerships; or . . . any action taken by [the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners] while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise." (See id. at p. 16, ¶ 32.)

Finally, the Preliminary Injunction Order directed the Receiver to develop a plan for the recovery and liquidation of the Receivership Property. (Id. at p. 20, at ¶¶ 52–53.)

On May 31, 2012, the SEC filed an amended complaint that added as named Defendants five offshore funds allegedly operated by Callahan: Diversified Global Investments (BVI), L.P. ("Diversified"); The Masters Global Fund, L.P. ("Masters"); Fiduciary Select Income Fund, L.P. ("Fiduciary"); Horizon Millennium Investments, L.P. ("Horizon Millennium"); and Pangea Offshore (collectively the "Callahan Funds"). The amended complaint also added as named Defendants Manson; Distinctive Investments, LLC ("Distinctive Investments"); Distinctive Ventures, LLC ("Distinctive Ventures"); and Sheri Manson Callahan as a Relief Defendant. (See Am. Compl., Dkt. No. 28.)

On June 4, 2012, the Court so-ordered a stipulation signed by the SEC and Callahan, in his official capacity as director of the Callahan Funds, placing the assets of the Callahan Funds into the Receivership (the "June 4, 2012 Stipulation"). (See Order, Dkt. No. 33.)

On June 6, 2012, granted a motion by the United States Attorneys' Office for the Eastern District of New York to stay the SEC Action until the resolution of the Criminal Action. (Order, Dkt. No. 48.) However, under the terms of the Order, the Receiver was permitted to continue to exercise all the authority granted to it under the Preliminary Injunction Order. (See id.)

On March 9, 2013, the Court approved a consent judgment against HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium, and Pangea High Yield, which

among other things, directed them to pay disgorgement and ill-gotten gains in an amount to be determined by the SEC. (See Order, Dkt. No. 99, at pp. 4–5.) As a result, the only remaining named Defendants in this case are Callahan, Manson, Distinctive Investments, and Distinctive Ventures. Sheri Manson Callahan remains the Relief Defendant.

On February 20, 2014, the Court issued an order establishing the deadline and procedures for the filing of claims against the "Receivership Entities," the Receiver, and the "Receivership Estate" (the "Claims Order"). (See the Claims Order, Dkt. No. 186.) The Claims Order defines the "Receivership Entities" as HGA LTD; HGA LLC; Diversified; Horizon Global Investments; L.P. ("Horizon Global"); Masters; Fiduciary; Pangea Bridge Investment L.P. ("Pangea Bridge"), Horizon Millennium; and Pangea Offshore. (See id. at p. 1.) The Claims Order does not define the term, "Receivership Estate." (See id.)

The Claims Order defines a "Potential Claim" as:

> (a) a right to payment . . . . against one or more of the Receivership Entities or the Receivership Estate; (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment . . . . against one or more of the Receivership Entities; (c) a right to a distribution from one or more of the Receivership Entities, including but not limited to a right based on an investment in or through one or more Receivership Entities.

(Id. at p. 2, at ¶ 3.)

Under the Order, the Receiver is required to send a notice of the Claims Order and the relevant procedures to all known Potential Claimants by March 20, 2014; and to publish a notice in several news publications by April 3, 2014. (See id. at p. 4–6, ¶ 3(c).)

The Order requires Potential Claimants to submit to the Receiver by April 21, 2014, a completed Proof of Claim Form accompanied by "all supporting documentation," *see id.* at p. 6, ¶ 3(d); if supporting documentation is not available, the Potential Claimant is required to "attach an explanation of why the documentation [was] unavailable," *see id.* at p. 9–10, ¶ 3(f)(ii); and

"indicate on the Proof of Claim each . . . Receivership Entity to which the Potential Claim relates and the Potential Claim amount(s) attributable to each such Receivership Entity, *see id.* at 10, ¶ 3(f)(iii).

Once a Potential Claimant submits a Proof of Claim form, the Potential Claimant becomes subject to the jurisdiction of this Court, *see id.* at p. 10, ¶ 3(g), and consents to the evaluation of its claim by the Receiver according to a number of conditions. Specifically, the Receiver reserves the right to reject any Proof of Claim that, among other things, omits information or was submitted "without sufficient supporting documents." (Id. at p. 8, ¶ 3(f).) In addition, the Claims Order authorizes the Receiver to "assess the validity, nature and priority of the Potential Claim," including "whether the Potential Clam is properly made against the Receivership Estate" and "whether the Potential Claim has priority over certain other claims." (Id. at p. 12, ¶ 3(k)(i).) The Claims Order also gives the Receiver the "discretion to recommend adjustment or non-payment of a Potential Claim on equitable or any other applicable grounds, irrespective and regardless if the Receiver had taken any specific discovery for such Potential Claim." (Id. at p. 13, ¶ 3(k)(iv).)

Further, the Claims Order outlines a process for Potential Claimants to challenge the determinations by the Receiver: (i) the Receiver is required to provide a written Notice of Determination to the Potential Claimant "setting forth the reasons for denying or disallowing the Potential Claim," *see id.* at p. 13–14, ¶ 3(m); (ii) if the Potential Claimant disagrees with the Receiver's decision, then it can serve objections on the Receiver, which have to include a statement of reasons explaining the objections and "copies of any proofs, documents or other writing upon which the Potential Claimant relies," *see id.* at p. 14–15, ¶ 3(n); (iii) the Receiver and Potential Claimant are then directed to work in good faith to resolve the Potential Claimant's

objections, *see id.* at p. 15, ¶ 3(m); and (iv) if the parties are unable to resolve the objections, the Potential Claimant is authorized to serve its objections on the Court, *see id.* at 15–16, ¶¶ 3(p)–(q).

On March 3, 2014 and March 18, 2014, respectively, the Receiver published notice of the procedures for submitting a Potential Claim under the Claims Order in the New York Times and the Financial Times. (See Nov. 20, 215 Lee Decl., Dkt. No. 349, Exs. C–G.)

On April 21, 2014, the deadline under the Claims Order to file Potential Claims expired. (See id. at Ex. A.)

As of June 30, 2014, the Receiver has received 67 Potential Claims that total $100,016,063.78. (See Receiver's 2016 First Quarter Report, Dkt. No. 382, at p. 35.) However, as of the First Quarter of 2016, the Receivership has recovered only $7,584,130.91 in assets. (See id. at p. 31.) Thus, there remains a significant disparity between the amount of the investors' potential claims, on the one hand, and the amount available in the Receivership Estate to pay those claims, on the other.

**C. As to the Trust's Claim**

On April 14, 2014, the Claimants submitted a Proof of Claim Form asserting a Potential Claim against the Receivership Estate for a total amount of $7,613,887. (See Sept. 21, 2015 Weinberg Decl., Ex. A, at p. 6.) The Potential Claim had two parts: William Johnson asserted a claim individually in the amount of $2,860,000 for his investment in Horizon Millennium; and the Trust asserted a claim in the amount of $4,753,887 for its investments in Pangea Global, Pangea Offshore, and Horizon Millennium. (See id.)

The Receiver requested additional information from the Claimants related to their Potential Claims on June 6, 2014; October 6, 2014; and January 5, 2015.  (See id. at Exs. C, D, F.)

The Claimants timely responded to those requests on July 7, 2014; November 7, 2014; and January 26, 2015, by providing the Receiver with more than 1,700 pages of documents.  (See id. at ¶¶ 8, 10, 12.)

On April 24, 2015, the Receiver issued a written Notice of Determination in which it (i) approved in its entirety the individual claim by William Johnson for $2,860,000; and (ii) approved in part the Trust's $4,707,149.23 claim in the amount of $1,759,571.24.  (See Id. at Ex. F, at pp. 1–2.)

With regard to the latter determination, the Receiver stated that it reduced the Trust's $4,707,149.23 claim by $2,947,577.99 because (i) the Trust failed to substantiate that it invested $1,595,912.86 of the $4,707,149.23 it claimed in a Receivership Entity; (ii) the Trust received a redemption on its investment in a Receivership Entity in the amount of $1,322,031.23; and (iii) the Receivership Entity in which the Trust invested used $29,633.90 of the Trust's money to pay for an insurance policy and administrative fees, which, according to the Receiver, is not recoverable under the Claims Order.  (See id. at 2.)

Finally, the Receiver found that the $1,322,031.23 redemption that the Trust allegedly received from a Receivership Entity represented 42.49% of its investment in the Receivership Entity.  (Id. at 2.)  Thus, the Receiver determined that the Trust could not participate in any distribution of the Receivership Estate until all approved claimants recovered at least 42.49% of their total investment.  (See id.)

On May 1, 2015, in response to a request from the Claimants, Kelsey Bilodeau, Esq. ("Bilodeau"), an attorney for the Receiver, provided the Claimants with a breakdown of its decision to reduce the Trust's $4,707,149.23 claim:

> Pursuant to the documents Claimants' provided to the Receiver: (i) the Trust in 2005 and 2006 invested $1,209,317.61 in Receivership Entity, Pangea Offshore High Yield Portfolio, LLC ("Pangea Offshore"); (ii) the Trust in 2009 transferred $10,302 to Receivership Entity, Horizon Global Advisors LLC; and (iii) the Trust in 2010 invested $105,174.32 in Receivership Entity Horizon Millennium Investments L.P. ("Horizon Millennium"), and invested $1,696,442.44 in Receivership Entity, Pangea Offshore. Accordingly, the documents from the Trust show investments of $3,111,236.36 in Receivership Entities. However, in January of 2007, the Trust redeemed $1,322,031.23 from its investment in Pangea Offshore and subsequently incurred $29,633.90 representing administrative and insurance policy fees, for a total sum of $1,351.695.13. The net difference is $1,759,571.24, the amount approved by the Receiver for the Trust Portion of the Claim (i.e. $3,111,236.36 – $1,351.695.13).

(Id. at Ex. G, at p. 2.)

In a May 11, 2015 letter, Joseph Marconi, Esq. ("Marconi"), counsel for the Claimants, responded, "[t]he Receiver's Notice of Determination of Claim . . . rejected the portion of the Trust's claim (approximately $2,350,000) that was invested in Pangea Global Opportunities Portfolio, LLC ('Pangea Global'). We do not understand why the Pangea Global fund was distinguished from those funds that were deemed Receivership Entities." (Id. at Ex. H, at p. 1.)

