## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

Civil Case No. 12-CV-1065 (ADS)(AYS)

Plaintiff,

v.

BRIAN RAYMOND CALLAHAN,
ADAM MANSON, DISTINCTIVE
INVESTMENTS LLC, and DISTINCTIVE
VENTURES LLC,

Assigned to:
    Hon. Arthur D. Spatt, U.S.D.J.
    Hon. Anne Y. Shields, M.J.

Defendants.

SHERI MANSON CALLAHAN,

Relief Defendant.

-------------------------------------------------------x

## RECEIVER'S FINAL CLAIM DETERMINATION REPORT

GOTTESMAN, WOLGEL, FLYNN,
WEINBERG & LEE, P.C.

A PROFESSIONAL CORPORATION INCORPORATED IN THE STATE OF NEW YORK

ATTORNEYS FOR

### *RECEIVER*

11 HANOVER SQUARE
NEW YORK, N.Y. 10005
TEL. NO. (212) 495-0100
FAX NO. (212) 480-9797

## <u>TABLE OF CONTENTS</u>

I.   The Receivership Proceeding ..... 2
II.   The Claims Process ..... 5

    A.   Notice of Claims Bar Deadline and Procedures ..... 5
    B.   Potential Claims Received by Claims Bar Deadline ..... 7
    C.   Receiver's Processing and Determination of Potential Claims ..... 9

III.   Claim Analysis ..... 12

    A.   Approval of Investments in or Claims against Receivership Entities ..... 12
    B.   Approval of Claims Based on the Cash-In Cash-Out Method ..... 15
    C.   Recognition of Withdrawals, Redemptions or Disbursements from Potential Claimants Investments in Receivership Entities ..... 17
    D.   Deduction of Fees and Insurance Costs Paid to Third Parties from Approved Claim Amounts ..... 19
    E.   Explanation of the Approved Claim Amounts ..... 22
    F.   An Exception – A. Dickel's Claim ..... 24
    G.   Releases of Certain Claimants' Claims ..... 25

IV.   Objections to the Receiver's Determinations of Claims ..... 25

    A.   Objections Settled with the Receiver Without Recourse to the Receivership Court ..... 26
    B.   Objections Filed with and Resolved by the Receivership Court ..... 27
        (i)   Legal Standard of Equitable Receiverships ..... 27
        (ii)   Objection by Defendants Adam Manson, Distinctive Ventures, LLC and Distinctive Investments, LLC ..... 28
        (iii)   Objection by Claimants William Johnson, Diane Johnson and Bocagrande Trust ..... 29
        (iv)   Objection by Claimant Dr. Luis Pernia ..... 31

V.   Ancillary Actions ..... 32

VI.   Distribution ..... 35

    A.   Receivership Court's Authority to Approve the Receiver's Distribution Plan ..... 36
    B.   All Assets and Liabilities of the Receivership Entities Have Been Pooled to Form a Single Receivership Estate ..... 37
    C.   Distribution Priority ..... 40
    D.   The Receiver's Distribution Method ..... 41

VII.   Conclusion ..... 48

1

EXHIBIT A     The Claims Order
EXHIBIT B     The Notice of Claims Bar Deadline and Procedures for Submitting Proof of Claims
EXHIBIT C     Proof of Claim Form
EXHIBIT D     Affidavits of Publication and Copies of the Publications
EXHIBIT E     List of Potential Claims Submitted and Received Pursuant to the Claims Order
EXHIBIT F     The Receiver's Determinations of Claimants Claims
EXHIBIT G     Proposed Order

# TABLE OF AUTHORITIES

Page

### *Cases Originating from the United States Supreme Court:*

*Cunningham v. Brown*
265 U.S. 1 (1924) ........................................................ 10, 41

### *Cases Originating from the Second Circuit Courts:*

*Eberhard v. Marcu*
530 F.3d 122 (2d Cir. 2008) ........................................ 36

*Esbitt v. Dutch-Am. Mercantile Corp.*
335 F.2d. 141 (2d Cir. 1964) ...................................... 3

*In re Carrozzella & Richardson*
270 B.R. 92 (Bankr.D.Conn.2001) ............................. 20, 21

*In re Churchill Mortg. Inv. Corp.*
256 B.R. 664 (S.D.N.Y. 2000) .................................... 20

*In re Madoff*
2011 WL 3568936 (S.D.N.Y. 2011) ........................... 17

*In re Unified Commercial Cap v. Weisz & Associates, Inc.*
2002 WL 32500567 (W.D.N.Y. 2002) ......................... 20, 21

*Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*
467 F.3d 73 (2d Cir. 2006) .......................................... 36, 48

*SEC v. Byers*
637 F.Supp.2d 166 (S.D.N.Y. 2009) ........................... 37, 40, 43, 44, 46, 48

*SEC v. Credit Bancorp. Ltd.*
2000 WL 1752979 (S.D.N.Y. 2000) ............................ 28, 41, 48

*SEC v. Credit Bancorp Ltd.*
290 F.3d 80 (2d Cir. 2002) .......................................... 36, 43, 13

*SEC v. Fischbach Corp.*
133 F.3d 170 (2d Cir. 1997) ........................................ 36

*SEC v. Pittsford Capital Income Partners, L.L.C.*
2007 WL 61096 (W.D.N.Y. 2007) .............................. 3

*SEC v. Princeton Econ. Int'l Ltd.*
2008 WL 7826694 (S.D.N.Y. 2008) — 8

*SEC v. Wang*
944 F.2d 80 (2d Cir. 1991) — 36, 37

*SEC v. World Gambling Corp.*
555 F.Supp. 930 (S.D.N.Y. 1983)
*aff'd,* 574 F.2d (2d Cir. 1978) — 27

## Cases Originating from Other Circuits Courts:

*Callahan v. Moneta Capital Corp.*
415 F.3d 114 (1st Cir. 2005) — 8

*CFTC v. Franklin*
652 F.Supp. 163 (W.D.Va.1986)
*rev'd on other grounds Anderson v. Stephens,* 875 F.2d 76 (4th
Cir.1989). — 42

*CFTC v. Topworth Int'l, Ltd.*
205 F.3d 1107 (9th Cir. 1999) — 40

*Commodity Futures Trading Comm'n v. Equity Fin. Grp.*
2005 WL 2143975 (D.N.J. Sept. 2, 2005) — 15, 16, 17, 18, 44, 45

*Donell v. Kowell*
533 F.3d 762 (9th Cir.2008) — 16

*In re First Commercial Management Group, Inc. v. Reinhardt*
279 B.R. 230 (N.D. IL 2002) — 20

*In re Hedged–Invs. Assocs.*
84 F.3d 1286 (10th Cir.1996) — 16

*In re Lancelot Investors Fund, LP v. Peterson*
451 B.R. 833 (N.D. IL 2011) — 21-22

*In re Tedlock Cattle Co.*
552 F.2d 1351 (9th Cir.1977) — 15

*Quilling v. Trade Partners, Inc.*
2006 WL 3694629 (W.D. Mich. 2006) — 28, 41

*Rieser v. Hayslip (In re Canyon Sys. Corp.)*
343 B.R. 615 (Bankr.S.D.Ohio 2006) — 22

*Scholes v. Lehmann*
56 F.3d 750 (7th Cir.1995)                                                16

*SEC v. Basic Energy & Affiliated Resources, Inc.*
273 F.3d 657 (6th Cir. 2001)                                            40

*SEC v. Cap. Consultants, LLC*
397 F.3d 733 (9th Cir. 2005)                                            27, 37

*SEC v. Elliot*
953 F.2d 1560 (11th Cir. 1992)                                          27, 28, 40

*SEC v. Enter. Trust Co.*
2008 WL 4534154 (N.D.IL 2008)                                             36

*SEC v. Forex Asset Mgmt. LLC*
242 F.3d 325 (5th Cir. 2001)                                            36-40

*SEC v. Hardy*
803 F.2d 1034 (9th Cir.1986)                                              37

*SEC v. HKW Trading, LLC*
2009 WL 2499146 (M.D. FL 2009)                                            39

*SEC v. Homeland Communications Corp.*
2010 WL 2035326 (S.D. FL 2010)                                            13, 14, 15

*SEC v. Huber*
702 F.3d 903 (7th Cir. 2012)                                            18, 44, 46

*SEC v. Parish*
2010 WL 5394736 (D.S.C. Feb. 10, 2010)                                    44, 45, 48

*SEC v. P.B. Ventures*
1991 WL 269982 (E.D.Pa. Dec.11, 1991)                                     27

*United States v. Cabe*
311 F.Supp.2d 501 (D.S.C. June 6, 2003)                                   18-19, 45-46

*United States v.*
*Real Property Located at 13328 and 13324 State Highway 75 North*         37
89 F.3d 551 (9th Cir.1996)

*U.S. Commodity Futures Trading Comm'n v. Barki, LLC*
2009 WL 3839389 (W.D.N.C. Nov. 12, 2009)                                  42, 45

***U.S. Commodity Futures Trading Comm'n
v. Capitalstreet Fin., LLC***
2010 WL 2572349 (W.D.N.C. June 18, 2010)          41

***United States Commodity Futures Trading Commission
v. Lake Shore Asset Mgmt. Ltd.***
2010 WL 960362 (N.D. IL 2010)          18

***United States Commodity Futures Trading Commission v. Wilson***
2013 WL 3776902 (S.D. Cal. July 17, 2013)          19, 43

## *Statutes*

Advisors Act §206          2

Exchange Act §10(b)          2

Securities Act § 17(a)          2

## *Treatises*

Ralph E. Clark, ***Clark on Receivers*** § 662.1 (Anderson 3d Ed. 1959)          28

Ralph E. Clark, ***Clark on Receivers*** § 826 (Anderson 1st Ed. 1918)          41

***Restatement (First) of Restitution*** § 213 (1937)          41

## *Article*

***USAO News Release***
(http://www.justice.gov/usao/nye/pr/April14/2014Apr29.php?print=1)          38-39

## *Filings in SEC v. Brian R. Callahan, et. al., 12-CV-1065*

*Claimants Johnson and Bocagrande Trust's Motion for Leave to File
a Reply in Support of their Objection to the Receiver's Determination
of Claim,* November 12, 2015 (ECF Doc. 344) *So Ordered* November
13, 2015 (ECF Doc. 346)          30

*Claimants Johnson and Bocagrande Trust's Motion for
Reconsideration of the Court's Order of June 9, 2016,* July 7, 2016
(ECF Docs. 392 & 393)          30

*Claimants Johnson and Bocagrande Trust's Reply in Support of their Objection to the Receiver's Determination of Claim No. 33,* November 16, 2015 (ECF Doc. 348) — 30

*Claimants Johnson and Bocagrande Trust's Reply to Receiver's Opposition to their Motion to Amend the Court's Order of March 27, 2012,* October 15, 2015 (ECF Doc. 336) — 30

*Claimants Johnson and Bocagrande Trust's Combined Reply in Further Support of its Reconsideration Motion,* July 27, 2016 (ECF Doc. 399) — 31

*Claimants William Johnson, Diane Johnson and Bocagrande Trust's Objection to the Receiver's Determination of Claim,* August 21, 2015 (ECF Doc. 319 & 320) — 29-30

*Claimants Johnson and Bocagrande Trust's Notice of Appeal of the June 9, 2016 Order and October 4, 2016 Order,* November 2, 2016 (ECF Doc. 424) — 31

*Extension nunc pro tunc of the Claims Order Deadline for the Receiver to file the Notice & Procedures and POC Form in the Claims Dropbox,* March 28, 2014 (ECF Doc. 219) — 7

*First Amended Complaint,* May 31, 2012 (ECF Doc. 28) — 2, 4, 5, 11, 14

*Letter Objection by Adam Manson, Distinctive Ventures, LLC and Distinctive Investments, LLC,* November 18, 2014 (ECF Doc. 265) — 28

*Letter Reply by Adam Manson, Distinctive Ventures, LLC and Distinctive Investments, LLC,* January 6, 2015 (ECF Doc. 287) — 29

*Letter Request by Adam Manson, Distinctive Ventures, LLC and Distinctive Investments, LLC,* December 22, 2014 (ECF Doc. 282) *so Ordered on* December 23, 2014 (ECF Doc. 285) — 29

*Letter Request by the Receiver re: Letter Request by Adam Manson, Distinctive Ventures, LLC and Distinctive Investments, LLC,* December 22, 2014 (ECF Doc. 283) *So Ordered on* December 23, 2014 (ECF Doc. 286) — 29

*Letter to the Honorable Arthur D. Spatt re: Pernia Claimants Objection,* December 23, 2015 (ECF Doc. 360) — 31

*Letter to the Honorable Arthur D. Spatt re: Pernia Claimants Objection,* January 22, 2016 (ECF Doc. 371), *So Ordered on* January 25, 2016 (ECF Doc. 375) ............................................. 32

*Letter to the Honorable Arthur D. Spatt re: Pernia Claimants Objection,* January 26, 2016 (ECF Doc. 379), *So Ordered on* January 27, 2016 (ECF Doc. 380) ............................................. 32

*Mandate Withdrawing Johnson/Bocagrande Appeal*, February 13, 2017 (ECF Doc. 433) ............................................. 31

*Memorandum of Decision & Order,* May 2, 2015 (ECF Doc. 294) ............................................. 29

*Memorandum of Decision & Order,* June 9, 2016 (ECF Doc. 383) ............................................. 30

*Memorandum of Decision & Order,* June 11, 2016 (ECF Doc. 384) ............................................. 32