In addition, Marconi challenged the Receiver's description of the Trust's 2007 sale of its shares in Pangea Offshore as a "redemption" because according to Marconi, the funds that the Trust received from the sale were transferred to the Westminster High Yield fund, which was also allegedly controlled by Callahan. (See id. at p. 3.) As the funds purportedly never left Callahan's control, Marconi asserted that the transfer of funds from Pangea Offshore to Westminster High Yield was not a "redemption" and therefore, should not have been deducted from the Trust's claim against the Receivership Estate. (See id.)

On May 26, 2015, the Claimants served the Receiver with formal objections to the April 24, 2015 Notice of Determination.  (See id. at ¶ 18.)  However, the Trust reduced the amount of its Potential Claim from $4,707,149.23 to $4,250,790.36 because of "an accounting difference too obscure to resolve in this format in the given time frame."  (Id.; see also id. at Ex. J, p. 4.)

In a July 21, 2015 letter, Bilodeau affirmed the Receiver's prior Notice of Determination because, among other things, she asserted that: (i) Pangea Global and the Westminster Funds are not "Receivership Entities" and therefore, not a part of the Receivership Estate; (ii) "[the] Claimants[] provide no documentation to show how or why the Receivership Estate is liable for Pangea Global or how or why they believe Pangea Global's funds are in the possession of the Receivership Estate"; and (iii) "[t]he Trust received a redemption when funds were redeemed from Receivership Entity Pangea Offshore and returned to First Fidelity Trust Ltd. as the holder of the Trust's funds."  (Id. at 1–10.)  She added, "[t]he fact that such funds were then transferred within the Trust's portfolio and invested in a non-Receivership Entity does not negate the fact that the Trust received a redemption from Receivership Pangea Offshore of more money than the Trust initially invested in Pangea Offshore."  (Id. at 10.)

On August 20, 2015, Marcante responded, claiming that (i) Callahan and HGA were responsible for the loss of the Trust's investment in Pangea Global; and (ii) "the alleged 2007 'redemption' wherein Pangea Offshore shares were purportedly exchanged for Westminster Offshore High Yield Portfolio shares, was not a relinquishment of Pangea Offshore shares at all, but a 'rebranding.'"  (Claimants' Aug. 21, 2015 Addendum, Ex. D, at 3–4.)

On August 21, 2015, the Claimants filed objections to the April 24, 2015 Notice of Determination in this Court.  They asserted two principal objections: (i) the Receiver erred by not recognizing the Trust's investments in Pangea Global and the Westminster Funds; and (ii)

the Receiver erred in finding that the Trust received a redemption in the amount of $1,322,031.23 from its investment in Pangea Offshore. (Claimants' Aug. 21, 2015 Objections, Dkt. No. 319, at p. 12.)

On September 14, 2015, the Claimants filed a motion to amend the Preliminary Injunction Order so as to place Pangea Global and the Westminster Funds into the Receivership. (Claimants' Sept. 14, 2015 Mot. to Amend, Dkt. No. 322.)

On September 21, 2015, the Receiver filed a response to the Claimants' objections. (See Rec.'s Sept. 21, 2015 Opp'n Mem. of Law, Dkt. No. 325.)

On September 25, 2015, and September 28, 2015, respectively, the SEC and the Receiver filed separate responses in opposition to the Claimants' motion to amend the Preliminary Injunction Order, asserting, among other things, that the Claimants' motion should be denied as procedurally improper because the Claimants are not parties to the SEC Action and had not moved to intervene in this Action. (See SEC's Sept. 25, 2015 Opp'n Mem. of Law, Dkt. No. 328; Sept. 28, 2015 Rec.'s Opp'n Mem. of Law, Dkt. No. 331.)

In response, on October 23, 2015, the Claimants filed a motion pursuant to Fed. R. Civ. P. 24 to intervene in the SEC Action. (See Claimants' Oct. 23, 2015 Mot. to Intervene, Dkt. No. 337.)

On November 3, 2015 and November 20, 2015, respectively, the SEC and the Receiver filed separate memoranda in opposition to the Claimants' motion to intervene in the SEC Action. (See SEC's Nov. 3, 2015 Opp'n Mem. of Law, Dkt. No. 341; Rec.'s Nov. 20, 2015 Opp'n Mem. of Law, Dkt. No. 349.)

In turn, the Court will address (i) the Claimants' Objections; (ii) the Claimants' Motion to Amend the Preliminary Injunction Order; and (iii) the Claimants' Motion to Intervene.

## II. DISCUSSION

**A. As to the Claimants' Objections**

As noted the Claimants object to the April 24, 2015 Notice of Determination on the grounds that the Receiver (i) failed to recognize its investment in Pangea Global as a claim against the Receivership Estate; and (ii) mischaracterized the January transfer of Funds in the Trust's portfolio from Pangea Offshore to Westminster High Yield as a "redemption." (Aug. 21, 2015 Claimants' Objections, Dkt. No. 319, at p. 12.)

The Court will briefly address the relevant legal standards and then resolve each objection below.

### 1. The Legal Standard

"District courts possess broad power to remedy violations of federal securities laws." Eberhard v. Marcu, 530 F.3d 122, 131 (2d Cir. 2008). In particular, "[a]s an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits. . . . Once the profits have been disgorged, it remains within the court's discretion to determine how and to whom the money will be distributed, and the district court's distribution plan will not be disturbed on appeal unless that discretion has been abused." S.E.C. v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997).

Although not specifically provided for in the Securities Act or the Exchange Act, the Second Circuit has held that district courts have the power to appoint receivers at the SEC's request to "'restore to a defrauded entity or defrauded persons that which was fraudulently diverted from its or their custody and control.'" S.E.C. v. Malek, 397 F. App'x 711, 713 (2d Cir. 2010) (Summary Order) (quoting SEC v. Shiv, 379 F.Supp.2d 609, 618 (S.D.N.Y. 2005)).

Here, as has already been discussed, the Court issued the Preliminary Injunction Order appointing the Receiver "[t]o use reasonable efforts to determine the nature, location and value" of the Receivership Property and the Receivership Estate, and to develop a plan for the recovery and liquidation of Receivership Property. (Preliminary Injunction Order, Dkt. No. 22, p. 7, ¶ 7(a); id. at p. 20, ¶¶ 52–53.) In addition, the Court issued the Claims Order, which setup an abbreviated procedure through which Potential Claimants could assert Potential Claims against the Receivership Entities and the Receivership Estate; the Receiver could determine the validity and amount of those Potential Claims; and Potential Claimants could file objections in this Court to the Notice of Determinations issued by the Receiver. (See the Claims Order, Dkt. No. 186.)

As this Court has already noted in prior decisions in this Action, a Receiver's role is analogous to the role of a court-appointed master, and therefore, the Court reviews the factual findings and legal conclusions of the Receiver under a *de novo* standard of review. See S.E.C. v. Callahan, 103 F. Supp. 3d 296, 302 (E.D.N.Y. 2015) (Spatt, J) ("As the Court finds that the Court-appointed Receiver in this case to be analogous to a Court-appointed master, the Court will apply a *de novo* standard to its review of the Notice of Determination."); see also Paone v. Microsoft Corp., 771 F. Supp. 2d 224, 229 (E.D.N.Y. 2011) ("[T]he Court reviews the Special Master's recommendations *de novo*.").

*De Novo* means without deference. See Zervos v. Verizon New York, Inc., 252 F.3d 163, 168 (2d Cir.2001) ("[O]ur review is independent and plenary; as the Latin term suggests, we look at the matter anew, as though it had come to the courts for the first time.").

**2. As to Pangea Global**

As noted, the Claimants submitted a claim on behalf of the Trust for $4,753,887. (See Sept. 21, 2015 Weinberg Decl., Ex. F, at p. 1.) However, the Receiver found that the Trust only

provided evidence that $3,11,236.37 of the Trust's funds were invested in the Receivership Entities, and therefore, the Receiver reduced the Trust's Potential Claim by $1,595,912.86.  (See id. at p. 2.)

The Claimants challenge the Trust's determination, asserting that the Receiver erroneously failed to recognize the Trust's $2,359,173.60 investment in Pangea Global.  (Aug. 21, 2015 Claimants' Objections, Dkt. No. 319, at p. 12.)

In support, the Claimants make a number of arguments spread out across hundreds of pages of briefing, including: (i) the Trust has a valid claims against the Receivership Estate because Pangea Global was included on Exhibit A to the Preliminary Injunction Order, *see* Aug. 21, 2015 Objections, Dkt. No. 319, at 13–16; (ii) the Trust has a valid claim against the Receivership Estate because the money it invested in Pangea Global was under the control of Callahan and commingled with the accounts of other Receivership Entities, *see* the Claimants' Oct. 23, 2015 Mem. of Law, Dkt. No. 338, at 7; (iii) even if there is not a clear paper trail tying Pangea Global to the Ponzi Scheme at issue in this case, it is improper and inequitable to impose a "tracing" requirement on investors who invested money in a Ponzi scheme, *see* Claimants' Oct. 15, 2015 Reply Mem. of Law, Dkt. No. 336, at 10–11; and (iv) the Receivership Estate would be unjustly enriched if it does not compensate the Claimants for the loss of the Trust's investment in Pangea Global, *see id.* at 20.

The Receiver disputes all of these arguments, asserting, among other things, that (i) Pangea Global is not a Receivership Entity and therefore, it has no claim against the Receivership Estate, *see* Rec.'s Sept. 21 2015 Opp'n Mem. of Law, Dkt. No. 325, at 14–15; (ii) the Claimants have provided no evidence substantiating their contentions that Pangea Global was under the control of Callahan or that its accounts were co-mingled with the accounts of other

17

investors in the Ponzi Scheme, *see id.* at 15–16; (iii) there is no evidence showing that Pangea Global was 100% owned by Pangea Offshore and even if there were, it would not render Pangea Offshore liable to the investors of Pangea Global, *see id.*; and (iv) the Receivership Estate was not enriched by at the Claimants' expense, *see* Rec.'s Oct. 26, 2015 Sur-Reply, Dkt. No. 339–1, at 13–14.) The Court agrees.

The Claimants' first contention that Pangea Global is a "Receivership Entity" and a part of the "Receivership Estate" because it is listed on Exhibit A to the Preliminary Injunction Order is based on what the Court finds to be a flawed reading of the Preliminary Injunction Order and the subsequent Orders of this Court.