*Motion to Establish Claims Bar Deadline, Approve Manner and Form of Claims Bar Deadline Notice, and Approve the Procedure and Process for Determining Claims,* December 31, 2013 (ECF Docs. 177-181) ............................................. 5

*Order denying Claimants Johnson and Bocagrande Trust's Motion to Request Reconsideration of the June 9, 2016 Order*, October 4, 2016 (ECF Doc. 415) ............................................. 31

*Order Establishing a Claims Bar Deadline, Approving the Form and Manner for a Claims Bar Deadline Notice, and Approv[ing] the Procedure and Process for Determining Claims,* February 20, 2014 (ECF Doc. 186) ............................................. 1, 5, 29

*Plaintiff's Opposition to Johnson & Boca Grande Trust's Motion for Reconsideration of the Court's Order Entered June 9, 2016,* July 20, 2016 (ECF Doc. 397) ............................................. 30-31

*Receiver's Memorandum of Law in Opposition to Motion for Reconsideration of the Court's Order of June 9, 2016 by Non-Party Claimants William Johnson, Diane Johnson and Bocagrande Trust,* July 21, 2016 (ECF Doc. 398) ............................................. 30-31

*Receiver's Reply to Defendant Adam Manson, Distinctive Investments LLC and Distinctive Venture LLC's Objections to the Notice of Receiver's Determination of Claim,* January 20, 2015 (ECF Docs. 288 & 289) ............................................. 29

*Receiver's Request and Supplemental Response to Claimants William Johnson, Diane Johnson and Bocagrande Trust's Reply,* October 26, 2015 (ECF Docs. 339) *so Ordered* January 25, 2016 (ECF Doc. 373) .......... 30

*Receiver's Response to Claimants William Johnson, Diane Johnson and Bocagrande Trust's Objection to the Receiver's Determination of Claim,* September 21, 2015 (ECF Docs. 324 & 325) .......... 30

*Receiver's Response to Defendant Adam Manson, Distinctive Investments LLC and Distinctive Ventures LLC's Objections to the Notice of Receiver's Determination of Claim,* December 18, 2014 (ECF Docs. 278 & 279) .......... 28-29

*Stipulation and Order for the Consensual Sale of the Cromwell Property and the Related Storage Business,* October 7, 2014 (ECF Doc. 259) .......... 25

*Stipulation and Preliminary Injunction Order [Receivership Order],* June 4, 2012 (ECF Doc. 33) .......... 1, 3

*The Pernia Claimants Filed Objection to the Receiver's Determination of Claim No. 42 Dated March 10, 2015,* July 13, 2015 (ECF Doc. 354) .......... 31

*The Receiver's Response to Claimant Luis Pernia's Objection to the Receiver's Determination of Claim,* January 26, 2016 (ECF Docs. 377 & 378). .......... 32

***Filings in United States of America v. The Real Property Located at 272 Old Montauk Highway, Montauk, New York 11954 and All Proceeds Traceable Thereto, et. al., 12-CV-1880***

*Decree of Forfeiture and Order for Delivery,* December 18, 2015 (ECF Doc. 112) .......... 11

***Filings in SEC v. Brian R. Callahan, et. al., Second Circuit, 16-3737***

*So-Ordered Stipulation withdrawing the Johnson/Bocagrande Appeal and Mandate regarding the "So Ordered" Stipulation Withdrawing Appeal,* February 13, 2017 (ECF Doc. 40, 45, 46) .......... 31

*Filings in United States of America v. Brian R. Callahan and*
*Adam J. Manson, 13-CR-453*

*Court Acceptance of Adam Manson Guilty Plea Recommendation of
magistrate Judge Tomlinson,* May 13, 2014 (ECF Doc. 63) — 39

*Court Acceptance of Brian Callahan Guilty Plea Recommendation of
Magistrate Judge Wall,* April 29, 2014 (ECF Doc. 59) *corrected* May
13, 2014 (ECF Doc. 64) — 38

*Criminal Cause for Guilty Plea for Adam J. Manson,* May 12, 2014
(ECF Doc. 67) — 39

*Criminal Cause for Guilty Plea for Brian R. Callahan,* April 28, 2014
(ECF Doc. 61) — 38

*Indictment of Brian R. Callahan and Adam J. Manson,* July 31, 2013
(ECF Doc. 1) — 38

## RECEIVER'S FINAL CLAIM DETERMINATION REPORT

Steven Weinberg, as the court appointed receiver (the "Receiver") for Horizon Global Advisors Ltd. ("HGA LTD"), Horizon Global Advisors LLC ("HGA LLC"), Diversified Global Investments (BVI), L.P. ("Diversified Global") f/k/a Horizon Global Investments, L.P. , The Masters Global Fund, L.P. ("Masters Global"), Fiduciary Select Income Fund, L.P. ("Fiduciary Select") f/k/a Pangea Bridge Investment, L.P., Horizon Millennium Investments, L.P. ("Horizon Millennium") and Pangea Offshore High Yield Portfolio, LLC ("Pangea Offshore") respectfully submits this as his final claim determination report for the claims submitted pursuant to the Order Establishing a Claims Bar Deadline, Approving the Form and Manner for a Claims Bar Deadline Notice, and Approve the Procedure and Process for Determining Claims ("Claims Order"). *See **ECF Doc. 186.*** The Claims Order is attached hereto and made a part herein as Exhibit A.

The Claims Order states, "[u]pon the Court's resolution of all Objections, the Receiver shall file a "Final Claim Determination Report", setting forth the final claim determinations including any adjustment made to the Potential Claim amount, for approval by the Court. The Final Claim Determination Report shall identify: (i) any Potential Claims that are the subject of any litigation against one or more of the Receivership Entities (the "Stayed Litigation") which have been stayed by the Initial Receivership Order and the Fund Receivership Order (collectively, the "Receivership Order") (ECF Doc. 33), which will be disposed by this Claims Order or by a subsequent decision and order of this Court as to an Objection; (ii) any Potential Claims which may be reduced or otherwise affected by the Receiver's Ancillary Claims, and (iii) any Potential Claims which may be reduced or otherwise affected by an action commenced by the Potential Claimant against a person or entity other than a person or entity which the

Receivership Order enjoins from suit or litigation (the "Claimant's Third-Party Actions") which has not been concluded as of the date of the Final Claim Determination Report." *Claims Order* ¶ **7, P. 18.**

Upon the resolution of any objections to the Final Claim Determination Report, the Receiver requests that this Court in accordance with the Claims Order: (i) approve the Receiver's determination and priority of claims as set forth in this Report and attached EXHIBIT F; (ii) deem waived and overruled all potential claims and objections to Notice of Receiver's Determination of Claim which were not timely submitted to the Receiver, not timely filed with this Court or denied by the Receiver and/or the Receivership Court; (iii) approve the Receiver's plan of distribution; and (iv) "enter a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure with respect to the Potential Claims that are the subject of the Final Claim Determination Report." *Claims Order* ¶ **7, P. 18.**

## I.   THE RECEIVERSHIP PROCEEDING

This receivership proceeding was commenced on March 5, 2012 by the United States Securities and Exchange Commission ("SEC") against Defendants Brian Raymond Callahan ("Callahan"), HGA LTD and HGA LLC (the "SEC/Receivership Action") for misappropriation of investors' assets and violations of Securities Laws, namely: §17(a)(1), (2) and (3) of the Securities Act; §10(b) of the Exchange Act and §206(1), (2) and (4) of the Advisors Act.  By the Amended Complaint (the "Amended Complaint") filed in the SEC/Receivership Action on May 31, 2012 (ECF Doc. 28), the SEC expanded the action to include as defendants, five offshore funds, Diversified Global, Masters Global, Fiduciary Select, Horizon Millennium and Pangea Offshore (collectively, the "Callahan Funds"), along with Defendant Callahan's brother-in-law, Adam Manson, his companies, Distinctive Investments, LLC ("Distinctive Investments") and

Distinctive Ventures, LLC ("Distinctive Ventures"), and as a Relief Defendant, Defendant

Callahan's spouse, Sheri Manson Callahan.

On March 27, 2012, on the motion made by the SEC (ECF Doc. 2), this Court signed the

Receivership Order (ECF Doc. 22) placing the HGA Fund Managers (HGA LTD and HGA

LLC) into Receivership, and appointed Steven Weinberg as their Receiver.  Pursuant to a

Stipulation (ECF Doc. 29) entered into by the SEC and Defendant Callahan, and "So Ordered"

(ECF Doc. 33) on June 4, 2012, the Receivership Court also placed the Callahan Funds into

receivership with Steven Weinberg, being the Receiver for both HGA Fund Managers and the

Callahan Funds.  *See* the Receivership Order.  See *ECF Doc. 33*.

This Court charged the Receiver with the duty: (a) to use reasonable efforts to determine

the nature, location and value of all property interests of the Receivership Defendants, of

whatever kind, (b) to take custody, control and possession of all Receivership Property and

records relevant thereto, and (c) subject to leave from this Court, to sue for and collect, recover,

receive and take into possession from third parties all Receivership Property and records relevant

thereto, including pursuing all suits, actions, claims and demands which may be brought by the

Receivership Estate, and bringing legal actions based on law and equity as the Receiver deems

necessary or appropriate in discharging his duties as Receiver, and (d) to take such action as

necessary and appropriate for the preservation of Receivership Property or to prevent dissipation

or concealment of Receivership Property.  *See **Esbitt v. Dutch-Am. Mercantile Corp.***, 335 F.2d

141 (2d Cir. 1964) ("[a] primary purpose of appointing a receiver is to conserve the existing

estate" and "marshal the assets"); ***SEC v. Pittsford Capital Income Partners L.L.C.***, 2007 WL

61096 (W.D.N.Y. 2007) (unreported decision) ("[t]he fundamental purpose of establishing a

Receivership is to protect the estate property and ultimately return that property to the proper parties").

The Amended Complaint asserts that from 2005 to 2012, Defendant Callahan raised over $90 million (the "Investor Funds") from at least 45 investors (the "Investors") for at least five offshore funds, namely, Diversified Global, Masters Global, Fiduciary Select, Horizon Millennium and Pangea Offshore, which he operated and controlled, directly or indirectly through HGA LTD and HGA LLC.  According to the Amended Complaint, "Callahan's solicitation of investors involved material misrepresentation about the use of their money, the liquidity of their investment and the asset diversification of the Callahan Funds."  *Amended Complaint* ¶ 2 (ECF Doc. 28).  Specifically, Callahan "represented to a number of U.S. residents that their money in the Callahan Funds would be invested with New York-based hedge funds" and that their "investments would be liquid".  *Amended Complaint* ¶ 2 (ECF Doc. 28). However, according to the Amended Complaint, Callahan "improperly diverted assets of the Callahan Funds to his brother-in-law Manson's private real estate project that was facing foreclosure."  *Amended Complaint* ¶ 3 (ECF Doc. 28).

The Amended Complaint further asserts that "after securing financing from a bank, Manson's entity Distinctive Ventures purchased cooperative rights to the real estate project, a beach resort on Long Island.  Manson and Distinctive Investments received about $11.1 million from Callahan's Pangea High Yield fund in 2005 and 2006, which was used toward the initial purchase of the real estate project."  *Amended Complaint* ¶ 44 (ECF Doc. 28).

"From 2007 to 2012, unbeknownst to investors, Callahan diverted approximately $21.8 million of investors' money from the Callahan Funds to Distinctive Ventures' real estate project to help make bank loan payments to avoid foreclosure and operate the property…Distinctive

4

Investments issued over 50 signed unsecured promissory notes to the Fiduciary and Diversified funds. The promissory notes falsely state that the Fiduciary and Diversified funds could demand the return of principal and interest upon 30 days' notice." *Amended Complaint* ¶ 46 & 47.

## THE CLAIMS PROCESS

The Claims process began with the filing of the Receiver's Motion for an Order Establishing a Claims Bar Deadline, Approving the Form and Manner for a Claims Bar Deadline Notice, and Approve the Procedure and Process for Determining Claims ("Motion to Establish Claims Bar Date"). *See ECF Docs. 177-181*. In response to the Receiver's unopposed Motion to Establish Claims Bar Date, the Receivership Court issued the Claims Order (ECF Doc. 186), on February 20, 2014. The Claims Order established April 21, 2014 at 5:00 p.m. EST (New York Time) as the claims bar deadline (the "Claims Bar Deadline").

### A.   NOTICE OF CLAIMS BAR DEADLINE AND PROCEDURES

The Receiver provided Notice of the Claims Bar Deadline and procedures for submitting a proof of claim to Potential Claimants by:

1. Serving all known Potential Claimants, and their counsel if then known, by electronic mail, or by regular mail (only if no electronic mail address was available), within twenty (20) business days after entry of the Claims Order, i.e. on or before March 12, 2014, with: (i) a copy of the Notice of Claims Bar Deadline and Procedures for Submitting Proof of Claim (the "Notice & Procedures"); (ii) an email from the Receiver concerning the Notice of Claims Bar Deadline and Procedures for Submitting Proof of Claim; and (iii) a copy of a blank Proof of Claim Form ("POC Form"). The Notice & Procedures and the POC Form are annexed hereto as EXHIBIT B and EXHIBIT C respectively.

2.  On March 31, 2014, the Receiver served all known Potential Claimants, by electronic
    mail, or by regular mail (only if no electronic mail address was available), with: a
    letter from the Receiver regarding the Notice & Procedures, and reminding all known
    Potential Claimants that the claims bar deadline was twenty-one (21) days from the
    date of the letter.