Under the terms of the Preliminary Injunction Order, the Court placed into its exclusive jurisdiction only those assets of the "Receivership Defendants." (See Prelim. Injunction Order, Dkt. No. 22, at p. 5, ¶ 1.) The Order defines "Receivership Defendants" as HGA and HGA LLC, and defines the "Receivership Assets" as "all assets titled in the name of the Receivership Defendants." (See id.) Subsequently on June 4, 2012, Callahan and the SEC agreed to a stipulation which added the assets of five additional funds to the Receivership: Diversified; Masters; Fiduciary; Horizon Millennium; and Pangea Offshore. (See Order, Dkt. No. 33, at p. 3.) Pangea Global is not on this list, and is therefore, not a "Receivership Defendant" and its assets are not "Receivership Assets."

The entities listed on Exhibit A to the Preliminary Injunction Order are separate and apart from the "Receivership Entities," the "Receivership Defendants," and the "Receivership Assets."

Specifically, the Preliminary Injunction has several functions. First, it places into the Receivership all Receivership Assets and Receivership Property. (See Prelim. Injunction Order, Dkt. No. 22, at p. 3, ¶¶ 6, 7.) Second, it appoints a Receiver to determine the value of the

Receivership Property; to take custody and possession of the Receivership Property; and to develop a plan for the fair, reasonable, and efficient liquidation of the Receivership Property. (See id. at ¶¶ 7, 52–56.)

As an adjunct to this second function, the Preliminary Injunction Order restrains all entities with indirect or direct control over the "Receivership Assets" and *an additional category* of "funds and other assets" held by Callahan, HGA, and HGA LTD, which are listed on Exhibit A to the Preliminary Injunction Order, from liquidating those assets until further direction of the Court.  (Id. at p. 6, ¶ 3)

The assets listed on Exhibit A are therefore, subject to an asset freeze, so that they are not liquidated while the Receiver performs its investigatory function and determines whether any of those assets are *in fact* Receivership Assets or Receivership Property.  See S.E.C. v. Veros Partners, Inc., No. 1:15-CV-00659 (JMS), 2015 WL 5821694, at *5 n. 1 (S.D. Ind. Oct. 5, 2015) ("The purpose of an asset freeze, accomplished through the Preliminary Injunction here, is 'to preserve the status quo by preventing dissipation and diversion of assets.'") (quoting U.S. S.E.C. v. Infinity Grp. Co., 212 F.3d 180, 197 (3d Cir. 2000)); S.E.C. v. AmeriFirst Funding, Inc., No. CIV A 307-CV-1188-D, 2007 WL 2192632, at *3 (N.D. Tex. July 31, 2007) ("The court is also empowered to freeze defendants' assets to preserve the status quo and prevent dissipation of ill-gotten gains so that they remain available to fund subsequent disgorgement orders and civil penalties.").

Indeed, that is precisely what happened in this case.  On March 22, 2012, the Court issued the Preliminary Injunction Order, which placed only the assets of HGA and HGA LLC into the Receivership, and froze the assets of a broader array of funds listed on Exhibit A over which Callahan, HGA, and HGA LLC purportedly exercised actual or apparent investment

authority.  (See Prelim. Injunction Order, Dkt. No. 22, at p. 3, ¶ 3.)  Exhibit A lists twenty funds, including Pangea Global, whose assets are subject to the asset freeze.  (See id. at Ex. A.)

Subsequently, on June 4, 2012, Callahan and the SEC entered into a stipulation to place the assets of five of the twenty funds listed on Exhibit A — Diversified; Masters; Fiduciary; Horizon Millennium; and Pangea Offshore — into the Receivership.  (See June 4, 2012 Order, Dkt. No. 33.)  There would have been no need for this stipulation had every fund listed on Exhibit A been a part of the Receivership.  The fact that the parties entered into such a stipulation provides clear evidence that they did not intend for the funds listed on Exhibit A to automatically be a part of the Receivership, as the Claimants contend.

The Claimants next contend that even if Pangea Global is not a "Receivership Entity," the Claimants still have a claim against the "Receivership Estate" because of its alleged close ties with Receivership Entity Pangea Offshore.  (See Claimants' Oct. 15, 2015 Mem. of Law, Dkt. No. 336, at 12–13.)  They further argue that it would be inequitable for the Court to require a claimant to "trace specific payments into the forfeited assets of the short list of Receivership Entities."  (Id. at 14.)

In response, the Receiver asserts that the Claimants have provided no evidence that the money invested in Pangea Global was co-mingled or placed into the same account as the money invested in the Receivership Entities.  (See Rec.'s Nov. 16, 2015 Supp. Response, Dkt. No. 348, at 10.)  In addition, they assert that there is nothing inequitable about requiring the Claimants to show that the Trust invested in the same accounts as the Receivership Entities.  (See id. at 7–9.)  Again, the Court agrees.

Requiring the Claimants to show that Callahan placed the money they invested in Pangea Global into the same account as the co-mingled funds of the Receivership Entities is not a "tracing" requirement, as the Claimants contend.

The Court uses this example to illustrate the concept of "tracing": a party invests money with a trustee, and the trustee improperly takes a portion of the money and places it into his personal account. If the party can trace his assets in the trustee's personal account, then the law of trusts permits that party to place a constructive trust or equitable lien on the assets that remain in the investment account and the traceable assets that were placed into the trustee's personal account. Thus, the concept of "tracing" permits an investor to recover his investment in a fraudulent enterprise according to the amount of money that he can "trace" into the accounts or assets of the wrongdoer. See United States v. Durham, 86 F.3d 70, 72 (5th Cir. 1996) ("Typically, when a party can trace its assets, that party is entitled to seek a constructive trust or equitable lien on its portion of those funds that remain."); United States v. Benitez, 779 F.2d 135, 140 (2d Cir. 1985) ("It is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer."); Restatement (First) of Restitution § 211, cmnt. 1 (1937) ("If a wrongdoer deposits in a single account in a bank money belonging to another and money belonging to himself, and subsequently makes withdrawals from the bank account, the claimant is entitled to an equitable lien for the amount of his money both upon the part withdrawn and its product if it can be traced and upon the balance of the account or if the balance is withdrawn upon its product if it can be traced.").

However, Ponzi schemes present problems for courts in imposing a "tracing" requirement on wronged investors because in a Ponzi scheme, the defendant co-mingles the funds of new

investors with the funds of old investors and then wrongfully withdraws funds from the joint

account, usually to pay fictitious returns to older investors. The Second Circuit has described the

nature of a Ponzi scheme as follows:

> A ponzi scheme is a scheme whereby a corporation operates and continues to
> operate at a loss. The corporation gives the appearance of being profitable by
> obtaining new investors and using those investments to pay for the high premiums
> promised to earlier investors. The effect of such a scheme is to put the corporation
> farther and farther into debt by incurring more and more liability and to give the
> corporation the false appearance of profitability in order to obtain new investors.

Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995) (quoting In re Huff

(McHale v. Huff), 109 B.R. 506, 512 (S.D. Fla. 1989)).

The defendant in a Ponzi scheme co-mingles the money of investors into one account so

that it is nearly impossible for defrauded investors to "trace" where their misappropriated money

ended up. To deal with this problem, courts have considered two options: (i) permitting

claimants to recover from the money left in the joint account based on the order in which they

deposited their funds into the joint account, a premise based on the "legal fiction" that the

defendant withdrew money from the account in the order in which investors deposited the funds

into the account, *see* Restatement (First) of Restitution § 211 cmt. a (1937); or (ii) permitting

claimants to recover on a *pro rata* basis based on the proportion of their investments in the co-

mingled account at the time of the improper withdrawals by the defendant, irrespective of what

order the investors deposited money into the account, *see* Restatement (First) of Restitution §

213 (1937).

Courts and the Restatement favor the latter *pro rata* option as the more equitable

distribution plan in Ponzi schemes because "[i]n such a scheme, whether at any given moment a

particular customer's assets are traceable is 'a result of the merely fortuitous fact that the

defrauders spent the money of the other victims first.'" S.E.C. v. Credit Bancorp, Ltd., 290 F.3d

80, 89 (2d Cir. 2002); see also id. ("Courts have favored *pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders."); United States v. Durham, 86 F.3d 70, 73 (5th Cir. 1996) ("When tracing is impossible, a claimant has merely a personal claim against the wrongdoer and the funds are distributed ratably."); Restatement (First) of Restitution § 213(b) (1937) ("Where a person wrongfully mingles money of two or more persons and with the mingled mass acquires property, each of the persons is entitled to share in the property so acquired in such proportion as his money bore to the whole amount of the fund.").

According to the allegations in the amended complaint, this case involves a classic Ponzi scheme whereby Callahan directed investors in the Receivership — namely, HGA LLC; HGA Ltd.; Diversified; Masters; Fiduciary; Horizon Millennium; and Pangea Offshore — to wire their funds to a Bermuda client funds accounts and then wrongfully withdrew portions of those funds to pay redemptions to investors in other Callahan Funds, and by misappropriating the money for his own personal benefit. (See Am. Compl. at ¶¶ 50–53.)

In recognition of the fact that it will be difficult for investors whose money was deposited by Callahan into the Bermuda client funds account to trace where and how their money was used in Callahan's Ponzi scheme, the Court has approved a claims process along the lines of the *pro rata* distribution plans discussed above. Specifically, a Potential Claim is defined by the Claims Order with reference to an individual's investment "in or through one of the Receivership Entities," and not based on when the investor's funds were deposited in the joint-account, or whether the funds can be tied to the specific fraudulent acts of Callahan. (See Claims Order, Dkt. No. 186, at 2, ¶ 3.) Thus, the Claims Order does not impose a "back door tracing

requirement," as the Claimants contend; but rather, is based on a claimants' investment in one or more of the Receivership Entities.  (<u>See</u> the Claimants' Oct. 15, 2015 Reply Mem. of Law at 14.)

As discussed earlier, Pangea Global is not a Receivership Entity.  However, the Claimants contend that they should still be able to recover from the Receivership Estate based on their investment in Pangea Global because the funds of Pangea Global were co-mingled with the funds of the Receivership Entities.  (<u>See</u> the Claimants' Oct. 23, 2015 Mem. of Law, Dkt. No. 338, at 7–8.)  However, the Court does not find any of the evidence submitted by the Claimants, to support their contention, which the Court notes is haphazardly organized across 700 pages of confusingly labelled exhibits.