3.  The Receiver published within thirty (30) calendar days after the entry of the Claims
    Order, on or before March 22, 2014, the Notice & Procedures on two days that were
    two weeks apart in the following publications on the following dates: (i) The
    Financial Times on March 3, 2014, and March 18, 2014; (ii) the New York Times on
    March 4, 2014, and March 18, 2014; (iii) The BVI Beacon on February 27, 2014, and
    March 13, 2014; and (iv) the St. Kitts and Nevis Observer on February 28, 2014 and
    March 14, 2014.  The Affidavits of Publication and copies of the publication provided
    by the publishing entities for the publications on the foregoing dates by the foregoing
    publishing entities are annexed hereto as EXHIBIT D.

4.  On February 21, 2014, the Receiver made the Notice & Procedures and POC Form
    available in the Receiver's dropbox which the Receiver established and uses to
    provide known investors with copies of papers filed in the subject Receivership
    Action and the related Civil Forfeiture and Criminal proceedings (the "Receivership
    Dropbox").

5.  On March 25, 2014, the Receiver made the Notice & Procedures and POC Form
    available in the Claims Dropbox located at
    https://www.dropbox.com/sh/1hfwzyx8s8pmplm/_gJDPOh6ug.  On March 28, 2014,
    the Receivership Court extended, nunc pro tunc the Claims Order deadline of March

2, 2014 up to and including March 25, 2014 for the Receiver to file the Notice &

Procedures and POC Form in the Claims Dropbox (ECF Doc. 219).

6.   The Receiver promptly provided the Notice & Procedures and POC Form to any

Potential Claimant who made a written request for such documents to the Receiver's

electronic mail address (ReceiverHGA@gottesmanlaw.com) or to the mailing address

of Gottesman, Wolgel, Malamy, Flynn & Weinberg, P.C., 11 Hanover Square, 4th

Floor, New York, New York 10005.

The above-described notice complied with the Claims Order requirements for provision of

sufficient and reasonable notice to be given by the Receiver to Potential Claimants. *See*

*generally,* **Claims Order** ¶ 6 (c), P. 4-6.

### B.   POTENTIAL CLAIMS RECEIVED BY CLAIMS BAR DEADLINE

As of April 21, 2014, the Claims Bar Deadline; the Receiver received 67 potential claims

submitted pursuant to the Claims Order totaling $100,017,063.78 ("Potential Claims").  A list of

the potential claims submitted and received pursuant to the Claims Order without their addresses

so as not to disclose personal and confidential information is annexed hereto as EXHIBIT E.

Pursuant to the Claims Order, all Potential Claimants who failed to submit a Proof of

Claim, by failing to submit one altogether or by failing to submit one in the proper manner and

form before the Claims Bar Deadline of April 21, 2014, were: (i) forever barred, estopped, and

enjoined to the fullest extent allowed by applicable law from asserting, in any manner, any claim

whatsoever against the Receiver, the Receivership, the Receivership Entities and their respective

estates or property, (ii) waived any objection to and is not permitted to object to any distribution

plan proposed by the Receiver, (iii) waived any distribution and is denied of any distributions

under any distribution  plan implemented by the Receiver, and (iv) waived all further notices

from the Receiver concerning any claim and distribution.  *See generally, **Claims Order*** ¶ 6 (h), P. 10-11.

Accordingly, and since the Claims Bar Date has long since passed, the Receiver respectfully requests that this Court issue an order barring and precluding all entities, estates, trusts, governmental entities and individuals from asserting a claim or any further claim, excepting administrative and professional claims as defined in the Claims Order section 6(b), against the Receiver, Receivership Estate, or any Receivership Entity.  S*ee **Callahan v. Moneta Capital Corp.,** 415 F.3d 114, 117-18 (1st Cir. 2005) (potential claimants that did not submit claims by the bar date lacked "standing to object to the adjudication of a pending claim in the Claims Disposition Order"); ***SEC v. Princeton Econ. Int'l Ltd.,*** 2008 WL 7826694, *4 (S.D.N.Y. 2008) ("All persons or entities with a claim that failed to file a proof of claim prior to the Bar Date and were not excused from filing a proof of claim under the [p]lan are forever barred, estopped and permanently enjoined.")  Enforcement of the Claims Bar Date against any previously rejected or future claim is necessary to allow the Receiver to proceed with his plan of distribution as delineated below.

After filing of this Report, the Receiver shall serve this Report upon all Potential Claimants by first class mail and on any other interested parties by posting it in the Receiver's dropbox and the Claims dropbox.  ***Claims Order*** ¶ 7, P. 18.

All objections to this Report shall be filed within thirty (30) days after the date that this Report was served by first-class mail on all Potential Claimants.  The only permissible grounds for objection shall be that this Report does not comport with the Court's decision and order as to the Objections or with an agreement previously reached with the Receiver as to the resolution or settlement of the Objection.  ***Claims Order*** ¶ 7, P. 18.

## C.  RECEIVER'S PROCESSING AND DETERMINATION
##      OF POTENTIAL CLAIMS

The Receiver received 67 potential claims submitted pursuant to the Claims Order totaling $100,017,063.78 ("Potential Claims").

The Receiver contacted at least 48 Potential Claimants, sometimes multiple times, to request additional information to assist the Receiver in reviewing and processing the Potential Claimants claim, and allowed such Potential Claimant at least thirty (30) days to submit such additional information to the Receiver.  *See generally, **Claims Order** ¶* 6 (j), P. 11-12.  The Receiver contacted these Potential Claimants to give the Potential Claimant an opportunity to correct deficiencies in their claim filings which ultimately may have affected the approval of their claim.

The Receiver evaluated each Potential Claim in accordance with the terms of the Claims Order and made a written determination (the "Notice of Determination") of each Potential Claim submitted based on the provisions of the Claims Order, the applicable law, and a review of the information submitted by the Potential Claimant in light of the information available to the Receiver, including information from the books and records of the Receivership Entities.  *See generally, **Claims Order** ¶* 6 (k), (l), (m), P. 12-13.

The Receiver has reviewed and considered all submitted potential claims and has approved, denied, or approved in part and denied in part each potential claim through a written Notice of Determination ("Receiver's Determinations") according to the terms and provisions of the Claims Order.  The 67 potential claims and the factors affecting each claim are set forth in EXHIBIT F.  The sections below contain general discussions of certain matters affecting the allowed amount of these claims.

The Receiver's Determinations are based on treating all potential claimants equally and applying the same analysis to each individual claimant's potential claim in the same manner. This is based on equity and on the general principle regarding distribution plans, in Ponzi scheme cases, which is "equality is equity" *Cunningham v. Brown,* 265 U.S. 1 (1924) (holding, that circumstances of Charles Ponzi's scheme "call strongly for the principle that equality is equity"). Claimants were approved by the Receiver who timely submitted a claim and were investors in Receivership Entities from which funds were diverted for the initial payment and financing of Manson's real estate project.

As detailed in EXHIBIT F, the Receiver has proposed an "Allowed Amount" for each claim, such Allowed Amount is the amount of a claim to which the Receiver has determined the Claimant is entitled. The Allowed Amount will serve as the basis for determining a Claimant's ultimate distribution of Receivership assets. The Receiver's Determination of a Claimant's Allowed Amount is not indicative of the amount the Potential Claimant will receive through distribution of Receivership assets. Rather, those Potential Claimants with an approved claim will be eligible for distribution of the receivership assets on a pro rata basis, to be described more thoroughly in this Report, and will be based on the total Receivership Estate's value at the time of disbursement less a holdback for incomplete Receivership matters, winding-up and completion of the Receiver's and certain Receivership fees and expenses. The Approved Amount of each Claim does not guaranty that the Potential Claimant will receive the total amount or any portion of their claim that has been approved by the Receiver and/or approved by the Receivership Court.

As of the last Receiver's Quarterly Report for the Fourth Quarter of 2016 the Receiver had approximately $6,479,105.17 in cash recovered from Receivership Entity bank accounts,

Receivership Entity investments, and funds recovered by the Receiver which were diverted from

Receivership Entities to third parties, entities or other non-claimant investors who received a

profit on their investment or other diverted Receivership Entity funds.  A large portion of the

funds diverted from investments in the Receivership Entities were used for the initial purchase

and financing of Manson's real estate project [the Montauk Property].  Specifically, Manson and

Distinctive Investments received about $11.1 million from Callahan's Pangea Offshore fund in

2005 and 2006, which was used toward the initial purchase of the real estate project and from

2007 to 2011 approximately $21.8 million of investors' money from Diversified Global and

Fiduciary Select was diverted to Manson's real estate project.  *See **Amended Complaint*** ¶¶ 2, 44,

46 & 47 (ECF Doc. 28).  The consensual sale of the Distinctive Ventures, LLC shares of stock in

93 Old Montauk Owners to Panoramic Partners LLC resulted in a $40,312,077.69 forfeiture to

the United States Marshals Service.  *See **Civil Forfeiture Action – ECF Doc. 112***.  The Claims

Order stated in regards to Remission Claims:

> Remission Claims.  Only those Potential Claimants who have timely and properly
> submitted their Proof of Claim and which has been approved by the Receiver in
> whole or in part (but only for the portion which has been approved) are eligible,
> authorized and permitted to make a remission claim for forfeited funds to the
> extent that such forfeited funds become available for distribution through the
> Receivership.  Whoever does not timely and properly submit a Proof of Claim or
> whose Proof of Claim has been denied in whole or in part (but only for the portion
> which has been denied) will be forever barred, enjoined and estopped from
> making any claim to such forfeited funds.

***Claims Order*** ¶ 6 (i), P. 11.

The Receiver asks this Court to approve his recommended claim determinations as set

forth in EXHIBIT F, in accordance with the analysis and explanation described in this Report.

Further, as the Claims Bar Date has passed and all Potential Claimants and other potential

creditors have had ample notice of the claims process and an opportunity to file claims and to

seek enforcement of any liens or other asserted rights or interests in Receivership property, the Receiver asks this Court to issue an order barring any future claims against Receivership Entities, Receiverships property or assets, the Receivership estate, or the Receiver, and any proceedings or other efforts to enforce or otherwise collect on any lien, debt, investment or other asserted interest in or against the Receiver, Receivership Entities, Receivership property or assets, or the Receivership Estate.

### III. CLAIM ANALYSIS

### A. APPROVAL OF INVESTMENTS IN OR CLAIMS AGAINST RECEIVERSHIP ENTITIES

The Receiver accepted any claim form that was submitted and later analyzed it for a valid potential claim against a Receivership Entity or the Receivership Estate. Specifically, the Receiver evaluated the submitted claims forms pursuant to the Claims Order terms which defines a potential claim as:

> (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, mature, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, against one or more of the Receivership Entities or the Receivership Estate; (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, against one or more of the Receivership Entities; or (c) a right to a distribution from one or more of the Receivership Entities, including but not limited to a right based on an investment in or through one or more of the Receivership Entities. *Claims Order,* ¶ 3, P. 2.

> Each Proof of Claim must identify the Receivership Entity to which the Potential Claim relates. If the Potential Claimant has a Potential Claim against more than one Receivership Entity, the Potential Claimant…must indicate on the Proof of Claim each such Receivership Entity to which the Potential Claim relates and the Potential Claim amount(s) attributable to each such Receivership Entity. *Claims Order,* ¶ 6(f)(iii), P. 10.

The Receivership Order defines the Receivership Entities and their assets stating:

1. This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the following Defendants: Horizon Global Advisors Ltd. and Horizon Global Advisors LLC (collectively, the "Receivership Defendants")...Steven Weinberg...is hereby appointed to serve without bond as receiver (the "Receiver") for the estates of the Receivership Defendants. *Receivership Order, Exhibit A,* P. 5.

On consent of plaintiff Securities and Exchange Commission (the "Commission") and Defendants...the parties agree and the Court orders...that this Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of Diversified Global Investments (BVI), L.P.; The Masters Global Fund, L.P.; Fiduciary Select Income Fund, L.P.; Horizon Millennium Investments, L.P.; and Pangea Offshore High Yield Portfolio, LLC and that, pending final disposition of this action or such further order of the Court, Steven Weinberg...shall serve as Receiver over the Fund Defendants pending final disposition of this action pursuant to all the terms stated in the Court's Preliminary Injunction Order.... *Receivership Order,* P. 1-3.

In accordance with the aforementioned terms of the Claims Order and Receivership Order, the Receiver evaluated the potential claims using the following analysis:

i. The Receiver will assess the validity, nature and priority of the Potential Claim (for example, whether the Potential Claim is properly made against the Receivership Estate....)...ii. The Receiver may consider each Potential Claimants' notice, knowledge, state of mind, role and actions taken (or non-actions), if any, in connection with the alleged fraud...iii. In evaluating the Potential Claim...the Receiver shall take into account the level of notice or knowledge of the alleged fraud attributable to each Potential Claimant...iv. The Receiver may exercise discretion to recommend adjustment or non-payment of a Potential Claim on equitable or any other applicable grounds.... *Claims Order,* ¶ 6(k), P. 12-13.