First, the Claimants point to an allegation in the amended complaint:

In March 2010, Callahan received a $990,000 Fiduciary subscription from an investor and then Callahan misused a portion of this money to make a redemption to an investor in another one of Callahan's funds, Pangea Global Opportunities Portfolio, LP. On March 24, 2010, after the investor wired $990,000 into a Fiduciary account at a bank in the BVI, Callahan transferred $895,000 to the Escrow Account. From the Escrow Account, Callahan transferred $892,000 to two other funds, Pangea High Yield ($640,000) and Diversified ($52,000), and to Distinctive Ventures ($200,000). <u>On March 25, 2010, Callahan wired $440,000 from the Pangea High Yield account to a different investor in Callahan's fund, Pangea Global Opportunities Portfolio, LP, to redeem his investment</u>.

(Am. Compl., Dkt. No. 28, at ¶ 59) (emphasis added).  Based on this allegation, as well as bank records provided by the SEC purportedly substantiating this transaction, the Claimants claim that "money invested with Pangea Global was part of the Callahan Enterprise."  (<u>See</u> the Claimants' Oct. 23, 2015 Mem. of Law, Dkt. No. 338, at 7–8.)

However, this allegation involves a transfer of money from Pangea High Yield to Pangea Global Opportunities, LP, *and not* Pangea Global Opportunities Portfolio, LLC, which is the entity that the Trust invested in.  In other words, this allegation appears to refer to a different entity than the entity that the Trust invested in.

Furthermore, even if Pangea Global Opportunities, LP was synonymous with Pangea Global Opportunities Portfolio, LLC, this allegation states only that a Receivership Entity, Pangea Offshore, transferred money to Pangea Global Opportunities LP, a non-Receivership Entity, as a redemption. This allegation says nothing about whether the funds of Pangea Global Opportunities LP were co-mingled with the funds of Pangea Offshore or any other Receivership Entity, which is a prerequisite to having a claim against the Receivership Estate.

Second, the Claimants also rely on allegations in the Indictment in the Criminal Action stating that Pangea Offshore, which is a Receivership Entity, owned 100% of Pangea Global; and that Callahan directly managed both funds. (See the Indictment, 13-cr-453, Dkt. No. 1, at ¶¶ 2–3.).

Even assuming the truth of these allegations, the facts that Pangea Global was 100% owned by Pangea Offshore and that Callahan directly managed both funds do not suggest that Callahan co-mingled the funds in the same Bermuda client accounts. Without such evidence, there is no reason for the Court to permit the Claimants to recover from the Receivership Estate, which consists of assets solely tied to the funds of Receivership Entities.

Third, the Claimants attach a copy of an alleged account statement prepared by Patrick Cherry ("Cherry"), the Claimants' financial advisor, showing that as of 2010, the Claimants' investments in Pangea Offshore, Horizon Millennium, and Pangea Global were held in the same HSBC Bermuda account. (See July 3, 2014 William Johnson Decl., Dkt. No. 320–6, at Ex. F-1.) However, as the Receiver correctly notes, this document was prepared by the Trust's financial advisor, not by an administrator of the Receivership, First Fidelity, or the Trust. (See id. at ¶ 7.) In a declaration filed with the Court, Johnson describes the spreadsheet as a list "of what we believe are the proper amount and dates for my contribution to the Fidelity Offshore through the

Trust." (Id. at ¶ 5.)  In addition, the spreadsheet does not list the Bermuda account number or any other identifying information showing that the funds included in this account were part of the Receivership Estate or co-mingled together.

Based on such sparse evidence, the Court finds that the Receiver correctly determined that this account statement failed to provide sufficient supporting documentation showing that the Claimants' investment in Pangea Global was co-mingled with the Receivership Entities.

Finally, the Claimants cite to a series of emails and assignment agreements purportedly establishing that Callahan, HGA, and HGA LLC controlled the Trust's investment portfolio. (See the Claimants' Oct. 23, 2015 Mem. of Law, Dkt. No. 338, at 7–8; see also Dkt. Nos 319–4; 320–6.)  However, none of these agreements or emails make reference to the Receivership Entities, let alone establishes that Callahan placed the funds of Pangea Global into the same accounts as the Receivership Entities.

In sum, the Claimants have failed to show that their investment in Pangea Global was co-mingled in the same investment accounts that held the funds of the Receivership Entities, which are the subject of the Ponzi scheme at issue in the amended complaint and whose assets make up the Receivership Estate.  Accordingly, the Court agrees with the Receiver that the Claimants have failed to establish that they should recover a *pro rata* share of the Receivership Estate based on their investment in Pangea Global.  See S.E.C. v. Byers, 637 F. Supp. 2d 166, 177 (S.D.N.Y. 2009) ("The Second Circuit in Credit Bancorp set forth two factors that must be satisfied to approve a pro rata distribution. First, investors' funds must have been commingled. Second, the victims must be similarly situated 'with respect to their relationship to the defrauders.') (quoting Credit Bancorp, 290 F.3d at 88–89).

For similar reasons, the Court is not persuaded by the Claimants' argument that the Receivership Estate would be unjustly enriched by failing to permit the Claimants to recover against the Receivership Estate based on the Trust's investments in Pangea Global.  (See Claimants' Oct. 15, 2015 Mem. of Law, Dkt. No. 336, at 20.).

This argument is based on the faulty premise that the funds of Pangea Global were co-mingled with the funds of the Receivership Entities.  However, as noted above, there is no evidence the funds of Pangea Global are part of the Receivership Estate or are being used to compensate investors of the Receivership Entities.  Accordingly, the Court finds the Claimants unjust enrichment argument to be without merit.

For these reasons, the Court overrules the objections by the Claimants that the Receiver erred by failing to recognize their alleged $2,359,173.60 investment in Pangea Global.

### 3. As to the Redemption

 As noted, in the April 24, 2015 Notice of Determination, the Receiver found that the Claimants had submitted sufficient documentation showing that the Trust invested $3,111,236.37 in Pangea Offshore.  (See Sept. 21, 2015 Weinberg Decl., Ex. F, Dkt. No. 320–6, at p. 3; see id. at Ex. J, Dkt. No. 320–10, at p. 10–11.)  However, the Receiver found that the Trust had received a redemption in the amount of $1,322,031.23.  (See id. at Ex. F, Dkt. No. 320–6, at p. 3.)  As such, the Receiver reduced the Claimants' claim from $3,111,236.37 to $1,789,205.14.  (See id.)  It also found that because the $1,322,031.23 redemption represented 42.49% of the Trust's total investment in Pangea Offshore, the Trust would be not be permitted to participate in any distribution of the Receivership Estate until all the approved claimants had recovered at least 42.49% of their total investment.  (See id.)

The Claimants' objections raise two issues: (i) whether the Receiver erred in ruling that the apparent transfer of the Trust's investment from Pangea Offshore to Westminster High Yield was a redemption; and (ii) whether the Receiver correctly barred the Claimants from recovering on the approved portion of their claim until all the other approved claimants had recovered at least 42.49% of their total investment. The Court will address each issue below.

### a. As to the Sale of Pangea Offshore

As will be described in more detail below, some courts reduce the claims of investors who withdraw money from a Ponzi scheme on the theory that "[i]nvestors who have made withdrawals will tend to be better off when the Ponzi scheme collapses than investors who have made no withdrawals because the former lose less than they would have lost had they not drawn down their investment." S.E.C. v. Huber, 702 F.3d 903, 907 (7th Cir. 2012).

However, the situation becomes more complicated when the investor withdraws his money from the Ponzi scheme and then reinvests that money back into the Ponzi scheme. In such a situation, the positive effect on the investor of withdrawing his money from the scheme is erased because he re-invested the money he took out back into the scheme and therefore, ended up losing the same amount of money that he would have lost had he decided not take his money out in the first instance. For this reason, some courts have refused to reduce an investor's claim against the receivership estate if the investor withdrew money from the scheme and then reinvested it or rolled it back into the scheme. See id. at 907; see also Byers, 637 F. Supp. 2d at 183 ("Ignoring the rolled-over amount, as the objectors propose, would further penalize those investors who chose to roll over their investments rather than receive them in cash. Such a result would be inequitable.").

Here, the Claimants argue that the Trust, at the direction of Callahan, reinvested the $1,322,031.23 it received from the sale of its Pangea Offshore shares into Westminster High Yield, a fund that they claim was controlled by Callahan and was co-mingled with the funds of other Receivership Entities. (See Claimants' Aug. 21, 2015 Objections, Dkt. No. 319, at 22–23.) As a result, the Claimants assert they never received the benefit of the $1,322,031.23 but rather lost that money at the hands of Callahan. (See id.)

In response, the Receiver asserts that Westminster High Yield is not a Receivership Entity and there is no evidence that its funds were co-mingled with the funds of the other Receivership Entities. (See Rec.'s Sept. 21, 2015 Mem. of Law, Dkt No. 324, at 16–21.) Thus, the Receiver disputes that the Claimants reinvested the $1,322,031.23 back into the Ponzi scheme. (See id.) The Court agrees.

Beginning in 2005 and 2006, the Trust invested its money in three life insurance policies held by Fidelity Insurance Company Ltd. ("Fidelity"), which ostensibly took that money and invested it in several funds, some of which were Receivership Entities. (See July 3, 2014 William Johnson Decl., Dkt. No. 320–6, at ¶ 2.) Specifically, the Receiver found that in 2005 and 2006, the Trust invested $1,209,317.61 in Pangea Offshore, a Receivership Entity; (ii) in 2009, the Trust transferred $10,302 to Receivership Entity, HGA LLC; and (iii) in 2010, the Trust invested $195,174.32 in Receivership Entity Horizon Millennium, and $1,696,442.44 in Receivership Entity Pangea Offshore. (See Sept. 21 2015 Weinberg Decl., Ex. J, at 3–4.) This amounted to a total investment of $3,111,236.37 in Receivership Entities. (See id.)

However, the Receiver found that in January 2007, the Trust redeemed $1,322,031.23 from its investment in Pangea Offshore and incurred $29,633.90 in administrative fees. (Id. at 3.) Thus, the Receiver reduced the Trust's claim by a total of $1,351,696.13. (Id. at 4.)