The Receiver also considered prevailing receivership cases. *See i.e.* ***SEC v. Credit Bancorp Ltd.,*** 290 F.3d 80, 88-89 (2d Cir. 2002) (the Second Circuit in Credit Bancorp set forth two factors that must be satisfied to approve a pro rata distribution. First, investors' funds must have been commingled. Second, the victims must be similarly situated 'with respect to their relationship to the defrauders.); *see* ***SEC v. Homeland Communications Corp.,*** 2010 WL 2035326 (S.D. FL 2010) ("The Court has entered final judgments against the Defendants, granted the SEC's motion for a temporary restraining order, and placed Homeland and the Relief

13

Defendants into a receivership for the benefit of Homeland and the Relief Defendants' investors and creditors.  The receivership does not extend to all victims of all purported frauds that involved any defendant to this case….The Receiver's jurisdictional authority is prescribed by the SEC's Complaint and the duty to recover and repatriate the losses of Homeland Investors").

The Amended Complaint asserts that from 2005 to 2012, Defendant Callahan raised over $90 million (the "Investor Funds") from at least 45 investors (the "Investors") for at least five offshore funds, namely, Diversified Global, Masters Global, Fiduciary Select, Horizon Millennium and Pangea Offshore, which he operated and controlled, directly or indirectly through HGA LTD and HGA LLC.  A large portion of the funds diverted from investments in Receivership Entities Pangea Offshore, Diversified Global and Fiduciary Select were used for the initial purchase and financing of Manson's real estate project.  Specifically, Manson and Distinctive Investments received about $11.1 million from Callahan's Pangea Offshore fund in 2005 and 2006, which was used toward the initial purchase of the real estate project and approximately $21.8 million of investors' money from Diversified Global and Fiduciary Select was diverted to the Manson's real estate project.  *See **Amended Complaint*** ¶¶ 2, 44, 46 & 47 (ECF Doc. 28).  Based on the foregoing one of the primary foundations for the Ponzi scheme was the diversion of investors' assets into Manson's real estate project.  Investments of claimants in Receivership Entities Pangea Offshore, Diversified Global and Fiduciary Select were diverted to Manson's real estate project.

Several potential claims were based in whole or in part on investments in non-receivership entities with which Defendant Callahan had a relationship, was an investment advisor or was otherwise purportedly involved with, or based in whole or in part on investment in some other non-receivership entity.  In accordance with, ***SEC v. Homeland Communications***

*Corp.,* the Receiver limited his claim approvals to those claims which fit the definition of potential claim in the Claims Order and the terms of the Receivership Order, and denied the potential claims which were based in whole or in part on investments in non-receivership entities or other claims against Defendant Callahan which do not have a relationship (nexus) with a Receivership Entity.  *See SEC v. Homeland Communications Corp.,* 2010 WL 2035326 (S.D. FL 2010).  The principal recovery is from the sale of the Manson real estate project for distribution to the claimants in connection with the Receivership Estates which invested in the Manson real estate project.

## B. APPROVAL OF CLAIMS BASED ON THE CASH-IN CASH-OUT METHOD

The Receiver's Determinations of claims for claimants who asserted that they invested funds in a Receivership Entity is based on the cash-in cash-out method and approval of actual dollar amounts invested in a Receivership Entity.  Claims for funds invested in other non-receivership entities and claims for profits, interest or other earnings shown on investors' account statements were denied.  To recognize such gains would cause recent investors to give up a share of the money they invested to fund a return of fictitious profits to earlier investors.  *See Commodity Futures Trading Comm'n v. Equity Fin. Grp.,* 2005 WL 2143975 *22 (D.N.J. Sept. 2, 2005).

*In re Tedlock Cattle Co.,* 552 F.2d 1351 (9th Cir.1977), the Court specifically rejected an approach recognizing such gains. In so ruling, the *Tedlock* Court found that a trustee of a bankrupt estate could utilize an "equity theory" in apportioning the assets to investor-creditors in a Ponzi investment scheme on the basis of restitution. *Tedlock,* 552 F.2d at 1352. Under the equity theory, or "cash-in-cash-out plan," investors receive a share of their original investment but do not recover paper "profits." *Id.*  In this regard, "no investor creditor will receive the

benefit of his bargain, but all will share some recovery." *Id.* Recovery of both "profits" and the

original investment is deemed inequitable under this theory, because the profits would be paid

"at the expense of the other equally innocent" later investors. *Id.* at 1352-53; *see also*

***Commodity Futures Trading Comm'n v. Equity Fin. Grp.,*** 2005 WL 2143975, at *22-24

(D.N.J. 2005) (holding that the equities approach to allocating loss in the case of a Ponzi scheme

required the use of the cash-in cash-out evaluation of each innocent investor's account, followed

by a pro rata allocation of remaining assets).

It is not surprising, therefore, that every circuit court to address this issue has concluded

that an investor's profits from a Ponzi scheme, whether paper profits or actual transfers, are not

"for value." *See **Donell v. Kowell,*** 533 F.3d 762, 771–72 (9th Cir.2008) ("Amounts transferred

by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by

that individual. If the net is positive, the receiver has established liability...."). In the context of

Ponzi schemes:

> [t]he injustice in allowing [a fortunate investor] to retain his profit at the
> expense of the defrauded investors is avoided by insisting on
> commensurability of consideration. [The fortunate investor] is entitled to his
> profit only if the payment of that profit to him, which reduced the net assets of
> the estate now administered by the receiver, was offset by an equivalent
> benefit to the estate.

***Scholes v. Lehmann***, 56 F.3d 750, 757 (7th Cir.1995) (Posner, J.); *see **In re Hedged–Invs.***

***Assocs.,*** 84 F.3d 1286, 1290 (10th Cir.1996) ("Because she had no claim against HIA Inc. for

damages in excess of her original investment, HIA Inc. had no debt to her for those amounts.

Therefore, the transfers could not have satisfied an antecedent debt of HIA Inc., which means

HIA Inc. received no value in exchange for the transfers").

Accordingly, the Receiver has determined that it is the most equitable to the claimants to

determine claims on the cash-in cash-out method and approve actual dollar amounts invested in a

Receivership Entity and actual dollars withdrawn, redeemed or disbursed from a Receivership Entity.  Claims for funds invested in other non-receivership entities and claims for profits, interest or other earnings shown on investors' account statements were denied as profits or gains are fictitious because no profits were earned by the Receivership Entities.  Rather, the Receivership Entities were operated as a Ponzi scheme, and the reported profits were a fiction. Specifically, 23 potential claimants' claims were partially or fully disallowed based on their claim for funds which were not invested in a Receivership Entity and/or claims based on fictitious profits or purported gains accrued on the potential claimants' investment in a Receivership Entity and/or failure of the potential claimant to recognize a withdrawal, redemption or disbursement on their investment.  To recognize such profits or gains would cause recent investors to give up a share of the money they invested to fund a return of fictitious profits to earlier investors.

**C. RECOGNITION OF WITHDRAWALS, REDEMPTIONS OR DISBURSEMENTS FROM POTENTIAL CLAIMANT'S INVESTMENTS IN RECEIVERSHIP ENTITIES**

The Receiver's claim determinations are based on taking into consideration the withdrawals, redemptions or disbursements from potential claimants' investments in Receivership Entities which were received by the Potential Claimant or a third-party at the Potential Claimants instruction.  Courts have consistently held that an investor's claims should be limited to the total dollar amount of its investment reduced by any funds it received.  *See **In re Madoff,*** 2011 WL 3568936 at *3-5 (S.D.N.Y. 2011); ***Commodity Futures Trading Commission v. Equity Fin. Grp. , LLC,*** 2005 WL 2143975 at *23-25 ("Court agrees that recognizing profits or other earnings in claims for distribution would be to the detriment of later investors and would therefore be inequitable…the Court agrees with the Receiver that the rising

17

tide method is the most equitable...the Court finds that as a result of crediting prior withdrawals, there will be more funds available to the investors with allowable claims...this method does not penalize investors based on the timing of their investments"); *United States Commodity Futures Trading Commission v. Lake Shore Asset Mgmt. Ltd.,* 2010 WL 960362 at *9 (N.D. IL 2010) ("the court agrees with the receiver that the "Rising Tide" method is the most equitable because it prevents an investor who previously received funds as withdrawals from 'benefitting at the expense of other investors by retaining the benefit of the full amount of his withdrawal *plus* a distribution calculated on the basis of net funds invested, rather than the recommended distribution amount adjusted to take into account all amounts already received.'") *quoting CFTC v. Equity Fin. Grp., LLC.* 2005 WL 2143975, at *25 (D.N.J. 2005) (emphasis in original) (internal quotations omitted).

Permitting Potential Claimants to claim the entire amount of their funds which were invested in the Receivership Entities without taking into consideration the amounts withdrawn, redeemed or distributed to such Potential Claimant, would permit the Potential Claimant to receive a disproportionate share of any distribution and would be inequitable to those Potential Claimants that never received a withdrawal, redemption or distribution. *See SEC v. Huber,* 702 F.3d 903, 907 (7th Cir. 2012) ("Investors who have made withdrawals will tend to be better off when the Ponzi scheme collapses than investors who have made no withdrawals because the former lose less than they would have lost had they not drawn down their investments.")

Additionally, the redemption, withdrawal or disbursement was taken into consideration regardless of whether these Potential Claimants invested additional funds in Receivership Entities after receipt of the withdrawal, redemption or disbursement. In *United States v. Cabe,* the Court determined that investors who had received partial repayment would receive a reduced

amount that, when combined with partial repayment, would equal the percentage of pro rata distribution given other investors. *See generally*, ***United States v. Cabe,*** 311 F.Supp.2d 501, 510 (D.S.C. June 6, 2003). This was the determination despite the challenge by an investor who had invested funds, received back a large distribution, and invested more funds than he had previously withdrawn and was seeking a distribution based solely on a net loss. *Id.;* ***United States Commodity Futures Trading Commission v. Wilson,*** 2013 WL 3776902 *7 (S.D. CA 2013) ("[u]ltimately, the Court concludes consideration of prior withdrawals as a full or partial satisfaction results in a fair method for a majority of the defrauded customers. The Court further notes there is only a small portion of funds in the registry available for distribution, and it must consider the full amount of both contribution and withdrawal to ensure a fair distribution of funds").

The Court determined that the redemption to the investor would be considered in the distribution amount because otherwise a great disparity amongst claimants would be produced if a determination was made solely based on the net amount lost without consideration of the repaid funds. *Id.* Please note, in regards to the foregoing, here, a Potential Claimant's transfer of funds from an investment in one Receivership Entity to an investment in another Receivership Entity was not considered a withdrawal, redemption or disbursement to the Potential Claimant or a third party at the Potential Claimants instruction.

## D. DEDUCTION OF FEES AND INSURANCE COSTS PAID TO THIRD PARTIES FROM APPROVED CLAIM AMOUNTS

The Receiver deducted any fees and insurance costs paid to third parties from the approved claim amounts. Many of the potential claimants invested in the Receivership Entities through the purchase of insurance policies, annuities, and business protection policies held by independent insurance companies and through trusts administered by independent trust servicing

companies or trustee companies. These independent entities performed services and/or provided insurance coverage for the potential claimants and charged the potential claimants for such services. Pursuant to the prevailing law such services were provided for value, and therefore must be deducted from the approved claim amounts of each Claimant. This is required for an equitable distribution because not all of the potential claimants invested in Receivership Entities while using such independent third party companies. Accordingly, to treat all claimants equally and therefore equitably, such payments for fees, administrative expenses and in certain circumstances insurance reserves have been deducted from potential claimants' claims.

This comports with courts determinations regarding third party companies' entitlement to payment which have provided services for value. Specifically, the courts have considered the payment to third parties in the context of brokers who referred investors to Ponzi schemes and determined that such services provided value despite the underlying Ponzi scheme unless the brokers were insiders or related to insiders of the fraud. *In re First Commercial Management Group, Inc., v. Reinhardt,* 279 B.R. 230 (N.D. IL 2002) ("It would be a legal fiction to say that brokers who produce investors to provide money for a Ponzi scheme are providing nothing of value. Money is valuable even when used for illegal purposes."); *citing In re Churchill Mortg. Inv. Corp.,* 256 B.R. 664 (S.D.N.Y. 2000) (Ponzi scheme, appointed trustee's claims failed against individuals and entities who had been hired to originate mortgages for, or solicit investors in, one or more of the Churchill companies, seeking to recover commissions with the court's determination focusing on the discrete transaction between the debtor and the defendant, without regard to the nature of the debtor's overall enterprise); *see also In re Carrozzella & Richardson,* 270 B.R. 92, 97 (Bankr.D.Conn.2001) ("fraudulent conveyance remedies are designed to 'right' the singular 'wrong' of a *windfall* received at the expense of the debtor's

estate, not to police the legality of transactions otherwise fair to the debtor.  Other available remedies-both civil and criminal-are designed for that latter purpose").

The courts reasoning regarding brokers applies to the insurance companies and trust companies which maintained the potential claimants' insurance policies and trust funds which were invested in Defendant Callahan's scheme because they provided trust services and insurance policies for value.  *See In re Unified Commercial Cap. v. Weisz & Associates, Inc.,* 2002 WL 32500567 at *6 (W.D.N.Y. 2002) ("In sum, to hold that the use of appellees' funds in this case was not valuable, simply because Unified used those funds to continue perpetrating its Ponzi scheme, would not be an accurate assessment of the facts, but simply a legal fiction resting upon considerations of perceived public policy."); s*ee In re Carrozzella & Richardson,* 270 B.R. 92, 97 (Bankr. D. Conn. 2001) ("This Court does not share the legal view that a transaction's illegality deprives that exchange of value.  That view amounts to a *legal fiction* …").