The account statements provided by Fidelity, during the period January 1, 2007 to March 31, 2007, appear to show that the Trust engaged in several transactions that liquidated its shares in Pangea Offshore and for which the Trust received a total $1,322,031.23. (See Sept. 21, 2015 Weinberg Decl., Ex. L.) The statements categorize these transactions as "redemptions" and "sales." (See id.)

The same account statements show that the Trust did appear to purchase a roughly equivalent number of shares in Westminster High Yield, as the Plaintiffs contend. (See id.) However, like Pangea Global, Westminster High Yield is not a Receivership Entity.

The Claimants attempt to avoid this fact by arguing that Westminster High Yield was essentially a shell entity of Pangea Offshore. In support, they primarily rely on a March 29, 2007 letter from Ernest J. Dean, Jr. ("Dean"), the President of Westminster Hope & Turnberry ("WH&T"), to Rick Loria ("Loria"), the Trust's financial advisor, in which Dean states:

> This letter is a follow up to our conversation last quarter regarding an administrative change being made that effect your client's policy invested in Pangea Offshore High Yield Portfolio, LLC. One of your client's insurance policy holdings under LLC SA 1621119/SA 427/SA 429 has been re-branded from Pangea Offshore High Yield Portfolio, LLC to Westminster Offshore High Yield Portfolio, LLC. The purpose of this change is greater administrative efficiency and to provide cost savings over the current structure . . . . Fidelity Insurance Company transferred all holdings in Pangea Offshore High Yield Portfolio on January 1, 2007 to Westminster High Yield Portfolio, LLC. Westminster High Yield Portfolio, LLC is 100% invested in Pangea Offshore High Yield Portfolio.

(Aug. 20, 2015 Johnson Decl., Dkt. No. 320–5, Ex. C) (emphasis added).

The Claimants contend that because WH&T rebranded the Trust's investment in Pangea Offshore as an investment in Westminster High Yield, it should not be classified as a redemption or a withdrawal from Receivership Entity Pangea Offshore. (See Claimants' Nov. 16, 2015 Reply Mem. of Law, Dkt. No. 23, at 22–23.)

However, as the Receiver correctly notes, the Claimants provide no account statements or documents evidencing the assertion made by Dean that he took 100% of the Claimants' investment in Westminster High Yield and re-invested it in Pangea Offshore. Further even if Dean did take the Claimants' money in Westminster High Yield and reinvest it back into Pangea Offshore, the Trust's claim would be against Westminster High Yield, not Pangea Offshore.

Indeed, on December 17, 2012, Laura Johnson, on behalf of the Trust, initiated a claim in the Circuit Court of Cook County against Keithley Lake ("Lake") and other individuals who allegedly had control over the Trust's accounts at Fidelity and decided to invest the Trust's money in Westminster High Yield (the "Cook County Complaint"). (See July 3, 2015 William Johnson Decl., Ex. C.) According to the Cook County Complaint, Laura Johnson is the sole trustee of the Trust, and the Claimants William and Diane Johnson are the sole and equal beneficiaries of the Trust.

As relevant here, the Cook County Complaint alleges that:

> Under Lake's supervision, money wired to the Fidelity Join Venture by settlors/grantors/investors, including Plaintiffs . . . would be routinely directed into the general trust bank account [First Fidelity Trust LTD ("First Fidelity")]. The funds were then supposed to be transferred from that account per the wishes and instructions of the various account settlor/grantors/investors to invest in funds offered by [WH&T]. [WH&T] was then responsible for allocating the funds . . . . Lake oversaw the disbursement of funds from the [WH&T] client accounts to the various investments, purportedly per the wishes and instructions of the various settlor/grantors/investors.

(Id. at ¶ 43.)

These allegations suggest that WH&T and Lake, not Callahan or a Receivership entity, had primary control over the Trust's investment in the Westminster entities. Thus, while the Claimants may have a claim against Lake and WH&T, based on the record before it, it does not appear that they have a potential claim against a Receivership Entity or the Receivership Estate.

The Claimants also rely on a December 31, 2010 assignment agreement in which WH&T and Fidelity agreed to transfer the Trust's investment portfolios to Caste Re.  (See Aug. 20, 2015 Johnson Decl, Dkt. No. 320–5, Ex. D.)  However, the agreement specified that Castle Re would accept the Trust's shares in Horizon Millennium, Pangea Global, and Pangea Offshore but would not accept the Trust's shares in the Westminster Entities, including Westminster High Yield.  (Id. at p. 1.)

Although not entirely clear, it appears that the Claimants contend that this assignment agreement shows that in 2010, the Trust still had Pangea Offshore shares and therefore, they contend that the Trust could not have liquidated its shares in Pangea Offshore and received a redemption, as the Receiver asserts.  (See the Claimants' Nov. 21, 2015 Reply Mem. of Law, Dkt. No. 348, at 24–25.)  Again, the Court disagrees.

The fact that WH&T or First Fidelity may have invested money on behalf of the Trust in a Receivership Entity does not mean that the Trust has a claim against the Receivership Estate. Rather, as noted, their claim would appear to be against WH&T or First Fidelity, which allegedly made the decisions to invest the Trust's money in the Receivership Entities.  Furthermore, the fact that the Trust's investments in Westminster High Yield and Pangea Offshore are referred to separately in this agreement directly undermines the Claimants' contention that Westminster High Yield was merely a shell entity of Pangea Offshore.  Had that been the case, Castle Re would have accepted the assignment of the shares in both entities as one and the same.  The fact that Castle Re chose not to do so and that the agreement refers to the entities separately suggests that the entities are in fact independent of one another.

For these reasons, the Court finds that Claimants have failed to show that the $1,322,031.23 that was credited to their investment account as a redemption was reinvested back

into a Receivership Entity or through one of the Receivership Entities. Accordingly, the Court affirms the Receiver's determination that the Trust received $1,322,031.23 from the sale of its Pangea Offshore shares.

### b. As to the Receiver's Reduction Methodology

The Court also considers the Receiver's methodology for calculating the Trust's claim in light of the redemption.

There are several different methods for a receiver to deal with the claims of investors who withdraw money from a Ponzi scheme. Under one approach also known as the "net investment" method, "any funds previously received by an investor are subtracted from the total amount invested prior to calculating the investor's *pro rata* share." U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd., No. 07C3598, 2010 WL 960362, at *8 (N.D. Ill. Mar. 15, 2010), *aff'd sub nom.* Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd., 646 F.3d 401 (7th Cir. 2011).

Under a second approach also known as the rising tide approach, "withdrawals are considered part of the distribution received by an investor and so are subtracted from the amount of the receivership assets to which he would be entitled had there been no withdrawals." S.E.C. v. Huber, 702 F.3d 903, 905 (7th Cir. 2012); see also Byers, 637 F. Supp. 2d at 182 ("[T]he Court could order what is known as the 'rising tide' approach. Under this approach, the amount of an investor's received cash distributions would be deducted, dollar for dollar, from the amount of the investor's total distribution award."); see also S.E.C. v. Par., No. 2:07-CV-00919-DCN, 2010 WL 5394736, at *3 (D.S.C. Feb. 10, 2010) ("Under this [rising tide] method, investors who received prior payments are entitled to receive a smaller pro-rata payment from the receivership estate than those who received no prior payment. Moreover, investors who previously received

payments exceeding their pro rata amount of the total distribution will receive no distribution from the receivership estate.").

To illustrate the difference between the approaches, the Court offers the following example: Investor A invests $100,000 in a co-mingled account with other investors in a Ponzi scheme. Investor A then withdraws $20,000 before the scheme collapses, so his net loss is $80,000. Investor B invests $100,000 in the scheme and withdraws nothing, so his net loss is $100,000. Suppose that the receiver was able to recover $18,000 in assets from the defendant, which equals one tenth of the total loss of $180,000 by the two investors. Under the net loss method, each investor would receive a tenth of his loss, so A would receive $8,000 (1/10 of $80,000) and B would receive $10,000 (1/10 of $100,000). However, technically because A already withdrew $20,000 from the scheme, the distribution of $8,000 permits him to recover a total of $28,000 or 35% of his total loss of $80,000, which is a far greater percentage of his loss than the 10% of his loss that Investor B will recover.

By contrast, using the rising tide approach, Investor A's withdrawal of $20,000 would count as a distribution and be subtracted from the distribution amount he would have received had he taken no withdrawal, which is $8000. Since the $20,000 withdrawal is greater than the $8,000 distribution, Investor A would receive no distributions under the rising tide approach, and Investor B would receive the full $18,000. In this way, Investor B is able to recover 18% of his total loss of $100,000, which is closer in proportion to the amount that Investor A withdrew from the scheme, which represented 25% of his total loss of $80,000.

Based on similar hypothetical calculations, courts have tended to favor the "rising tide" approach as more equitable because it prevents an investor who previously received funds as a withdrawal from benefitting at the expense of other investors in the scheme who did not receive

any withdrawals and therefore, lost the entire amount of their investment in the Ponzi scheme. See Huber, 702 F.3d at 906 ("Rising tide appears to be the method most commonly used (and judicially approved) for apportioning receivership assets.") (collecting cases); Lake Shore Asset Mgmt. Ltd., 2010 WL 960362 at *9 ("Ultimately, the court agrees with the receiver that the 'Rising Tide' method is the most equitable because it prevents an investor who previously received funds as withdrawals from 'benefitting at the expense of other investors[.]'") (alteration added) (quoting Commodity Futures Trading Comm'n v. Equity Fin. Grp., Inc., No. CIV.04-1512 (RBK) (AMD), 2005 WL 2143975, at *1 (D.N.J. Sept. 2, 2005)); United States v. Cabe, 311 F. Supp. 2d 501, 510 (D.S.C. 2003) (same).

However, some courts have rejected the "rising tide" approach if, for example, a significant number of investors withdrew their money from the Ponzi scheme at issue and would not be entitled to a distribution. See Huber, 702 F.3d at 907 ("The more investors in a Ponzi scheme there are who would receive nothing under rising tide and might therefore have difficulty paying their future expenses, the more likely the net loss method is to maximize the overall utility of the investors."); Byers, 637 F. Supp. 2d at 182 ("Deloitte, the Receiver's accountant, has estimated that, assuming a 10% multiplier, using the rising tide approach would mean that 45% of investors would receive no distribution. For this reason, the Receiver does not recommend this approach.").