Specifically, in the context of insurance, in *In re Lancelot Investors Fund, LP v. Peterson*, the Trustee alleged that because the Petters Entities were involved in a Ponzi scheme in which they sold little or no goods, the insurance policies either had no value or the premiums were excessive.  The Court dismissed the Trustee's claims and determined that the critical issue was whether reasonably equivalent value was given and received when the insurance defendants brokered and issued the insurance policies in issue.  The court reasoned that:

> [t]he Premium Payment Debtors bargained for and received insurance at a price that has not been alleged to be excessive or improper for any other reason. Defendants [] assumed a risk, set aside reserves for the risk and provided insurance coverage for the risk of the Retailers' insolvency.  That the accounts receivable did not exist has not been alleged to be the fault of the Defendants or within their knowledge.  The court finds that discerning consideration, good faith and reasonably equivalent value for purposes of evaluating fraudulent transfer counts, does not prevent the court from finding that the Premium Payment Debtors actually received consideration. The Premium Payment Debtors got what they bargained for—insurance coverage of the Retailers' accounts receivable.

The fraudulent transfer analysis deals with totally separate issues of whether what the Premium Payment Debtors got in exchange for $5,862,200.50 was a reasonably equivalent value and whether the transfers were made in good faith....To say that the Premium Payment Debtors got nothing in the transactions is not true; they received recourse in the form of insurance.

*In re Lancelot Investors Fund, LP v. Peterson,* 451 B.R. 833, 842 (N.D. IL 2011).

The Receiver, however, did not deduct from approved claim amounts any fees or expenses paid to Defendant Callahan or any of the Receivership Entities as they were involved in Defendant Callahan's scheme. *See* **Rieser v. Hayslip (In re Canyon Sys. Corp.),** 343 B.R. 615, 645-46 (Bankr.S.D. Ohio 2006) (holding that even under *Churchill*, brokers failed to give reasonably equivalent value where they were insiders or related to insiders of the debtor and therefore presumably familiar with the debtor's scheme).

### E.  EXPLANATION OF THE APPROVED CLAIM AMOUNTS

Attached hereto and made a part herein in Exhibit F is the Receiver's determination of each Potential Claimant's asserted claim.  Each Potential Claimant was notified of the Receiver's determination through a Notice of Receiver's Determination of Claim which was sent by mail to the Potential Claimant.  Each Notice of Determination included the Receiver's determination in regards to the potential claimants asserted claim amount and whether same was approved or denied, in whole or in part.  The Notice of Determination also notified Potential Claimants that had received withdrawals, redemptions or distributions that they would be required to wait until each other potential claimant had received back the same percentage of their initial principal investment as the potential claimant that had already received some of their principal investment back.  This determination comports with the rising tide method of distribution and is the most equitable as it treats all potential claimants equally, so that they may each receive back the same percentage of their total principal investment at the end of the distribution process.  Specifically,

an example of the language included in the Notices of Determination where the potential

claimant had already received a certain percentage of their investment in Receivership Entities

back and is required to wait until the other potential claimants receive back the same percentage

of their investment stating:

> The total investment amount in a Receivership Entity prior to withdrawals for redemptions and fees by the Trust was $3,111,236.37, and the total amount withdrawn, redeemed or distributed on the total investment of $3,111,236.37 was $1,322,031.23, which equals 42.49% of the Trust's total investment in a Receivership Entity.   Thus the Trust is not permitted to participate in any distribution of Receivership Estate funds unless and until all approved claimants have recovered at least 42.49% of their total investment.

*Notice of Determination.*  Of the sixty-seven (67) potential claims, only twelve (12)

claimants received redemptions which will require the potential claimant to wait until the

other potential claimants receive back the same percentage of their investment.  Four (4)

of the twelve (12) affected potential claimants percentage is less than 4%.  In addition,

each Notice of Determination included the following language:

> Please note payment of approved claims: (1) is contingent on the approval of the Receivership Court; (2) will be pro rata by a method to be established by the Receiver; and (3) will be based on the total Receivership Estate's value at the time of disbursement.   This Notice does not guaranty that you will receive the total amount or any portion of your claim that has been approved by the Receiver and/or approved by the Receivership Court.

*Notice of Determination.*  The individual Notices of Determination of claim which were issued

to each potential claimant by the Receiver are summarized in the attached chart at Exhibit F.

Exhibit F includes: (i) the list of the potential claims submitted and received pursuant to the

Claims Order without their addresses so as not to disclose principals' personal and confidential

information; (ii) the Potential Claimants' total asserted potential claim amount; (iii) the

Determination's total investment in a Receivership Entity Amount; (iv) the Determinations total

withdrawals, redemptions or distributions amount; (v) the Determination's Total Approved

Claim Amount; (vi) the Determinations Total Denied Claim Amount; (vii) the Determination's

Reason for the Denied Claim Amount; (viii) the Determination's Percentage of investment in a

Receivership Entity which the Potential Claimant has already received back in withdrawals,

redemptions or distributions; (ix) whether the potential claimant filed an Objection with the

Receivership Court; (x) the Receivership Court's determination on the Objection; (xi) any

withdrawn or released potential claims; and (xii) any ancillary actions instituted by the potential

claimant.

### F.  AN EXCEPTION -- A. DICKEL'S CLAIM

Mr. Dickel submitted a Proof of Claim to the Receiver for the release of $773,045.28

(HK $6,000,000.00) currently held in escrow by Wilbert Neo of Hoosenally & Neo, pursuant to

an October 21, 2013 Escrow Agreement between the Receiver, Mr. Dickel and the escrow agent

Hoosenally & Neo and later Addendum.

In 2011, Receivership Entity Pangea Offshore signed an agreement to lend Mr. Dickel

HK $6,000,000.00 in exchange for a mortgage against real property owned by Mr. Dickel.  Mr.

Dickel represented that he never received loan proceeds from Pangea Offshore and the Receiver

does not have evidence that Pangea Offshore loaned or transferred loan proceeds to Mr. Dickel.

In 2013 Mr. Dickel requested a release of the Pangea Offshore mortgage from the Receiver so

that he could sell the property thereby encumbered.  The Receiver had not completed his

investigation at that time in October of 2013 and required that Mr. Dickel place the principal

loan amount of HK $6,000,000.00 in escrow pending: (i) the completion of his investigation; and

(ii) Mr. Dickel submitting a claim pursuant to the claims process.  Mr. Dickel has consistently

asserted that no funds were ever drawn down from the loan provided by Pangea Offshore.

Further the Receiver's investigation has revealed no evidence that funds were ever withdrawn

from Pangea Offshore on account of the loan or mortgage to Mr. Dickel.  Therefore, the

Receiver approved Mr. Dickel's claim.  Due to the foregoing, if and when this report is approved

by this Court, the Receiver requests that this Court permit the Receiver to disburse the escrowed

funds to Mr. Dickel.  Mr. Dickel will only receive back the funds Mr. Dickel placed in escrow

totaling $773,045.28 (HK $6,000,000.00).  No funds from the Receivership Entities and

Receivership Estate, other than the moneys held in escrow by Hoosenally & Neo will be paid to,

or for the benefit of, Mr. Dickel.

### G.  RELEASES OF CERTAIN CLAIMANTS' CLAIMS

On November 13, 2014, the closing occurred for the sale of the Cromwell Property and

Cromwell Storage Business, pursuant to the Stipulation and Order for the Consensual Sale of the

Cromwell Property and the Related Storage Business, which also released the Receiver,

Receivership Entities and Receivership Estate from Citizens claim filed pursuant to the Claims

Order for $1,970,000.00.  *See **ECF Doc. 259**.*

On December 23, 2015, Gibraltar released the Receiver, Receivership Entities and

Receivership Estate from its claim filed pursuant to the Claims Order for $2,247,055.97.

### IV.   <u>OBJECTIONS TO THE RECEIVER'S DETERMINATIONS OF CLAIMS</u>

Pursuant to the Claims Order, "[a]ny Potential Claimant who disagrees or otherwise

objects or takes issue with the Receiver's determination of his or her Potential Claim, shall first

serve, but not file with the Court, a written objection ("Objection" or "Objections") to the

Receiver's determination in accordance with the instructions included with the Receiver's Notice

of Determination...All Objections shall include: (i) the claim number assigned by the Receiver

to the Potential Claim; (ii) a detailed statement of the reasons for the Potential Claimant's

Objection to the Receiver's determination; (iii) copies of any proofs, document or other writing

upon which the Potential Claimant relies; and (iv) mailing, phone, and email contact information for the Potential Claimants.  Objections not timely served shall be deemed waived and overruled without the need for further order of this Court or action by the Receiver." ***Claims Order,*** ¶ 6(n), P. 14-15.

A total of eight (8) objections out of sixty-seven (67) submitted potential claims were submitted to the Receiver in response to the Notice of Receiver's Determination of Claim.  Five (5) objections were resolved between the Receiver and the claimant by adhering to the original Notice of Determination.  Three (3) objections were submitted to the Receivership Court for determination.  The Court affirmed the Notices of Receiver's Determination of Claims, rejecting the Claimants objections.

## A.  OBJECTIONS SETTLED WITH THE RECEIVER WITHOUT RECOURSE TO THE RECEIVERSHIP COURT

Five (5) of the eight (8) objections submitted to the Receiver were resolved by and between the Receiver and the Potential Claimant without intercession of this Court.  Each of these objections which were resolved without Court involvement were resolved by adhering to the Receiver's original Notice of Receiver's Determination of Claim for each such claimant.  Such determinations are reflected in the chart attached as Exhibit F.

Pursuant to the Claims Order "[t]he Potential Claimant and the Receiver shall attempt to resolve the Objection served on the Receiver by the Potential Claimant.  All Potential Claimants submitting a Proof of Claim are directed to work in good faith with the Receiver to resolve any Objections before submitting them to the Court for determination." ***Claims Order,*** ¶ 6(o), P. 15.

These five (5) claimants resolved their claims with the Receiver or otherwise decided not to file their Objection with the Receivership Court.  The deadline for each Potential Claimant to file objections with the Court pursuant to the Claims Order was no earlier than ninety (90) days

26

and no later than one hundred and twenty (120) days from the date of the Receiver's Notice of Determination ("Objection Deadline").  Pursuant to the Claims Order, "[o]bjections not timely filed with the Court shall be deemed waived and overruled without the need for further order of this Court or action by the Receiver." *Claims Order,* ¶ 6(p), P. 15-16.  Pursuant to this Court's Claims Order, the five (5) objections which were not filed with the Receivership Court are waived and overruled.

## B.  OBJECTIONS FILED WITH AND RESOLVED BY THE RECEIVERSHIP COURT

Three (3) of the eight (8) objections submitted to the Receiver were filed with the Receivership Court within the Objection Deadline.  The Court affirmed the Notices of Receiver's Determination of Claims, rejecting the three (3) Claimants objections submitted to the Receivership Court.

### i.  LEGAL STANDARD OF EQUITABLE RECEIVERSHIPS

In equity receiverships resulting from SEC enforcement actions, district courts have very broad powers and wide discretion to fashion remedies and determine to whom and how the assets of the Receivership Estate will be distributed.  *See SEC v. Elliot,* 953 F.2d 1560, 1566 (11th Cir. 1992) ("The district court has broad powers and wide discretion to determine relief in an equity receivership.  This discretion derives from the inherent powers of an equity court to fashion relief.") (citing cases); *see also SEC v. Cap. Consultants, LLC,* 397 F.3d 733, 750 (9th Cir. 2005).  When it comes to fashioning a claims process and related distribution plan, "[n]o specific distribution scheme is mandated so long as the distribution is 'fair and equitable.'" *SEC v. P.B. Ventures,* 1991 WL 269982, at *2 (E.D.Pa. Dec.11, 1991) *citing SEC v. World Gambling Corp.,* 555 F.Supp. 930, 935 (S.D.N.Y. 1983), *aff'd,* 574 F.2d (2d Cir. 1978).

Similarly, in deciding what claims should be recognized and in what amounts, "[t]he fundamental principle which emerges from this case law is that any distribution should be done equitably and fairly, with similarly situated investors or customers treated alike." *SEC v. Credit Bancorp. Ltd.,* 2000 WL 1752979, at \*13 (S.D.N.Y. 2000).  Since any one group of investors in a ponzi-type scheme generally occupies the same legal position as other investors, equity should not permit one group a preference over another, because "equality is equity." *See SEC v. Elliot,* 953 F. 2d at 1570.  There is no requirement, however, that all claimants be treated in the same manner; rather, fairness only requires that similarly situated claimants should be treated alike. *See, e.g., Quilling v. Trade Partners, Inc.,* 2006 WL 3694629, \*1 (W.D. Mich. 2006) ("As an equitable matter in receivership proceedings arising out of a securities fraud, the class of fraud victims takes priority over the class of general creditors with respect to proceeds traceable to the fraud.").  The equitable doctrine of constructive trusts gives "the party injured by the unlawful diversion a priority of right over the other creditors of the possessor."  Ralph E. Clark, *Clark on Receivers* § 662.1 (Anderson 3d Ed. 1959) (quoting authorities).

## ii.  OBJECTION BY DEFENDANTS ADAM MANSON, DISTINCTIVE VENTURES, LLC AND DISTINCTIVE INVESTMENTS, LLC

On November 18, 2014, Defendants Adam Manson, Distinctive Ventures, LLC and Distinctive Investment LLC (collectively referred with non-party Distinctive Management LLC as the "Manson/Distinctive Claimants") filed with this Court their objections ("Manson/Distinctive Objections") to the Notice of the Receiver's Determination of Claims ("Determination") which denied their claim ("Claim") for the Receivership to reimburse them for the $390,496.93 they paid Gibraltar on the account of a loan secured against the Callahan Coop Unit, Sea Salt No. 4. *See ECF Doc. 265*.  The Receiver filed its response and opposition

28

to the Manson/Distinctive Objection (the "Response") on December 18, 2014 and December 19, 2014. *See **ECF Docs. 278 & 279***.