In the present case, the Receiver appears to adopt the "rising tide" approach. Specifically, it found that the Trust invested $3,111,236.37 in Pangea Offshore but received $1,322,031.23 redemption for the sale of its shares. Thus, its net loss is $1,789,205.50, which represents 42.49% of its total loss.

However, instead of permitting the Trust to participate in the distribution of the Receivership Estate based on its net loss of $1,789,205.50, the Receiver determined that the Trust could not receive a distribution from the Receivership Estate until other investors recovered at least the same 42.49% proportion of their total losses in the Receivership Entities. (See Sept. 21, 2015 Weinberg Decl., Ex. F, Dkt. No. 320–6, at p. 3; see id. at Ex. J, Dkt. No. 320–10, at p. 10–11.)

For its part, the Claimants do not appear to object to the methodology used by the Receiver but rather, focus their efforts entirely on the factual determination made by the Receiver that the Trust received a redemption from Pangea Offshore. (See Aug. 21, 2015 Claimants' Objections, Dkt. No. 319, at 24.)

In any event, the Court finds that the Receiver's method for calculating the Trust's claim to be "fair and reasonable" because it appears to ensure that all investors obtain the same proportion of their overall investment that was lost as a result of the Ponzi scheme at issue in the SEC Action. The Receiver's methodology is also in line with the majority of cases described above that have adopted a similar "rising tide" methodology in calculating the claims of investors who withdrew money from Ponzi schemes. Accordingly, the Court affirms the Receiver's determination that the Claimants should not recover on the Trust's claim until other claimants have recovered 42.49% of their total investment.

However, the Court notes that the Receiver has not submitted a Final Claim Determination Report which will set forth "the manner and method for distribution of the Receivership Assets, along with the priority and order that any approved claim be paid, including any interim distribution and payment." (See First Quarter 2016 Status Report, Dkt. No. 382, at 37–38.)

Accordingly, the Court may revisit the Receiver's methodology for the treatment of investors, such as the Trust, who withdrew their money from the Ponzi scheme when the Final Claim Determination Report is submitted to the Court for approval, and it is made clear to the Court exactly how many claimants withdrew their money from the Receivership Entities prior to Callahan's scheme collapsing and how their claims will be impacted by adopting the rising tide approach to distributions.

## B. As to the Motion to Intervene

Although the Claimants moved to intervene after they moved to amend the Preliminary Injunction Order, the Court will address the motion to intervene first because it finds that without intervention, the Claimants lack a procedural avenue to amend the Preliminary Injunction Order.

The Court also notes that it has already held in this action when ruling on RBS's motion to intervene that Section 21(g) of the Exchange Act — which provides in relevant part that "no action for equitable relief instituted by the [SEC] pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the [SEC]" — does not bar intervention in all SEC actions (the "RBS Decision"). See S.E.C. v. Callahan, 2 F. Supp. 3d 427, 437 (E.D.N.Y. 2014) (Spatt, J). Thus, the Court need not address the issue again here, particularly given that the SEC has not sought to re-litigate the issue in opposing the Claimants' present motion to intervene.

The Claimants move to intervene as a matter of right and permissively to "(1) eliminate objections based on standing; (2) to include Pangea Global losses as a qualified claim; and if necessary, (3) petition the Court for additional equitable relief with regard to the Claim Process." (See Oct. 23, 2015 Claimants' Mem. of Law, Dkt. No. 339, at 3.)

Fed. R. Civ. P. 24(a) *requires* a court to permit anyone to intervene in an action when:

> (1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties.

MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 389 (2d Cir. 2006).

Fed. R. Civ. P. 24(b) gives a court discretion to grant intervention where an applicant "has a claim or defense that shares with the main action a common question of law or fact." When considering permissive intervention, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Id.

Significantly, district courts are afforded wide discretion in ruling on motions for permissive intervention. See AT & T Corp. v. Sprint Corp., 407 F.3d 560, 561 (2d Cir. 2005) ("'[A] denial of permissive intervention has virtually never been reversed.'") (quoting United States v. Hooker Chems. & Plastics Corp., 749 F.2d 968, 990 n. 19 (2d Cir. 1984)); see also United States v. Pitney Bowes, Inc., 25 F.3d 66, 73 (2d Cir. 1994) ("Reversal of a district court's denial of permissive intervention is a very rare bird indeed, so seldom seen as to be considered unique.").

Ultimately, however, "[t]he court considers substantially the same factors whether the claim for intervention is 'of right' under Fed. R. Civ. P. 24(a)(2), or 'permissive' under Fed. R. Civ.P. 24(b)(2)." R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp., 467 F.3d 238, 240 (2d Cir. 2006). Thus, the Court will not analyze permissive intervention and intervention as a matter of right separately for purposes of deciding this motion.

Finally, Rule 24(c) specifies the procedures to be followed when a party seeks intervention:

> A person desiring to intervene shall serve a motion to intervene upon the parties as provided in Rule 5. The motion shall state the grounds therefor and shall be

accompanied by a pleading setting forth the claim or defense for which intervention is sought. The same procedure shall be followed when a statute of the United States gives a right to intervene.

Fed. R. Civ. P. 24(c).

In seeking intervention under Rule 24, "the proposed intervenor bears the burden of demonstrating that it meets the requirements for intervention." Kamdem-Ouaffo v. Pepsico, Inc., 314 F.R.D. 130, 134 (S.D.N.Y. 2016); see also United States v. Real Prop. Located at 272 Old Montauk Highway, Montauk, N.Y., 11954, 298 F.R.D. 43, 54 (E.D.N.Y. 2014) (Spatt, J) (same). Further "[e]xcept for allegations frivolous on their face, an application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention." Bridgeport Guardians, Inc. v. Delmonte, 602 F.3d 469, 474 (2d Cir. 2010) (quoting parenthetically Oneida Indian Nation v. New York, 732 F.2d 261, 265 (2d Cir. 1984)).

The Claimants assert that they have met each of the factors relevant to both intervention as of right and permissive intervention.

The SEC and the Receiver oppose the Claimants' motion, asserting that the Claimants have failed to show that the second, third, and fourth factors support intervention. The Receiver also opposes intervention on the additional grounds that the Claimants' motion is untimely, and the Claimants have not complied with Rule 24(c) because they have failed to attach a pleading to their motion setting forth the proposed claim or defense for which intervention is sought.

As explained below, the Court agrees that the Claimants have failed to show that (i) their motion is timely; (ii) they have an interest in the subject matter of this action; (iii) without intervention, their interests would be unduly impaired; and (iv) the SEC and the Receiver do not

adequately represent their interests.  Therefore, the Court need not address the Claimants' Rule 24(c) argument.

### 1. As to First Timeliness Factor

"The timeliness requirement is flexible and the decision is one entrusted to the district judge's sound discretion."  United States v. Yonkers Bd. of Educ., 801 F.2d 593, 594-95 (2d Cir. 1986) (citing NAACP v. New York, 413 U.S. 345, 366, 93 S. Ct. 2591, 2603, 37 L.Ed.2d 648 (1973)).

"Among the factors to be taken into account to determine whether a motion to intervene is timely are: (a) the length of time the applicant knew or should have known of his interest before making the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to applicant if the motion is denied; and (d) presence of unusual circumstances militating for or against a finding of timeliness."  United States v. State of N.Y., 820 F.2d 554, 557 (2d Cir. 1987) (citing Deveraux v. Geary, 765 F.2d 268, 270 (1st Cir. 1985)).  The Court will now address the length of the delay and prejudice factors.

### a. As to the Length of the Delay

As to the first factor, "[d]elay is not measured solely subjectively because, if that were the test, a putative intervenor could always claim it did not know it needed to intervene until the eve of its motion." Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 182 (2d Cir. 2001). Rather, the clock for intervening starts to run from the moment that a proposed intervenor becomes aware or *should have become aware* that he or she had interests in the subject matter of the litigation not otherwise protected by the existing parties to the lawsuit.  See League of United Latin Am. Citizens v. Wilson, 131 F.3d 1297, 1307 (9th Cir. 1997) ("[U]nder Rule 24 the timeliness clock begins ticking from the time a proposed intervenor 'should have been aware

[its] 'interest[s] would no longer be protected adequately by the parties[.]'") (quoting <u>Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco</u>, 934 F.2d 1092, 1095 (9th Cir. 1991)); <u>Floyd v. City of New York</u>, 302 F.R.D. 69, 84-85 (S.D.N.Y.), *aff'd in part, appeal dismissed in part on other grounds*, 770 F.3d 1051 (2d Cir. 2014) ("Assuming, *arguendo*, that the Unions' alleged interests are colorable on a motion to intervene, the intervention clock started to run from the moment the Unions became aware or should have become aware that they had interests in the subject matter of the litigation not otherwise protected by the existing parties to the lawsuit.").

In the RBS Decision, the Court found that the delay of more than one year and five months would weigh against timeliness. See <u>Callahan</u>, 2 F. Supp. 3d at 438 ("Nevertheless, RBS Citizens waited a year and five months to seek to intervene. Courts in this Circuit have found similar delays to be untimely.").

Other courts have similarly held. See <u>Butler, Fitzgerald & Potter v. Sequa Corp.</u>, 250 F.3d 171, 182 (2d Cir. 2001) (finding a delay of more than a year to weigh in favor of untimeliness); <u>United States v. Simpson Borough Place Corp.</u>, No. 01-CV-693 DLI VVP, 2007 WL 2581888, at *3 (E.D.N.Y. Sept. 5, 2007) ("A delay of fifteen months is untimely.").

In the present case, the Receiver contends that the Claimants should have become aware that they could not assert a claim against the Receivership Estate based on the Trust's investment in Pangea Global as early as February 2014. To support this assertion, the Receiver attaches an affidavit stating that on February 25, 2014, it emailed and mailed to the Claimant William Johnson, a copy of the Claims Order and a letter concerning the Claims Order. (See Hung Aff., Dkt. No. 394–3, at ¶ 2.) The letter from the Receiver states:

> Potential Claimants should file Proof of Claims <u>only</u> for claims against one or
> more of the Receivership Entities including but <u>limited to</u> Horizon Global

Advisors Ltd., Horizon Global Advisors LLC, Diversified Global Investments
(BVI), L.P. f/k/a Horizon Global Investments, L.P., the Master Global Fund, L.P.,
Fiduciary Select Income Fund, L.P. f/k/a Pangea Bridge Investment, L.P.,
Horizon Millennium Investments, L.P. and Pangea Offshore High Yield Portfolio,
LLC. Potential Claimants should not file Proof of Claim Forms for claims against
any other entities.