The procedures set by this Court's February 20, 2014 Order (ECF Doc. 186) do not permit any further papers following the filing of the Receiver's Response to Manson/Distinctive. Nevertheless, on December 22, 2014, the Manson/Distinctive Claimants made a letter application seeking leave to file a reply to the Receiver's Response to Manson/Distinctive. *See **ECF Doc. 282***. The Court granted the Manson/Distinctive Claimants leave to file a reply ("Manson/Distinctive Supplemental Objection") to the Receiver's Response to Manson/Distinctive, and granted the Receiver leave to file a response ("Supplemental Response to Manson/Distinctive") to the Manson/Distinctive Supplemental Objection. *See **ECF Doc. 285 & 286***. The Manson/Distinctive Supplemental Objection was filed on January 6, 2015 and the Receiver's Supplemental Response to Manson/Distinctive was filed on January 20, 2015 (with the complete Exhibit M refiled on January 21, 2015). *See **ECF Doc. 287, 288 & 289***. On May 2, 2015, the Receivership Court issued a Memorandum of Decision & Order (ECF Doc. 294) wherein the Court affirmed the Notice of Determination by the Receiver and dismissed the claims by Distinctive Entities. *See **ECF Doc. 294***.

iii.   **OBJECTION BY CLAIMANTS WILLIAM JOHNSON, DIANE JOHNSON AND BOCAGRANDE TRUST**

On August 21, 2015, non-party Claimants William Johnson, Diane Johnson and Bocagrande Trust (collectively, the "Johnson/Bocagrande") filed with this Court their objections ("Johnson/Bocagrande Objections") to the Notice of the Receiver's Determination of Claims ("Johnson/Bocagrande Determination") which: (i) denied the portion of the Bocagrande Trust's claim asserted against non-Receivership Entity Pangea Global Opportunities Fund Portfolio; and (ii) took into consideration the redemption received by the Bocagrande Trust from Receivership

29

Entity Pangea Offshore. *See ECF Docs. 319 & 320*. The Receiver filed its response and

opposition to the Objection (the "Response") on September 21, 2015. *See ECF Docs. 324 &*

*325*.

On October 26, 2015, the Receiver submitted a letter with Supplemental Response to the

Honorable Arthur D. Spatt requesting that the Receivership Court accept and consider the

Receiver's Supplemental Response to the Claimants Reply (ECF Doc. 336) which was limited to

responding to the arguments in the Johnson/Bocagrande Reply which solely related to the

Johnson/Bocagrande claim and Johnson/Bocagrande Objection. *See ECF Docs. 336 & 339*.

The Receivership Court So Ordered the Receiver's request on January 25, 2016. *See ECF Doc.*

*373*. On November 12, 2015, Johnson/Bocagrande filed a Motion for Leave to File a Reply in

Support of their Objection to the Receiver's Determination of Claim with attached Supplemental

Response. *See ECF Doc. 344*. On November 13, 2015, the Honorable Arthur D. Spatt granted

Johnson/Bocagrande's Motion for Leave to File a Reply in Support of their Objection to the

Receiver's Determination of Claim. *See ECF Doc. 346*. On November 16, 2015

Johnson/Bocagrande filed their Reply in Support of their Objection to the Receiver's

Determination of Claim. *See ECF Doc. 348*.

On June 9, 2016, the Receivership Court issued a Memorandum of Decision & Order (the

"June 9, 2016 Order"), wherein the Court affirmed the Receiver's April 25, 2015

Johnson/Bocagrande Determination, overruled the Johnson/Bocagrande Objections, denied the

Johnson/Bocagrande motions to: (i) intervene and; (ii) amend the Receivership Order. *See ECF*

*Doc. 383*. On July 7, 2016 Johnson/Bocagrande filed a motion seeking reconsideration of the

June 9, 2016 Order.   *See ECF Docs. 392 & 393*. Both the Plaintiff Securities and Exchange

Commission (ECF Doc. 397) and the Receiver (ECF Doc. 398) filed Opposition to

Johnson/Bocagrande's reconsideration motion. *See ECF Docs. 397 & 398*. On July 27, 2016, Johnson/Bocagrande filed a combined reply in further support of its reconsideration motion. *See ECF Doc. 399.*

On October 4, 2016, the Receivership Court issued an order denying the Johnson/Bocagrande motion requesting reconsideration of the June 9, 2016 Order (the "October 4, 2016 Order"). *See ECF Doc. 415.* On November 2, 2016 Johnson/Bocagrande filed a Notice of Appeal appealing to the United States Court of Appeals for the Second Circuit (the "Johnson/Bocagrande Appeal") from: (i) the June 9, 2016 Order; and (ii) the October 4, 2016 Order. *See ECF Doc. 424.* On February 13, 2017, the Second Circuit "So Ordered" a stipulation executed by counsel for Appellant Johnson/Bocagrande and Respondents Receiver and Securities and Exchange Commission withdrawing the Johnson/Bocagrande Appeal with prejudice and without costs (the "Appeal Withdrawal Stipulation"), and issued a mandate regarding the "So Ordered" appeal withdrawal. *See Johnson/Bocagrande Appeal – ECF Doc. 40, 45 & 46.* On February 13, 2017, this Court filed the aforesaid mandate. *See ECF Doc. 433.*

iv.   **OBJECTION BY CLAIMANT DR. LUIS PERNIA**

On December 23, 2015, Claimant Pernia's Objection to the Receiver's Determination of Claim ("Pernia Objection") was entered on this SEC/Receivership Action's docket, requesting approval of their claim based on losses from investments in non-receivership entities Rochdale Offshore Global Opportunities Fund, L.P. and certain of the Westminster Funds. *ECF Doc. 354.* On December 23, 2015, the Receiver filed a letter to the Honorable Arthur D. Spatt, notifying the Receivership Court that the December 23, 2015 electronic notice and filing of the Pernia Objection was the first notice the Receiver had received that the Pernia Objection was filed with this Court. *ECF Doc. 360.* On December 24, 2015, Judge Spatt granted the Receiver the right

to file a response to the objection on or before January 23, 2016, which deadline was later extended to January 26, 2016 *nunc pro tunc*. *See **ECF Docs. 375 & 380***. On January 26, 2016, the Receiver filed the Receiver's Response to Claimant Luis Pernia's Objection to the Receiver's Determination of Claim which included the Receiver's Declaration and exhibits in support of the Receiver's Response. *See **ECF Docs. 377 & 378***.

On June 11, 2016, the Receivership Court issued a Memorandum of Decision & Order, wherein the March 10, 2015 Notice of Determination was affirmed in its entirety and the Pernia objections were denied and dismissed. *See **ECF Doc. 384***.

## V. <u>ANCILLARY ACTIONS</u>

The Claims Order requires that this Report identify: "(i) any Potential Claims that are the subject of any litigation against one or more of the Receivership Entities (the "Stayed Litigation") which have been stayed by the Initial Receivership Order and the Fund Receivership Order (collectively, the "Receivership Orders"), which will be disposed by this Claims Order or by a subsequent decision and order of this Court as to an Objection; (ii) any Potential Claims which may be reduced or otherwise affected by the Receiver's Ancillary Claims, and (iii) any Potential Claims which may be reduced or otherwise affected by an action commenced by the Potential Claimant against a person or entity other than a person or entity which the Receivership Orders enjoins from suit or litigation (the "Claimant's Third-Party Actions") which has not been concluded as of the date of the Final Claim Determination Report." ***Claims Order, ¶7***, P. 18-19.

There are no potential claims that are the subject of any litigation against one or more of the Receivership Entities which have been stayed by the Receivership Order which will be disposed by the Claims Order or by a subsequent decision and order of this Court as to an Objection.

There are no potential claims which will be reduced or otherwise affected by the Receiver's Ancillary Claims.

There are several actions pending by Potential Claimants against persons or entities other than a person or entity which the Receivership Order enjoins from suit or litigation which have not been concluded as of the date of this Report.  Such ancillary actions, depending on their result, could result in a reduction or change to the approved claim amount of certain Potential Claimants.  Each such potential claimant is identified below, and has been identified on the attached Exhibit F.

- Claimant #33, has an action captioned *Laura Johnson as Trustee of the Bocagrande Trust v. Duane Crithfield, Stephen P. Donaldson, Keithly Lake, Handler Thayer & Duggan, L.L.C., Handler Thayer, L.L.P., Duggan Bertsch, L.L.C., James M. Duggan, Thomas J. Handler and Steven J. Thayer, Patrick Cherry, Protected Planning, LLC, and Tracy Sunderlage,* case number 12-L-7823, pending in the Circuit Court of Cook County, County Department, Law Division.  The Complaint Claimants' provided to our office states that Mr. Crithfield, Donaldson and Lake did business through, among other entities, non-receivership entities Westminster, Hope & Turnberry, LLC and First Fidelity Trust Ltd. and seeks (i) compensatory damages in an amount to be proven at trial, which Plaintiffs believe will materially exceed Fifty Thousand Dollars ($50,000.00) plus costs of suit; (ii) punitive damages; (iii) attorney's fees; and (iv) such other relief as the court deems just and proper.

- Claimant #33, Claimant #42 and Claimant #9, have a FINRA proceeding captioned *William V. Johnson, John Dietz, Individually and as Trustee of the Pienza Trust, Luis Pernia, individually and on behalf of the dissolved Pernia Family Trust, Laura*

33

*Johnson As Trustee of the Bocagrande Trust v. RIM Securities, LLC, Rochdale Investment Management, LLC, Rochdale Offshore Management, a division of Rochdale Investment Management, MPS Loria Financial Planners, LLC, and Loria Financial Group, LLC,* FINRA case number 12-02144, currently pending.  The relief sought is: "an award of compensatory damages equal to the total amounts invested by Claimants with Callahan and Rochdale [more than $10 million dollars]; (b) Respondents disgorge all fees they have charged Claimants in connection with their services to Claimants; (c) Respondents held liable for Claimants' attorneys' fees and costs; and (d) such other relief as the panel deems just and proper."

C.  Claimant #30 and Claimant #6 have a FINRA proceeding captioned *Helvetia Trust and AAA Group International Trust, v. Phillipe Bertherat, Remy Antione Best, Renaud Fernand De Planta, Jacques Joseph De Saussure, Bertrand Francois Lambert Demole, Jean-Francois Demole, Marc Phillipe Pictet, Nicolas Lucien Pictet as individual partners and FINRA registrants d/b/a Pictet Overseas Inc., Pictet North America Advisors SA, Pictet Asset Management, FPP Asset Management, Pictet Asset Mgt Ltd, Pictet Asset Management SA, Pictet Advisors SA, Pictet and Cie,* FINRA case number 13-02053, currently pending.  The relief sought in the Statement of Claim is $108,225,000.00.  The above FINRA proceeding led to an action in the United States District Court for the Southern District of Florida, captioned *Pictet Oversas, Inc. v. Helvetia Trust and AAA Group International Trust,* case number 13-CIV-81088, wherein Plaintiff Pictet Overseas is seeking declaratory judgment and injunctive relief to preclude Helvetia Trust and AAA Group International Trust from proceeding with the FINRA arbitration, FINRA case number 13-02053.

D.  A claimant has filed an anonymous Whistleblower Complaint regarding Unlicensed

Securities Broker-Dealer Activities against Pictet & Cie in the Securities and

Exchange Commission Office of the Whistleblower, captioned *In re Pictet & Cie,*

which states "Pictet knowingly conducted securities brokerage business in the United

States and with US persons and made substantial brokerage fees, while seeking to

avoid compliance with the US securities laws and regulations.  Pictet's actions

undermine the integrity of the US financial industry and the ability of US regulators

to monitor its activities, and put investors at risk.  Enforcement action against Pictet is

appropriate, given its knowing violations." ***In re Pictet & Cie,*** *Whistleblower*

*Complaint, P. 9.*

## VI.   DISTRIBUTION

The Receiver intends to distribute funds in the Receivership Estate, with a hold back for

administrative claims and expenses, pursuant to the terms of the Claims Order, when the

Receiver has completed his investigation, the Claims Process and any ancillary litigation or

motions.

The Receiver intends to distribute the Receivership Estate according to the following: (i)

pool together all of the assets of the Receivership Estate; (ii) distribute funds according to the

order of priority in ***Clark's on Receivers*** while withholding certain funds from distribution for

administrative claims and Receivership Estate expenses; (iii) distribute the remaining

Receivership Estate assets to the potential claimants pursuant to the Rising Tide method of

distribution so that each claimant receives back the same percentage of their approved claim as

each other claimant, through either an interim distribution with final distribution or through one

final distribution as explained *infra.*

This Court has broad discretion to approve the Receiver's distribution method and plan. The Receiver respectfully requests that this Court grant the Receiver the discretion to complete interim and/or final distribution based on the methods outlined below at his discretion and upon notice to this Court through a Distribution Report outlining the amounts to be distributed based on: (i) the Receivership Estate's cash on hand; (ii) outstanding administrative claims and expenses; (iii) any expected administrative claims and expenses; and (iv) any outstanding matters which require funds to be held-back until completion.