(Lee Decl., Dkt. No. 349–1, Ex. A) (emphasis in original).

As the Claimants did not move to intervene until October 23, 2015, more than a year and

a half year after they received the above-notice, the Receiver contends that the Claimants'

motion is untimely. (See Rec.'s Nov. 20, 2015 Mem. of Law, Dkt. No. 350, at 9.)

For their part, the Claimants do not dispute that they received the Receiver's February 25,

2014 letter regarding the Claims Order. (See Claimants' Dec. 4, 2015 Reply Mem. of Law, Dkt.

No. 353, at 10.) However, they contend that the Claims Order defines a Potential Claim more

broadly than does the Receiver's letter and thus, it was reasonable for them to believe that the

Receiver might recognize the Trust's investment in Pangea Global. (See id. at 7.) Rather, they

claim that they did not become aware that the Receiver would interpret the Claims Order to

exclude Pangea Global from the Receivership Estate until July 21, 2015, when the Receiver

responded to the Trust's objections. (See id. at 8.) They further contend that they only became

aware that intervention would be necessary after the SEC raised a standing objection in its

response to the Claimants' motion to amend on September 25, 2015. (See id. at 10.) The Court

disagrees.

"Rule 24 does not require that an applicant's interest be 'crystallize[d]' or that an

applicant wait until there is 'no doubt' that his or her interests will be impacted. Instead, Rule 24

encourages applicants to move when it becomes apparent that their interests might not be

protected." Floyd, 302 F.R.D. at 87 (collecting cases); see also Butler, Fitzgerald & Potter v.

Sequa Corp., 250 F.3d 171, 182 (2d Cir. 2001) ("We believe that GBJ's purported solicitation of

help from a law firm that it had previously discharged should have alerted Butler to any possible danger that its charging lien *might* not be adequately represented.") (emphasis added).

"If the rule were otherwise, an intervenor could argue that, notwithstanding a ruling seemingly fatal to her interests, she could defer intervening until judgment was entered, an appeal taken and decided, and certiorari denied, merely because she had predicted that the ruling would be reversed at some stage."  Chen-Oster v. Goldman, Sachs & Co., No. 10 CIV. 6950 (AT) (JCF), 2015 WL 4619663, at *7 (S.D.N.Y. Aug. 3, 2015); see also Gutman v. Klein, No. 03 CIV. 1570 BMC, 2015 WL 5022510, at *6 (E.D.N.Y. Aug. 24, 2015) ("The Second Circuit recently rejected this 'stay silent until things start going badly' strategy in Floyd v. City of New York, 770 F.3d 1051 (2d Cir.2014), the case challenging the 'stop and frisk' policy of the New York Police Department.").

Here, in the February 25, 2014 letter, which it is undisputed that the Claimants received, the Receiver clearly represented and indeed emphasized the fact that it would not accept claims against "any other entities," aside from the Receivership Entities.  Thus, the letter left little doubt as to how the Receiver was going to interpret the claims against non-Receivership Entities under the Claims Order.  The Court finds that it was at this point that the Claimants should have objectively realized that the Receiver *might* not recognize their claim against Pangea Global, which is not a Receivership Entity and is clearly not listed as a Receivership Entity in either the Claims Order or the February 25, 2014 letter.  Accordingly, the Court finds that the Claimants' failure to move to intervene until more than a year and a half after it received the February 24, 2014 letter weighs against a finding of timeliness.

**b. As to Prejudice**

The Receiver and the SEC assert that existing claimants will be prejudiced if the Claimants are permitted to intervene because it will delay the Receiver's ability to issue final distribution payments to claimants and liquidate the Receivership Estate.  (See SEC's Nov. 3, 2015 Opp'n Mem. of Law, Dkt. No. 341, at 5; Receiver's Nov. 20, 2015 Opp'n Mem. of Law, Dkt. No. 350, at 11–12.)

On the other hand, they argue that the Claimants will not suffer prejudice from denying intervention because (i) they have an opportunity to be heard in the summary claims process established by the Claims Order; and (ii) they have the ability to pursue their claims against Pangea Global in an independent action and are therefore, not left without a remedy.  (See id.)

For their part, the Claimants assert that permitting them to intervene will not delay relief to other claimants because they contend that (i) there is no need to restart the claims process to amend the Preliminary Injunction Order; and (ii) discovery should be limited because according to them, the SEC and the Receiver already possess the documents that the Claimants would be seeking in the course of discovery.  (See Claimants' Dec. 4, 2015 Reply Mem. of Law, Dkt. No. 353, at 11, 13–15.)

The Claimants further dispute that (i) they have an opportunity to be heard in the summary claims process because the Claims Order explicitly does not include Pangea Global; and (ii) they have no adequate remedy because Pangea Global cannot sustain a judgment against it, and without permitting them to participate in the distribution of the Receivership Estate, they will not recover any relief for their claim against Pangea Global.  (See id. at 11, 13–16.)  The Court again finds the Claimants' arguments unpersuasive and based on several incorrect assumptions.

Although "[d]istrict courts possess possess broad power to remedy violations of federal securities laws," Marcu, 530 F.3d at 131, that power is "not without limits,' id. at 132. At a minimum, the Due Process clause requires that non-party claimants must be afforded notice and an opportunity to be heard before a Receiver or a Court resolves its claims. See S.E.C. v. Am. Capital Investments, Inc., 98 F.3d 1133, 1146 (9th Cir. 1996) ("For the claims of nonparties to property claimed by receivers, summary proceedings satisfy due process so long as there is adequate notice and opportunity to be heard."), *abrogated on other grounds by* Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998); S.E.C. v. Elliott, 953 F.2d 1560, 1567 (11th Cir. 1992) ("[A] district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts."); S.E.C. v. Credit Bancorp, Ltd., No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *33 (S.D.N.Y. Nov. 29, 2000), aff'd, 290 F.3d 80 (2d Cir. 2002) (finding that summary procedures used in a receivership satisfied Due Process because they afforded claimants an opportunity to be heard regarding the validity of their interest in the receivership estate).

Thus, even if the Court were to amend the Receivership Order to include Pangea Global, the Court could not rule on the Claimants' claim on Pangea Global without addressing the claims of other potential investors in Pangea Global, as the Claimants contend. Rather, it would have to afford other potential claimants who had investments in Pangea Global notice of the Claims Order and the opportunity to be heard on their potential claims. That would require the Receivership to investigate and marshal the assets of Pangea Global; locate investors to Pangea Global; draft and file a new Claims Order that set new deadlines for the filing of such claims;

issue notice to the claimants; evaluate the new claims; respond to objections and appeals to this Court; and propose a new settlement and implementation plan for distribution.

While the Claimants contend that "[t]here is no evidence that there is any other investor who lost money in Pangea Global," the Receiver could not just assume that was the case. Rather, it must attempt to locate investors of Pangea Global and give them an opportunity to be heard before disposing of the assets available to satisfy their claims against Pangea Global.

It has taken more than two years for the Receiver and the Court to resolve the same claims process for investors of Receivership Entities. It is self-evident that opening up the claims process again to investors in a new entity, as the Claimants would like the Court to do, would delay distribution to other claimants of the Receivership Entities and deplete the Receivership Estate, which would have to cover the additional expenses incurred by the Receiver to resolve claims against Pangea Global.

This Court and other courts have repeatedly denied intervention under similar circumstances. See Callahan, 2 F. Supp. 3d at 438 ("'[C]ase law is clear that if an intervenor attempts to introduce collateral issues in a proceeding, a court may be justified in denying a motion to intervene based on undue delay or prejudice.'") (quoting FTC. v. First Capital Consumer Membership Servs., Inc., 206 F.R.D. 358, 366 (W.D.N.Y. 2001)); see also Floyd, 302 F.R.D. at 98 ("Having prevailed to this extent, plaintiffs face significant prejudice if previously uninterested late-comers are permitted to prolong the legal wrangling and further delay plaintiffs' hard-won relief."); U.S. Commodity Futures Trading Comm'n v. Efrosman, No. 05 CIV 8422 (KMW), 2012 WL 2510338, at *4 (S.D.N.Y. June 26, 2012) (denying intervention, in part, because "permitting the Iatarola Intervenors to intervene would reopen the case, introduce new claims and parties, and impose additional costs and burdens on the CFTC.").

On the other hand, the Court finds, as will be described in more detail below, that the Claimants have failed to show any tangible prejudice that might result from the denial of intervention because (i) they can pursue their claims against Pangea Global in a separate private action; and (ii) the SEC adequately represents their interests.

For these reasons, the Court finds that the Claimants' motion is untimely and therefore, intervention should be denied on that basis.

### 2. As to the Second, Third, and Fourth Factors

As an alternative holding, the Court also finds that the Claimants have failed to carry their burden with regard to the remaining factors relevant to intervention.

The SEC and the Receiver argue that intervention is improper because the Claimants can adequately protect their interests in the Receivership Estate by asserting a claim through the process set forth in the Claims Order and by initiating a separate private action against Pangea Global.  (See SEC's Nov. 3, 2015 Opp'n Mem. of Law, Dkt. No. 341, at 4–5; Rec.'s Nov. 20, 2015 Opp'n Mem. of Law, Dkt. No. 350, at 6–7.)

For their part, the Claimants contend that (i) the claims process is inadequate because it does not include Pangea Global as a Receivership Entity; (ii) a separate claim against Pangea Global does not provide them with an adequate remedy because Pangea Global has no assets; and (iii) the SEC and the Receivership do not represent their interests because they have refused to include Pangea Global in the Receivership.  (See Claimants' Oct. 23, 2015 Mem. of Law, Dkt. No. 338, at 7–12.)  Again, the Court disagrees.

For a number of reasons, "[c]ourts are reluctant to allow private parties to intervene in government enforcement actions."  U.S. Commodity Futures Trading Comm'n v. Efrosman, No. 05 CIV 8422 (KMW), 2012 WL 2510338, at *4 (S.D.N.Y. June 26, 2012).