## A. RECEIVERSHIP COURT'S AUTHORITY TO APPROVE THE RECEIVER'S DISTRIBUTION PLAN

In general, this Court has broad authority to craft remedies for violations of the federal securities laws. *See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,* 467 F.3d 73, 81 (2d Cir. 2006); *Eberhard v. Marcu,* 530 F.3d 122, 131 (2d Cir. 2008); *SEC v. Fischbach Corp.,* 133 F.3d 170, 175 (2d Cir. 1997). Courts have held that within that broad authority lies the power to approve a plan of distribution proposed by a federal receiver. *See SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 82-83 (2d Cir. 2002) (affirming approval of pro rata distribution plan as "within the equitable discretion of the District Court"); *SEC v. Wang,* 944 F.2d 80, 88 (2d Cir. 1991) (same); *see also SEC v. Forex Asset Mgmt. LLC,* 242 F.3d 325, 332 (5th Cir. 2001) ("Because we find that the district court did not abuse its discretion when it approved the Receiver's plan, we AFFIRM."). The Court has the authority to approve any plan provided it is "fair and reasonable." *Wang,* 944 F.2d at 81 (distribution plan should be "reviewed under [the District Court's] general equitable powers to ensure that it is fair and reasonable"); *see also SEC v. Enter. Trust Co.,* 2008 WL 4534154, at *3 (N.D.IL 2008) ("There are no hard rules governing a district court's decisions in matters like these. The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge.").

When approving a distribution plan, a district court sits in equity and has "the authority to approve any plan provided it is 'fair and reasonable.'" *SEC v. Byers*, 637 F.Supp.2d 166, 174–175 (S.D.N.Y.2009), *quoting SEC v. Wang,* 944 F.2d at 81. "[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir.1986). A "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *Id.* at 1037. District courts have "broad powers and wide discretion" to determine the appropriate distribution of funds to those who invested in a fraudulent investment enterprise. *SEC v. Cap. Consultants, LLC,* 397 F.3d 733, 738 (9th Cir.2005). Moreover, the Ninth Circuit has noted that equity demands equal treatment of victims who have been defrauded. *See United States v. Real Property Located at 13328 and 13324 State Highway 75 North*, 89 F.3d 551, 553 (9th Cir.1996) (Upholding the district court's approval of an SEC-administered plan to distribute the funds to defrauded customers on a pro-rata basis, and that "the equities demand that all [] defrauded customer[s] share equally in the fund of pooled assets in accordance with the SEC plan.")

## B.  ALL ASSETS AND LIABILITIES OF THE RECEIVERSHIP ENTITIES HAVE BEEN POOLED TO FORM A SINGLE RECEIVERSHIP ESTATE

The Amended Complaint asserts that from 2005 to 2012, Defendant Callahan raised over $90 million (the "Investor Funds") from at least 45 investors (the "Investors") for at least five offshore funds, namely, Diversified Global, Masters Global, Fiduciary Select, Horizon Millennium and Pangea Offshore, which he operated and controlled, directly or indirectly through HGA LTD and HGA LLC. According to the Amended Complaint, "Callahan's solicitation of investors involved material misrepresentation about the use of their money, the liquidity of their investment and the asset diversification of the Callahan Funds." *Amended*

*Complaint* ¶ 2.  Specifically, Callahan "represented to a number of U.S. residents that their money in the Callahan Funds would be invested with New York-based hedge funds" and that their "investments would be liquid".  *Amended Complaint* ¶ 2.  However, according to the Amended Complaint, Callahan, among other things, "improperly diverted assets of the Callahan Funds to his brother-in-law Manson's private real estate project that was facing foreclosure."  *Amended Complaint* ¶ 3.

The Indictment lays out the allegations or the acts for each count, including allegations of raising over $108,000,000.00 and diverting approximately $96,000,000.00 to operate the investment funds as well as a ponzi scheme.  *See Criminal Action – ECF Doc. 1*.  The allegations are that the monies were utilized for the Panoramic View, redemptions to a few investors at the expense of later investors, and to maintain a luxury lifestyle in lieu of maintaining the funds in liquid accounts in mutual funds, hedge funds or low risk securities as represented to investors.

On April 28, 2014, Defendant Brian R. Callahan appeared before Magistrate Judge Kathleen Tomlinson, withdrew his initial not guilty plea, and entered a plea of guilty to Counts 4 (Securities Fraud) and 11 (Wire Fraud) of the Indictment.  *See Criminal Action – ECF Doc. 61*.  On April 29, 2014, on Magistrate Judge Tomlinson's recommendation, the Court in the Criminal Action accepted Defendant Callahan's guilty plea.  *See Criminal Action – ECF Docs. 59 & 64*.  On that same day, the USAO reported in its news release that Defendant Callahan "pleaded guilty to one count of securities fraud and one count of wire fraud for operating a $96 million Ponzi scheme through his various offshore investment funds" and "agreed to the forfeiture of $67.4 million, which includes proceeds from the sale of his former residence in Old Westbury,

New York and a beachfront condominium in Westhampton, New York." *See* **USAO News Release** (http://www.justice.gov/usao/nye/pr/April14/2014Apr29.php?print=1).

On May 12, 2014, Defendant Adam J. Manson appeared before Magistrate Judge Kathleen Tomlinson, withdrew his initial not guilty plea, and entered a plea of guilty to Count 1 (Conspiracy to Commit Securities Fraud) of the Indictment. *See* **Criminal Action – ECF Doc. 67**. On May 13, 2014, on Magistrate Judge Tomlinson's recommendation, the Court in the Criminal Action accepted Defendant Manson's guilty plea. *See* **Criminal Action – ECF Doc. 63**. According to a news release issued by the USAO on May 12, 2014, as part of "his plea agreement with the government, Manson agreed to forfeit all unsold units at the Panoramic View beachfront resort and residence development in Montauk, New York, valued in excess of $60 million, and an additional $3.9 million in criminal proceeds." *See* **USAO News Release** (http://www.justice.gov/usao/nye/pr/April14/2014Apr29.php?print=1).

The Receiver's investigation confirmed that Defendant Callahan failed to maintain investor funds in liquid segregated accounts, and indiscriminately commingled and used commingled investor funds to satisfy redemption requests. Such commingling warrants pooling all assets of the Receivership Entities, so that all money and other assets that constitute Receivership Assets, regardless of how they were previously allocated, constitute one fund and may be used in a collective manner to pay the collective liabilities of the Receivership Entities, in accordance with the terms of the Receivership Order, Claims Order and the claim determinations and distribution plan in this Report.

Courts routinely permit equity receivers to pool assets in circumstances such as these. *See, e.g.,* **SEC v. HKW Trading, LLC**, 2009 WL 2499146 at *6 (M.D. FL 2009) ("The Court directs that all assets and liabilities of the Receivership Entities be consolidated for all

purposes"); *SEC v. Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 657, 663 (6th Cir. 2001) (adopting receiver's plan to create single pool of assets for all investors); *SEC v. Elliott*, 953 F.2d 1560, 1584 (11th Cir. 1992) (approving district court's decision to reject tracing and treat three companies as single entity); *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 332 (5th Cir. 2001) (affirming district court's order approving receiver's plan to distribute funds to all Claimants on *pro rata* basis even though funds invested by two claimants were segregated by the fraudster and could be traced to separate account); *CFTC v. Topworth Int'l, Ltd.,* 205 F.3d 1107, 1115-16 (9th Cir. 1999) (affirming district court's adoption of receiver's plan to treat three companies involved in scheme as one for purposes of paying claims).

Courts have determined that "*any* commingling is enough to warrant treating all the funds as tainted." *SEC v. Byers*, 637 F. Supp. 2d 166, 177 (S.D.N.Y. 2009). Accordingly, the most equitable and efficient approach is to pool all assets and liabilities of the Receivership Entities into one consolidated estate. *Id.* (In a case involving a Ponzi scheme, the interests of the receiver are very broad and include not only protection of the receivership *res,* but also protection of defrauded investors and considerations of judicial economy.)

## C. DISTRIBUTION PRIORITY

The general priority for distribution in an equitable receivership is:

> A. To claims for expenses of the administration of the Receivership Estate, including legal and accounting fees; expenses to preserve the value of assets; and costs of realization and payment of any taxes due on property or income of property of the Receivership Estate incurred during the pendency of the receivership (the "Administrative Claimants");
>
> B. To the return of investments to Investors; and
>
> C. To any General Creditors, should any assets remain in the Receivership Estate.

See *U.S. Commodity Futures Trading Comm'n v. Capitalstreet Fin., LLC*, 2010 WL 2572349 at *2 (W.D.N.C. June 18, 2010); *see also* **Quilling v. Trade Partners Inc.,** 2006 WL 3694629 at *1 ("As an equitable matter in receivership proceedings arising out of a securities fraud, the class of fraud victims takes priority over the class of general creditors with respect to proceeds traceable to the fraud."); Ralph E. Clark, *Clark on Receivers* §826 (Anderson 1st Ed. 1918) ("The rule generally acted upon is that the receiver's remuneration and costs shall be paid before distributing the assets."). There are no general creditor approved claims. All approved claims were made by defrauded investors.

### D.  THE RECEIVER'S DISTRIBUTION METHOD

The Receiver's determinations are based on treating all potential claimants equally and applying the same analysis to each individual claimant's potential claim in the same manner. This is based on equity and on the general principle regarding distribution plans, in Ponzi scheme cases, which is "equality is equity" *Cunningham v. Brown,* 265 U.S. 1 (1924) (holding, that circumstances of Charles Ponzi's scheme "call strongly for the principle that equality is equity"); *SEC v. Credit Bancorp, Ltd.,* 2000 WL 1752979 (S.D.N.Y. 2000) (in determining whether to adopt a plan that distributes receivership assets to investors victimized by a Ponzi scheme, courts are governed by "the fundamental principal" that the plan "should be equitable and fair, with similarly-situated investors treated alike.")  The Receiver determined that the most equitable distribution here would be based on a pro rata distribution "permitting claimants to recover on a *pro rata* basis based on the proportion of their investments in the comingled account at the time of the improper withdrawals by the defendant, irrespective of what order the investors deposited money into the account. *See* ***Restatement (First) of Restitution*** § 213 (1937).

There are at least four distribution methods that a court can use: "(1) the investors could return the [withdrawn] "profits" to the entire pool prior to the pro rata distribution; (2) the investors could both retain their [withdrawn] "profits" and demand a full pro rata share of their initial investments; (3) [the rising tide method whereby] the investors could retain their distributed profits but would be forced to subtract that profit after determining the pro rata share of their investments; or (4) [the net investment method whereby] the investors could retain their [withdrawn] "profits" but would receive a pro rata share based on their initial investments *minus* the profit distribution, i.e., profits would be subtracted before determining the investor's pro rata shares." **CFTC v. Franklin**, 652 F.Supp. 163, 169 (W.D.Va.1986) *rev'd on other grounds* **Anderson v. Stephens**, 875 F.2d 76 (4th Cir.1989).

The first method is "impracticable because it unrealistically would require some investors to return funds that they may no longer have on hand." *Id.* The second method "is inequitable because it rewards some investors for their random good fortune while depleting the share available to investors who were equally situated but merely less lucky." *Id.* The third and fourth methods are all equitable because they "require the fortunate investors to account for payments received before they can obtain the benefit of a pro rata division of the residual receivership assets." *Id.* The facts of a given case dictate which method would be most equitable. **U.S. Commodity Futures Trading Comm'n v. Barki, LLC,** 2009 WL 3839389 at *2 (W.D.N.C. 2009).

The Receiver believes that the most equitable distribution of funds in this case will be distribution pursuant to the Rising Tide Method, particularly because all of the approved claimants are defrauded investors and therefore are similarly situated.

[T]he Rising Tide Method is the most equitable approach. In this case, all the eligible claimants contributed a certain amount of funds with the guarantee that

42

they would receive their return. Some customers, under varying circumstances, withdrew portions of their investments prior to the initiation of this litigation, and will not receive any funds given those circumstances. The Court appreciates the time customers took to consider and file objections to the Commissioner's Distribution Plan, and understands that not every customer will be satisfied. The Court also understands the difficulties many of these customers face in this economic environment. Ultimately, the Court concludes consideration of prior withdrawals as a full or partial satisfaction results in a fair method for a majority of the defrauded customers. The Court further notes there is only a small portion of funds in the registry available for distribution, and it must consider the full amount of both contribution and withdrawal to ensure a fair distribution of funds. Overall, the customers' objections do not state sufficient reasons for not selecting the Rising Tide Method as proposed by the Commission. For these reasons, the Court believes that a pro rata distribution based on the Rising Tide Method results in the most equitable distribution of funds.

*United States Commodity Futures Trading Commission v. Wilson,* 2013 WL 3776902 at *7

(S.D. Cal. July 17, 2013).

The Receiver considered other distribution methods including the net loss method where funds previously received by a customer are subtracted from the total amount invested prior to calculating the investor's pro rata share.  The Rising Tide method prevents a customer who previously received funds as withdrawals from benefitting at the expense of other investors by retaining the benefit of the full amount of his withdrawal plus a distribution calculated on the basis of net funds invested.  *SEC v. Byers*, 637 F. Supp. 2d 166, 175 (S.D.N.Y. 2009) (noting that the court "may give weight to the Receiver's judgment").

The Second Circuit has explicitly held that "the use of a pro rata distribution has been deemed especially appropriate for fraud victims of a Ponzi scheme, in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." *SEC v. Credit Bancorp Ltd.,* 290 F.3d 80, 91 (2d Cir. 2002) (internal citations and quotations omitted); *see also Id* at 89 ("Courts have favored *pro rata*

distribution of assets where as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders.").