First, "an investor has no 'legally protectable' right to the SEC's bringing (or continuing, or settling) an enforcement action." <u>S.E.C. v. Petro-Suisse Ltd.</u>, No. 12 CIV. 6221 AJN, 2013 WL 5348595, at *3 (S.D.N.Y. Sept. 25, 2013); <u>cf.</u> <u>Heckler v. Chaney</u>, 470 U.S. 821, 831, 105 S. Ct. 1649, 1655, 84 L. Ed. 2d 714 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

Second, private litigants "will often not be precluded by *res judicata* or collateral estoppel from bringing their own action for money damages regardless of the disposition of the SEC action." <u>Sec. & Exch. Comm'n v. Everest Mgmt. Corp.</u>, 475 F.2d 1236, 1239 (2d Cir. 1972); <u>see also</u> <u>F.T.C. v. First Capital Consumer Membership Servs., Inc.</u>, 206 F.R.D. 358, 363 (W.D.N.Y. 2001) (denying a non-party's motion for intervention in an enforcement action initiated by the federal trade commission, in part, because "[i]t appears that the issues decided in this litigation would have no negative *res judicata* effect on any subsequent litigation brought by [the non-party].").

Third, government entities, like the SEC, that bring enforcement proceedings are mandated to act in the interest of maximizing the recovery to all defrauded individuals and therefore, are often presumed to be adequately representing the interests of non-party investors. <u>See</u> <u>S.E.C. v. Byers</u>, No. 08 CIV. 7104 (DC), 2008 WL 5102017, at *1 (S.D.N.Y. Nov. 25, 2008) (denying a private parties' motion for intervention because "[t]his is an enforcement action brought by the SEC to, among other things, address the alleged fraud perpetrated by defendants and to recover defendants' assets and the proceeds of their purported scheme for the benefit of defrauded investors and creditors. Although not all investors and creditors share the same

interests, it is in all their interests to maximize the value of the assets under the receivership. This is what the Receiver is charged with doing.").

The Court finds two decisions particularly analogous to the instant case. In <u>S.E.C. v. Petro-Suisse Ltd.</u>, *supra*, the SEC initiated an action against an oil company for violations of the federal securities law in connection with alleged misrepresentations made by the company in 21 offering memoranda. 2013 WL 5348595 at *1. Together with the complaint, the SEC filed a motion to approve a consent judgment with the company which provided for the disgorgement of proceeds that the company had received from the 21 offerings. <u>Id.</u> A group of investors moved to intervene, alleging the existence of 34 other limited offerings that resembled the offerings charged in the complaint and arguing that "that the SEC should have brought charges with respect to those 34 offerings as well." <u>Id.</u> at *2. "In essence, the Investors describe a Ponzi scheme under which Defendants used proceeds from the uncharged offerings to make distributions to investors in the Charged Offerings." <u>Id.</u>

The court in <u>Petro-Suisse</u> denied the investors' intervention motion, finding that they had not established a cognizable interest in the case. <u>Id.</u> at 3. The court reasoned that the investors were not seeking to assert their "own claims alongside the SEC's," but rather were seeking to intervene merely in order to "assert opposition to the consent judgment." <u>Id.</u> According to the court, "[e]ffectively, the interest that the Investors claim in the Charged Offerings is thus an interest not in bringing their own claims against Defendants, but in forcing the SEC to settle its own claims on new terms more favorable to the Investors. Putting aside the contingency of such an interest, an investor has no 'legally protectable' right to the SEC's bringing (or continuing, or settling) an enforcement action." <u>Id.</u>

Similarly, in <u>U.S. Commodity Futures Trading Comm'n v. Efrosman</u>, *supra*, the Commodities Futures Trading Commission ("CFTC") filed a complaint charging an individual defendant and his company with violating the Commodity Exchange Act by diverting money from investors in his company for his own personal purposes. 2012 WL 2510338, at *1. After the court approved an entry of judgment against the defendant and a *pro rata* distribution of the defendant's estate to the investors, a group of investors filed a motion to intervene to reopen the action to amend the complaint to add new defendants and to freeze additional assets associated with this second purported scheme. <u>Id.</u> at 2–3. The court denied the motion for intervention because the victims of the new scheme did not invest in the first scheme covered by the CFTC's complaint and therefore, lacked an interest in the case. <u>Id.</u> Further, the court found that their interests would not be impaired by denying intervention because they could bring their own private actions and that "[r]eopening the case to . . . . new claims based on an entirely separate fraud will impose undue costs and burdens on the CFTC." <u>Id.</u> at 4.

Likewise in this case, the Claimants do not seek to intervene as a traditional party alongside the SEC, but rather, to object to the SEC's decision not to include Pangea Global as a Receivership Entity or in the Receivership Estate. However, the Claimants have no "legally protected right" in the SEC placing Pangea Global into the receivership. Rather, that is a decision that reserved to the SEC's sound discretion and cannot be overturned by this Court. <u>See Petro-Suisse Ltd.</u>, 2013 WL 5348595 at *4 ("The Investors are unhappy that the SEC chose not to bring charges based on information that the Investors provided about all 55 of Defendants' offerings, but that was the SEC's decision, not this Court's.").

Furthermore, as already discussed at length in resolving the Claimants' objections, Pangea Global is *not* a Receivership Entity, and the Claimants have not provided sufficient

evidence establishing that funds from Pangea Global are being used to compensate investors of the Receivership Entities in this action. Thus, their interest in the subject matter of this action is too remote to support intervention. See Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co., 922 F.2d 92, 96-97 (2d Cir. 1990) ("The first of the remaining requirements, that the putative intervenor have an interest in the proceeding, requires that that interest be direct, substantial, and legally protectable.").

In addition, the Claimants do not dispute that the disposition of this SEC Action will not preclude them under *res judicata* or collateral estoppel grounds from pursuing their own separate private action against Pangea Global. Further, even assuming that Pangea Global is without assets, the Claimants can and have brought claims against their investment advisors in the Cook County Action seeking damages for, among other things, those advisors' alleged decisions to invest the Claimants' money in Pangea Global and other supposedly Callahan-controlled entities. Thus, the Claimants are not left without a remedy to recoup some of their allegedly misappropriated investment in Pangea Global if they are denied participation in the SEC action.

Moreover, as already stated, the Claimants have not shown that they have a right to participate in a distribution of the Receivership Estate based on the Trust's investment in Pangea Global. Thus, distribution of the Receivership Estate to other Claimants will not impair their claim against Pangea Global, nor will it affect their right to recover against Pangea Global.

Finally, the SEC has represented the interests of defrauded investors in the Receivership Entities in this action by filing a complaint against Callahan, Manson, and several of the funds they controlled; by appointing a Receiver to investigate claims of investors in those funds; and by authorizing the Receiver to marshal the assets of the Receivership Entities and distribute those assets to defrauded investors in those entities. While the interests of the Receiver are not

perfectly aligned with the Claimants with respect to its investments in non-Receivership Entities, perfection is not required. Rather, courts have found that government entities in enforcement actions, such as this, do adequately represent the interests of defrauded investors for purposes of Rule 24 because they are charged with maximizing the value of the defendants' assets under receivership. See Efrosman, 2012 WL 2510338, at *4 (finding that the interests of the proposed intervenors were adequately represented by the CFTC because the CFTC brought an action to recover investor funds; obtained a restraining order freezing some of the defendants' assets; obtained a judgment against the defendants; and distributed money from the receivership estate to investors); Byers, 2008 WL 5102017 at *1 ("Although not all investors and creditors share the same interests, it is in all their interests to maximize the value of the assets under the receivership. This is what the Receiver is charged with doing.").

For these reasons, the Court finds that the Claimants have failed to show that: (i) they have a "legally protected" interest relating to the subject of this action; (ii) without intervention, disposition of the SEC Action would impede their ability to protect their interest; and (iii) their interests are not adequately represented by the SEC and the Receiver.

Accordingly, intervention under Rule 24 is also improper on these grounds.

## C. As to the Motion to Amend

Finally, as noted earlier, the Claimants move to amend the Preliminary Injunction Order to place Pangea Global and the other non-Receivership Entities listed on Exhibit A to the Preliminary Injunction Order into the Receivership and recognize them as Receivership Entities. (See Claimants' Sept. 14, 2015 Mem. of Law, Dkt. No. 323.)

The SEC and the Receiver oppose the motion as procedurally improper because, among other things, (i) the Claimants have not moved or been granted permission to intervene; and (ii)

only the SEC possesses the ability to authorize the filing of a suit against an individual or entity. (See SEC's Sept. 25, 2015 Opp'n Mem. of Law, Dkt. No. 325, at 1–3; the Rec.'s September 28, 2015 Opp'n Mem. of Law, Dkt. No. 331, at 5–7.)

In response, the Claimants do not cite to any legal authority or Federal Rule which gives them a procedural basis for moving to amend the Preliminary Injunction Order and the Claims Order. Rather, they rely on a provision in the Claims Order, which states, "The submission of a Proof of Claim will subject and submit that Potential Claimant to the jurisdiction of this Court." (See Claims Order, Dkt. No. 186, at p. 10, ¶6(g).)

Although the Claims Order purports to give the Court jurisdiction over claims against the Receivership Estate, it does not provide a procedural basis for a non-party claimant to seek to amend the Preliminary Injunction Order or any other Court-approved order or settlement agreed to by the parties in the SEC Action. The Claimants cite to no authority — nor has the Court identified any — that has permitted such a motion without first requiring the non-party claimant to intervene in the action. Further, as discussed above, the Court denied the Claimants' motion to intervene and rejected many of the same arguments the Claimants advance in the context of their motion to amend.

The Court sees no reason to revisit those arguments. Accordingly, the Claimants' motion to amend is denied as procedurally improper and duplicative of their motion to intervene.

### III. CONCLUSION

For the foregoing reasons, the Claimants' objections are overruled; the April 25, 2015 Notice of Determination is affirmed in its entirety; the Claimants' motion to intervene is denied; and the Claimants' motion to amend is denied. However, the Court notes it may revisit the Receiver's methodology for the treatment of investors who withdrew their money from the Ponzi

scheme, such as the Trust, when the Final Claim Determination Report is submitted to the Court

for approval.

The Clerk of the Court is directed to terminate docket entries 320–323 and 337–338.


**SO ORDERED.**
Dated: Central Islip, New York
June 9, 2016


                                          _/s/ Arthur D. Spatt_____
                                             ARTHUR D. SPATT
                                          United States District Judge