"Rising tide appears to be the method most commonly used (and judicially approved) for apportioning assets." *SEC v. Huber,* 702 F.3d 903, 906 (7th Cir. 2012) (collected cases).  Under the rising tide method, investors are permitted to retain previously received funds, but those withdrawals will be credited against the investors' respective pro rata shares calculated based on the full amounts invested.  Under this proposal, distributions would be calculated according to the following formula: (actual dollars invested x pro rata multiplier) – withdrawals previously received = distribution amount.  *See generally Byers,* 637 F.Supp.2d at 182 ("[T]he Court could order what is known as the 'rising tide' approach.  Under this approach, the amount of an investor's received cash distributions would be deducted, dollar for dollar, from the amount of the investor's total distribution award."); *see also SEC v. Parish,* 2010 WL 5394736, at *3 (D.S.C. Feb. 10, 2010) ("Under this [rising tide] method, investors who received prior payments are entitled to receive a smaller pro-rata payment from the receivership estate then those who received no prior payment.  Moreover, investors who previously received payments exceeding their pro rata amount of the total distribution will receive no distribution from the receivership estate.").

Only investors who have received less in withdrawals than their respective distribution amount will receive funds.  Any investors whose withdrawals were in excess of their respective distribution amounts would not receive any distribution.  *Commodity Futures Trading Commission v. Equity Fin. Grp., LLC, et. al.,* 2005 WL 2143975 *24 (D.N.J. 2005) ("[t]he [c]ourt agrees with the Receiver that the rising tide method is the most equitable.  Under this method, the [c]ourt finds that as a result of crediting prior withdrawals, there will be more funds

available to the investors with allowable claims.  In addition, this method does not penalize investors based on the timing of their investments.").

Other courts have come to the same conclusion.); *United States v. Cabe,* 311 F.Supp.2d 501, 509 (D.S.C. 2003) (favoring Rising Tide over Net Loss because "[a] closer examination of [the Net Loss method of distribution] … reveals that it suffers from serious flaws and produced inequitable results because it ignores the illegal activities of the defendants," including the fact that money paid to those investors during the course of the scheme "came from other victims of the fraud."); *CFTC v. Equity Fin. Grp., LLC,* 2005 WL 2143975, at *25 (D.N.J. Sept. 2, 2005) (adopting the Rising Tide methodology); *SEC v. Parish,* 2010 WL 5394736 *5 (D.S.C. Feb. 10, 2010) (the Court choosing the Rising Tide Method stated "[i]f the payments to some investors had not been made, the estate in this case would presumably be larger and the distribution to all investors would be greater. To adopt the Net Loss method would be to permit those investors who have already received more than their proportionate share of the res to receive even more investor funds via a distribution of the estate, at the expense of those victims who have not received any payments."); *c.f. United States Commodity Futures Trading Commission v. Barki, LLC,* 2009 WL 3839389 at *2 (W.D.N.C. Nov. 12, 2009) (the court found that it was more equitable to compensate all the investors rather than a fraction of them when in applying the net investment method, the court found that 100 percent of the net-loss investors would receive a distribution, and in using the rising tide method, only 55 percent would receive a distribution).

The equitable nature of the Rising Tide method is demonstrated in the following example from *United States v. Cabe*:

> The circumstance of one investor who received early returns and who appeared at the hearing to advance the net loss theory illustrates the differences between the net loss proposal and the plan of distribution adopted by this court.  This investor initially invested $100,000 and received back $144,500.  He later invested another

$185,000 but received nothing more in return. He also paid fees to the defendants in the amount of $3,000. He thus claims a total investment of $288,000 and a net loss of $143,500. Under the net loss proposal, this investor would have a claim of $143,500 for which he would receive a pro rata distribution without reduction for monies previously received from the defendants. Applying a 46% pro rata distribution, the investor would receive $66,010 on account of his net loss. This amount added to the $144,500 already received from the defendants, would give him a total return of $210,510 on a $288,000 total investment, or a 73% recovery. Under the plan adopted by the court, on the other hand, he would have a claim of $288,000 which at 46% would yield a pro rata share of $132,480. Since he has already received $144,500 from the defendants (a 50% recovery of his total investment), his claim would be deemed satisfied by the money previously received from the defendants (but he would not be required to disgorge the excess of $12,020. A comparison of the claim of this investor and the claim of another investor couple further illustrates the merits of the court's plan of distribution. The couple invested $360,500 and received nothing from the defendants. Therefore, under either distribution plan, they would receive the 46% recovery of their investment. As previously noted however, the net loss proponent would realize a total recovery of 73% under his proposed plan of distribution and 50% under the proposal adopted by the court. Based on the greater disparity in claims produced by the net loss method, the court simply cannot, in good conscience, endorse the net loss method.

*United States v. Cabe,* 311 F.Supp.2d 501, 510 (D.S.C. June 6, 2003). As discussed *supra* using the Rising Tide approach will ensure that all investors obtain the same proportion of their overall investment that was lost as a result of the Ponzi scheme at issue in this SEC/Receivership action and will not keep a significant number of investors who withdrew their money from the Ponzi scheme from being entitled to a distribution. *See supra* at Point III (E) (only 12 out of 67 claims affected, with 4 of those 12 under 4%); *see also* Exhibit F; *cf. Byers,* 637 F. Supp.2d at 182 ("Deloitte, the Receiver's accountant has estimated that, assuming a 10% multiplier, using the rising tide approach would mean that 45% of investors would receive no distribution. For this reason, the Receiver does not recommend this approach."); *cf. SEC v. Huber,* 702 F.3d at 907 ("The more investors in a Ponzi scheme there are who would receive nothing under rising tide and might therefore have difficulty paying their future expenses, the more likely the net loss method is to maximize the overall utility of the investors.")

Pursuant to the terms of the Claims Order the Receiver will follow the subsequent steps for distribution if and when the Court issues an Order approving and adopting this Final Claim Determination Report (the "Claims Determination Order"):

after the time for any appeal of that Claims Determination Order has expired, or the resolution of any such appeal, the Receiver shall distribute the Receivership Assets to the extent that such distribution is practical and will not hamper the needs of the continuation of the Receivership, including any pending Receivership litigation including but not limited to the Receiver's Ancillary Claims (the "Receivership Litigation"), provided that the Receiver believes that no reason exists for not satisfying such Court approved Potential Claims. ***Claims Order*** ¶8 (a), P. 19.

In the event that the Receiver determines that an interim distribution is in the best interests of the Receivership Estate, the Receiver is authorized to make an interim distribution provided that the Receiver establishes and holds a reserve from the Receivership Assets in an amount reasonably necessary to pay for the costs of winding up the Estate and any other costs, including but not limited all remaining unpaid Administrative Claims and Professional Claims, after distribution of the Receivership Assets. ***Claims Order*** ¶8 (b), P. 19.

In the event that there remains Receivership Litigation or Claimant's Third-Party Actions that have not been resolved or concluded when the Receiver makes a distribution, whether in the form of an interim distribution or otherwise, the Receiver shall also: (1) hold off distribution and payment of the Potential Claims which may be reduced or affected by the Receiver's Ancillary Claims or by the Claimant's Third-Party Actions, and (2) establish and hold an additional reserve from the Receivership Assets in an amount sufficient or necessary: (i) to pay the costs, including the Receiver's fees and attorney's fees, of any remaining Receivership Litigation, (ii) equal to the full amount of the approved Potential Claims which may be reduced or affected by the Receiver's Ancillary Claims and Claimant's Third-Party Actions which have not been resolved or concluded at such time, and (iii) to account for such other amounts which the Receiver deems necessary or prudent to withhold from distribution and payment. The distribution of any funds remaining after winding up of the Receivership Estate or resolution of the Receivership Litigation shall be distributed according to the Claims Determination Order, the terms and conditions of the Receivership Orders, and any further Order of this Court. ***Claims Order*** ¶8 (c), P. 19-20.

If at the time of the distribution, whether in the form of interim distribution or otherwise, the Receiver's Ancillary Claims or the Claimant's Third-Party Action have been concluded in a manner which will reduce one or more Potential Claims, then the Receiver requests that this Court authorize the Receiver to reduce such Potential Claims in accordance with the Claims Determination Order without

further Order of this Court, and distribute and pay to the Potential Claimant of such Potential Claim the remaining balance, if any, after such reduction. *Claims Order* ¶8 (d), P. 20.

## VII.   CONCLUSION

The Receiver understands that not all Potential Claimants will be satisfied with the determinations made in this Report, however, the Receiver believes that the determination methods described above are the most equitable methods and treat similarly situated claimants equally. "For a District Court sitting in equity, however, it is important to remember that each investor's recovery comes at the expense of the others. As the Second Circuit has acknowledged, '[w]hen funds are limited, hard choices must be made.'" *SEC v. Byers,* 637 F.Supp.2d 166, 175 (S.D.N.Y. 2009) *quoting Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC,* 467 F.3d 73, 81 (2d Cir. 2006). "[W]here the assets of the receivership estate are insufficient to afford full recovery to all victims, any given plan is likely to be viewed more favorably by certain victims than others depending on how they fare under that plan .... An equitable plan is not necessarily a plan that everyone will like." *SEC v. Credit Bancorp, Ltd.,* 2000 WL 1752979, at *29 (S.D.N.Y. Nov. 29, 2000); *SEC v. Parish,* 2010 WL 5394736, at *5 (D.S.C. Feb. 10, 2010) ("The court is well aware that no distribution plan can treat the victims of Parish's scheme absolutely fairly. The only way to treat the victims fairly would be for each and every victim to be repaid in full. Unfortunately, this is impossible. It is the task of this court to choose not what is the "fairest" distribution plan, but to choose the plan which is the least unfair.").

The Receiver respectfully requests that this Court approve this Report by so ordering the proposed order attached as Exhibit G:

(i)     Approving this Report in it's entirely, overruling all objections not withdrawn or resolved by this Order in all respects;

(ii)    Confirming the claims determinations summarized in Exhibit F to this Report, thereby confirming the approved claim amounts and confirming that those claims which have been denied remain denied;

(iii)   Confirming that all Claims and Claimants who did not timely submit a claim are forever barred, estopped, and enjoined to the fullest extent allowed by applicable law from asserting in any manner, any claim whatsoever against the Receiver, the Receivership, the Receivership Entities and their respective estates or property;

(iv)    All potential claims and objections to Notice of Receiver's Determination of Claim which were not timely submitted to the Receiver, not timely filed with this Court or denied by the Receiver and/or the Receivership Court are denied, waived and overruled;

(v)     Entering final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure with respect to the Potential Claims that are the subject of the Final Claim Determination Report;

(vi)    Confirm that after the time for any appeal of the Claims Determination Order has expired, or the resolution of any such appeal, the Receiver shall distribute the Receivership Assets to the extent that such distribution is practical and will not hamper the needs of the continuation of the Receivership, including any pending Receivership litigation including but not limited to the Receiver's Ancillary Claims (the "Receivership Litigation"), provided that the Receiver believes that no reason exists for not satisfying such Court approved Potential Claims.

49

(vii)    Authorize the Receiver to make an interim and/or final distribution(s), if in his discretion he chooses to do so, provided that the Receiver establishes and holds a reserve from the Receivership Assets in an amount reasonably necessary to pay for the costs of winding up the Estate and any other costs, including but not limited all remaining unpaid Administrative Claims and Professional Claims, after distribution of the Receivership Assets.

(viii)    Confirm that in the event that there remains Receivership Litigation or Claimant's Third-Party Actions that have not been resolved or concluded when the Receiver makes a distribution, whether in the form of an interim distribution or otherwise, the Receiver shall also: (1) hold off distribution and payment of the Potential Claims which may be reduced or affected by the Receiver's Ancillary Claims or by the Claimant's Third-Party Actions, and (2) establish and hold an additional reserve from the Receivership Assets in an amount sufficient or necessary: (i) to pay the costs, including the Receiver's fees and attorney's fees, of any remaining Receivership Litigation, (ii) equal to the full amount of the approved Potential Claims which may be reduced or affected by the Receiver's Ancillary Claims and Claimant's Third-Party Actions which have not been resolved or concluded at such time, and (iii) to account for such other amounts which the Receiver deems necessary or prudent to withhold from distribution and payment.  The distribution of any funds remaining after winding up of the Receivership Estate or resolution of the Receivership Litigation shall be distributed according to the Claims Determination Order, the terms and conditions of the Receivership Order, and any further Order of this Court.

50

(ix)     Confirm that if at the time of the distribution, whether in the form of interim

distribution or otherwise, the Receiver's Ancillary Claims or the Claimant's

Third-Party Action have been concluded in a manner which will reduce one or

more Potential Claims, then the Receiver is authorized to reduce such Potential

Claims in accordance with the Claims Determination Order without further Order

of this Court, and distribute and pay to the Potential Claimant of such Potential

Claim the remaining balance, if any, after such reduction; and

(x)     Grant such further relief as this Court deems proper.


Dated: New York, New York
          February 14, 2017

RESPECTFULLY SUBMITTED,

_____
STEVEN WEINBERG
as RECEIVER for
Horizon Global Advisors, Ltd.,
Horizon Global Advisors, LLC,
Diversified Global Investments (BVI), L.P.,
The Masters Global Fund, L.P.,
Fiduciary Select Income Fund, L.P.,
Horizon Millennium Investments, L.P.
and Pangea Offshore High Yield Portfolio, LLC

51